UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

JASON MILLER,

     Plaintiff,

       v.

GIZMODO MEDIA GROUP, LLC,
a Delaware Corporation, AND KATHERINE
KRUEGER, individually,

     Defendants.

Case No.:

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Jason Miller ("Miller"), by and through his undersigned counsel, files his Complaint against Defendants, Gizmodo Media Group, LLC ("Gizmodo") and Katherine Krueger ("Krueger") (collectively, "Defendants"), and alleges as follows:

## OVERVIEW OF THE CASE

1.     This case is a terrifying example of how people can use false *accusations* of violence against women to destroy someone's life.

2.     Late on a Friday night, the Defendants carried out the final step in a plot hatched by Arlene "A.J." Delgado ("Delgado") to publicly accuse Miller of having an affair with, impregnating, attempting to murder, and killing the unborn child of one woman ("Jane Doe") by slipping her an "abortion pill;" as well as beating another unidentified woman; and then trying to cover up these horrific crimes. Before that weekend was over, Miller's life was in shambles and his reputation was destroyed.

3.     ***None of these accusations are true***.  Jane Doe verified under oath that these events never happened.  Her sworn Declaration (redacted to protect her privacy and safety) is

attached hereto as **Exhibit 1**.   Miller does not know the identity of the other woman he supposedly beat, but he never physically abused any woman.

4.      The sad reality is that the Defendants could not care less about the truth of the accusations they published to millions of readers.

5.      The truth rarely matters in the court of public opinion, where the fallout from the Defendants' baseless accusations about Miller was immediate and devastating:   Miller was labeled a "murderer," he lost his job on CNN, he is being harassed and threatened online, he and his family are being shunned in their community, and his personal, professional and family life have been permanently scarred—all without a shred of proof or corroborating evidence.

6.      The maliciousness of the defamatory assault on Miller and the ease with which it was executed is frightening because what happened to Miller could happen to anyone.

7.      Unfortunately, there are people who know they can weaponize important social movements to inflict immediate and irreversible harm upon their adversaries.

8.      There are people who think the First Amendment gives them free reign to publicly level false allegations which, once posted online and on social media, result in knee-jerk reactions, scorn and ridicule, assumptions of guilt in the court of public opinion, and immediate terminations of employment because businesses are understandably fearful of being associated with people merely *accused* of engaging in misconduct society deplores.

9.      People who play games with others' lives and think they can hide behind the First Amendment are wrong and must be held accountable and punished.

10.      Miller was a prime target for the Defendants and Delgado—who is waging "all-out war" in a highly-publicized court case with Miller in Miami-Dade family court.   Because of

Miller's politics and association with the current Presidential Administration, the Defendants knew they could benefit financially and editorially by attacking him.

11.     Delgado initially enlisted other journalists, including former democratic-operative turned journalist Yashar Ali ("Ali"), to try to propagate false stories about Miller engaging in horrific conduct toward women.

12.     Delgado's nefarious plot to destroy Miller with fabricated court filings and press coverage about fictional events culminated late on Friday, September 21, 2018, when *Splinter.com* published false and defamatory accusations against Miller originating from a ***sealed*** family court filing.

13.     Miller helplessly requested a retraction, which *Splinter.com* predictably and flippantly refused to give.

14.     The Defendants' false story about Miller spread like a virus through online and social media.  Millions of readers rushed to judgment.  Delgado fueled their hatred for Miller on social media while calling for his employers to terminate him.  Yashar Ali piled-on by seemingly confirming the truth of the accusations—even though Jane Doe had already told him the accusations about a relationship between her and Miller were not true.

15.     Within twenty-four hours and without a scintilla of proof, the plot succeeded.  The false accusations ended Miller's relationship with CNN and put his entire career in serious jeopardy.  Millions of people read about how Miller tried to kill a woman, killed her unborn child, and beat another woman—none of which actually happened.  And as planned, everyone rushed to judgment.  Miller's life as he knew it was over.

16.     The Defendants assume and will argue that they are impervious to liability.  They are wrong.   The First Amendment does not protect those who yield swords from within its shelter.

### PARTIES, JURISDICTION, AND VENUE

17.     The compensatory and punitive damages Miller seeks against those who ruined his life, branded him a criminal, and made him and his family social pariahs by broadcasting lies to millions of people on the Internet, are believed to be in excess of One Hundred Million Dollars ($100,000,000.00), exclusive of interest, costs and attorneys' fees.   Miller's damages are extensive given the economic damages at issue, nature of the lies about Miller, consequences of those lies, size of the audience to which those lies were disseminated, and amounts necessary to punish and deter the misconduct set forth herein.

18.     Plaintiff, Miller, is a citizen and resident of Virginia.

19.     Defendant, Gizmodo, is a Delaware limited liability company believed to be wholly-owned by Univision Communications, Inc. ("Univision"), also a Delaware corporation; both of which have their principal places of business in New York, New York. Under Univision's control, Gizmodo owns and operates the website *Splinter.com*, which reaches millions of readers across the world, including within the State of Florida.

20.     Defendant, Krueger, is a citizen and resident of New York.

21.     Delgado is a citizen and resident of Miami, Florida, who acted in concert with the Defendants from within the state of Florida to, among other things, commit the torts set forth herein and detrimentally impact Miller (among other ways) in a family law proceeding pending in Miami-Dade Circuit Court.

22.     Jane Doe, whose true identity is known but being withheld to protect her safety and privacy, is a citizen and resident of this judicial district.  She also is a victim of the plot orchestrated by Delgado and carried out by the Defendants.

