**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**1:18-CV-24227-CMA-Altonaga**

| | |
|---|---|
| JASON MILLER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| GIZMODO MEDIA GROUP, LLC, | ) |
| a Delaware Corporation, KATHERINE | ) |
| KRUEGER, individually, and WILL | ) |
| MENAKER, individually, | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS GIZMODO MEDIA GROUP, LLC'S AND KATHERINE KRUEGER'S MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Gizmodo Media Group, LLC and Katherine Krueger (collectively, "Defendants" or "Gizmodo") move to dismiss Plaintiff Jason Miller's ("Plaintiff" or "Miller") First Amended Complaint ("Complaint") (ECF No. 5) for failure to state a claim. In support thereof, Defendants state as follows:

### INTRODUCTION

This action arises out of a September 21, 2018 news article (the "Article") reporting on a court filing by Arlene "A.J." Delgado ("Delgado") in the bitter child custody battle between Plaintiff Miller and Delgado, two individuals who had served as senior advisors on then-candidate Trump's presidential campaign and engaged in a highly publicized affair that resulted in Delgado's pregnancy. There is no dispute that Delgado's filing at issue was made on the public docket of a Florida court. Nor is there any dispute that the Article accurately reported on the filing and its allegations concerning Miller. Nor is it in dispute that the very allegations in the filing were repeated on the record in open court and that Plaintiff himself placed the transcript of that hearing on the public docket.

Miller nonetheless brings a panoply of claims against Gizmodo that all turn on his claim that Delgado's filing was "sealed." But this allegation is false; no order exists sealing Delgado's filing at issue; nor does Miller's Complaint identify one. On two separate occasions, Defendants

1

have obtained copies of the so-called "sealed" filing directly from the family court.  Put simply, absent a sealing order, the Article was nothing more than a straightforward report on a public record.  And even if the filing had been sealed, and Defendants somehow received those pleadings in error, the claims are not actionable as a matter of law.  The Article is shielded from liability by both the First Amendment and the fair report privilege.  For the reasons set forth below, based on the allegations of the Complaint and the public record, Plaintiff's claims fail and must be dismissed.

## BACKGROUND

### A.    The Parties

Miller is, as discussed above, a former aide to then-candidate Trump and a litigant in *J.M. v. A.J.D.*, Case No. 17-016674-FC-17 (11th Jud. Cir. Fla., filed July 10, 2017) ("the Lawsuit").

Gizmodo Media Group is an online media company that publishes on a dozen news platforms, including the website www.splinternews.com, which published the Article at issue in this dispute.  Katherine Krueger is the managing editor of Splinter and wrote the Article.

### B.    The Underlying Family Court Dispute

Miller, a communications strategist, and Delgado, a media personality, worked together in high profile capacities on Donald Trump's 2016 presidential campaign and appeared frequently on cable news to promote then candidate Trump.  (Compl. ¶¶ 37, 38, 40.)  During the campaign, the two engaged in an affair which resulted in the birth of a child.  (*Id*. ¶ 37, 41.)  The child is the subject of an ongoing and highly publicized paternity and custody lawsuit filed by Miller in Miami-Dade County, Florida.  (*Id*. ¶ 41; Ex. 9.)  Both the affair and the Lawsuit have been the subject of widespread news coverage.  (*Id*. ¶¶ 41, 43, 47.)  To say the Lawsuit has been acrimonious is an understatement; the docket reflects more than 400 filings since the action was filed in July 2017.

### C.    The Publicly Filed Supplement at Issue

On September 14, 2018, Delgado filed a supplement to a prior, publicly filed motion in the Lawsuit, seeking an evaluation of Miller's mental health, titled "Mother's Supplement to Mother's March 2018 Motion for Court to Consider Psychological Evaluation of Father" (the "Supplement").  The Supplement alleges that Miller engaged in an extramarital affair with a woman identified as Jane Doe, and that after Jane Doe became pregnant, Miller drugged her with

an abortion pill without her knowledge, leading to her hospitalization and the termination of the pregnancy.  (Compl. ¶¶ 2, 15, 88.)

Delgado filed the Supplement publicly, without moving to file it under seal or otherwise designating it as confidential, and it is publicly identified on the family court docket. (Declaration of Deanna K. Shullman ("Shullman Decl.") Ex. A ("FC Dkt.") No. 351; Ex. B; Compl. ¶ 89 (Delgado "wrongfully assumed that filing [her] false and salacious accusations *in the public record* would open them to constitutionally-protected coverage by the press") (emphasis added).)[1]  From the time the Supplement was filed on September 14 until today, there has been no indication whatsoever on the public docket that the Supplement is under seal.  (FC Dkt. No. 351.)

### D.   The Motion to Determine Confidentiality

Three days later, on September 17, 2018, Miller filed a "Motion to Determine Confidentiality of and to Seal Court Records" pursuant to Florida Rule of Judicial Administration 2.420(c)(9) in which, invoking Florida Rule 2.420(e)(2), he sought the family court's determination of whether the Supplement should be considered "confidential" as a matter of law and therefore be sealed.  (Shullman Decl. Ex. D (FC Dkt. No. 356) ("Motion to Seal"); Compl. ¶ 91.)  Per Miller's motion, he acknowledged that under Florida Rule 2.420(c)(9)(A), "certain court records are confidential *if* the Court determines that confidentiality is required…" (Motion to Seal ¶ 5 (emphasis added)) and requested that the court "set an expedited hearing on September 24, 2018 at 12:30 p.m. to determine *whether* Respondent's Supplement is confidential and should be sealed."  (*Id.* ¶ 9 (emphasis added) ("September 24 Hearing").)[2]

By its express terms, Rule 2.420(e)(1) does not act to retroactively or permanently seal the Supplement.  On its face, the Rule provides guidance *only* to the Clerk, not the litigants or the

---

[1] Pursuant to Federal Rule of Evidence 201(b), this Court may take judicial notice of the docket and the documents filed in the Lawsuit.  *See Ash v. Strobel*, 2016 WL 1567113, at *1 n.2 (N.D. Fla. March 15, 2016) (A court "may take judicial notice of another court's docket entries and orders for the limited purpose of recognizing the filings and judicial acts they represent"); *Cherry v. Ventures Trust 2013-I-NH by MCM Capital Partners LLC*, 2016 WL 6538447, at *2 (S.D. Fla. Feb. 26, 2016) (on a motion to dismiss, courts may take judicial notice of state court records without converting the motion into one for summary judgment).

