UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:18-cv-24227-CMA

JASON MILLER,

      Plaintiff,

       v.

GIZMODO MEDIA GROUP, LLC,
a Delaware Corporation, KATHERINE
KRUEGER, individually, and
WILL MENAKER, individually,

      Defendants.

_____/

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
MENAKER'S RENEWED MOTION TO DISMISS [Doc. 70]
<u>AND RENEWED REQUEST FOR LEAVE TO AMEND</u>**

Plaintiff, Jason Miller ("Miller" or "Plaintiff"), by counsel and pursuant to Local Rule 7.1, responds to the Renewed Motion to Dismiss [Doc. 70] filed by Defendant, Will Menaker ("Menaker"), and to the extent necessary based on Menaker's arguments requests leave to amend pursuant to *Bryant v. Dupree*, 252 F.3d 1161 (11th Cir. 2001) and Rule 15 of the Federal Rules of Civil Procedure,[1] and states in support as follows:

## INTRODUCTION

In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 22-23 (1990), the Supreme Court recognized the import role defamation cases play as a check and balance on the incredible power guaranteed under the First Amendment:

> The numerous discussions above establishing First Amendment protection for defendants in defamation actions surely demonstrate the Court's recognition of the Amendment's vital guarantee of free and uninhibited discussion on public issues. But there is also another side to the equation; we have regularly acknowledged the "important social values which underlie the law of defamation," and recognized that "[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation." *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966)…
>
> *****
>
> "The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem. Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored." *Id.* at 92-93 (concurring opinion).

This lawsuit is Miller's only hope for vindication and redress after being falsely branded a "baby killer." Yet, at the outset Menaker asks the Court to deprive Miller of his opportunity to restore his reputation even though no one disputes or will be able to dispute the statement that Miller killed an unborn baby by slipping a woman an abortion pill in a smoothie is untrue. Menaker makes this extraordinary request based on legal arguments that would excuse his tortious conduct even though what he said about Miller is demonstrably false and defamatory.

Menaker chose for personal reasons to inject himself into this lawsuit when he called Miller a "baby killer." He cannot contest personal jurisdiction because his tweet about Miller was published in Florida and harmed Miller, his reputation, and his vested interests in Florida. Menaker

---

[1]  Miller previously moved for leave to amend [Doc. 57] but that request was denied without explanation on January 14, 2019 [Doc. 62], before Menaker re-filed his Motion to Dismiss.

does not dispute his tweet was accessed in Florida and cannot deny his knowledge that his tweet was meant to impact this lawsuit in Florida over his girlfriend's defamatory *per se* publication of the same false criminal accusation about Miller, which emanated from a sealed court filing in Miller's Florida paternity case.

Menaker cannot escape liability on the merits of Miller's claim.  Menaker's tweet was not protected speech on a matter of legitimate public concern.  It was a false and defamatory personal attack posted out of spite and hostility toward Miller that, only in hindsight after being sued, Menaker seeks to disguise as rhetorical hyperbole or an opinion.  Miller plausibly alleges facts that directly or through required inferences set forth the required elements of his defamation claim, including actual malice.  Simply stated, Menaker can and should be held accountable for professing that Miller is indeed the "baby killer" Krueger falsely accused Miller of being.

<u>**Miller's Operative Allegations**</u>

Miller added Menaker to this suit because he voluntarily "join[ed] Krueger's defamatory attack on Miller by tweeting Miller is a "baby killer":



[Doc 5, ¶ 120].  "In the comments on [his] tweet, Menaker revealed his intent to continue to be a mouthpiece against Miller for his close friend, Krueger."  [Doc. 5, ¶ 121]  The defamatory attack Menaker "joined" arose out of a sealed court filing in Miller's Florida paternity case with Arlene Delgado involving their minor son, who lives in Florida.  [Doc. 5, ¶¶ 10, 12, 32]

Miller alleges Menaker's statement that Miller is a 'baby killer' is false and defamatory and was published with actual malice.  [Doc 5, ¶ 122]  In support, Miller pleads Menaker had actual knowledge his statement was false and at a minimum published the statement with reckless disregard for its truth.  [Doc. 5, ¶ 142]  More specifically, Miller alleges how at the time of his defamatory tweet Menaker was aware of Jane Doe's Declaration [Doc. 5-1] confirming the falsity

of Menaker's statement about Miller, and that Jane Doe's declaration is specifically referenced in the *Page Six* article embedded in Menaker's defamatory tweet ("the Page Six article...specifically states that 'Jane Doe gave Miller's lawyers a sworn statement that she...never met Miller, and was never given a poisoned smoothie that caused a miscarriage.'") [Doc. 5, ¶ 143].

Miller further alleges to support actual malice that he was targeted by Gizmodo Defendants' [Doc. 5, ¶¶ 127-130] and Menaker [Doc. 5, ¶¶ 117-118, 142-143] for personal, political, and economic reasons, and because Miller was a prime target for attacks against Trump supporters, which inflame passions and drive readership. Miller specifically alleges Gizmodo Defendants and Menaker were driven by ill-will and hostility toward him. [*Id.* ¶¶ 127, 118] Miller also alleges Menaker and Krueger "appear to be close friends" [Doc. 5, ¶ 17] and that, on September 22, 2018, Menaker tweeted, "Have a smoothie on me Jason!" after reports surfaced about Miller departing CNN due to Krueger's Article. [Doc. 5, ¶ 119]

Miller alleges this Court has personal jurisdiction over Menaker under § 48.193, Florida Statutes, and the Due Process Clause because Menaker directly or in concert with an agent or co-conspirator committed tortious acts in Florida and committed intentional torts expressly aimed at Florida, effects of which were suffered in Florida. [Doc. 5, ¶ 35]

### Menaker is Subject to Personal Jurisdiction Inquiry in Florida

To establish personal jurisdiction over a non-resident defendant, "the plaintiff must allege sufficient facts to 'support a reasonable inference that the defendant can be subjected to jurisdiction within the state.'" *American Collegiate Financial Servs., Inc. v. Cology, Inc.*, 2007 WL 2412939, *2 (M.D. Fla. Aug. 21, 2007) (citing *Bracewell v. Nicholson Air Servs., Inc.*, 680 F.2d 103, 104 (11th Cir. 1982); *Future Tech Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000)). "However, Plaintiff is not required to plead detailed factual allegations in the complaint. That is to say, 'the pleading of a long-arm jurisdiction is not an exercise in detailed factual allegations... [P]leading the basis for long-arm jurisdiction is essentially 'notice' pleading.'" *Id.* (citing *McCarter v. Bigfoot Indus., Inc.*, 805 So.2d 1028, 1032 (Fla. 4th DCA 2001); *Coca-Cola Foods v. Empresa Comercial Internacional De Frutas, S.A.*, 941 F.Supp. 1175, 1178 (M.D. Fla. 1996)). "In a diversity action, a plaintiff may seek to obtain jurisdiction over a non-resident defendant by pleading the basis for service in the language of the applicable state statute; *it is not necessary to plead the supporting facts.*" *Empressa Comercial*, 941 F.Supp. at 1178 (citations omitted) (emphasis added).