23.     Pursuant to 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the events giving rise to the claims occurred in this District.

24.     This Court has personal jurisdiction over the Defendants under § 48.193, *Florida Statutes*, and the Due Process Clause because they each, directly or in concert with or through an agent or co-conspirator:

> (a)     committed tortious acts within Florida;
>
> (b)     committed intentional torts expressly aimed at Florida, the effects of which were suffered in Florida;
>
> (c)     operated, conducted, engaged in or carried on a business or business venture within Florida;
>
> (d)     engaged in a substantial and not isolated activity within Florida; and/or
>
> (e)     engaged in a conspiracy to commit tortious acts within Florida and/or overt acts in furtherance of that conspiracy within Florida.

25.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and this action is between citizens of different states.

## STATEMENT OF THE FACTS

26.     Miller is a communications strategist and political manager who in 2016, while a partner at political consulting firm Jamestown Associates, served as Senior Communications Advisor on President Donald Trump's 2016 campaign.  After the election, while still a partner at Jamestown Associates, he served as Communications Director on President Trump's transition team.  In late 2016, Miller was slated to be President Trump's White House Communications

Director but declined the position after Delgado, with whom Miller had an affair, prompted press coverage of their relationship and resulting pregnancy.[1]

27.     In February 2017, Miller joined Teneo Strategy, a company that advises Fortune 500 CEOs on crisis communications, corporate communications, and media relations. In March 2017, Miller also started working as a Political Commentator for CNN, often appearing on national television advocating for and defending the Trump Administration.

28.     Given his line of work, Miller's livelihood depends on his reputation and public image.

29.     Delgado is a Harvard-educated lawyer who also worked as a columnist and media personality. She served with Miller on President Trump's 2016 campaign and transition team. In 2017, Delgado became increasingly hostile toward Miller and his family, both privately and on social and online media.

30.     In July 2017, Miller tried to ensure that he would be a part of his and Delgado's son's life by filing a petition in Miami-Dade family law court (the "Family Case"). Soon thereafter, Delgado brought national attention to the Family Case by giving a series of interviews about her relationship with Miller and their case to *The Atlantic*. *See* https://www.theatlantic.com/politics/ archive/2017/08/from-trump-aide-to-single-mom/536892/.

31.     As Delgado's hostility and anger toward Miller grew in the Family Case, it often spilled over to social and online media.

32.     Delgado frequently took to the press and Twitter to attack Miller and his family. For example, in November 2017, Delgado "unleash[ed] her full FURY on Jason Miller" on

---

[1] Delgado responded to news of Miller's appointment as Communications Director with a series of cryptic tweets hinting at a sex scandal, including *"Congratulations to the baby-daddy named WH Comms Director."*

Twitter in a series of tweets that were reported on by *Twitchy.com*.   *See* https://twitchy.com/sarahd-313035/2017/11/30/constant-lies-a-j-delgado-unleashes-her-full-fury-on-jason-miller/.   Delgado also enlisted Talking Points Memo ("TPM") to falsely accuse Miller of dragging out their Family Case for "revenge" and "blam[ing] [Delgado] for not terminating the pregnancy or not keeping it confidential."   *See* https://talkingpointsmemo.com/muckraker/ex-trump-aide-says-jason-miller-forcing-long-custody-battle-for-revenge.

## A.   Delgado's All-Out-War Against Miller

33.   Despite her public pronouncements in the press and on social media to the contrary, Delgado was the one who waged "lawfare" against Miller in the Family Case.   Miller has already paid over $110,000 toward Delgado's legal fees in what should have been a simple, straightforward paternity case because Delgado is intent on dragging out the proceeding (including firing five lawyers and moving to recuse three judges).

34.   In July 2018, the Family Case judge finally recognized that Delgado has an "***inability to control herself***" and questioned "***her mental or emotional health***," while expressing serious concern about the well-being of the now 15-month-old child suffering the effects of the "***all-out war***" that Delgado (<u>not</u> Miller) was waging in court.   (*See* **Exhibit 2**, 7/23/2018 Order of Recusal).   The Judge who reached these conclusions about Delgado (who denied Delgado's request for him to disqualify himself, but nevertheless recused himself presumably based on Delgado's conduct[2]) was the *third* judge Delgado sought to recuse within a 12 month period of time.

---

[2]   The Judge denied Delgado's motion, but then *sua sponte* recused himself—presumably to distance himself from the circus Delgado made of the "relatively simple, straight-forward" Family Case.

35.     Around that time, Delgado's obsession over retaliating against Miller spiraled out of control. On a frequent (and at times almost daily) basis, she launched personal attacks against Miller on social media (often tagging members of the press and CNN in her posts).

36.     Delgado publicly and crudely discussed certain details of the parties' private lives—even though many of her concerned social media followers cautioned her about the harm she was inflicting on her own child.  She also resorted to scandalous and false accusations in court filings in the Family Case, especially during periods of time she was representing herself (as was the case with her false and defamatory September 14, 2018 filing at issue herein).  Delgado even coordinated with members of the press so that her salacious court filings would get media coverage, which she then proliferated on social media as part of her concerted effort to destroy Miller and his family.

37.     Delgado's actions toward Miller are symptomatic of deep-seeded issues.  From 2012-2017, Delgado was subject to a Final Judgment of Injunction for Protection Against Repeat Violence (After Notice) entered in *De Neufville vs Delgado* [Case Number: 2012-008427-FC-04, Eleventh Judicial Circuit Court in and for Miami-Dade County, Florida] (the "De Neufville Case").