[2] On the public facing docket in the Lawsuit, available to Gizmodo and the public generally, both Miller's Notice of Confidential Information within Court Filing (FC Dkt. No. 355) and his Motion to Seal (*id.* No. 356) do not in any way reference the Supplement or its docket number, so that it was not apparent which documents Miller was moving to seal.

court.  And per the plain meaning of the Rule, the instruction that the clerk keep a document "confidential" is an interim step until, and if, a sealing order is issued under Florida Rule of Judicial Administration 2.420(e)(3), which identifies specific requirements for any order sealing documents, including that the order must issue 30 days from a hearing on the motion and must specify the grounds for sealing as well as the specific information to be sealed.  Fla. R. Jud. Admin. 2.420(e)(3).  Additionally, the Court must publish the order within 10 days on the clerk's website and post a copy of the order in a prominent public location in the courthouse for no less than 30 days.  Fla. R. Jud. Admin 2.420(e)(4).  None of those requirements has been met and, again, Plaintiff does not allege that any order ever issued consistent with these clear requirements.  On September 20, 2018, Delgado opposed Miller's Motion to Seal (FC Dkt. No. 361), asserting that the Supplement contains "information that is already in the public domain." (Shullman Decl. Ex. E.)

To this day, no court order grants Miller's Motion to Seal, meaning that the Supplement cannot properly be considered sealed under the Rules of Judicial Administration.  *See* Fla. R. Jud. Admin. 2.420(e)(3) (sealing orders must make specified findings); 2.420(e)(4) (requiring public notice of sealing orders).[3]  And the time for any such order has now lapsed.  Per the Rule, the court must "issue a ruling on the motion within 30 days of the hearing."  Here, Plaintiff noticed the September 24 Hearing as the hearing on the Motion to Seal (FC Dkt. No. 356 ¶ 8), but no such sealing order has ever issued.  In short, no court order has sealed the Supplement.

**E.**     **The Article**

Katherine Krueger received a copy of the publicly filed Supplement (*see* Compl. ¶¶ 95-96), which appears on the public family court docket.  (FC Dkt. No. 351.)  On September 21, 2018, Gizmodo published the Article on its website www.splinternews.com, titled "Court Docs Allege Ex-Trump Staffer Drugged Woman He Got Pregnant With 'Abortion Pill.'" (Shullman

---

[3] In addition, on the morning of September 24, Miller filed a motion asking the court to strike and remove the Supplement from the record and to require that all of Delgado's "pleadings be pre-screened before filing," along with other relief.  (Shullman Decl. Ex. F (FC Dkt. No. 358).) Consistent with the family court's failure to decide or grant Miller's Motion to Seal the Supplement, the docket reflects that this motion was never decided.  As a result, the Supplement remains on the docket and there is no indication that Delgado's filings are pre-screened.

Decl. Ex. G.)[4]  The Article reports on the custody battle between Miller and Delgado, accurately describing the allegations made in the Supplement and embedding the document within the body of the Article.  (*Id.*)  The Article neither adopts as true nor purports to assess the truth of the Supplement's claims – it simply reports on the filing.  (*Id.*)  Both Delgado and Miller were asked to comment on the Supplement before the Article was published.  (Compl. ¶¶ 95, 99; Shullman Decl. Ex. G.)  Delgado confirmed the authenticity of the Supplement but declined to comment further.  (Shullman Decl. Ex. G.)  Miller also declined to comment.  (Compl. ¶ 95; Ex. 3.)

After the Article was published, Miller's counsel contacted Gizmodo about the Article and the allegedly "false accusations" contained in Delgado's filing.  (Compl. Ex. 4.)  Defendants promptly updated the Article to include Miller's denial of the allegations contained in the Supplement, and later updated the Article again to report on additional denials Miller made on social media regarding Delgado's claims.  (Shullman Decl. Ex. G.)

**F.      The Supplement Is Publicly Available**

On September 24, 2018, the first business day after the Article was published, Judge George Sarduy of the family court held a status conference in the Lawsuit, which was on the record and held in open court.  (Shullman Decl. Ex. H (FC Dkt. 443).)[5]  Although Miller's counsel had requested there be a hearing then on the Motion to Seal, the merits of the motion were not discussed.  Instead, at the beginning of the hearing, Miller's counsel referred to the Supplement, but Judge Sarduy appeared unfamiliar with it and was seemingly reading it for the first time.  (*Id.* 7:2 ("I didn't notice it."); 13:3-23 ("I was not [previously] aware that it was filed. I must have overlooked it. I don't know why . . . [I]t did not draw my eye . . . I didn't really look at it any further. I just glanced over it.").  During the course of the hearing, the key allegations from the Supplement – including that a Jane Doe became pregnant by Miller, who later gave her an abortion "smoothie" that caused her to miscarry and end up in the hospital – were cited and discussed in open court.  (*See id.* 14:17-24, 16:14-24.)  Despite that explicit discussion, Miller did not move to have the transcript sealed and has actually *filed* the transcript on the public

---

[4] The Article is the sole basis for Plaintiff's claims against Gizmodo and is attached to the Complaint as an exhibit.  Accordingly, the Court may consider it on this motion. *See Benson v. QBE Ins. Corp.*, 61 F. Supp. 3d 1277, 1279 (S.D. Fla. 2014).

[5] On a motion to dismiss, the Court may consider any documents attached to the complaint or incorporated into the complaint by reference.  *See Benson*, 61 F. Supp. 3d at 1279.  Plaintiff has attached an excerpt of the transcript to the Complaint as Exhibit 10.  Its full contents are thus properly before the Court.

docket.  (Shullman Decl. Ex. H; FC Dkt. No. 443.)  Further, at no point in the hearing did the Court issue any ruling on Miller's Motion to Seal.[6]  Nor does the docket for the Lawsuit contain any sealing order.

**G.**     **Gizmodo Twice Retrieved the Supplement from the Clerk's Office**

Plaintiff's counsel first represented to Gizmodo that the Supplement was sealed on the evening of Friday, September 21, after the publication of the Article and at a time when the Miami-Dade Family Court Clerk's office was closed.  (Compl. Ex. 4 ("The filing upon which your story is based [is] sealed.").)  Gizmodo responded less than two hours later, explaining that the Article "concerns a filed court document in an ongoing dispute over a relationship that has already received much public attention" and "describes the allegations that are contained in the filing [and] references the motion."  (*Id*. Ex. 5.)  After being informed by Plaintiff's counsel of his belief that the Supplement was sealed, Gizmodo sent a runner to the Miami-Dade Family Court Clerk's office on Monday, September 24, 2018, the first business day after the Article was published.  (Shullman Decl. Ex I.)  The runner was easily able to obtain a copy of the Supplement from the Clerk.  (*Id.*)  Notably, September 24 was the very day of the hearing that Plaintiff claims "confirmed" the sealed status of the Supplement.  (Compl. ¶ 151.)

On October 16, after the filing of this lawsuit, which repeated Miller's allegation that the Supplement was sealed, Gizmodo again sent a runner to the Miami-Dade Family Court Clerk's office.  Once again, the runner was provided a copy of the Supplement by the Clerk's office (Shullman Decl. Ex. J),[7] which further confirmed that it was publicly available.  Accordingly, Gizmodo informed Plaintiff's counsel on October 18, 2018 that, as of that date, the Supplement remained easily accessible by any member of the public and had been retrieved from the Clerk's office on multiple occasions, including as recently as October 16.  (*Id*. ¶ 11.)