Once the plaintiff meets its burden (as Miller did here),[2] the burden shifts to the defendant. *Cology, Inc.*, 2007 WL 2412939 at *3. "By itself, the filing of a motion to dismiss on grounds of lack of jurisdiction over the person does nothing more than raise the legal sufficiency of the pleadings. A defendant wishing to contest the allegations of the complaint concerning jurisdiction or to raise a contention of minimum contacts must file affidavits in support of his position. The burden is then placed upon the plaintiff to prove by affidavit the basis upon which jurisdiction may be obtained." *Venetian Salami Co. v. Parthemais*, 554 So.2d 499, 502-03 (Fla. 1989)

In his Declaration filed in support of his Motion to Dismiss [Doc. 30-1], Menaker denies general contacts with Florida but does not deny posting his tweet, committing a tort within Florida, nor committing an intentional tort expressly aimed at Florida. On its face, Manaker's Motion to Dismiss is facially insufficient because it fails to refute Miller's specific personal jurisdictional allegations. Consequently, Menaker's motion should be denied. *Intego Software, LLC v. Concept Dev., Inc.*, 198 So.3d 887, 893 (Fla. 1st DCA 2016). Regardless, Menaker's motion still fails because Miller submitted evidence to substantiate the personal jurisdiction allegations in the FAC.

For purposes of specific jurisdiction under Florida's longarm statute in a defamation action, "[w]hen [an Internet] posting is… accessed by a third-party in Florida, the material has been 'published' in Florida, and the poster has communicated the material 'into' Florida, thereby committing the tortious act of defamation within Florida." *Catalyst Pharmaceuticals*, 2017 WL 6558397, *6 (quoting *Internet Solutions Corp. v. Marshall*, 39 So.3d 1201, 1215 (Fla. 2010)). "The pivotal issue for the Court's determination then, is whether the information was accessed, and thereby published, in Florida." *Id.* Here, it was.

Miller submitted evidence demonstrating third-parties accessed Menaker's defamatory tweet in Florida. Specifically, Miller filed the Declaration of Erik Zimmerman [Doc. 57-1]

---

[2] Here, Miller's FAC satisfies his pleading burden. Miller alleges Menaker "committed tortious acts within Florida" [Doc. 5, ¶ 35(a)] (which tracks the language of § 48.193(1)(a)(2), Florida Statutes) and alleges Menaker "committed intentional torts expressly aimed at Florida, effects of which were suffered in Florida" [Doc. 5, ¶ 35(b)] (which sets forth sufficient ultimate facts to establish minimum contacts under the Due Process Clause). Although not necessary to meet his initial burden, Miller further alleges facts concerning this lawsuit, his minor son, and his paternity case in Florida, from which an inference can be drawn that effects of Menaker's tweet were felt in Florida. Thus, the burden shifted to Menaker to make a prima facie showing that jurisdiction does not exist. *Catalyst Pharmaceuticals, Inc. v. Fullerton*, 2017 WL 6558397, *3 (S.D. Fla. Aug. 8, 2017).

attesting that at least three of Menaker's Florida Twitter followers accessed his defamatory tweet. [Doc. 57-7, ¶¶ 6-11)  A defendant's "electronic" communications into Florida may form the basis for personal jurisdiction… if the alleged cause of action arises from the communication." *Hongjin Sui v. Wu*, 2011 WL 1396994, *3 (M.D. Fla. Apr. 13, 2011) (citing *Acquardo v. Bergeron*, 851 So.2d 665, 670-71 (Fla. 2003)).  Miller's claim against Menaker arises from his electronic communication, published with malice and an intent to harm Miller in Florida, even though Miller is not a resident of Florida.  "Intentional, tortious conduct (which caused harm in Florida) provides a sufficient basis for asserting jurisdiction under the longarm statute." *Id.* at *4.

Menaker's intentional misconduct also is sufficient to satisfy due process and minimum contacts.  "[P]ersonal jurisdiction over defendants may be based on the 'effects' of their conduct." *Hongjin Sui*, 2011 WL 1396994 at *5 (*citing Vision Media TV Group, LLC v. Forte*, 724 F.Supp.2d 1260, 1265 (S.D. Fla. 2010) (*citing Calder v. Jones*, 465 U.S. 783, 789 (1984)).  "Jurisdiction may be constitutionally asserted over the nonresident defendant whenever he by his own purposeful conduct created a 'substantial connection' with the forum state.  The Court made clear, however, that '[s]o long as it creates a 'substantial connection' with the forum, ***even a single act*** can support jurisdiction." *Licciardello v. Lovelady*, 544 F.3d 1280, 1285 (11th Cir. 2008) (emphasis added). "Intentional torts are such acts, and may support the exercise of personal jurisdiction over the nonresident defendant who has no other contacts with the forum." *Id.*  "Accordingly, if a 'defendant's tortious conduct is intentionally and purposefully directed at a resident of the forum, the minimum contacts requirement is met, and the defendant should anticipate being haled into court in that forum.'" *Hongjin Sui*, 2011 WL 1396994 at *5 (citations omitted).