38.     In the *De Neufville* case, the Court recognized Delgado's inability to control her hatred and vitriol toward another former paramour:

> . . . present[ing] to this Court the dilemma of trying to resolve at what point non-violent but ***vexatious, seemingly never-ending and indisputably unwanted vitriolic communication*** crosses the line between legitimate conduct and ***malicious harassment that must come to an end***.
>
> . . .
>
> Of course, to be deserving of such a "remedy," a respondent must show a change of circumstances such as the passage of time with no violation whatsoever, the completion of mental health counseling if so indicated, or other events clearly justifying the

cessation of the need for the protective order which was earlier warranted when initially issued. . . . In the case at bar, the respondent has utterly failed to demonstrate entitlement to the "remedy" provided by the mentioned statute.  If, at some point in time, she can do so, and convince a successor Court that she has ***"moved on" and overcome her vitriolic and toxic emotional state***, whether justified or not by her perception of the petitioner's treatment of her, she may yet prevail in obtaining the relief she has so vigorously, and untimely, pursued here.  Even without any "wrong" having been suffered by respondent as a result of the injunction that ***she brought, and continues to bring, upon herself***, this Court will leave that future "remedy" for another day and another judge to ponder, if and when she can demonstrate the change in circumstances that will be her burden to demonstrate.[3]

## B.    Delgado's Playbook—"Crying Rape"

39.    As the judge in the Family Case was trying to put an end to the war Delgado was waging, Delgado hatched a scheme to try to destroy Miller once and for all.  Delgado's own words foreshadowed this nefarious plot.  Years prior, Delgado wrote about how false accusations can be weaponized to inflict irreparable harm as they rapidly spread across the Internet and social media.

40.    In 2014, Delgado wrote an article titled **"*Crying Rape*"** (*see* https://www.nationalreview.com/2014/05/crying-rape-j-delgado/), in which she recognized how "the term 'rape' or 'sexual assault' is thrown around almost effortlessly, accusations [are] easily made, and lives [are] easily ruined [by them]."  Shortly thereafter, she wrote another article titled "*How a False Domestic-Violence Charge Ruined an NBA Career*" (*see* https://www.nationalreview.com/2014/10/how-false-domestic-violence-charge-ruined-nba-career-j-delgado/), which detailed how the promising career of a young professional basketball player was destroyed by fabricated charges of domestic violence.  In that piece, she noted how "a system that rushes to believe domestic-violence accusers provides a surefire way to ruin someone's

---

[3] *See* Order Denying Respondent's "Motion for Re-Hearing and Motion to Vacate" Without Prejudice dated December 4, 2012 ("De Neufville Rehearing Order").

reputation and livelihood, to cause unimaginable emotional harm…[and] … the wholesale destruction of lives and rights…" Pointedly, Delgado also commented in that piece on the lack of consequences for those who use false allegations to wreak havoc on the lives of their enemies: "*Forged documents, false allegations, and defamatory lies in police reports or restraining-order petitions are met with a shrug…[and]…Defamation suits arising from false statements made in police reports or court documents are typically unrecognized by the courts…*"

## C.      The Fabrication of Abuse Allegations

41.      When Delgado set out to use false accusations to try to ruin Miller's life, she first tried to enlist members of the media to do her bidding.

42.      In April 2018, Delgado communicated with Jordan Bloom ("Bloom") about her Family Case with Miller.

43.      Bloom (writing under the pseudonym "Cockburn") published an article in the *London Spectator* on April 10, 2018 titled, "Trump Campaign Lovers Embroiled In Bitter Custody Dispute." (*See* https://spectator.us/2018/04/trump-campaign-lovers-embroiled-in-bitter-custody-dispute/.) Bloom's article included quotes from Delgado and images of court filings from the Family Case.

44.      Around that same time, it appears that Delgado talked to Bloom about the Jane Doe rumor, because on May 29, 2018, Bloom messaged Jane Doe asking about a story he was working on and asking if she knew "Jason Miller." Jane Doe responded that she did not know what or whom Bloom was talking about. After Bloom provided details about the rumored relationship, pregnancy, and abortion pill incident, Jane Doe told Bloom that she had no knowledge of or connection to the story.

45.     Also in late May 2018, Delgado was supposedly communicating with Yashar Ali about a "potential profile piece he wanted to do" on Delgado.

46.     Yashar Ali, who Delgado describes as "one of the nation's most respected and pre-eminent journalists, who has broken many national stories," is a free-lance journalist who has contributed to *Huffington Post* and *New York* magazine.

47.     He is also a former Democratic fundraiser, political operative, and opposition researcher who worked on Hillary Clinton's 2008 presidential campaign, and also reportedly worked as a federal lobbyist and gave significant sums to Democratic candidates.   (*See* https://www.businessinsider.com/who-is-yashar-ali-reporter-2017-10.)

48.     Yashar Ali's coziness to sources and failures to disclose relationships with certain subjects of his stories has raised concerns.   (*See* https://www.buzzfeednews.com/article/stevenperlberg/who-is-yashar.) One such relationship is with comedian Kathy Griffin—an outspoken Miller critic who recently publicly supported Delgado during one of Delgado's Twitter attacks against Miller.

49.     According to Delgado, she fed Yashar Ali information about the Jane Doe rumor. Delgado identified Jane Doe by her real name to Yashar Ali, who decided to look into the rumor and did so through what Delgado describes as "a painstakingly methodical and responsible process."

50.     Using the name Delgado provided, Yashar Ali found and reached out to Jane Doe through Facebook on June 5, 2018.  Jane Doe did not respond.