---

[6] The portion of the transcript cited by Plaintiff (Compl. ¶ 151 (quoting Tr. 8-9)) does *not* indicate that the Court has made any finding that the Supplement is sealed, and it most certainly does *not* reflect an Order granting Plaintiff's motion.  When the judge says "I can see it there. That's sealed," he is apparently referring to a non-public facing docket sheet, such as the one attached to the Complaint as Exhibit 9, where a lock symbol appears next to the Supplement. Critically, Defendants did not see that version of the docket until the Amended Complaint was filed.  No lock symbol appears next to the docket entry for the Supplement on the version of the docket available to Defendants and the public.  (FC Dkt. No. 351.)

[7] The Court may take judicial notice of Exhibits I and J to the Shullman Declaration, which are state court records.  *See Cherry v. Ventures Trust 2013-I-NH, LLC*, 2016 WL 6538447, at *2.

H.      **This Litigation**

On October 15, 2018, Miller sued Defendants for defamation and a variety of other torts arising out of Defendants' publication of the Article.  After the Court ordered Plaintiff *sua sponte* to file an amended complaint to add jurisdictional allegations (ECF No. 4), Plaintiff filed the First Amended Complaint on October 18, 2018 – the very same day that his counsel was informed by Gizmodo that the Supplement (consistent with the rules of the Florida Family Court), was unsealed and available to the public.  *See* Fla. Fam. L. Rule 12.400(a) ("Closure of court proceedings or sealing of records may be ordered by the court only as provided by Florida Rule of Judicial Administration 2.420.").  The bulk of the Complaint is devoted to *ad hominem* attacks against Delgado:  Plaintiff excoriates Delgado for filing the Supplement, vigorously refutes the allegations it contains, and accuses Delgado of waging an "all-out war" and seeking to "destroy" him.  (Compl. §§ A, F.)  Plaintiff also explicitly pleads that Delgado provided the Supplement to Defendants.  (*Id.* ¶ 135.)

Plaintiff's allegations against Gizmodo are sparse and hinge almost entirely on the provably false allegation that the Supplement is under seal and that therefore Defendants are somehow not afforded the benefits of either the First Amendment or the fair report privilege. (Compl. ¶¶ 91, 92, 96, 97, 99, 102, 144-158.)  Plaintiff seeks damages in excess of one hundred million dollars ($100,000,000).  (*Id.* ¶ 17.)

## ARGUMENT

This is a simple case.  Regardless of whether the Supplement was sealed (and it was not), Gizmodo's publication of the Article was privileged and thus, non-actionable.  To survive a motion to dismiss for failure to state a claim, a complaint must allege sufficient facts to state a claim for relief that is plausible on its face.  *Fuentes v. Mega Media Holdings, Inc.*, 721 F. Supp. 2d 1255, 1257 (S.D. Fla. 2010).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Dismissal is appropriate where it is clear the plaintiff can prove no set of facts in support of the claims in the complaint." *Marshall Cty. Bd. of Educ. V. Marshall Cty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).  A court may therefore dismiss a complaint under 12(b)(6) "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action."  *Id.*; *see also Ortega Trujillo v. Banco Central del Ecuador*, 17 F. Supp. 2d 1340, 1342 (S.D. Fla. 1998) (a

court need not accept the truth of conclusions of law in the complaint, and, "[r]egardless of the alleged facts… may dismiss a complaint on a dispositive issue of law.")[8]

Because defamation cases implicate the exercise of free speech, both federal and Florida courts stress the prominent function courts play in such cases and favor the early dismissal of untenable claims.  *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) ("there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation"); *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983) (courts have a "prominent function" in defamation cases to "either dismiss[] the complaint for failure to state a cause of action or [ ] grant[] a directed verdict at the proof stage") (citation omitted).  Pretrial disposition is especially appropriate in defamation cases because of "the chilling effect" these cases have on First Amendment rights. *Karp v. Miami Herald Publ'g Co.*, 359 So. 2d 580, 581, (Fla. 3d DCA 1978).

Here, the Complaint must be dismissed because no construction of the Complaint and the public records referenced in the Complaint can support Plaintiff's claims.  ***First***, Defendants cannot, consistent with the First Amendment, be punished for accurately reporting on information that the government has made public.  ***Second***, under either Florida or New York law, the Article is plainly protected by the fair report privilege, regardless of whether the Supplement is sealed.  ***Third***, Plaintiff's invasion of privacy claim fails under both New York and Florida law.  New York does not recognize such a cause of action and, under Florida law, a publication of private facts claim requires a Plaintiff to plead that the private facts at issue were *truthful*, which Plaintiff has not done here.  In fact, Plaintiff's claim is based on the allegation that Defendants published *false* accusations found in the Supplement.  ***Fourth***, Plaintiff's non-defamation claims are based on the same facts that give rise to his defamation claim and must

---

[8] The Complaint generally invokes Florida law as the basis of its claims, though it also cites New York law for the proposition that the fair report privilege does not apply.  (Compl. ¶ 156, 156 n.11.)  For purposes of this motion, the Court need not determine whether Florida or New York law applies to Plaintiff's claims.  Under Florida choice of law principles, "[a] court need only undertake a conflict of law analysis if a true conflict exists."  *Five for Entm't, S.A. v. Rodriguez*, 2013 WL 632977, at *5 (S.D. Fla. Feb. 20, 2013) (citation omitted).  A false conflict exists where "the laws of different states are (1) the same, [or are] (2) different but would produce the same outcome under the facts of the case[.]" *Id.*  Here, Plaintiff's claims fail under Florida or New York law, as set forth fully herein.  In the event of any future motion practice in this case, Gizmodo seeks to reserve the right to make additional choice-of-law arguments, as appropriate.

therefore be dismissed under Florida's single action rule or as duplicative under New York law.

## I.   THE ARTICLE IS PROTECTED BY AN ABSOLUTE CONSTITUTIONAL PRIVILEGE

There can be no dispute that the Supplement was a public record and no court order ever issued sealing the filing.  Indeed, on two occasions, Defendants obtained a copy of the Supplement from the Clerk's office.  Plaintiff's claims, therefore, fail in their entirety because the Defendants' publication of the Article is protected by the absolute constitutional privilege established by *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975).  In *Cox Broadcasting*, the United States Supreme Court addressed whether "the State may impose sanctions on the accurate publication of . . . [information] obtained from public records—more specifically, from judicial records which are . . . open to public inspection."  *Id.* at 491.  The Court concluded that the State may not do so, holding that "the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records."  *Cox*, 420 U.S. at 496.  The Court reasoned that "[b]y placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served."  *Id.* at 495.