Here, like in *Hongjin Sui*,[3] although Miller is not a "resident" of Florida he possesses a reputation in Florida and has vested interests and rights in Florida (this lawsuit, his paternity case, his son, and his parental rights).  [Miller 2/7/19 Declaration, *See* **Exhibit 1**, ¶¶ 3, 5-6, 9]  Menaker's

---

[3] Miller recognizes Magistrate Goodman's decision in *Vorbe v. Morisseau*, 2014 WL 12637924 (S.D. Fla. Aug. 27, 2014), discussed *Hongjin Sui* and concluded "obtaining jurisdiction over a nonresident defendant in a defamation case involving publication on a website *likely* requires that the plaintiff be a Florida resident or a Florida company."  *Id.* at *4, n. 1 (emphasis added). However, Miller's substantial connections to Florida that were harmed by Menaker's intentional misconduct more closely align with the facts in *Hongjin Sui*.  In *Catalyst Pharmaceuticals*, Her Honor also discussed *Hongjin Sui*, as well as *Howard v. Nano*, 2012 WL 3668045 (N.D. Fla. Aug. 25, 2012)), in recognizing that communications actually accessed in Florida coupled with an injury in this state permit a finding of personal jurisdiction.  2017 WL 6558397, *8, n. 5.

alleged intentional, tortious conduct was purposefully directed at Miller with knowledge of Miller's interests in Florida and caused injury in Florida, such that Menaker's "minimum contacts" are established. *Id.*

In an intentional tort case, there are two applicable tests for determining whether purposeful availment occurred. *Louis Vuitton Malletier v. Mosseri*, 736 F.3d 1339, 1356 (11th Cir. 2013). The Court may apply the Calder "effects test" and/or the traditional minimum contacts test set forth in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770.

Under the "effects test," a single tortious act can establish purposeful availment without regard to other contacts with the forum state. *Louis Vuitton*, 736 F.3d at 1356. This occurs when the tort:  "(1) [was] intentional; (2) [was] aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state." *Id.* Personal jurisdiction is proper under the Calder "effects test" where a defamatory publication is "expressly aimed" at the forum state, "which impels the conclusion that the defendant reasonably anticipated being haled into court there." *Alternate Energy Corp. v. Redstone*, 328 F.Supp.2d 1379, 1383 (S.D. Fla. 2004) (citing *Calder*, 465 U.S. at 789).  The rationale is that the "reputation-based 'effects' of the alleged libel connected the defendants to [the forum], not just to the plaintiff." *Walden v. Fiore*, 571 U.S. 277, 287 (2014).  "[T]he kind of foreseeability critical to the proper exercise of personal jurisdiction is *not* the ability to see that the acts of third persons may affect the forum, but rather that the defendant's own purposeful acts will have some effect on the forum." *Madara v. Hall*, 916 F.2d 1510, 1517 (11th Cir. 1990).  Stated another way, jurisdiction is proper because Florida was "the focal point of both [Menaker's tweet] and the harm suffered." *Sovereign Offshore, LLC v. Shames*, 2017 WL 7798664, *3 (S.D. Fla. Aug. 3, 2017)

Menaker is not a defendant who passively operated an online billboard accessible across the United States.  It is undisputed Menaker intentionally published his defamatory tweet to followers including third-parties in Florida.  Beyond that, his tweet made a defamatory *per se* statement about Miller which Menaker knew could "complicate [this] lawsuit" [Doc. 57-2] arising out of a defamatory accusation in a sealed court filing in Miller's Florida paternity case.  The focal point of the subject matter of the tweet is Florida.  Accordingly, this case involves even stronger minimum contacts than those at issue in *Keeton*, where the Supreme Court found the monthly circulation of a magazine in New Hampshire sufficient to support personal jurisdiction even though the plaintiff was a resident of New York and defendant was an Ohio corporation.  465 U.S.

at 772.  In fact, jurisdiction is proper even where "the bulk of the harm done to petitioner occurred outside [the forum]." *Id.* at 780; *see also Gubarev v. Buzzfeed, Inc.*, 235 F.Supp.3d 1149, 1161 (S.D. Fla. 2017).

When analyzing personal jurisdiction over a defendant in a case involving social media posts, the plaintiff should provide the residence of the posts' audience.  *Boddy v. Pourciau*, 2018 WL 4637380, \*7 (W.D. Wash. Sept. 27, 2018).  Moreover, the plaintiff should show "the tweet's audience, *coupled with other case-related facts*, reveals that Defendants expressly aimed their tweets at [the forum]." *Id.* (emphasis added).  Here, Miller has shown Menaker's audience included at least 200 followers in Florida [Doc. 57-7, ¶ 6], as well as other case-related facts demonstrating Menaker expressly aimed his tweet here.  At the time of his tweet, Menaker knew this lawsuit and Miller's paternity case were pending in Florida (*see* Doc. 57-6, Int. Nos. 5-7), and Menaker and Krueger, who at the time of the tweet was already a defendant in this lawsuit, worked in concert with one another to defame Miller for personal reasons despite Menaker's recognition his defamatory tweet could impact this lawsuit in Florida (***"…or should I not identify you as my gf?  Would that complicate the lawsuit?"***).  (*See* Doc. 57-2)

Once a plaintiff shows the defendant purposely directed activities toward the forum state (as Miller did here), the defendant has the burden to present a "compelling case" that other considerations make the exercise of personal jurisdiction unreasonable; absent which "the Court need not delve into the consideration of other factors, as the exercise of jurisdiction will comport with 'traditional notions of fair play and substantial justice.'"  *Interlink Group Prof. Srvs., Inc. v. ClearOne, Inc.*, 2017 WL 10187646, \*7 (S.D. Fla. Oct. 11, 2017) (citing *Burger King Corp.*, 471 U.S. at 477-78; *Int'l* Shoe, 326 U.S. at 320).[4]  Here, Menaker has not made his required showing. He devotes just one paragraph of his motion (p. 10) to this issue, and failed to offer any evidence of his finances or any other limitations on him to show that he would be burdened by having to litigate the case in Florida.  *Louis Vuitton*, 736 F.3d at 1359.  Moreover, "modern methods of transportation and communication reduce [the burden of litigating in a foreign jurisdiction]

---

[4]  The defendant contesting jurisdiction bears the burden and "must make a 'compelling case' that the exercise of personal jurisdiction would violate traditional notions of fair play and substantial justice."  *Louis Vuitton*, 736 F.3d at 1356 (citing *Diamond Crystal Brands, Inc. v. Food Movers Int'l., Inc.*, 593 F.3d 1249, 1267 (11th Cir. 2010).

significantly." *Cology, Inc.*, 2007 WL 2412939 at *5 (citing *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 259 (11th Cir. 1996)).