51.     According to Delgado, Yashar Ali traveled to Florida to personally investigate the rumor in mid-June 2018.  Delgado also claims that on June 23, 2018, she spoke to Yashar Ali after he returned from Florida and he "confirmed what Miller did to Jane Doe" and told Delgado

he "had all I need from [Jane Doe] to write the story." Delgado further maintains that Yashar Ali told her about "an additional, separate victim" he supposedly discovered "with whom [Miller] was physically abusive."

52.     However, based on messages between Jane Doe and Yashar Ali which Miller recently obtained, it does not appear that Yashar Ali had actually talked to Jane Doe as of June 23, 2018.  Moreover, Yashar Ali later told Miller that the story about the "additional" woman in Clearwater, Florida who Miller supposedly "physically beat" actually came *from* Delgado.

53.     Delgado claims that Yashar Ali was ready to publish an article about the accusations against Miller on July 6, 2018—but did not do so because his editors were concerned "that Jane Doe would backtrack and disappear post publication (indeed, it appears Mr. Miller has paid her off once again, once he learned in July that Mother knew of this…)"  Delgado further claims that "Jane Doe began to pull away from [Yashar Ali]" because Miller "paid her off or had thugs intimidate her."  None of this is true.

54.     Based on messages between Yashar Ali and Jane Doe, it appears that Jane Doe did not respond to Yashar Ali's request to talk about a "story about Jason Miller" until July 3, 2018. Moreover, Jane Doe told Yashar Ali in messages that she never heard of Miller and didn't know anything about him.  As set forth in Exhibit 1, Jane Doe also confirms that she was not paid off or intimidated by Miller.

55.     Jane Doe eventually spoke on the phone with Yashar Ali and again confirmed that the rumor about her and Jason Miller was not true.  In response, Yashar Ali told Jane Doe that he believed her but Delgado would not, and that Delgado would be contacting Jane Doe because she was not letting the story go.

56.    Yashar Ali was fully aware of the contentious Family Case between Miller and Delgado.   It is unclear why he injected himself into that dispute and decided to act as an investigator for Delgado while feeding her information to fuel her war against Miller.

57.    After Yashar Ali chose not to run the story on Miller, Delgado took to social media to try to apply pressure.

58.    Delgado tweeted and tagged *Huffington Post* and its Editor-in-Chief, alluding that they might "do a catch-and-kill" of the story, which Delgado labeled "enabling a predator":



> **A.J. Delgado** ✓ @... · 1h ⌄
> Replying to @karen_hava
> @juliegwilf and 2 others
> I'm not the journalist on it.
> Perhaps inquire as to the
> status w @HuffintonPost's
> @lpolgreen who has more
> info. I can't imagine they'd
> do a catch-and-kill,
> considering such would be
> enabling a predator
>
> 💬 1     ⟲     ♡

59.     Delgado also applied direct pressure to Yashar Ali by pinning a tweet naming him
and commenting that a "full story will be out soon" concerning "a very big rumored skeleton in
Miller's past from Miller's time in FL":



60.     Apparently, Delgado also was trying to get Bloom to run a story about the Jane
Doe accusation during the same time period.  On August 8, 2018, Bloom messaged Jane Doe
again because he "was told [Doe] spoke to Yashar Ali."  Jane Doe again responded that she did
not know about the rumor.  Bloom, like Yashar Ali, never ran the story about Miller even though
he previously indicated to Jane Doe that he may end up writing about the story even if Jane Doe
decided not to talk to him.

61.     As Yashar Ali predicted, Delgado would not let the story go.  On August 9, 2018
(three days after Jane Doe confirmed on the phone call with Yashar Ali that the rumor about
Miller was not true), Delgado messaged Jane Doe to "chat about our mutual experience."  This
cryptic message made no mention of Miller, and Jane Doe did not respond.

62.     One week later, on August 16, 2018, Delgado sent an offensive message to Jane Doe falsely asserting that she was paid off:

> Ah, you got paid off. Gross that any woman would help a guy who did that to her, or accept money for that. But typical here. Best wishes to you.

63.     On September 7, 2018, Delgado messaged one of the Florida politicians she believed might have knowledge of Miller's supposed relationship with Jane Doe.

64.     Delgado told this politician about a journalist working on a story about Miller meeting and impregnating Jane Doe in Orlando in 2012, and suggested that campaign staffers from this politician's and other politicians' offices had knowledge of these events.

65.     The politician immediately contacted his campaign staff, as did one of the other politicians Delgado identified, and none of the staffers knew anything about Delgado's story. The politician got back to Delgado and told her that both he and the other politician confirmed with their staffs that such an incident did not occur.

**D.     Yashar Ali Warns Miller About Delgado's Obsession Over the False Jane Doe Rumor**

66.     It appears that in August 2018 Yashar Ali realized he helped open a Pandora's box. On August 8, 2018, he reached out to Miller for the first time about the Jane Doe rumor, which Miller immediately denied. Yashar Ali told Miller that although be believed "Jane Doe's" accusations had been made they were not true *as to Miller*, and although he thought this tragic event may have actually happened, he did not believe Miller was the actual perpetrator. Yashar Ali made no mention to Miller of the fact that Jane Doe told Yashar Ali on August 6, 2018 that the story was not true.

67.     During their August 8, 2018 communication, Yashar Ali also told Miller that he was not writing a story about the accusations because there was not enough support that Miller

was the perpetrator.  Yashar Ali also urged Miller to get a "gag order" to stop Delgado from going public with the accusations.