While *Cox* concerned privacy claims and the publication of truthful information in court records, its holding applies with equal measure to any claim arising out of the accurate reporting of information in government records.  *See, e.g.*, *Medico v. Time, Inc.*, 643 F.2d 134, 137 (3d Cir. 1981) (applying *Cox* to defamation claims arising out of accurate reporting on confidential FBI reports); *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1299 (D.C. Cir. 1988) (affirming dismissal of defamation claim based on accurate report of court proceedings as privileged under *Cox* and the fair report privilege).  The Court in *Cox* emphasized the profound chilling effect that a rule prohibiting the publication of publicly available information would have on the media:

> We are reluctant to embark on a course that would make public records generally available to the media but forbid their publication if offensive to the sensibilities of the supposed reasonable man.  Such a rule would make it very difficult for the media to inform citizens about the public business and yet stay within the law.

420 U.S. at 496.  *See also The Florida Star v. B.J.F.*, 491 U.S. 524, 535 (1989) ("[P]unishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance [state interests] . . . [W]here the government has made certain information publicly

available, it is highly anomalous to sanction persons other than the source of its release."); *Heath v. Playboy Enters., Inc.*, 732 F. Supp. 1145, 1148-49 (S.D. Fla. 1990) ("Facts taken from public records or proceedings are not private . . . The law supports the view that even otherwise private facts may become public when acquired by legitimate means.") (citations omitted).

Applying these constitutional principles to this case, it is clear that the First Amendment bars Plaintiff's claims.  The Supplement is a publicly filed document that was available to the public as part of the court file in the Lawsuit at least until October 16 and was retrieved from the Clerk's office by Defendants on September 24 and October 16.  (Shullman Decl. Exs. I, J.) Defendants accurately reported on the allegations contained in the Supplement, consistent with their constitutional right to do so.  The Complaint should, therefore, be dismissed in its entirety.

In fact, Plaintiffs do not appear to dispute this principle – the *only* alleged basis for Plaintiff's claims, and his demand for $100 million, is his belief that the Supplement was "sealed."  (*See* Compl. ¶¶ 91, 92, 146, 149, 151, 157.)  This is simply incorrect.  Even if the Supplement should have been kept "confidential by the clerk" – the only possible basis for Plaintiff's argument that it was "sealed" – the fact that Defendants were able to obtain it from the Clerk's office bars any claim.  For example, in *Florida Star*, a reporter obtained the name of a rape victim from an incident report prepared by the Sheriff's Department and mistakenly made publicly available in the Department's pressroom.  491 U.S. at 527.  The Court held that under the Constitution, the newspaper's publication of the victim's name could not be punished simply because "[w]here, as here, the government has failed to police itself in disseminating information, it is clear under *Cox Broadcasting* . . . that the imposition of damages against the press can hardly be said to be a narrowly tailored means of safeguarding anonymity."  491 U.S. at 538.  *See also Cox*, 420 U.S. at 496 ("If there are privacy concerns to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information" rather than punishing the press for disclosing such information); *Cape Publ'ns, Inc. v. Hitchner*, 549 So. 2d 1374, 1379 (Fla. Sup. Ct. 1989) (newspaper could not be held liable in tort for publishing confidential child abuse information that it lawfully obtained from government records even though the government should not have disclosed the information); *Medico*, 643 F.2d at 143 ("While *Cox Broadcasting* arose from a news report based on judicial records open to public inspection, the Court's commitment to dissemination of information of interest and value to the public seems just as apposite when . . .

10

the press reports on materials not open for inspection.")  For this reason alone, Plaintiff's complaint should be dismissed.

## II.     PLAINTIFF'S CLAIMS FAIL AS A MATTER OF LAW BECAUSE THE ARTICLE IS PROTECTED BY THE FAIR REPORT PRIVILEGE

Plaintiff's claims must also be dismissed as a matter of law because Defendants' publication of the Article is protected by the fair report privilege, which shields the press from liability for reporting on information in official government proceedings.

### A.     <u>The Fair Report Privilege</u>

This privilege "exists so that the public may be kept informed of the workings of government . . . [t]hat purpose is served . . . when the information brought out in official proceedings is reported." *Ortega v. Post-Newsweek Stations, Florida, Inc.*, 510 So.2d 972, 976 (Fla. 3d DCA 1987).  Accordingly, under Florida law, "[t]he news media has been given a qualified privilege to accurately report on the information they receive from government officials . . . even if the official documents contain erroneous information." *Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502 (Fla. 3d DCA 1993).  New York has codified the privilege, providing that "[a] civil action may not be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative or other official proceeding[.]"  N.Y. Civ. Rights L. § 74 ("Section 74").  *See also Cholowsky v. Civiletti*, 69 A.D.3d 110, 114 (2d Dep't 2009) ("The case law has established a liberal interpretation of the 'fair and true report' standard of Civil Rights Law § 74 so as to provide broad protection to news accounts of judicial or other official proceedings.") (citation omitted).

Florida and New York courts apply the fair report privilege to shield reporting on a wide range of information, including court records.  *See Alan v. Palm Beach Newspapers, Inc.*, 973 So.2d 1177, 1180 (Fla. 4th DCA 2008) (privilege covers arrest warrant, probable cause affidavit, and trial testimony); *Rasmussen v. Collier Cty. Pub. Co.*, 946 So.2d 567 (Fla. 2d DCA 2006) (applying privilege to criminal informations, executive orders, and plea agreements).  *See also Branca v. Mayesh,* 101 A.D.2d 872,873, *aff'd*, 63 N.Y2d 994 (2d Dep't 1984) ("Section 74 protection extends . . . to any pleading made within the course of the [judicial] proceeding.").

Once the fair report privilege attaches, it can be defeated *only* where the challenged report is not "'reasonably accurate and fair'" in describing the contents of government records or information.  *Woodard*, 616 So. 2d at 502 (citations omitted); *Rasmussen*, 946 So. 2d at 570 (privilege applied because publications were "substantially truthful" accounts of public

records); *Jamason v. Palm Beach Newspapers, Inc.*, 450 So. 2d 1130, 1132 (Fla. 4th DCA 1984) (privilege applied to "accurate report of a judicial proceeding"); *Glendora*, 201 A.D.2d at 620 (as long as the report at issue is "fair and true," the Section 74 fair report privilege is "absolute").  In making this determination, "newspaper accounts of legislative or other official proceedings must be accorded some degree of liberality" and must not be "dissected and analyzed with a lexicographer's precision." *Holy Spirit Ass'n for Unification of World Christianity v. N. Y. Times Co.*, 399 N.E.2d 1185, 1187 (N.Y. Ct. App. 1979); *Woodard*, 616 So. 2d at 502-03 (it is unnecessary that the publication at issue "be exact in every immaterial detail or that it conform to the precision demanded in technical or scientific reporting.  It is enough that it conveys to the persons who read it a substantially correct account of the proceedings").