Regardless, the exercise of jurisdiction over Menaker comports with fair play and substantial justice, based upon:  (1) the burden on the defendant; (2) the forum's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; and (4) the judicial system's interest in resolving the dispute. *Lovelady*, 544 F.3d at 1288.  Florida has strong interests in preventing the publication of defamatory materials in this state and protecting its residents  as well as litigants in its courts.  Miller's interest in obtaining complete and effective relief supports jurisdiction in Florida because Miller should not have to litigate defamation claims arising out of the same false accusation in two forums and cases in the Southern District of Florida reach trial in half the time of cases in the Southern District of New York. *Gubarev*, 253 F.Supp.3d at 1162.

Miller set forth an uncontested factual basis to support jurisdiction based on the location of Menaker's Twitter followers who accessed his defamatory tweet and other case-related facts demonstrating Menaker expressly aimed his tweet at Florida and thus reasonably could anticipate being haled into court here.  Simply stated, Menaker chose to subject himself to jurisdiction in Florida by posting a defamatory tweet about Miller in the context of this lawsuit and Miller's paternity case pending in Florida, which involves Miller's minor son and parental rights in Florida, thus harming Miller in Florida.

### Menaker's Tweet is Not Protected Speech

Menaker's attempt to shroud his defamatory tweet as protected speech fails for two reasons.  First, Menaker's tweet was a personal, private attack that is not protected by the First Amendment.  Second, Menaker's tweet was not rhetorical hyperbole or a statement of unactionable opinion; it was a false statement of objectively verifiable fact.

**A.    Personal Attacks are not Protected by the First Amendment**

The Supreme Court recognizes that speech concerning a personal dispute cannot be disguised as speech about matters of legitimate public concern to be shielded from liability. *Connick v. Myers*, 461 U.S. 138, 148 (1983).  Where the circumstances surrounding a defamatory statement are alleged to show the statement was uttered as a personal attack and that a defendant's claimed commentary on public matters was merely contrived to try to insulate speech on a private matter from liability, there is no First Amendment protection. *Snyder v. Phelps*, 562 U.S. 443, 455

(2011). Speech uttered incident to a personal dispute simply is not constitutionally protected. *Connick*, 461 U.S. at 148, 153-54. As the majority opinion states in *Snyder*, 562 U.S. at 452, "[w]here matters of purely private significance are at issue, First Amendment protections are often less rigorous… because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest." *Id.*[5]

The personal nature of Menaker's tweet is similar to the speech addressed in *Gersh v. Anglin*, 2018 WL 5962480, *4 (D. Mont. Nov. 14, 2018). Like the plaintiff in *Gersh*, Miller makes a plausible claim Menaker's speech involved a matter of strictly private concern, and that Menaker's speech on public matters [if any] was intended to mask an attack over a private matter. "Unlike in *Snyder*, here there is a suggestion that 'speech on public matters was intended to mask an attack… over a private matter." *Id.* (citing *Snyder*, 562 U.S. at 455).

The Court should reject any effort by Menaker to conflate the concept that First Amendment protection can extend even "to speech that is patently offensive and is intended to inflict emotional injury" on a matter of *public* concern (*i.e., Hustler*, 485 U.S. at 50) with the concept that personal, private attacks are not protected speech. *Hustler* did not involve a "speech on public matters [that] was intended to mask an attack… over a private matter." *Gersh*, 2018 WL 5962480, *4. More importantly, *Hustler* explicitly exempts false statements of facts – which this case involves – from its holding because they "are particularly valueless; they interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective." 485 U.S. at 52.

## B.   Menaker's Tweet Is Not Rhetorical Hyperbole or Opinion

Menaker's assertion that his tweet is constitutionally protected rhetorical hyperbole or opinion does not hold water. The cases Menaker cites defeat his own arguments. Menaker sets the stage by citing to *Milkovich*, which when read in detail dispenses any notion Menaker's tweet

---

[5] Long ago, the Supreme Court recognized that words may "by their very utterance inflict injury" and that the First Amendment does not shield utterances that form "no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942); *see also Cantwell v. Connecticut*, 310 U.S. 296, 310 (1940) ("[P]ersonal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution.").

is protected speech. *Milkovich* recognizes that *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), did not create a "wholesale defamation exemption for anything that might be labeled 'opinion'" because "it would also ignore the fact that expressions of 'opinion' may often imply an assertion of objective fact." 497 U.S. at 18; *see also Moldea v. New York Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994).[6]

In *Milkovich*, the Supreme Court relied on *Cianci v. New Times Publishing Co.,* 639 F.2d 54 (2d Cir. 1980), in discussing how statements such as the one published by Menaker are actionable:

> If a speaker says, "In my opinion John Jones is a liar," he implies knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speakers states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications.; and the statement "in my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think'." *Cianci*, supra, at 64. It is worthy of note that at common law, even the privilege of fair comment did not extend to "a false statement of fact, whether it was expressly stated or implied from an expression of opinion." Restatement (Second) of Torts. § 566, Comment a (1977).
> 497 U.S. at 18-19.

Menaker's decision to surround his false assertion of fact about Miller with personal attacks ("rat faced" and "homunculus") and the word "cool!" is no different than trying to add "in my opinion" to his tweet – which the Supreme Court considers meaningless.[7]

---

[6] "As we stated in our initial opinion, the Supreme Court's decision in *Milkovich* and this court's decision in *White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990), make clear that there is no wholesale exemption from liability in defamation for statements of 'opinion.' Instead, statements if opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false."

[7] The requirement that actionable defamatory statements must reasonably be interpreted as stating actual facts "provides assurance that public debate will not suffer for lack of 'imaginative expression' or 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Id.* at 20 (*citing Hustler*, 485 U.S. at 53-55). That requirement, along with the actual malice requirement set forth in *Sullivan*, 376 U.S. 254, and the enhanced appellate review required under *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984), provide

Menaker's tweet is not the "imaginative expression" and "rhetorical hyperbole" at issue in *Hustler*. *Hustler's* parody stating Rev. Falwell had sex with his mother in an outhouse to convey the opinion that Falwell was a hypocrite is incomparable to Menaker's purely factual statement Miller is a "baby killer" in the context of a lawsuit over the falsity of that very statement. 485 U.S. at 50. *Hustler* created *fictional*[8] events as a means to artistcly express an opinion; whereas Menaker doubled-down on the existing false and defamatory statement that Miller killed an unborn child by slipping a woman an abortion pill.