68.     Yashar Ali and Miller communicated again about Delgado's threats to make the false allegations about Jane Doe public on August 22, 2018.  Yashar Ali pressed Miller as to why he would not just "settle" with Delgado because Miller's life would be "over" if Delgado went public with the false accusations even if they were untrue.

**E.      The Execution of the Plan to Destroy Miller**

69.     In July 2018, Delgado started questioning Miller about the false charges related to Jane Doe and the unidentified second woman; sending direct messages to Miller and an e-mail to his wife.  Delgado did this in the context of using the accusations as leverage to try to intimidate and coerce Miller into agreeing to her unreasonable and controlling positions in the Family Case; positions that are contrary to the minor child's best interests.

70.     On July 12, 2018, Delgado sent Miller a message identifying Jane Doe by her real name and laying out the rumored relationship, pregnancy and forced abortion story; as well as the rumor about the unidentified woman Miller supposedly "beat."  Over the ensuing weeks, Delgado sent several more messages to Miller identifying Jane Doe by name.  Miller initially was hesitant to even entertain Delgado's delusional accusations.

71.     As Delgado's obsession over the Jane Doe story persisted, Miller denied the accusations and realized that he needed to start gathering evidence to refute Delgado's claims in the event she followed through on her threats to go public.

72.     Miller had Jane Doe's real name from Delgado and Yashar Ali.

73.     During their August 8, 2018 communications, Yashar Ali implied to Miller that Jane Doe lived and worked in South Florida and sent Miller three photos of Jane Doe, which allowed Miller to put a face to the real name Yashar Ali and Delgado previously provided.

74.     Armed with this information, Miller eventually was able to track down Jane Doe's work and personal addresses and social media accounts, the publicly available portions of which included the photos Yashar Ali provided.

75.     Meanwhile, Delgado's frustration over her inability to get a reporter to publish the false accusations about Miller had already boiled over.

76.     On September 14, 2018, Delgado took matters into her own hands and filed a Supplement to Mother's March 2018 Motion for Court to Consider Psychological Evaluation of the Father (the "Supplement") making the false accusations about Miller in the Family Case. Delgado filed the Supplement *pro se*, just hours before her sixth attorney appeared in the Family Case.

77.     Delgado wrongfully assumed that filing these false and salacious accusations in the public record would open them to constitutionally-protected coverage by the press.

78.     In her November 30, 2017 Twitter rant (*see* ¶ 32 above), Delgado responded to a comment questioning Delgado's decision to talk about the Family Case on Twitter by stating "… A court document is forever/***cant' be sealed***/…"  (emphasis added)

79.     However, Miller filed a Notice designating the entirety of Delgado's Supplement confidential and moved to determine its confidentiality under Florida's Rules of Judicial Administration.  (*See* September 17, 2018 Notice and Motion) As a result, the Supplement was sealed and the press coverage Delgado was hoping for did not occur.

**F.      Delgado Enlists *Splinter.com* to Defame and Destroy Miller**

80.      For a week while Delgado's Supplement remained sealed in the Family Case file, she tried to find someone willing to risk liability by publishing the false and defamatory accusations she leveled against Miller.

81.      *Splinter.com*—an off-shoot of Gawker, the notorious web company that met its demise in 2016 after years of defamatory publications and violations of privacy rights—was willing to agree with her to take that risk.

82.      *Splinter.com* touts its pledge to publish journalism that "get(s) under your skin."[4]

83.      At 5:45 p.m. on Friday, September 21, 2018, Krueger sent Miller an e-mail asking for a comment on Delgado's Supplement.  Krueger is the Managing Editor of *Splinter.com*, an outspoken critic of the Trump Administration, and worked as breaking news editor at TPM—the publication that Delgado enlisted to accuse Miller of seeking "revenge" through the Family Case. (*See* ¶ 32 above).

84.      On September 21, 2018 at 8:01 p.m., without obtaining the Supplement from the actual Court file, Krueger posted her story "*Court Docs Allege Ex-Trump Staffer Drugged Woman He Got Pregnant With "Abortion Pill*"[5] ("Defamatory Article"), which included a link to view the entire **sealed** Supplement and hyperlinked TPM's April 7, 2018 article about the "custody battle" between Miller and Delgado.  (S*ee* ¶ 32 above).

85.      The Defamatory Article and images of the Supplement exposed all the scandalous, false, and defamatory accusations lodged against Miller, none of which were publicly known and

---

[4]   https://www.poynter.org/news/what-splinter-anyway-editor-chief-dodai-stewart-explains-sites-rebrand

[5]   https://splinternews.com/court-docs-allege-ex-trump-staffer-drugged-woman-he-got-1829233105

all of which are untrue.  A copy of the original Defamatory Article and its most-recently updated version are attached as **Composite Exhibit 3**.  The Defamatory Article goes beyond the Supplement by falsely asserting that "Jane Doe" herself "claims" that Miller "surreptitiously dosed her with an abortion pill without her knowledge, leading to the pregnancy's termination and nearly her death." ***Jane Doe has never "claimed" that Miller did anything.***  To the contrary, she denied the accusations and told two reporters that they were not true.

86.     The Defamatory Article confirmed that the Defendants did not obtain the Supplement from the publicly available Family Case court file.  In fact, Krueger wrote that Delgado had to "confirm the document's authenticity to *Splinter*…"

87.     On September 21, 2018, Miller promptly made demand on *Splinter.com* to pull the Defamatory Article.  (*See* **Exhibit 4**).  In this demand, Miller advised the Defendants (among other things) that "[t]he filing upon which your story is based is sealed."

88.     Soon after Miller's retraction demand, the Defendants flippantly "declined to do so." (*See* **Exhibit 5**).  Instead, they updated their story with isolated quotes pulled from Miller's retraction demand—but never informed readers or other publications that a retraction demand had actually been made.