**B.**     **The Fair Report Privilege Applies to The Article at Issue Here**

There can be no dispute that the fair report privilege applies to the Article, which reported on the Supplement, a court filing.  *See Branca*, 101 A.D.2d at 873 (applying privilege to lecture and written material that accurately described complaint and trial transcript); *Rasmussen*, 946 So.2d at 571 (applying fair report privilege where article "accurately described matters of public record").  And here, the Article accurately reports the Supplement's contents: there are *no* material differences between the allegedly defamatory statements in the Article and the contents of the Supplement. (*Compare* FC Dkt. No. 351 with Shullman Decl. Ex. G.)  Broadly speaking, the Supplement alleges that Plaintiff had an affair with a Jane Doe and, after she became pregnant, drugged her with an abortion pill without her knowledge, leading to her hospitalization and the termination of her pregnancy.  (FC Dkt. No. 351 ¶¶ 5-13.)  The Article reports the very same factual allegations, consistently attributing them to the court filings.  (Shullman Decl. Ex. G.)  That should end the lawsuit.

**C.**     **Regardless of Whether the Supplement Was "Sealed," The Fair Report Privilege Applies**

Plaintiff nonetheless makes three arguments to try to avoid the fair report privilege. *First*, Plaintiff attempts to avoid a straightforward application of the fair report privilege altogether by claiming that the Supplement was under seal.  (Compl. ¶¶ 12, 91, 96, 100, 102, 103, 135, 145, 146, 147, 148, 149, 157, 195, 205).  Yet, no sealing order ever issued, and Plaintiff does not allege that any such order exists.  Instead, Plaintiff will no doubt argue that after he filed the Motion to Seal, the Clerk was under an obligation to retroactively treat the Supplement as "confidential" pursuant to Fla. R. Jud. Admin. Rule 2.420(e)(1).  Based on that,

Plaintiff will likely argue that the Supplement was effectively "sealed" as of the date that his Motion to Seal was filed. That is incorrect as a matter of Florida law. On the face of Rule 2.420(e)(1), any interim obligation imposed on the Clerk is readily distinguishable from the import of a sealing order determining confidentiality issued by the court. Such an order may only issue after a hearing has been held, required findings have been made, and the order is made publicly available. Rule 2.420(e)(2)-(4). Yet, the public docket is clear that Plaintiff's Motion to Seal was never granted and no order designating the Supplement confidential or sealed was ever made. In fact, Rule 2.420(e)(1) merely requires that "information that is subject [to a motion to determine confidentiality]" must be treated as confidential *by the Clerk* pending the court's ruling on the motion." *Id.* (emphasis added); *see also Carter v. Conde Nast Publ'ns*, 983 So. 2d 23, 26 (Fla. 5th DCA 2008) (construing Rule 2.420(d)(1)(B), renumbered as 2.420(e)(1), as a mechanism whereby records subject to a sealing motion are treated as confidential by the Clerk "until the court [holds] a hearing to determine if those records [are] entitled to be exempt from public disclosure"). It does not bind the parties in any way.

And any other reading of the statute would be inconsistent with its plain terms and would render the remaining provisions of Rule 2.420(e) superfluous. Rule 2.420(e)(1) requires a clerk to treat the Supplement as "confidential" upon the filing of a motion to seal, but that is necessarily distinguished from an order that complies with the strict requirements of 2.420(e)(2)-(4) – that an order may only issue after a hearing has been held, required findings have been made, and the order is made publicly available within certain limits. Plaintiff's apparent reading of the statute – that a party may permanently restrict public access to court records for all time simply by filing a motion – would render this distinction meaningless. This reading of the statute is incompatible with the "basic rule of statutory construction provid[ing] that the Legislature does not intend to enact useless provisions, and courts should avoid readings that would render part of a statute meaningless." *State v. Goode*, 830 So. 2d 817, 824 (Fla. 2002); *see also Unruh v. State*, 669 So. 2d 242, 245 (Fla. 1996) ("[W]henever possible courts must give full effect to *all* statutory provisions and construe related statutory provisions in harmony with each other.") (citation omitted). It would also render meaningless the established Florida law that "because of the presumption of openness in court proceedings, denial of access may not be based solely upon the wishes of the parties to the litigation." *Rocket Group, LLC v. Jatib*, 114 So. 3d 398, 400-1 (Fla. 4th DCA 2013) (trial court must make a determination of confidentiality

under 2.420(e) even if all parties agree to the sealing) (internal quotations and citations omitted).

Moreover, Plaintiff expressly pleads that Defendants got the Supplement from Delgado. (Compl. ¶ 135.) Even assuming Plaintiff's allegations as true, as Defendants are required to do, Delgado was nonetheless permitted to distribute the Supplement as she saw fit, because Rule 2.420(e)(1), on its face, binds only the Clerk.

But even if the Supplement could be deemed "sealed" – and it clearly was not – the fair report privilege still shields Defendants from liability. Both Florida and New York law extend the protections of the fair report privilege to reporting on sealed or other confidential records. In Florida, there is a strong presumption in favor of public access to court records. *See* Fla. Const. Art. I § 24 ("[E]very person has the right to inspect or copy any public record."); *Smithwick v. Television 12 of Jacksonville, Inc.*, 730 So. 2d 795, 799 (Fla. 1st DCA 1999) (Florida has a "strong public policy in favor of open government"); Fla. Stat. § 1119.01 ("It is the policy of this state that all state, county, and municipal records are open for personal inspection and copying by any person. Providing access to public records is a duty of each agency."); *Florida Freedom Newspapers, Inc., v. Sirmons*, 508 So. 2d 462 (Fla. 1st DCA 1987) ("There is no private litigation in the courts of Florida.").

Consistent with this, Florida courts have extended the fair report privilege to sealed documents. *Ortega v. Post-Newsweek Stations Florida, Inc.* is the leading case in Florida on the application of the fair report privilege to confidential records. 510 So. 2d at 976. In *Ortega*, the defendant broadcaster reported on a Florida Department of Law Enforcement investigation into suspected organized crime, relying in part on the testimony of a FDLE agent before a legislative committee. Neither the agent's public testimony nor the committee record disclosed the names of suspects in the investigation. *Id.* at 974 n.2. Nonetheless, defendant's news report identified the plaintiff as a suspect based on non-public information provided to the reporter by FDLE sources and confidential FDLE documents shown to the committee. The *Ortega* court held that the defendant's news report was "a fair and accurate summary because [it] consisted of information . . . told to him by FDLE personnel from information in the FDLE files *upon which he was entitled to rely*." *Id.* at 976 (emphasis added). In so holding, *Ortega* approvingly cited *Medico v. Time*, in which the Third Circuit applied the fair report privilege to confidential FBI reports and expounded on the importance of the policies underlying the fair report privilege. *Id.* (discussing *Medico*, 643 F.2d 134 (3d Cir. 1981)). Relying on *Cox Broadcasting*, the *Medico*