Notably, in *Milkovich*, the Supreme Court reversed the dismissal of a defamation claim based on statements that a public figure perjured himself. *Id.* at 21-22. The language at issue (like here) was "not the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that petitioner committed the crime of perjury ["Anyone who attended the meet … knows in his heart that Milkovich … lied at the hearing."]. Committing the crime of perjury (much like the crime of killing a baby) "is sufficiently factual to be susceptible of being proved true or false…[because]…[it] can be made on a core of objective evidence…" *Id.* "Unlike a subjective assertion the averred defamatory language is an articulation of an objectively verifiable event." *Id.* at 22.

The Supreme Court's reliance on *Cianci* in *Milkovich* is significant because it shows the import of a false accusation of criminal conduct. In *Cianci*, the plaintiff sued for defamation over a "statement that [he] raped [a woman] at gunpoint twelve years ago and then paid her in an effort to obstruct justice…" 639 F.2d at 63. The article publishing those allegedly false and defamatory accusations was held actionable because the accusations were "reasonably susceptible of a defamatory connotation" for two reasons: "it contained explicit statements and fair implications by the writer which could be considered defamatory, and it also republished defamatory statements by others, for which a defendant, unless protected by a privilege, is as liable as if he had made the statements himself." 639 F.2d at 60. Like the defendant in *Cianci*, Menaker rests his defense upon

---

adequate protection under the Constitution such that a separate constitutional privilege for opinion is not necessary to ensure the freedom of expression guaranteed by the First Amendment. *Milkovich*, 497 U.S. at 21. The dispositive question is whether a reasonable factfinder could conclude that the statement Menaker made about Miller can reasonably be interpreted as stating actual facts. *Id.*

[8] In fact, a jury determined Hustler's parody ad "was not reasonably believable" when it rejected Falwell's defamation claim. Id. at 57.

the protection of opinions in the "marketplace of ideas," but he too ignores that the exchange of information the First Amendment guarantees does not extend to statements such as a false criminal charge: "there is no constitutional value in false statements of fact." 639 F.2d at 61 (*discussing Gertz*). *Cianci* also distinguished cases upon which Menaker heavily relies (*Greenbelt Cooperative Pul'g Ass'n v. Bresler*, 398 U.S. 6 (1974) and *Letter Carriers v. Austin*, 418 U.S. 264 (1974)) because those cases involved phrases ("blackmailing" and "scab" and "traitor") used as "no more than rhetorical hyperbole, a vigorous epitet" in a "loose, figurative sense," and "a lusty and imaginative expression of the contempt felt by union members to those who refuse to join." *Id.* at 62. Such statements are different than Menaker's:

> [W]hen an "opinion" is something more than a generally derogatory remark ***but is laden with factual content, such as charging the commission of serious crimes, the First Amendment confers no absolute immunity***, as distinguished from the qualified protection afforded by Sullivan in the case of public figures.

*Id.* at 63 (emphasis added). *Cianci* hammered home the significance of false criminal accusations by citing to *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 397 (1977), which held that while passages of a book charging a judge with incompetence and advocating for the judge's removal were protected as opinion, a charge of judicial corruption was not:

> ***Accusations of criminal activity, even in the form of opinion, are not constitutionally protected…***While inquiry into motivation is within the scope of absolute privilege, outright charges of illegal conduct. If false, are protected solely by the actual malice test…there is a critical distinction between opinions which attribute improper motives to a public officer and accusations, in whatever form, that an individual has committed a crime or is personally dishonest. No First Amendment protection unfolds false charges of criminal behavior. (citations omitted).

639 F.2d at 63 (emphasis added).[9]

---

[9] This same principle is acknowledged in *Moldea*: "but an accusation of criminal conduct is classic libel, and so *Milkovich* did not even pause to assess the effect that the column's context may have had on those who read it." 22 F.3d at 314. This is not to say context is irrelevant, but context can (and should) be "discounted" when a case (like this one) involves a direct accusation of criminal misconduct. *Id.* ("*Milkovich* did not disavow the importance of context, but simply 'discounted it in the circumstances of that case.'" *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 729 n.9 (1st Cir. 1992)). The reason for this is simple: "It would be destructive of the law of libel if a writer could escape liability for accusations of crime simply by using, ***explicitly or implicitly***, the words 'I think.'" *Id.* at 64 (emphasis added).

Thus, even when made as part of an "opinion," false charges of crimes remain actionable:

> It is clear from the foregoing that even if the article were to be read as only expressing the "opinion" that Cianci committed the crimes of rape and obstruction of justice, it is not absolutely protected as distinguished from the protection afforded by *Sullivan*. The charges of rape and obstruction of justice were not employed in a 'loose, figurative sense" or as "rhetorical hyperbole." A jury could find that the effect of the article was not simply to convey the idea that Cianci was a bad man unworthy of the confidence of voters of Providence but rather to produce a specific image of depraved conduct committing rape with the aid of trickery, drugs and threats of death or serious injury, and the scuttling of a well-founded criminal charge by buying off the victim. Such serious charges have not yet become "undefined slogans that are part of the conventional give-and-take in our economic and political controversies." *Cafeteria Union v. Angelos*, 320 U.S. 293, 295 (1943). To call such charges merely an expression of "opinion" would be to indulge in a Humpty-Dumpty's use of language. We see not the slightest indication that the Supreme Court or this court ever intended anything of the sort and much to demonstrate to the contrary.

639 F.2d at 64.

*Cianci* also dispels Menaker's argument that the link to the *Page Six* article in his tweet somehow absolves him of liability. "While the disclosure of factual background may indicate whether a particular word constituted a direct charge of crime or a looser protected opinion, as with 'blackmail' in *Greenbelt* or 'traitor' in *Letter Carriers*, nothing in those cases nor in our own *Buckley* and *Hotchner* decisions suggests that such disclosure would protect as opinion a direct accusation of criminal misconduct." 639 F.2d at 65. "[T]he more recent cases are in accord with the view that charges of specific criminal misconduct are not protected as 'opinions.'" *Id.* at 66.