89.     In response, Miller's counsel re-confirmed that the Defendants published a sealed court filing and noted the exponential increase in harm Miller would suffer if the Defamatory Article was not pulled.  (*Id.*)

90.     Little to no additional press coverage immediately followed publication of *Splinter.com*'s Defamatory Article and the sealed Supplement.

91.     However, because the story was not pulled widespread coverage by other media outlets began the following Saturday.  Among other outlets, *Newsweek*, *Huffington Post*, the *New*

*York Post*, *The Hill*, *Bustle*, *The Hollywood Reporter*, *Yahoo News*, *Variety*, *Cosmopolitan*, and *The Daily Beast* reported on the Defamatory Article.  The coverage prompted Fox News Sunday to cancel Miller's scheduled appearance for the following day, Sunday, September 23, 2018.

92.     As those events unfolded, Delgado tweeted about Krueger's story and called for CNN to terminate its relationship with Miller:



93.     Krueger also tweeted the Defamatory Article to her followers as her "Friday Night Scoop" (*see* **Exhibit 6**), where it was retweeted and viciously commented on by readers; including comments tagging CNN and asking for Miller to be fired, referring to him as a criminal, and calling for him to be prosecuted.

94.     Facing an immense backlash over the Defamatory Article, Miller issued a statement trying to defend himself and vehemently denying the false accusations.  Expectedly, his plea fell on deaf ears.

95.     Adding insult to injury, Yashar Ali posted a series of tweets seemingly confirming the accusations—even though Jane Doe told Yashar Ali the story was untrue:



96.    Shortly thereafter, because of CNN's understandable concern over public perception of the situation, Miller and CNN agreed to terminate Miller's contract.

97.    After that happened, Krueger again took to Twitter to boast that her reporting led to Miller's departure from CNN (*see* **Exhibit 7**); in response to which a new round of comments and tweets attacking Miller erupted.

98.    By the end of the weekend, Miller's life was in shambles.  He lost his job at CNN. His job at Teneo was (and remains) in serious jeopardy.  He was convicted in the court of public opinion—forever labeled a "murderer," "sexual predator" and "rapist."  His Wikipedia page was edited to include information about the Jane Doe story—citing to the *Splinter.com* Defamatory Article in support.  (*See* **Exhibit 8**).  And he is constantly being harassed and threatened by people online.

99.    Miller was convicted and condemned online and on social media as shockwaves from the false allegations and the public's immediate presumption of guilt rapidly spread.

100.    In very little time, Miller's family, friends, and co-workers all got wind of the horrific criminal conduct Miller was falsely accused of committing.

101.    Miller and his family were shunned.  Previously frequent playdates for his children suddenly stopped.  At youth sporting events, people refused to acknowledge Miller and sat feet away from him.  No one wants to be associated with the monster Miller was falsely accused of being.

102.    These foreseeable, devastating impacts were precisely what Delgado and the Defendants intended.

### ACTUAL MALICE

103.    Krueger and Gizmodo published the Defamatory Article with actual knowledge of its falsity or reckless disregard for the falsity of the statements made about Miller.

104.    Even though the charges Krueger and Gizmodo made against Miller were extremely serious and should have been verified through a reasonable investigation, the Defendants did not independently verify *anything* in the Defamatory Article and Supplement.

105.    Instead, Krueger and Gizmodo deliberately posted the Defamatory Article and Supplement knowing that the statements made about Miller were false and defamatory; and they continued to run the Defamatory Article after Miller demanded a retraction.[6]

106.    At bare minimum, Krueger and Gizmodo published the Defamatory Article and Supplement with reckless disregard for and a purposeful avoidance of the truth.

107.    Krueger's and Gizmodo's personal, political, economic, and professional motivations and ill-will toward Miller because of his affiliation with the Trump Administration

---

[6]  All conditions precedent to the filing and maintenance of this action have been performed, occurred or been waived.

led them to ignore facts which were known and facts which were easily, quickly, and readily available that established the falsity of the Defamatory Article.

108.     Krueger and Gizmodo knew that fact-checking would only undermine their story and prevent them from publishing it, so they consciously avoided and refused to gather evidence that would contradict their reporting.

109.     Krueger and Gizmodo knew Miller was a prime target for attacks against Trump supporters, which inflame passions and drive readership.  They even referred to Miller as an "Ex-Trump Staffer" in the title of the Defamatory Article.

110.     The Defendants also knew based on professional experience that controversy, even over false allegations, also drives readership and brings an economic benefit to their publication.

111.     The false content in the Defamatory Article directly and in no uncertain terms made very serious criminal charges against Miller at a time when such horrific conduct toward women is at the forefront of a national dialogue about the mistreatment of women.

112.     Despite the seriousness of the charges against Miller, Krueger and Gizmodo failed to take even the most basic steps to investigate and test the accuracy of their false and defamatory publication.

113.     In fact, they did not fact-check *anything*.

114.     Krueger and Gizmodo engaged in highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.

115.     Even a cursory review of the Family Case docket would have revealed the Supplement was subject to confidentiality protections and sealed.

116.    The Defendants' failure to investigate is further compounded by the obvious reasons to doubt the veracity of the charges they made against Miller.

117.    The nature and severity of the false accusations about Miller were such that Krueger and Gizmodo entertained serious doubts as to their truth and/or were such that they published them with a high degree of awareness of their probable falsity.