14

Court emphasized "the First Amendment value of reports that inform the public of the affairs of government and assist the citizenry in its supervisory duties," 643 F.2d at 144, which is equally served by reporting on materials "not open for inspection," *id.* at 143. [9]

In New York, multiple courts have considered the application of the fair report privilege to non-public or confidential documents and information and have uniformly concluded that the privilege does so apply. *See, e.g.*, *Komarov v. Advance Magazine Publishers*, 180 Misc. 2d 658, 660 (Sup. Ct. N.Y. Cty. 1999) (privilege applied to reporting on FBI report that was "not prepared for public consumption"); *Keogh v. N.Y. Herald Tribune, Inc.*, 51 Misc. 2d 888, 891 (Sup. Ct. N.Y. Cty. 1966), *aff'd*, 28 A.D.2d 1209 (1st Dep't 1967) (privilege applies "to fair and true reports of judicial and other proceedings, regardless of whether they are public or nonpublic."); *Freeze Right Refrig. & A.C. Servs. v. City of New York*, 101 A.D.2d 175, 183 (1st Dep't 1984) (privilege applied to report of confidential undercover consumer protection investigation because "the activities of the agency need not be public for the statutory privilege to apply").

And Plaintiff's argument that New York's fair report privilege does not extend to sealed or non-public filings in family court proceedings (Compl. ¶ 156) simply misstates New York law. Plaintiff relies primarily on *Shiles v. News Syndicate Co.*, 27 N.Y.2d 9 (1970), a case that addressed the application of Section 74 to a series of articles reporting on the plaintiff's lawsuit. *Id.* at 11. But *Shiles*, a matrimonial case, is not applicable to the facts here because it deals only and specifically with cases brought under the New York Domestic Relations Law, which expressly "prohibits the taking of copies, or even the inspection, of the records of matrimonial proceedings by any one other than the parties or their counsel." *Id.* at 14 (construing Domestic Relations Law § 235). The holding in *Shiles* therefore hinges on a specific statutory scheme not at issue in this case or in Miller's underlying family court lawsuit.[10] And, indeed, in New York,

---

[9] One Florida court, on readily distinguishable facts, has suggested that it is not clear whether Florida's fair report privilege applies to sealed or confidential records. *See, e.g.*, *Gubarev v. Buzzfeed, Inc.*, No. 1:17-cv-60426-UU (June 2, 2018 Order) (ECF No. 169) ("[A]lthough there is one case [*Ortega*] suggesting that Florida courts might extend the privilege to cover non-public information in some circumstances, it is not clear that confidential or classified materials are protected.") Nonetheless, the holding of *Ortega* is clear and controlling.

[10] The other case on which Plaintiff relies, *Zappin v. Daily News, L.P.*, only serves to underscore that *Shiles* is limited to matrimonial court records subject to Section 235. In *Zappin*, the court rejected the plaintiff's argument that *Shiles* renders Section 74 *per se* inapplicable to reports of

paternity proceedings must be brought in Family Court, where those proceedings are <u>not</u> presumptively closed to the public.  N.Y. Fam. Ct. Act § 115, § 166.  *See also Dorsey*, 973 F.2d at 1435 n.3 (noting that under Section 166, paternity proceedings in New York Family Court are not strictly confidential, and "[a]ccess of non-parties to records and proceedings is left to the discretion of the court").  Put simply, *Shiles* does not limit the application of the fair report privilege to the Article at issue here, even if Plaintiff could show that the Supplement is sealed.[11]

Likewise, Plaintiff's claim that Defendants did not obtain the Supplement from the "actual Court file" (Compl. ¶ 96) is a red herring under both Florida and New York law.  The relevant inquiry is whether the allegedly defamatory statements are contained in a public record to which the fair report privilege applies, not how the journalist obtained the information. *Ortega*, 510 So. 2d at 976 (fact that reporter gathers second-hand information regarding an official proceeding is immaterial to whether fair report privilege applies); *Cholowsky*, 69 A.D.3d at 114 ("[O]nce it is established that the publication is reporting on a judicial proceeding, 'how a reporter gathers his information concerning a judicial proceeding is immaterial provided his [or her] story is a fair and substantially accurate portrayal of the events in question.'").  Where Defendants originally obtained the Supplement is legally irrelevant to the application of the fair report privilege.  The key inquiry is whether Defendants accurately reported on the contents of a court record, which they plainly did.

---

matrimonial proceedings generally and held that the fair report privilege applied to a *Daily News* article reporting on a public evidentiary hearing in plaintiff's divorce proceedings.  2017 WL 3425765, at *9 (S.D.N.Y. Aug. 9, 2017); *see also Zappin v. NYP Holdings, Inc.*, 2018 WL 1474414, at *5 (S.D.N.Y. Mar. 26, 2018) (*Shiles* does not categorically prohibit the application of Section 74 in matrimonial proceedings).

[11] Florida and New York's approach is consistent with the majority of jurisdictions to have considered the issue. *See, e.g., Global Relief Found. v. N.Y. Times Co.*, 390 F.3d 973 (7th Cir. 2004) (applying fair report privilege to FBI confidential investigation; *Dorsey v. Nat'l Enquirer, Inc.*, 973 F.2d 1431, 1435 (9th Cir. 1992) (rejecting argument that privilege cannot apply to closed family court proceedings); *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990) (for purposes of fair report privilege, "it is of no moment" whether the police department investigation at issue "was barred to the public"); *Medico*, 643 F.2d at 144 (privilege applies to FBI reports not released to the public); *Gardner v. Poughkeepsie Newspapers, Inc.*, 68 Misc. 2d 169 (N.Y. Sup. Ct. 1971) (applying privilege to report on sealed records of youthful offender proceedings); *Smith v. Santa Rosa Press Democrat*, No. 11-02411, 39 Media L. Rep. 2709, 2011 WL 500643, at *5 (N.D. Cal. 2011) (that underlying proceedings reported were confidential or otherwise closed to the public does not defeat the application of the privilege).

*Second*, Plaintiff alleges that Defendants "did not independently verify *anything*" contained in the Article and Supplement prior to publication (Compl. ¶ 124), arguing that they "knew that fact-checking would only undermine their story and prevent them from publishing it, so they consciously avoided and refused to gather evidence that would contradict their reporting," (*Id.* ¶ 128; *see also* ¶¶ 124, 127, 128, 132, 133, 136, 141.)  These allegations are simply irrelevant as a matter of law.  The press need not "investigate the accuracy of official statements before reporting on their contents" in order to be protected by the fair report privilege.  *Jeter v. McKeithen*, 2014 WL 4996247, at *2 (N.D. Fla. Oct. 7, 2014); *see also Ortega*, 510 So. 2d at 976 (press has no duty to independently determine accuracy of statements in government records); *Jamason*, 450 So. 2d at 1133 (because privilege applied to statement made during a deposition, defendant "newspaper could have devoted the entire issue to the statement without any effort to neutralize the accusation by giving the accused the opportunity to deny"); *SentosaCare v. Lehman*, 504407/2016, 2018 WL 692568 (Table), at *9 (Sup. Ct. Kings Cty. 2018) (Section 74 "was designed precisely to protect the publisher of a fair and true report for . . . an error and to relieve it of any duty to expose the error through its own investigation") (quoting *Freeze Right*, 101 A.D.2d at 183).  Accordingly, as a matter of law, Defendants had no duty to independently verify the content of a public record and this argument also fails.