Menaker relies heavily upon *Keller v. Miami Herald Pub. Co.*, 728 F.2d 771 (11th Cir. 1985), but that case involved a cartoon – which "[o]ne cannot reasonably interpret… as literally depicting an actual event or situation." 778 F.2d at 716. Menaker's tweet is not analogous to a cartoon. Another Florida case cited by Menaker, *Florida Medical Center, Inc. v. New York Post Co., Inc.*, 568 So.2d 454, 456-57 (Fla. 4th DCA 1990), cites to *Milkovoich* and *Cianci* in its discussion of the difference between "pure opinion" and "mixed opinion."[10] "Pure opinion is

---

[10] In *Florida Medical*, the appellate court recognized *Milkovich* "rejected any artificial dichotomy between opinion and fact" when it reversed the dismissal[10] of a defamation claim. *Id.* While the court agreed that "in the context of the article" a statement that doctors and hospital administrators

based on facts that the communicator sets forth in a publication, or that are otherwise known or available to the reader or the listener as a member of the public. Mixed opinion is based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication." 568 So.2d at 457. "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis of the opinion. *Id.* at 458 (*citing Cianci*, 639 F.2d 54, 65). ***"However, that rule does not relieve the writer from being subject to suit if the disclosed facts upon which he basis his opinion are defamatory and false, even though there is no suggestion or implication that the writer is relying on undisclosed facts."*** *Id.* (emphasis added).

Menaker also relies heavily on the publication of his statement on Twitter to suggest that its forum automatically protects it as hyperbole or opinion. In support, he relies on cases involving defamation claims based on tweets by President Trump and cases generally discussing the "freewheeling" nature of Twitter and online forums. But this argument misses the mark. The context of defamatory statements, be it Twitter or television, requires a more detailed analysis than the forum standing alone.

For example, *Horsley v. Rivera* (cited by Menaker) involved a defamation claim against Geraldo Rivera based on his statement during a length TV interview that the plaintiff was an "accomplice to homicide," which the plaintiff maintained "accused [him] of a felony." 292 F.3d 695, 701 (11th Cir. 2002). However, the devil is in the details Menaker omits. Rivera's statement was part of a much longer debate with the plaintiff that the Eleventh Circuit described as "a dialogue at a non-literal level" and "an emotional debate on a highly sensitive topic [anti-abortion activist tactics]." *Id.* at 698-700, 702. In full, Rivera's challenged statement read "But in listing these people's names and their addresses and Social Security number, what you are doing, *in my opinion*, is aiding and abetting a homicide," in response to which the plaintiff replied "Well, *you're*

---

conspired to "rob the insurance company" was not tantamount to an accusation that the hospital committed the crime of robbery, it still found the statement actionable because it accused the hospital of dishonesty in connection with its billing system and business. *Id.* at 459. The court analogized the situation to *Palm Beach Newspapers, Inc. v. Early*, 334 So.2d 50, 52 (Fla. 4th DCA 1976), *cert. denied*, 354 So.2d 351 (Fla. 1977), which held that "[a] charge of cheating or stealing, if false and made with knowledge of such falsity or with reckless disregard for the truth thereof, would certainly be beyond the constitutional privilege established by the [*Sullivan*] standard." *Id.* at 460.

*entitled to your opinion…*" *Id.* at 698 (emphasis added).[11]  The plaintiff and Rivera "were engaged in an emotional debate concerning emotionally-charged issues of significant public concern [and both] used non-literal, figurative language expressing their views." *Id.*

Here, Menaker and Miller were not involved in an emotionally-charged debate over issues of significant public concern.  Miller and Menaker were not involved in any debate.  Menaker just launched an unsolicited personal attack on Miller in which, after making derogatory comments about Miller's personal appearance, Menaker publicly professed Miller was a baby killer—a false statement of fact that directly tied to and reinforced the same false charge published by Menaker's girlfriend, Krueger.

Where there is rhetorical hyperbole, the language itself "negates the impression that the writer was seriously maintaining that [the plaintiff] committed the [act described]." *Presley v. Graham*, 936 F.Supp.2d 1316, 1325 (M.D. Ala. 2013 (*distinguishing Horsley* in finding the statement the plaintiff was a "supervisor's nightmare" actionable, even if it amounted to an opinion).  There is nothing in Menaker's tweet that negates the impression he was seriously maintaining Miller killed a baby as reported by Krueger.  To the contrary, the context of Menaker's tweet—calling Miller a baby killer to defend his girlfriend and speak on her behalf after she was sued for falsely accusing Miller of killing a baby—suggests Menaker was indeed confirming as a matter of fact that Miller killed a baby.

Menaker's reliance on *Levin v. McPhee*, 119 F.3d 189 (2d Cir. 1997), also is misplaced. *Levin* involved a situation where publications expressed opinions the plaintiff could be a murderer, but "the statements implicating [the plaintiff] in a murder appear among conflicting and speculative versions of an unresolved mystery reflects only that a ***jury issue exists*** as to how "the words were likely to be understood by the ordinary and average reader.'" *Id.* at 195 (emphasis added).  Moreover, "[b]oth the book and article emphasize that the facts underlying the [murder] remain unknown, and a reasonable reader would understand that any allegations of murder, especially any implicating [plaintiff], are nothing more than conjecture and rumor."  Here,

---

[11] Based on that dialogue and the entirety of the exchange as a whole, the Eleventh Circuit concluded a reasonable viewer would have understood Rivera's comments merely as expressing his belief the plaintiff shared in the moral culpability of the death of an abortion doctor, not as a literal assertion that the plaintiff had, by his actions, committed a felony; a conclusion bolstered by the fact the plaintiff himself acknowledged that he understood Rivera to be speaking in a figurative rather than literal sense as soon as Rivera's statement was made.  *Id.* at 702.

Menaker's tweet does not emphasize competing versions of events. It does not even mention them. Menaker's tweet plainly states Miller is a baby killer, which does no more than adopt and reinforce the same false version of events published by Menaker's girlfriend.

This case is more akin to the facts in *Friedman v. Bloomberg, L.P.*, 884 F.3d 83, 97 (2d Cir 2017), which reversed the dismissal of a defamation claim involving the word "extort." In reaching its decision, the Second Circuit discussed the different contexts in which words such as "extort" could be used, some of which could render the term rhetorical hyperbole, but recognized that its use in that case was in fact meant to convey the plaintiff had committed the crime of extortion. *Id.* at 96-97. Similarly, in *Sterm v. O'Quinn*, 2008 WL 11401794 (S.D. Fla. Aug. 8, 2008), this District denied a motion to dismiss a defamation claim based on the accusation the plaintiff was a murderer and rejected the same arguments Menaker makes regarding rhetorical hyperbole and opinion in the context of "tabloid television," a forum comparably "freewheeling" to Twitter.