118.    The Defendants also turned a blind-eye to basic journalistic ethics, policies and procedures.

119.    For example, Krueger and Gizmodo ignored and violated the Society of Professional Journalists' Code of Ethics, including that, "Journalists should: Test the accuracy of information from all sources and exercise care to avoid inadvertent error."

120.    Krueger and Gizmodo did not ensure that what they represented as fact about Miller was correct.

## THE FAIR REPORTING PRIVILEGE DOES NOT APPLY

121.    Any contention by the Defendants that they are protected by the fair reporting privilege is wrong.

122.    The fair reporting privilege affords no protection to journalists who publish defamatory statements from *sealed* court documents.

123.    The Defendants are liable for defamation and other torts because they published details from sealed court documents that are untrue.

124.    The rationale for this is simple:  It is illogical to hold that a defendant has the right to publish to millions of readers information which not one of those readers could personally obtain because the public has no right to see sealed court filings.  A publisher does not have the right to spread false contents of sealed court papers to the public.

125.   Sealed records and documents withheld from the public eye lie outside the fair-reporting privilege.  *Prosser and Keaton on Torts* § 115 at 837 (5th ed. 1984).  Likewise, the privilege does not extend to matters contained in sealed filings even when discovered during a publisher's extra-judicial investigation.

126.   Consequently, the Defendants cannot hide from accountability and liability for the false and defamatory statements they published about Miller.

**COUNT I**
***(Defamation Per Se)***

127.   Miller re-alleges paragraphs 1 through 126 as if fully set forth herein.

128.   Krueger and Gizmodo published or caused to be published the false and defamatory statements in the Defamatory Article and sealed Supplement, which did and had the tendency to expose Miller to hatred, contempt, ridicule and/or disgrace.

129.   The false statements in the Defamatory Article and Supplement are of and concerning Miller, and reasonably understood to be about Miller.

130.   As more specifically set forth above, the statements in the Defamatory Article and Supplement concerning Miller's relationship with and crimes against Jane Doe and her unborn child, his attempts to silence and coerce her, and his physical abuse of another woman are not true.  The Defendants' false assertion the Defendants added in the beginning of the Defamatory Article that Jane Doe "claims" that Miller surreptitiously dosed her with an abortion pill leading to the pregnancy's termination and nearly her death also is not true.

131.   Krueger and Gizmodo published and refused to retract the false statements in the Defamatory Article and Supplement knowing that they were false or with reckless disregard for the truth of the statements.

132.     The false statements in the Defamatory Article and Supplement constitute defamation *per se* because they tended to injure Miller in his trade, business or profession and directly charged Miller with committing horrific crimes.

133.     The nature of the statements made about Miller, the extent to which those statements were circulated, and the tendency of such statements to injure someone such as Miller are such that the false statements in the Defamatory Article and Supplement have directly and proximately caused Miller to suffer significant damages, including damage to his reputation, humiliation, embarrassment, mental suffering, shame, emotional distress, loss of employment, economic damages, and other harms, all of which are ongoing in nature and will be suffered in the future.   Miller will also incur and is entitled to recover significant expenses for repairing his reputation online and otherwise.

134.     The re-publication of the false statements in the Defamatory Article and Supplement in other publications, as well as via the dissemination of the Defamatory Article through social media, caused Miller  to suffer additional damages; all of which were foreseeable.

135.     The Defendants published the Defamatory Article and Supplement with actual knowledge that salacious stories attacking Miller inflame readers and drive readership and Web clicks.  Thus, they knowingly and voluntarily exploited and retained a benefit conferred by Miller in special circumstances particular to this case in which it would be inequitable for the Defendants to retain that benefit without paying the value thereof to Miller.

136.     The facts and circumstances at issue in this case present a unique and special situation in which Miller is entitled to the broad and flexible equitable remedy of restitution damages to be applied.

137.    The essential inquiry in any action seeking restitution is whether it is against equity and good conscious to permit the defendant to retain what is sought to be recovered.

138.    The Defendants' tortious conduct alleged herein presents a special circumstance in which it would be inequitable and unjust to allow them to retain the advertising revenues generated from the Defamatory Article without paying Miller  the value thereof.

139.    As a direct and proximate result of Defendants' inequitable, unjust and tortious conduct, Miller is also entitled to restitution in the form of Gizmodo's advertising revenues attributable to the Defamatory Article.

140.    The Defendants' conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Miller, or in blatant disregard of the substantial likelihood of causing him harm, thereby entitling Miller to an award of punitive damages.

141.    As a direct and proximate result of the Defendants' misconduct, Miller is entitled to compensatory, special, and punitive damages in an amount to be proven at trial.

## COUNT II
### (*Tortious Interference With Advantageous Business Relationships*)

142.    Miller re-alleges paragraphs 1 through 141 above as if fully set forth herein.

143.    The Defendants had actual and imputed knowledge of Miller's advantageous contractual and business relationships with CNN and Teneo.

144.    The Defendants knowingly, intentionally and unjustifiably interfered with Miller's business relationships by publishing the Defamatory Article and Supplement and promoting the article through social media.

145.    As a direct and proximate result of Defendants' actions, Miller has suffered significant damages.

146.    The nature of the statements made about Miller, the extent to which those statements were circulated, and the tendency of such statements to injure someone such as Miller are such that the false statements in the Defamatory Article and Supplement have directly and proximately caused Miller to suffer significant damages, including damage to his reputation, loss of employment, economic damages, and other harms, all of which are ongoing in nature and will be suffered in the future.  Miller will also incur and is entitled to recover significant expenses for repairing his reputation online and otherwise.