*Finally*, Plaintiff quibbles with the accuracy of Defendants' reporting in just one respect, alleging that the Article

> goes beyond the accusations in the Supplement by falsely asserting that "Jane Doe" herself "claims" that Miller surreptitiously dosed her with an abortion pill without her knowledge, "leading to the pregnancy's termination and nearly her death."  ***Jane Doe has never "claimed" that Miller did anything***.

(Compl. ¶ 98) (emphasis in original).  But this argument misrepresents the portion of the Article at issue, which expressly attributes those allegations to court documents and not to Jane Doe herself.  (Shullman Decl. Ex. G) ("Additionally, ***court documents claim***, when the woman found out she was pregnant, Miller dosed her with an abortion pill without her knowledge, leading, the woman claims, to the pregnancy's termination and nearly her death.") (emphasis added).) *See Abkco Music, Inc. v. William Sagan, Norton LLC*, 2016 WL 2642224, at *6 (S.D.N.Y. May 6, 2016) (finding "unpersuasive" the argument that a press release improperly transformed allegations into facts where "the body of the press release repeatedly makes reference to the *filing* of the lawsuit").  Moreover, the Article is entirely consistent with the Supplement itself,

which states: "*[A]ccording to Jane Doe*, Miller visited her at her apartment with a Smoothie beverage . . . [that] contained an abortion pill." (FC Dkt. No. 351 ¶ 9) (emphasis added). Plaintiff's contention that the Article "goes beyond" the Supplement thus manufactures minor inaccuracies that do not exist (or in any event are immaterial). As is clear from the face of the Article, it is a news report that expressly relies on and quotes from the contents of a court record. As such, it is fully protected by the fair report privilege.

## III.   PLAINTIFF'S INVASION OF PRIVACY CLAIM MUST BE DISMISSED

Plaintiff's invasion of privacy claim also fails as a matter of law. New York "[has] no common law of privacy" and does not recognize privacy torts that have been recognized by other jurisdictions. *Howell v. New York Post Co., Inc.*, 612 N.E.2d 669, 703 (N.Y. 1993); *see also Farrow v. Allstate Ins. Co.*, 53 A.D. 3d 563, 564 (2d Dep't 2008) (New York law "does not recognize the common-law tort of invasion of privacy"). Under Florida, law the elements of a public disclosure of private facts claim are: (1) publication, (2) of a private fact, (3) that is offensive, and (4) not of public concern. *See Hitchner*, 549 So. 2d at 1377. The tort hinges on the publication of *truthful* facts that are not a matter of public concern. *See Tyne v. Time Warner Entm't Co.*, 204 F. Supp. 2d 1338, 1344 (M.D. Fla. 2002), *aff'd*, 425 F.3d 1363 (11th Cir. 2005) ("essential element" of public disclosure of private facts is that "facts at issue be true"); *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1103 n.7 (Fla. 2008) (private facts tort requires "the dissemination of *truthful* private information" that reasonable person would find objectionable).

Plaintiff's own pleading on its face negates any private facts claim. Plaintiff alleges that Gizmodo "published private facts about Miller that are alleged in the Supplement which are *untruthful* [.]" (Compl. ¶ 190 (emphasis added).) And, indeed, Plaintiff's claim for defamation is based on the *same facts* as those that form the basis of Plaintiff's invasion of privacy claim. *Compare* Compl. ¶¶ 159-173 (asserting claim for defamation based on Defendants' publication of the Article and its reporting on the Supplement) *with* Compl. ¶¶ 189-201 (asserting claim for invasion of privacy based on Defendants' publication of the allegations in the Supplement). Unfortunately for Plaintiff, he needs the allegations in the Supplement to be false for purposes of his defamation claim, but true for purposes of his privacy claim. He cannot have it both ways, and this dooms Plaintiff's claim.

Plaintiff then attempts to save his private facts claim by asserting that "[a]lthough the allegations in the Supplement about Miller are untrue, Krueger and Gizmodo invaded Miller's

privacy by reporting on and publishing the confidential and sealed Supplement itself – thus revealing publicly the non-public fact that the allegations about Miller had been made and what those allegations were." (Compl. ¶ 191.) This argument fails as well, because, as a matter of constitutional and clearly established Florida law, matters of public record are not actionable in an invasion of privacy claim. *Cox,* 420 U.S. at 491; *Woodard*, 616 So. 2d at 503 ("The right of privacy does not protect against publication of public records and matters of legitimate public interest."); *Heath* 732 F. Supp. at 1148 ("Facts taken from public records or proceedings are not private."). In addition, of course, all of the key allegations in the Supplement were discussed in open court at the September 24 Hearing, further undercutting Plaintiff's claim that these facts were private. (Shullman Decl. Ex. H (FC Dkt. No. 443) at 14:17-24, 16:14-24.) Accordingly, it is clear that the existence and content of the Supplement is not a "non-public fact," as established above.

Finally, even if Plaintiff's privacy claim were based on the publication of truthful private facts, it would fail as a matter of law because Defendants' reporting clearly relates to a matter of public concern. "Under Florida law the publication of facts regarding matters of legitimate public or general interest will not support an invasion of privacy action." *Valentine v. C.B.S., Inc.*, 698 F.2d 430, 432 (11th Cir. 1983). The Florida Supreme Court has recognized that the public concern or "newsworthiness" doctrine is "*so broad as to nearly swallow the tort.*" *Hitchner*, 549 So. 2d at 1377 (emphasis added). *See also Cason v. Baskin*, 20 So. 2d 243, 251 (Fla. 1944) ("The right of privacy does not prohibit the publication of matter which is of legitimate public or general interest . . . the truth may be spoken, written, or printed about all matters of a public nature, as well as matters of a private nature in which the public has a legitimate interest.") There is no question that the allegations against Miller – a former advisor to the current President of the United States and current public commentator on the President – are a matter of public interest. Plaintiff's privacy claim must, therefore, be dismissed.

## IV.   PLAINTIFF'S NON-DEFAMATION CLAIMS ARE DUPLICATIVE AND ARE BARRED UNDER THE SINGLE ACTION RULE

Plaintiff's remaining claims for tortious interference (Count II), intentional infliction of emotional distress (Count III), invasion of privacy (Count IV), and conspiracy (Count V) are barred on their face because they are each premised solely upon the allegedly defamatory statements in the Article.