The two cases Menaker cites involving President Trump are inapposite. *Clifford v. Trump*, 339 F.Supp.3d 915 (C.D. Cal. 2018) and *Jacobus v. Trump*, 55 Misc.3d 470 (2017), both rely on the political nature of the President's tweets and primarily the fact that they were defensive in nature to support the ruling they were non-actionable rhetorical hyperbole. The situation in this case is much different: Menaker is the attacker.

In *Clifford*, a California District Court recognized President Trump "issued the tweet in the context of Plaintiff presenting herself as a political adversary to the President" and "made a hyperbolic statement against a person who had sought to publicly present herself as a political adversary to him." 339 F.Supp.3d at *8. Because the President was responding to an attack by Clifford, the Court considered his tweet a "public rejoinder to the allegations made by [Clifford]," such that preventing the President from "engaging in this type of 'rhetorical hyperbole' against a political adversary…would significantly hamper the office of the President:

> In short, should Plaintiff publicly voice her opinions about Mr. Trump, Mr. Trump is entitled to publicly voice non-actionable opinions about Plaintiff. To allow Plaintiff to proceed with her defamation action would, in effect, permit Plaintiff to make public allegations against the President without giving him the opportunity to respond. Such a holding would violate the First Amendment.

339 F.Supp.3d at *8.

*Jacobus* reached the same conclusion.  There, a New York court found tweets by President Trump (which refereed to the plaintiff as a "real dummy," "real dumb," and having "begged" for a job) to be non-actionable rhetorical hyperbole[12] in a situation where, like *Clifford*, the President responded to an attack first launched by the plaintiff.  55 Misc.3d at 473.  The court recognized that "statements advanced during the course of a heated public debate, during which an audience would reasonably anticipate the use of 'epithets, fiery rhetoric or hyperbole,' are not actionable." *Id.* at 475.

In deciding whether the President's chosen words have a precise, readily understood meaning, the *Jacobus* court discussed how "imprecise" words "are indefinite and ambiguous" and "may mean different things to different people and cannot be proved true or false because of their subjective, relative meanings."  *Id.* at 476-77 (*citations omitted*).  Conversely, calling someone a "whore"—much like calling someone a "baby killer" in the context of accusations that person killed a baby by slipping its mother an abortion pill—have a "sufficiently precise meaning."  *Id.* at 477 (*citation omitted*).

*Jacobus* generally discusses how the culture of the Internet[13] encourages a "freewheeling, anything-goes" writing style and suggests that social media signals the use of "vigorous expressions of personal opinion," but ultimately the decision in that case (just like the decision in

---

[12]  In discussing the difference between facts and opinions, the court noted that "an opinion cannot be proved false" and protected statements of opinion are either accompanied by the facts upon which they are based, or do not imply that they are based on undisclosed facts."  *Id.*  "When a statement of opinion implies that it is based on unstated facts [which Menaker does here by positioning his statement alongside a reference to his "girlfriend" who was being sued for a news article that made the same defamatory criminal accusation] that justify the opinion, the opinion becomes an actionable 'mixed opinion'…'because a reasonable listener or reader would infer that 'the speaker [or writer] knows certain facts, unknown to [the] audience, which support [the] opinion and are detrimental to the person [toward] whom [the communication is directed].'"  *Id. (citations omitted).*  Moreover, "if the predicate facts are disclosed but are false [such as Menaker's link to the *Page Six* article about the false accusations that Miller killed a baby], such that the disparity between the stated facts and truth would cause a reader to question the opinion's validity, the statement may be actionable as a 'defamatory opinion.'"  *Id. (citations omitted).*

[13]  The mere fact that Menaker posted his defamatory statement about Miller on Twitter is not dispositive.  To suggest otherwise would create a "Twitter-privilege" exempting all blatantly false and defamatory statements from liability simply because they are uttered on social media.  The law is clear that the chosen forum of a defamatory statement standing alone is not dispositive.  *See Michel v. NYP Holdings*, 816 F.3d 686, 699 (11th Cir. 2016) ("the mere placement of a story in a particular section of the paper is not enough to categorily preclude it from a defamation action.")

*Clifford*) focuses its analysis on the "*defensive tone* of the [President's] tweet, having followed plaintiff's negative commentary about Trump [which] signals to readers that plaintiff and Trump were engaged in a petty quarrel." *Id.* at 483 (emphasis added). "[T]he immediate context of the defendants' statements is the familiar back-and-forth between a political commentator and the subject of her criticism, and the larger context is the Republican presidential primary and Trump's regular use of Twitter to circulate his positions and skewer his opponents and others who criticize him, including journalists and media organizations whose coverage he finds objectionable." *Id.*

Menaker did not use loose, figurative terms or fiery rhetoric to jab at Miller during a heated public debate, and he certainly was not responding in a defensive nature to an attack by Miller because Miller never attacked him. Menaker was the aggressor, and the fact that he called Miller names before making an objectively false statement of fact that Miller committed a horrific crime does not transform his defamatory attack into protected speech.

### Miller Plausibly Alleges Actual Malice[14]

Menaker's contention Miller fails to allege actual malice is wrong. Miller plausibly alleges actual malice. First and foremost, Miller alleges actual knowledge of falsity. That alone defeats Menaker's motion.

Beyond that, Menaker completely ignores the requirement that a plaintiff's allegations of direct and circumstantial facts must be viewed in ***totality*** to determine whether they plausibly set forth knowledge of falsity or reckless disregard for the truth. *Celle*, 209 F.3d at 183 ("There is no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity."). The totality of these circumstances includes, among other factors:

---

[14] At the outset, it bears mention that, by nature, facts concerning a publisher's subjective mental state are not reasonably available before a lawsuit is filed. Consequently, "[m]alice may be proved inferentially because it is a matter of the defendant's subjective mental state, revolves around facts usually within the defendant's knowledge and control, and rarely is admitted." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000). Defendants "are prone to assert their good-faith belief" in their actions and "plaintiffs will rarely be successful in proving awareness of falsehood from the mouth of the defendant himself," and thus plaintiffs necessarily rely on circumstantial evidence to allege and prove their claims. *Herbert v. Lando*, 441 U.S. 153, 170 (1979); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989).

bias or ill-will; motive; failure to investigate; a predetermined and preconceived plan to malign plaintiff's character; refusals to retract; and inherently improbable defamatory statements.[15]