147.    Defendants' conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Miller, or in blatant disregard of the substantial likelihood of causing him harm, thereby entitling Miller to an award of punitive damages.

148.    As a direct and proximate result of the Defendants' misconduct, Miller is entitled to recover compensatory, special, and punitive damages in appropriate amounts to be proven at trial.

### COUNT III
### *(Intentional Infliction of Emotional Distress)*

149.    Miller re-alleges paragraphs 1 through 126 as if fully set forth herein.

150.    Defendants intentionally or recklessly inflicted emotional distress upon Miller when they knew or should have known that emotional distress would result.

151.    The Defendants' conduct was outrageous, as to go beyond all bounds of decency and to be regarded as odious and utterly intolerable in a civilized community.

152.    The revilement the Defendants inflicted upon Miller is explicit and egregious.

153.    The Defendants' conduct has caused and will continue to cause severe emotional distress, shame, embarrassment, and humiliation to Miller.

154.     The nature of the statements made about Miller, the extent to which those statements were circulated, and the tendency of such statements to injure someone such as Miller are such that the false statements in the Defamatory Article and Supplement have directly and proximately caused Miller to suffer significant damages, including damage to his reputation, humiliation, embarrassment, mental suffering, shame, emotional distress, and other harms, all of which are ongoing in nature and will be suffered in the future.

155.     Defendants' conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Miller, or in blatant disregard of the substantial likelihood of causing him harm, thereby entitling Miller to an award of punitive damages.

156.     As a direct and proximate result, Miller is entitled to recover compensatory, special, and punitive damages in appropriate amounts to be proven at trial.

## COUNT IV
### *(Invasion of Privacy)*

157.     Miller re-alleges paragraphs 1 through 126 as if fully set forth herein.

158.     The Defendants published private facts about Miller that are alleged in the Supplement which are highly offensive to a reasonable person and are not a matter of legitimate public concern.

159.     Although the allegations in the Supplement about Miller are untrue, the Defendants invaded Miller's privacy by reporting on and publishing the sealed Supplement itself—thus revealing publicly the non-public fact that the allegations about Miller had been made and what those allegations were.

160.     The nature of the published facts about Miller, the extent to which they were circulated, and the tendency of such a publication to injure someone such as Miller is such that the publication of the sealed Supplement directly and proximately caused Miller to suffer

significant damages, including damage to his reputation, humiliation, embarrassment, mental suffering, shame, emotional distress, loss of employment, economic damages, and other harms, all of which are ongoing in nature and will be suffered in the future. Miller will also incur and is entitled to recover significant expenses for repairing his reputation online and otherwise.

161. The re-publication of the Supplement and its contents in other publications, as well as via the dissemination of the Supplement and its contents through social media, caused Miller to suffer additional damages; all of which were foreseeable.

162. The Defendants published the sealed Supplement with actual knowledge that stories attacking Miller inflame readers and drive readership and Web clicks. Thus, they knowingly and voluntarily exploited and retained a benefit conferred by Miller in special circumstances particular to this case in which it would be inequitable for the Defendants to retain that benefit without paying the value thereof to Miller.

163. The facts and circumstances at issue in this case present a unique and special situation in which Miller is entitled to the broad and flexible equitable remedy of restitution damages to be applied.

164. The essential inquiry in any action seeking restitution is whether it is against equity and good conscious to permit the defendant to retain what is sought to be recovered.

165. The Defendants' tortious conduct alleged herein presents a special circumstance in which it would be inequitable and unjust to allow them to retain the advertising revenues generated from publishing the sealed Supplement without paying Miller the value thereof.

166. As a direct and proximate result of Defendants' inequitable, unjust, and tortious conduct, Miller is also entitled to restitution in the form of Gizmodo's advertising revenues attributable to publishing the sealed Supplement.

167.    Defendants' conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Miller, or in blatant disregard of the substantial likelihood of causing him harm, thereby entitling Miller to an award of punitive damages.

168.    As a direct and proximate result, Miller is entitled to recover compensatory, special, and punitive damages, in appropriate amounts to be proven at trial.

## COUNT V
### *(Conspiracy)*

169.    Miller re-alleges paragraphs 1 through 168 as if fully set forth herein.

170.    The Defendants agreed and conspired with Delgado to defame and intentionally inflict emotional distress upon Miller, interfere with his advantageous business relationships, and invade his privacy.

171.    In doing so, the Defendants and Delgado agreed and conspired to do an unlawful act or a lawful act by unlawful means.

172.    The Defendants, by publishing the Defamatory Article and sealed Supplement, committed an overt act in pursuance of their conspiracy.

173.    As a direct and proximate result, Miller suffered the damages alleged in Counts I-IV, above, including compensatory, special, and punitive damages in amounts to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, Jason Miller, demands judgment against Defendants, Gizmodo Media Group, LLC and Katherine Krueger, as follows:

A.    An award of compensatory, special and punitive damages in appropriate amounts to be established at trial;

B.      Permanent injunctive relief prohibiting the publication or republication of the defamatory statements in the Defamatory Article and Supplement; and

C.      Such other and further relief as the Court deems just and appropriate to protect Plaintiff's rights and interests.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

> */s/ Shane B. Vogt*
> Kenneth G. Turkel – FBN 867233
> E-mail: kturkel@bajocuva.com
> Shane B. Vogt – FBN 257620
> E-mail: svogt@bajocuva.com
> BAJO | CUVA | COHEN | TURKEL
> 100 North Tampa Street, Suite 1900
> Tampa, Florida 33602
> Tel: (813) 443-2199
> Fax: (813) 443-2193
>
> *Attorneys for Plaintiff*