Under Florida's "single action rule," claims premised on allegedly defamatory statements

must be brought as defamation claims and not as separate tort claims. *See Fridovich v. Fridovich*, 598 So. 2d 65, 69-70 (Fla. 1992) (single cause of action rule precludes interference claims premised upon allegedly defamatory statements); *Ovadia v. Bloom*, 756 So. 2d 137, 140-41 (Fla. 3d DCA 2000) (single action rule "does *not* permit multiple actions to be maintained when they arise from the same publication upon which a failed defamation claim is based"); Even if a plaintiff's defamation claim survives, the single action rule applies to bar tort claims based on the same allegedly defamatory statements. *See Klayman v. Judicial Watch Inc.*, 22 F. Supp. 3d 1240, 1256 (S.D. Fla. 2014) (dismissing tort claims unsupported by facts independent of those giving rise to a defamation claim that survived summary judgment); *Trujillo*, 17 F. Supp. 2d at 1343 (declining to dismiss claim for defamation but applying single action rule to bar intentional infliction of emotional distress claim based on same publication). New York law follows a virtually identical rule, dismissing as duplicative tort claims that are based on the same underlying facts as a defamation claim. *See, e.g.*, *Fleisher v. NYP Holdings, Inc.*, 104 A.D.3d 536, 538-9 (1st Dep't 2013) (claims for prima facie tort and intentional infliction of emotional distressed properly dismissed where "[t]he underlying allegations fall within the ambit of other traditional tort liability, namely, plaintiff's cause of action sounding in defamation"); *Lesesne v. Brimecome*, 918 F. Supp. 2d 221, 224-25 (S.D.N.Y. 2013) (collecting a "plethora of cases in which courts have found that claims brought under the guise of other causes of action actually sound in defamation, even if the plaintiff alleged economic harm").

A key purpose of Florida's single action rule is to ensure that a plaintiff cannot plead around the requirements of defamation law as a way to evade valid affirmative defenses to a defamation claim, like the fair report privilege. *See Fridovich*, 598 So. 2d at 69-70 (a plaintiff cannot "make an end-run around" defamation defenses by "simply renaming the cause of action and repleading the same facts"); *Orlando Sports Stadium, Inc. v. Sentinel Star Co.*, 316 So. 2d 607, 609 (Fla. 4th DCA 1975) ("A contrary result might very well enable plaintiffs in libel to circumvent [defamation defenses] by the simple expedient of re-describing the libel action to fit a different category of intentional wrong"); *Callaway Land & Cattle Co., Inc. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. 4th DCA 2002) ("The rule is designed to prevent plaintiffs from circumventing a valid defense to defamation by recasting essentially the same facts into several causes of action all meant to compensate for the same harm.")

Here, Counts II-V are based on exactly the same set of operative facts as Count I, the

defamation claim. *Compare* Compl. ¶¶ 160, 162 (defamation claim based on the allegation that Defendants "published or caused to be published . . . the statements in the Defamatory Article and Supplement concerning Miller's relationship with and crimes against Jane Doe and her unborn child") *with* Compl. ¶ 176 (tortious interference claim based on Defendants publication of "Defamatory Article and Supplement"); Compl. ¶ 178 (intentional infliction of emotional distress claim based on the allegation "that the false statements in the Defamatory Article and Supplement have directly and proximately caused Miller to suffer significant damages"); Compl. ¶ 190 (invasion of privacy claim based on Defendants publication of "private facts about Miller that are alleged in the Supplement which are untruthful"); Compl. ¶ 205 (conspiracy claim based on the grounds that Defendants "publish[ed] the Defamatory Article and sealed Supplement"). These counts are, therefore, duplicative and barred by the single action rule. *See, e.g.*, *Kinsman v. Winston*, 2015 WL 12839267 (M.D. Fla. Sept. 15, 2015) (dismissing tortious interference count based on allegedly defamatory statements); *Thomas v. Patton*, 34 Media L. Rep. 1188, 1191, 2005 WL 3048033 (Fla. Cir. Ct. 2005), *aff'd* 939 So. 2d at 139 (Fla. 1st DCA 2006) (conspiracy to defame and privacy claims barred by single action rule); *Trujillo*, 17 F. Supp. 2d at 1343 (dismissing intentional infliction claim arising from same publication as defamation claim). *See also Lesesne*, 918 F. Supp. 2d at 224-25.

## CONCLUSION

For the foregoing reasons, Plaintiff's Complaint should be dismissed in its entirety with prejudice.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Defendants respectfully request oral argument on their Motion to Dismiss.  Because the motion raises important First Amendment considerations and issues of law that are dispositive of this case, Defendants believe that the Court's decision-

making process would be significantly aided by oral argument.  Defendants estimate that a total of one hour will be required for argument.

Dated: December 6, 2018

Respectfully submitted,

/s/ *Elizabeth A. McNamara*
Elizabeth A. McNamara
(*pro hac vice* motion forthcoming)
Katherine M. Bolger
(*pro hac vice* motion forthcoming)
Claire K. Leonard
(*pro hac vice* motion forthcoming)
DAVIS WRIGHT TREMAINE
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 489-8230
lizmcnamara@dwt.com
katebolger@dwt.com
claireleonard@dwt.com

/s/ *Deanna K. Shullman*
Deanna K. Shullman (Florida Bar No. 514462)
Rachel Fugate (Florida Bar. No. 144029)
Giselle M. Girones (Florida Bar. No. 124373)
SHULLMAN FUGATE PLLC
2101 Vista Parkway, Suite 4006
West Palm Beach, FL 33411
Telephone: (561) 429-3619
dshullman@shullmanfugate.com
rfugate@shullmanfugate.com
ggirones@shullmanfugate.com

*Attorneys for Defendants Gizmodo Media Group, LLC and Katherine Krueger*

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2018, a true and correct copy of the foregoing has been served by CM/ECF on all counsel or parties of record on the service list.

*/s/Deanna K. Shullman*

Deanna K. Shullman

Florida Bar No. 514462

## SERVICE LIST

*Attorneys for Plaintiff:*

Kenneth G. Turkel, Esq.
kturkel@bajocuva.com
Shane B. Vogt, Esq.
shane.vogt@bajocuva.com
BAJO CUVA COHEN TURKEL
100 N. Tampa Street, Ste. 1900
Tampa, FL 33602
Telephone: (813) 443-2193

*Attorneys for Defendant Will Menaker:*

Charles D. Tobin, Esq.
tobinc@ballardspahr.com
Chad R. Bowman, Esq. (*pro hac vice*)
bowmanchad@ballardspahr.com
Maxwell S. Mishkin, Esq.
(*pro hac vice*)
mishkinm@ballardspahr.com
BALLARD SPAHR LLP
1909 K Street, NW, 12th Floor
Telephone: (202) 661-2218