Here, Miller already alleges many of these factors in the FAC [Doc. 5 ¶¶ 123-143, 118]. His existing allegations are legally sufficient. To the extent the Court disagrees, Miller should be granted an opportunity to allege additional specific facts[16] learned through the recent discovery to further demonstrate Menaker's actual malice. Actual malice can be inferred from the relation of the parties, the circumstances attending the publication, the terms of the publication itself, and from the words or acts of the defendant before, at, or after the time of the communication. *DR Partners v. Floyd*, 228 S.W.3d 493, 498 (Tex. App. – Texarkana 2007) (citing *Proctor & Gamble*

---

[15] *Connaughton*, 491 U.S. at 668; *Celle*, 209 F.3d at 183; *Hunt v. Liberty Lobby*, 720 F.2d 631, 645 (11th Cir. 1983); *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir. 1995) ("[I]ll will is considered circumstantial evidence of actual malice."); *Duffy v. Leading Edge Prods., Inc.*, 44 F3d 308, 315 n. 10 (5th Cir. 1995) ("[E]vidence of ulterior motive can often bolster an inference of actual malice."); *Goldwater v. Ginzburg*, 414 F.2d 324, 337 (2d Cir. 1969) (jury can find actual malice based on "a predetermined and preconceived plan to malign [the plaintiff's] character."); *Ham's v. City of Seattle*, 152 F.Appx. 565, 568 (9th Cir. 2005); *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 539 (7th Cir. 1982); *Alioto v. Cowles Comm., Inc.*, 519 F.2d 777, 780-81 (9th Cir. 1975), *aff'd*, 623 F.2d 616 (9th Cir. 1980); *Sharon v. Time, Inc.*, 599 F.Supp. 538, 576 (S.D.N.Y. 1984); *Sisemore v. U.S. News & World Report, Inc.*, 662 F. Supp. 1529, 1536 (D. Alaska 1987); *Tosti v. Ayik*, 476 N.E.2d 928, 936 (Mass. 1985), *aff'd*, 508 N.E. 2d 1368 (Mass. 1987); *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015); *Tavoulareas v. Piro*, 763 F.2d 1472, 1477 (D.C. Cir. 1985), vacated on other grounds, 759 F.2d 90 (D.C. Cir. 1985); *Zerargue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987); *Spacecon Specialty Contractors, LLC v. Besinger*, 713 F.3d 1028, 1057-58 (10th Cir. 2013) (rush to publish despite lack of time pressure is actual malice); *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987) (malice can be established when statement is so inherently improbable only a reckless man would have put it in circulation); *Vasquez v. O'Brien*, 85 A.D.2d 791, 792 (3d Dep't 1981) ("The context of the statements themselves and the context in which they arose may give rise to significant suggestions of possible falsity which should alert the speaker… [and] inaccurate or untrue use of language, in the intense political climate then prevailing, could certainly be found to be evidence of actual malice…").

[16] Specifically, Menaker's and Krueger's iMessages about Miller [Doc. 57-1] are direct and circumstantial evidence of bias, ill-will, motive, and a preconceived plan to malign Miller that combined with other alleged facts support a finding of actual malice. *Connaughton*, 491 U.S. at 668; *Celle*, 209 F.3d at 183; *Shoen*, 48 F.3d at 417; *Duffy*, 44 F.3d at 315 n.10; *Biro*, 807 F.3d at 546; *Goldwater*, 414 F.2d at 337. Menaker's preconceived plan to malign Miller and deliberate or purposeful avoidance of the falsity of his defamatory tweet further support a finding of actual malice. *Goldwater*, 414 F.2d at 337; *Harris*, 152 F.App'x. at 568; *Gertz*, 680 F.2d at 539; *Alioto*, 519 F.2d at 780-81; *Sharon*, 599 F.Supp. at 576; *Sisemore*, 662 F.Supp. at 1536; *Tosti*, 476 N.E.2d at 936.

*Mfg. Co. v. Hagler*, 880 S.W.2d 123, 126 (Tex. App. – Texarkana), *writ denied*, 884 S.W.2d 771 (Tex. 1994); *Ball v. E.W. Scripps Co.*, 801 S.W.2d 684, 686-87 (1990) (evidence of bias or hostility lends evidence to other circumstances showing actual malice including holding a grudge).  Here, recent discovery shows Menaker held a personal grudge against Miller because Miller sued his girlfriend, and that in words before and at the time of his defamatory tweet Menaker acted out of ill-will, hostility, and bias toward Miller.  [Doc. 57-1, 57-2]

### Miller Should Be Granted Leave to Amend
### Address Any Technical Pleading Deficiencies

The Eleventh Circuit recognizes that generally, "[w]here a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice."  *Bryant v. Dupree*, 252 F.3d 1161, 1162 (11th Cir. 2001); *Mesa v. Law Enforcement Systems, LLC*, 2015 WL 12804525, *7 (S.D. Fla. Aug. 4, 2015).  "A district court's discretion to dismiss a complaint without leave to amend is severely restricted by Fed. R. Civ. P. 15(a)."  *Jemison v. Wise*, 386 Fed.Appx. 961, 964 (11th Cir. 2010) (citing *Bryant*).  The Court need not permit amendment:  (1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile.  *Mesa*, 2015 WL 12804525 at *7 (citing *Bryant*).

Miller previously filed his proposed Second Amended Complaint, which sets forth additional actual malice allegations against Menaker and new facts refuting Menaker's contention his tweet was rhetorical hyperbole or pure opinion.  [Doc. 57-3, ¶¶ 139-47]  Miller has not acted in bad faith or with dilatory motive, nor undue delay.  He has not failed to cure deficiencies by amendments previously allowed.  Consequently, if the Court believes the FAC is insufficiently pleaded, Miller should be granted leave to correct any pleading deficiencies.  The amendment he seeks will not prejudice Menaker and is not futile.  No prior amendment based on Menaker's arguments has been allowed.

Dated:  February 7, 2019.                    Respectfully submitted,

                                             */s/ Shane B. Vogt*
                                             Kenneth G. Turkel – FBN 867233
                                             E-mail:  kturkel@bajocuva.com
                                             Shane B. Vogt – FBN 257620
                                             E-mail:  svogt@bajocuva.com
                                             BAJO | CUVA | COHEN | TURKEL
                                             100 North Tampa Street, Suite 1900
                                             Tampa, Florida 33602
                                             Tel:  (813) 443-2199
                                             Fax: (813) 443-2193
                                             *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 7, 2019, the foregoing document was filed with the Court's CM/ECF system, which will send electronic notice to all counsel of record.

                                             */s/ Shane B. Vogt*
                                             Attorney