**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 18-24227-CIV-ALTONAGA/Goodman**

**JASON MILLER**,

　　　　Plaintiff,

v.

**GIZMODO MEDIA GROUP, LLC**; *et al.*,

　　　　Defendants.

_____/

**<u>ORDER</u>**

**THIS CAUSE** came before the Court on Defendants, Gizmodo Media Group, LLC's and Katherine Krueger's Corrected Motion to Dismiss the Amended Complaint [ECF No. 44]. Defendants have submitted the Declaration of Deanna K. Shullman in Support of the Motion [ECF No. 32]. Plaintiff, Jason Miller, filed a Response [ECF No. 53], to which Defendants filed a Reply [ECF No. 54]. The Court held a Hearing [ECF No. 61] on the Motion on January 14, 2019. After the Hearing, the parties filed supplemental briefing (*see* [ECF Nos. 65, 68, 71]), and Defendants submitted a Notice of Supplemental Authority [ECF No. 85].

The Court has carefully considered the Amended Complaint [ECF No. 5], the parties' written submissions, the record, and applicable law. For the following reasons, the Motion is granted in part and denied in part.

**I.　　BACKGROUND**

This case presents a claim of defamation, as well as four related claims, by political commentator Miller against Krueger, the managing editor of a news website, *Splinter*, and Gizmodo, *Splinter*'s corporate parent. (*See generally id.*). Plaintiff alleges Defendants'

defamatory article publicized false accusations made against him in a confidential court filing and inaccurately characterized those accusations.  (*See id*.).

## A.  The Parties

Plaintiff is a communications strategist and political manager who served as Senior Communications Advisor on President Donald Trump's 2016 campaign.  (*See id*. ¶ 37).  In February 2017, Plaintiff joined Teneo Strategy, a company that advises Fortune 500 CEOs on crisis communications and media relations.  (*See id*. ¶ 38).  In March 2017, Plaintiff also began working as a political commentator for CNN, often appearing on national television advocating for and defending the Trump Administration.  (*See id*.).  He lives in Virginia.  (*See id*. ¶ 18).

Krueger is the managing editor of *Splinter* and an outspoken critic of the Trump Administration.  (*See id*. ¶ 95).  She lives in New York.  (*See id*. ¶ 30).  Gizmodo is a Delaware limited liability company with its principal place of business and headquarters in New York.  (*See id*. ¶ 19).  Gizmodo is registered to do business in Florida as a single-member limited liability company whose sole member is Univision Interactive Media, Inc. ("Fusion").  (*See id*.).  Fusion is a Delaware corporation with its principal place of business and headquarters in New York.  (*See id*.).  Fusion operates a network of national and local online and mobile websites, including *Splinter*, from offices in New York.  (*See id*. ¶¶ 20–24).

## B.  The Facts

The background events of this case began in 2016, when Plaintiff had a relationship with Arlene Delgado, who also served on President Trump's 2016 campaign.  (*See id*. ¶¶ 37, 40).  The relationship resulted in Delgado's pregnancy.  (*See id*. ¶ 37).  Delgado lives in Miami, Florida. (*See id*. ¶ 32).

1.   <u>The Family Court Action</u>

In July 2017, Plaintiff brought a paternity action in Miami-Dade Family Circuit Court to ensure he would be part of his and Delgado's son's life.  (*See id.* ¶¶ 41, 44; *see also* Family Court Docket [ECF No. 5-9] 23).  The Family Court case turned increasingly hostile.  (*See* Am. Compl. ¶¶ 42–47).  The proceedings were "highly-publicized" and received national media attention.  (*Id.* ¶¶ 10, 41).

In March 2018, Delgado filed a motion in Family Court requesting Plaintiff be ordered to undergo a psychological evaluation.  (*See id.* ¶ 88; *see also* Family Court Docket 13–14).  On September 14, 2018, Delgado filed a Supplement[1] to that motion, accusing Plaintiff of having an affair with and impregnating "Jane Doe" years earlier, slipping her an "abortion pill," and killing her unborn child without her consent.  (*Id.* ¶¶ 2, 52, 88, 97–98, 162).  The Supplement states in part:

In summer 2018, [Delgado] was informed as follows:

1.   In 2012, Mr. Miller, while working for Jamestown Associates, was working closely with the firm's Florida clients.

2.   As part of this, Mr. Miller spent significant time in Orlando, Florida.

3.   Evenings with clients and colleagues sometimes entailed steakhouse dinners followed by strip clubs and/or patronage of escorts for some of the participants.

---

[1] *Splinter's* website includes a link to and images of the sealed Supplement.  *See* Katherine Krueger, *Court Docs Allege Ex-Trump Staffer Drugged Woman He Got Pregnant With 'Abortion Pill'*, Splinter (Sept. 21, 2018,  8:14  PM),  https://splinternews.com/court-docs-allege-ex-trump-staffer-drugged-woman-he-got-1829233105.  The Court may consider the Supplement because it is incorporated by reference into the Amended Complaint, it is central to Plaintiff's claims, and neither party challenges its authenticity.  *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002); *see also Elder v. Tronc Inc.*, No. 3:17-cv-01285, 2018 WL 3233135, at *3 (D. Conn. July 2, 2018) (concluding court could take judicial notice of an underlying state court decision and corresponding publications to evaluate fair report privilege defense on motion to dismiss because "a complaint is deemed to include any documents incorporated by reference" (citation omitted)).

4. During one such evening, Mr. Miller and other colleagues/clients visited Rachel's Gentleman's Club, a strip club in Orlando (which also has a West Palm Beach location).

5. At the time, Mr. Miller was already married to his wife (whom he married in July 2008) and had a 4-year-old daughter (who was born in late 2008).

6. Mr. Miller met a stripper that evening, which [sic] will be referred to herein as "Jane Doe" (Mother has individual's full name).

7. **Mr. Miller had sexual intercourse with Jane Doe and continued a sexual relationship with her for some unknown period of time.**

8. **Jane Doe became pregnant.**

9. Shortly thereafter, according to Jane Doe, Mr. Miller visited her apartment with a Smoothie beverage.

10. Unbeknownst to Jane Doe, the Smoothie **contained an abortion [p]ill.**

11. The pill induced an abortion, and Jane Doe wound up in a hospital emergency room, bleeding heavily and nearly went into a coma.

12. The unborn child died.

(Supplement 1–2 (alterations added; emphasis in original)).  The Supplement also accuses Plaintiff of beating another unidentified woman and trying to cover up the crime.  (*See id.* 9).

The Supplement details Delgado's source for the information.  (*See id.* 3–10).  The Supplement explains Delgado initially discovered the accusations from a man she met on Twitter, who told Delgado he had received information about Jane Doe from "multiple" sources that were "unverified by him," and he was unable to "vouch for its veracity."  (*Id.* 6 (internal quotation marks omitted)).  When a private investigator contacted Jane Doe, she was not interested in speaking out.  (*See id.* 2, 7).  The Supplement states a journalist who investigated the allegations chose not to publish a report on the story out of concern "Jane Doe would backtrack" after publication.  (*Id.* 10).

On September 17, 2018, Plaintiff filed a notice designating the Supplement confidential and a motion to determine its confidentiality under the Florida Rules of Judicial Administration. (*See* Am. Compl. ¶ 91; *see also* Family Court Docket 3).  From the time the Supplement was filed, it was confidential and sealed.  (*See* Am. Compl. ¶¶ 91, 135, 149–51).

    2.  The *Splinter* Article

On September 21, 2018, Krueger published a news report on *Splinter* ("Article")[2] about the Supplement.  (*See id.* ¶¶ 12, 96).  The Article, titled "Court Docs Allege Ex-Trump Staffer Drugged Woman He Got Pregnant with 'Abortion Pill,'" describes "an explosive new court filing," in which Delgado alleges Plaintiff "carried out an affair with a woman he met at an Orlando strip club."  (Article 3).  The Article goes on to state: "[T]he court documents claim[] when the woman found out she was pregnant, Miller surreptitiously dosed her with an abortion pill without her knowledge, leading, *the woman claims*, to the pregnancy's termination and nearly her death."  (*Id.* (alterations and emphasis added)).

Plaintiff alleges the accusations in the Article and Supplement are not fair and true, having been published "only to gratify public spite and promote public scandal."  (Am. Compl. ¶ 97).  He insists the Article "goes beyond the accusations in the Supplement" by asserting "'Jane Doe' herself 'claims'" Plaintiff caused the termination of her pregnancy and nearly her death, as the Supplement does not attribute those accusations to Jane Doe.  (*Id.* ¶ 98).  Plaintiff also states Defendants did not obtain the Supplement from Family Court but from Delgado. (*See id.* ¶¶ 96, 99, 153).

After the Article was published, widespread coverage of the story by other media outlets ensued.  (*See id.* ¶ 104).  The coverage prompted Fox News Sunday to cancel Plaintiff's scheduled

---

[2] (*See generally* Article [ECF No. 5-3]).  A link to the Article is found *supra*, note 1.

appearance for the following Sunday, September 23, 2018 (*see id.*), and by the end of the weekend, Plaintiff had lost his job at CNN (*see id.* ¶¶ 109–111).

C. Procedural History

In October 2018, Plaintiff filed his initial Complaint [ECF No. 1] against Defendants Krueger and Gizmodo. (*See generally* Compl.). Plaintiff stated claims of defamation *per se* (Count I), tortious interference with advantageous business relationships (Count II), intentional infliction of emotional distress (Count III), invasion of privacy (Count IV), and civil conspiracy (Count V). (*See id.* ¶¶ 127–173).

A few days later, Plaintiff filed the operative Amended Complaint, stating the same claims against Krueger and Gizmodo as in the original Complaint, while also adding a defamation *per se* claim against Defendant William Menaker (Count VI) for posting a defamatory statement about Plaintiff on Twitter. (*See* Am. Compl. ¶¶ 207–216). Menaker filed a Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim [ECF No. 70], which the Court recently granted, dismissing the claim against Menaker without prejudice given the Court lacks personal jurisdiction over him (*see* Order [ECF No. 109]). Gizmodo and Krueger filed the present Motion, seeking dismissal of all five claims asserted against them under Federal Rule of Civil Procedure 12(b)(6). (*See generally* Mot.).

## II.   LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id*. (alteration added) (citing *Twombly*, 550 U.S. at 556).   Although this pleading standard "does not require 'detailed factual allegations,' . . .  it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id*. (alteration added) (quoting *Twombly*, 550 U.S. at 555).   Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citation omitted).

On a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and accepts its factual allegations as true.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).   Unsupported allegations and conclusions of law, however, will not benefit from this favorable reading.   *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").   The scope of review on a motion to dismiss under Rule 12(b)(6) is limited to the four corners of the complaint and the exhibits attached.  *See Thaeter v. Palm Beach Cty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006) (citation omitted).

## III.   DISCUSSION

Defendants move to dismiss Plaintiff's defamation claim, arguing the Article is protected by: (1) the fair report privileges under Florida common law and New York statute and (2) a federal constitutional privilege for accurate reports of judicial proceedings.  (*See* Mot. 8–17).  Defendants also move to dismiss Plaintiff's non-defamation claims, arguing they are duplicative under New York law or alternatively, barred by the single action rule under Florida law.  (*See id*. 19–20).

A threshold question is whether the New York or Florida fair report privilege governs the parties' dispute. The Court first addresses that issue before turning to the merits of Defendants' arguments for dismissal.

## A. Choice-of-Law

Defendants contend a choice-of-law analysis is unnecessary because Plaintiff's claims fail under both New York and Florida law. (*See* Mot. 7 n. 8). For his part, Plaintiff suggests a choice-of-law analysis is appropriate and the Court should apply Florida law. (*See* Resp. 3–4). The Court agrees with Plaintiff a conflict-of-law analysis is necessary, but concludes New York's, rather than Florida's, law of privilege governs the dispute.

### 1. Conflict-of-Law Analysis is Required

Courts must conduct a conflict-of-law analysis where there is a true conflict. *See Pycsa Panama, S.A. v. Tensar Earth Techs., Inc.*, 625 F. Supp. 2d 1198, 1218–19 (S.D. Fla. 2008), *aff'd*, 329 F. App'x 257 (11th Cir. 2009). A "true conflict" exists when "two or more states have a legitimate interest in a particular set of facts in litigation and the laws of those states would produce a different result." *Id*. at 1219 (internal quotation marks and citation omitted).

There is a true conflict between Florida and New York's fair report privilege. *See Gubarev v. BuzzFeed, Inc.*, No. 1:17-cv-60426-UU, Corrected Order on Plaintiff's Motion for Partial Judgment on the Pleadings [ECF No. 171] filed June 5, 2018 (S.D. Fla. 2019) at 5; *see also Nix v. ESPN, Inc.*, No. 1:18-cv-22208-UU, Order on Defendants' Motion to Dismiss [ECF No. 27] filed August 30, 2018 (S.D. Fla. 2018) at 6. While Florida follows the common law privilege of the Restatement (Second) of Torts section 611, New York follows a codified absolute fair report privilege. *Compare Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502–03 (Fla. 3d DCA 1993), *with* N.Y. Civ. Rights Law § 74. Florida's privilege is qualified, whereas New York's

privilege is absolute. *Compare Woodard*, 616 So. 2d at 502, *with Cholowsky v. Civiletti*, 887 N.Y.S.2d 592, 594 (App. Div. 2nd Dep't 2009).

Moreover, "[t]he common law generally protects only reports of proceedings open to the public[.]" *Gubarev*, No. 1:17-cv-60426-UU [ECF No. 171] at 5–6 (internal quotations and citations omitted; alterations added). "[A]lthough there is one case suggesting that Florida courts might extend the privilege to cover non-public information in some circumstances, it is not clear that confidential or classified materials are protected." *Id.* (citing *Ortega v. Post-Newsweek Stations, Fla. Inc.*, 510 So. 2d 972 (Fla. 3d DCA 1987) (alteration added)); *see also* Restatement (Second) of Torts § 611, cmt. d (1977) ("It is not clear whether the privilege extends to a report of an official proceeding that is not public or available to the public under the law.").

In contrast, New York's statutory privilege generally applies to reports of confidential proceedings. *See Keogh v. N.Y. Herald Tribune, Inc.*, 274 N.Y.S.2d 302, 305 (Sup. Ct. 1966) (applying privilege to reports of grand jury proceedings even though they are confidential); *Freeze Right Refrigeration & Air Conditioning Servs., Inc. v. City of New York*, 475 N.Y.S.2d 383, 388 (App. Div. 1st Dep't 1984) (explaining "the activities of the agency need not be public for the statutory privilege to apply"); *Komarov v. Advance Magazine Publishers, Inc.*, 691 N.Y.S.2d 298, 300 (Sup. Ct. 1999) (concluding section 74 applies to a report on an affidavit of an FBI agent that was not prepared for "public consumption"); *Grab v. Poughkeepsie Newspapers, Inc.*, 399 N.Y.S.2d 97–98 (Sup. Ct. 1977) (applying the privilege to coverage of confidential youth offender proceedings); *but see Shiles v. News Syndicate Co.*, 27 N.Y.2d 9, 18–19 (N.Y. 1970) (holding the privilege does not apply to reports on sealed filings in matrimonial actions under New York's

Domestic Relations Law section 235). As there is a true conflict, the Court conducts a choice-of-law analysis on Defendants' fair report privilege defense.[3]

### 2. New York Law Governs the Fair Report Privilege

In a diversity case, federal courts apply the choice-of-law principles of the forum state. *See Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007). "As a preliminary matter, the court must characterize the legal issue and determine whether it sounds in torts, contracts, property law, etc." *Id.* The courts then determines the choice-of-law rule the forum state applies to the issue. *See id.*

The relevant issue here is an affirmative defense to defamation, a claim that sounds in tort. In claims and affirmative defenses under tort law, Florida applies the "most significant relationship" test of the Restatement (Second) of Conflict of Laws section 145. *Id.* (citing *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980)); *see also Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016). "When determining the most significant relationship, the courts consider '(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation, and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.'" *Id.* at 694 (quoting *Bishop*, 389 So. 2d at 1001). "These factors are considered according to their relative importance with respect to the particular issue." *Id.* (internal quotation marks and citation omitted).

The section 145 contacts guide the application of the principles in section 6 of the Restatement. *See Grupo Televisa, S.A.*, 485 F.3d at 1240. These principles include the interests of other states in resolving the relevant issue and the basic policies underlying the specific field of

---

[3] A choice-of-law analysis on the constitutional privilege is unnecessary, as that privilege is necessarily a question of federal law.

CASE NO. 18-24227-CIV-ALTONAGA/Goodman

law. *See id.* at 1242 (citing Restatement (Second) Conflict of Laws § 6(2)(a)–(g) (1971)). The section 145 factors favor applying New York law.

First, Plaintiff was not injured in Florida. (*See generally* Am. Compl.). The Article was published online and was accessible worldwide. (*See id.* ¶ 12). Certainly "there is 'little reason in logic or persuasiveness to say that one state rather than another is the place of injury . . . in the case of multistate defamation.'" *Gubarev*, No. 1:17-cv-60426-UU [ECF No. 171] at 8 (quoting Restatement (Second) of Conflicts of Laws § 145 cmt. e (1971) (alteration added)).

Second, Defendants posted the allegedly defamatory article after it was drafted and published in New York, as Krueger resides in New York, Gizmodo's headquarters and only U.S. office are in New York, and *Splinter* operates out of New York. (*See* Am. Compl. ¶¶ 19–24, 30). Although Plaintiff alleges Defendants conspired with Delgado, a Florida resident (*see id.* ¶ 32), Defendants' most significant conduct — publishing the allegedly defamatory article — took place in New York. *See Gubarev*, No. 1:17-cv-60426-UU [ECF No. 171] at 8 (noting this factor favored applying New York law because the decision to publish the allegedly defamatory material was made in New York); *see also Wilkow v. Forbes, Inc.*, No. 99 C 3477, 2000 WL 631344, at *6 (N.D. Ill. May 15, 2000), *aff'd*, 241 F.3d 552 (7th Cir. 2001) (concluding the "injury-causing conduct occurred in New York" where the newspaper and reporter who published the allegedly defamatory article were both located).

Third, the parties all reside outside of Florida. Plaintiff is domiciled in Virginia. (*See* Am. Compl. ¶ 18). Although Gizmodo is registered to do business in Florida, its principal place of business is in New York. (*See id.* ¶ 19). The principal place of business of its sole member is New York. (*See id.*). And Krueger lives in New York. (*See id.* ¶ 30).

The fourth factor does not favor either state, as Plaintiff does not allege a relationship with Defendants aside from the alleged defamation. *See Gubarev*, No. 1:17-cv-60426-UU [ECF No. 171] at 9.

The principles underlying section 6 of the Restatement also favor the application of New York law. Plaintiff asserts Florida has a vested interest in ensuring its litigants are afforded confidentiality protections under its laws. (*See* Resp. 4). But New York also "has a strong interest in encouraging unfettered expression by protecting certain types of speech within its borders." *Wilkow*, 2000 WL 631344, at *7 (citation omitted). When multiple states have an interest in an issue, "[t]he extent of the interest of each of the potentially interested states should be determined on the basis, among other things, of the purpose sought to be achieved by . . . the particular issue involved . . . ." Restatement (Second) Conflict of Laws § 150, cmt. b (1971) (alterations added). As the courts in *Gubarev*, *Wilkow*, *and Nix* recognized, "the fair reporting privilege is meant to protect speakers, not provide a remedy to plaintiffs." *Wilkow*, 2000 WL 631344, at *7 (citation omitted); *see also Gubarev*, No. 1:17-cv-60426-UU [ECF No. 171] at 9–10; *Nix*, No. 1:18-cv-22208-UU [ECF No. 27] at 8–9. New York thus has a "more substantial relationship with the conduct at issue here," because Defendants' conduct took place in New York. *See Wilkow*, 2000 WL 631344, at *7. The Court therefore applies New York's law on the fair report privilege.

**B.  Defamation (Count I)**

In Count I, Plaintiff alleges Defendants are liable for defamation *per se* because the Article publicized Delgado's false accusations against Plaintiff, which were made in a sealed court filing. (*See* Am. Compl. ¶¶ 135, 159–73). Defendants assert the Article is protected by both a New York statutory privilege and a federal constitutional privilege for fair and accurate reports of judicial proceedings.  (*See* Mot. 8–17).  Plaintiff maintains neither privilege warrants dismissal of the

defamation claim at the motion-to-dismiss stage. (*See* Resp. 4–16). The Court addresses the New York statutory privilege and the constitutional privilege in turn.

### 1. New York's Statutory Privilege

Defendants contend New York's absolute statutory privilege bars Plaintiff's defamation claim, whether the Supplement was sealed or not. (*See* Mot. 12–15). According to Defendants, New York's absolute privilege applies independent of the Supplement's source and even if Defendants never independently verified the allegations. (*See id.* 16). Finally, Defendants argue they are protected by the privilege because the Article is a fair and true report of the Supplement. (*See id.* 17).

Plaintiff asks the Court not to apply New York's absolute privilege, insisting the Supplement was sealed. (*See* Resp. 13). The sealing of the Supplement is significant because New York's privilege applies only to media coverage of confidential documents where the published information advances the administration of justice. (*See id.* 9–16). In contrast, where the press publishes the contents of private litigants' court filings, the privilege does not apply. (*See id.*).

The Court need not venture into the nuances of New York's statutory privilege as applied to sealed documents in paternity actions. As explained below, Plaintiff plausibly alleges the Article was not a fair and true report of the Supplement. Defendants therefore cannot benefit from the privilege at the motion-to-dismiss stage.

New York's fair report privilege is codified in section 74 of its Civil Rights Law: "A civil action cannot be maintained against any person, firm, or corporation, for the publication of a fair and true report of any judicial proceeding . . . ." N.Y. Civ. Rights Law § 74 (alteration added). A publication is considered "fair and true" if it is "substantially accurate." *Cholowsky*, 887 N.Y.S.2d

at 595–96 (quoting *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 67 (N.Y. 1979)) (internal quotation marks omitted).  "A report is substantially accurate if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth."  *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir. 2005) (internal quotation marks and citations omitted).  A report is not substantially accurate "if it would have a different effect on the mind of the recipient than the actual truth."  *Id.* (internal quotation marks and citation omitted).  "Application of the fair reporting privilege is inappropriate at the motion to dismiss stage if a reasonable jury could conclude that the report 'suggest[ed] more serious conduct than that actually suggested in the' judicial proceeding."  *Bilinski v. Keith Haring Found. Inc.*, 96 F. Supp. 3d 35, 49 (S.D.N.Y. 2015) (quoting *Karedes*, 423 F.3d at 119) (alteration in original).

Plaintiff alleges the following portion of the Article is misleading: "[T]he court documents claim, when the woman found out she was pregnant, Miller surreptitiously dosed her with an abortion pill without her knowledge, leading, *the woman claims*, to the pregnancy's termination and nearly her death."  (Article 3 (emphasis and alteration added); *see also* Am. Compl. ¶ 98).  Plaintiff asserts the Article goes beyond the Supplement, which does not attribute the bulk of the accusations to Jane Doe.  (*See id.*).

Defendants contend the Article is a fair and true report of the Supplement, pointing to language in the Supplement suggesting at least one accusation came from Jane Doe directly.  (*See id.*; Supplement 1 ("[A]ccording to Jane Doe, Mr. Miller visited her at her apartment with a Smoothie beverage." (alteration added))).  The Court disagrees with Defendants.

The Court acknowledges the Supplement's statement that "according to Jane Doe, Mr. Miller visited her at her apartment with a Smoothie beverage."  (Supplement 1).  But the

Supplement does not attribute *any other accusation* to Jane Doe.  (*See generally id*.).  In other words, the Supplement, unlike the Article, does not state Jane Doe "claims" Plaintiff gave her an abortion pill without her knowledge, deceptively terminating her pregnancy and causing her injury. (*See id.*; (Article 3)).

A careful review of the Supplement belies the contention Jane Doe was the source of those allegations.  (*See generally* Supplement).  The Supplement details Delgado's sources, explaining she initially discovered the accusations from a gentleman she met on Twitter, who received the information about Jane Doe from "multiple" sources that were "unverified by him."  (*Id.* 6 (internal quotation marks omitted)).  The Supplement also notes that when a private investigator reached out to Jane Doe, she failed to confirm the allegations.  (*See id.* 2).  And a journalist who investigated the story did not publish a report because of his editors' concerns Jane Doe would "backtrack" from the allegations.  (*Id.* 10).

Again, the Article expressly suggests Jane Doe is the source of several of the accusations. (*See* Article 3).  By reading the Supplement, the average reader may conclude that Delgado, relying on indirect sources, and in the context of a contested paternity action, has accused Plaintiff of misconduct.  By reading the Article, the average reader may conclude Jane Doe — the alleged victim herself — has accused Plaintiff of misconduct.

As the latter reading tenably bolsters the credibility of the allegations in the Supplement, the Court cannot conclude the Article does not produce a different effect on a reader than would a report on the Supplement.  *See Karedes*, 423 F.3d at 119 (holding a reasonable jury could conclude article did not give a fair and true account of a town meeting because it omitted auditor's disclaimer of misconduct by plaintiff that was given at the meeting); *see also Pisani v. Staten Island Univ. Hosp.*, 440 F. Supp. 2d 168, 178 (E.D.N.Y. 2006) (denying defendant's motion to dismiss under

New York's absolute privilege where a reasonable jury could conclude the defendant's publication "transformed [the] allegations as to plaintiff in [a lawsuit] into fact . . . ." (alterations added; emphasis omitted)); *cf. Doe v. Doe*, 941 F.2d 280, 291 (5th Cir. 1991), *on reh'g in part*, 949 F.2d 736 (5th Cir. 1991) (noting as relevant that defendant referred to the source as a "respected journalist" and omitted the sources' refusal to corroborate the journalist's conclusion in their legislative testimony, thus upgrading findings from speculative to probable).

The Court recognizes "once it is established that the publication is reporting on a judicial proceeding, how a reporter gathers his information concerning a judicial proceeding is immaterial . . . ." *Zappin v. Daily News, L.P.*, No. 16 CIV. 8762, 2017 WL 3425765, at *8 (S.D.N.Y. Aug. 9, 2017) (internal quotation marks and citations omitted; alteration added).  It is also true that "a plaintiff's side of the story is not itself a part of the official proceeding — and as such, an article can still be fair and true even if it does not include denials from the plaintiff or a detailed account of the plaintiff's version of the facts." *Thomas v. City of New York*, No. 17-cv-06079, 2018 WL 5791965, at *10 (E.D.N.Y. Nov. 5, 2018) (internal quotation marks and citations omitted; alteration omitted).

But these axioms do not mitigate Defendants' burden of establishing the "*story is a fair and substantially accurate portrayal of the events in question*." *Zappin*, 2017 WL 3425765, at *8 (emphasis added).  Indeed, the Court's conclusion is not predicated on the truth or falsity of the *underlying allegations in the Article*.  Rather, the Court, after comparing the statements in the Supplement with those in the Article, cannot conclude as a matter of law that the Article is a fair and true report of the Supplement.

Defendants contend *Abkco Music, Inc. v. William Sagan, Norton LLC*, No. 15 Civ. 4025, 2016 WL 2642224 (S.D.N.Y. May 6, 2016), dictates a contrary result.  (*See* Mot. 17).  In *Abkco*

*Music*, the court concluded a statement in a press release informing the National Music Publishers' Association had filed a lawsuit was substantially accurate even though the association was not actually a named party in the lawsuit. *See id*. at *4. The court reasoned the statement did not "imply any more serious conduct than alleged, given that [National Music Publishers' Association] was admittedly 'masterminding' the lawsuit." *Id*. (alteration added).

*Abkco Music* is inapposite. By arguably misattributing the allegations in the Supplement, the Article plausibly bolsters the allegations' validity. Unlike in *Abkco Music*, a reasonable jury here could find the Article's attributions of the allegations to Jane Doe would have a "different effect" on the mind of the average reader than would a reading of the Supplement. *Karedes*, 423 F.3d at 119 (internal quotations and citations omitted). New York's statutory privilege therefore does not bar Plaintiff's defamation claim at the pleading stage.

    2.  The Constitutional Privilege

In Defendants' view, the United States Supreme Court established an absolute privilege for accurate reports of public records in *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975). (*See* Mot. 8–9.) Defendants assert the absolute privilege applies because the Article is about the Supplement, which Defendants assert is a public filing that was never sealed in Family Court, contrary to Plaintiff's allegations.[4] (*See id*.).

According to Plaintiff, any constitutional privilege would not extend to the sealed Supplement. (*See* Resp. 6–9). Plaintiff also states the rationale behind the purported constitutional privilege does not support its application to this case. (*See id*. 9–16).

---

[4] Defendants rely on materials outside the Amended Complaint and its exhibits to support this contention (*see* Shullman Declaration, Ex. I, Affidavit of Mike Ernst [ECF No. 32-9]), which the Court cannot consider in resolving the Motion. *See Thaeter*, 449 F.3d at 1352.

The Court agrees with Plaintiff, but again, on the same limited basis the Court explained in its analysis of New York's absolute privilege.  Even if a constitutional privilege exists, the privilege would not bar Plaintiff's defamation claim because Plaintiff plausibly alleges the Article was not a fair and true report of the Supplement.

In *Cox Broadcasting*, the Supreme Court held that "the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records."  *Cox Broadcasting Corp.*, 420 U.S. at 496 (holding television station cannot be liable for invasion of privacy when its reporter broadcasts the name of a rape victim he learned from public indictments).  The Supreme Court has recognized that published information obtained from official records is entitled to constitutional protection.  *See Florida Star v. B.F.J.*, 491 U.S. 524, 533–36 (1989) (holding newspaper cannot be liable for publishing the name of a rape victim, in violation of a state statute, where the reporter lawfully obtained the name from an incident report); *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 831, 840–45 (1978) (holding newspaper cannot be criminally sanctioned for accurately reporting on a confidential judiciary review commission inquiry consistent with the First Amendment).

Although these cases do not "explicitly recognize[] a constitutional privilege of fair report," several circuit courts have suggested the fair report privilege has constitutional implications. *Medico v. Time, Inc.*, 643 F.2d 134, 143 (3d Cir. 1981) (alteration added); *see also Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1299 (D.C. Cir. 1988) ("Federal constitutional concerns are implicated as well when common law liability is asserted against a defendant for an accurate account of judicial proceedings."); *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 712 (4th Cir. 1991) ("While the sources of the fair report privilege are in some dispute, several circuits

have recognized that a privilege which goes to the heart of news organizations' ability to report citizens about their government is one with constitutional implications." (citations omitted)).

Even if Defendants are correct that *Cox* and its progeny established a constitutional privilege, the privilege would only extend to fair and true reports of official proceedings. *See Cox Broadcasting Corp.*, 420 U.S. at 496 (stating the press cannot be liable for "*truthfully* publishing information released to the public in official court records" (emphasis added)); *see also Time, Inc. v. Firestone*, 424 U.S. 448, 458–59 (1976) (explaining Time magazine could be liable for publishing defamatory article that inaccurately described divorce judgment so long as other constitutional limitations were satisfied); *Horne v. WTVR, LLC*, No. 3:16-cv-000092, 2017 WL 1330200, at *5 (E.D. Va. Apr. 6, 2017) (stating regardless of whether the fair report privilege stems from the constitution or state law, "any such privilege at least requires that the report be fair and accurate").

As noted, Plaintiff plausibly alleges Defendants' Article did not accurately describe the Supplement. Specifically, Plaintiff alleges:

> The Defamatory Article goes beyond the accusations in the Supplement itself by falsely asserting that "Jane Doe" herself "claims" that Miller surreptitiously dosed her with an abortion pill without her knowledge, "leading to the pregnancy's termination and nearly her death." ***Jane Doe has never "claimed" that Miller did anything.*** To the contrary, she denied the accusations, told two reporters that they were not true, and never even spoke to Delgado about them.

(Am. Compl. ¶ 98 (emphasis in original)).

Even though Defendants insist the Article is entirely consistent with the Supplement (*see* Mot. 16–17), a comparison of the Article and Supplement plausibly supports Plaintiff's allegations. While the Article states Jane Doe "claims" the abortion pill led to the termination of her pregnancy and nearly her death (Article 3), the Supplement suggests *Delgado* made the accusations based on information she learned *from various third parties*. (*See* Supplement 3–10).

Plaintiff properly alleges the Article exceeds the scope of the Supplement.   Defendants are therefore not entitled to any purported constitutional privilege.

Because neither New York's absolute privilege nor a federal constitutional privilege applies as a matter of law,  Plaintiff's defamation claim survives Defendants' Motion to Dismiss.

### C.  The Non-Defamation Claims

Defendants also move to dismiss Plaintiff's remaining claims for tortious interference (Count II), intentional infliction of emotional distress (Count III), invasion of privacy (Count IV), and conspiracy (Count V).  (*See* Mot. 19–20).  Defendants contend these claims must be dismissed under Florida's "single action rule" or New York's similar rule against duplicative tort claims.[5] (*Id*.).  The Court agrees.

> #### 1.   Tortious Interference, Intentional Infliction of Emotional Distress, and Invasion of Privacy (Counts II-IV)

In Count II, Plaintiff alleges Defendants tortiously interfered with his business relationships with CNN and Teneo by "publishing the Defamatory Article and Supplement and promoting the article through social media."  (Am. Compl. ¶¶ 175–76).  Plaintiff alleges the "nature of the statements" damaged his reputation — the same damage Plaintiff seeks to recover for in his defamation claim.  (*Compare id*. ¶ 178, *with* ¶ 165).  In Count III, Plaintiff alleges Defendants inflicted emotional distress by publishing the Article, again alleging the "nature of the statements" damaged his reputation.  (*Id*. ¶¶ 182–86).  Likewise, in Count IV, Plaintiff alleges

---

[5] Defendants also argue the invasion of privacy claim should be dismissed because there is no public disclosure of private facts claim under New York law and Plaintiff has failed to state a claim for invasion of privacy under Florida law.  (*See* Mot. 17–19).  The Court does not address these arguments, as the invasion of privacy claim is dismissed for a different reason.

Defendants published private facts about him when they reported on the Supplement, thus damaging his reputation.  (*See id.* ¶¶ 190–93).

Under both Florida and New York law,[6] a plaintiff cannot proceed on concurrent counts for related torts that are "intended to compensate for the same alleged harm" as a defamation claim. *See Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1256 (S.D. Fla. 2014) ("When claims are based on analogous underlying facts and the causes of action are intended to compensate for the same alleged harm, a plaintiff may not proceed on multiple counts for what is essential the same defamatory publication or event." (citation omitted)); *see also Hengjun Chao, M.D. v Mt. Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) ("'New York law considers claims sounding in tort to be defamation claims . . . where those causes of action seek damages only for injury to reputation, [or] where the entire injury complained of by plaintiff flows from the effect on his reputation.'") (quoting *Jain v. Sec. Indus. & Fin. Mkts. Ass'n*, No. 08 Civ. 6463, 2009 WL 3166684, at *9 (S.D.N.Y. Sept. 28, 2009) (alterations in original)).[7]   In contrast, a plaintiff may recover for separate claims when they "'are properly pled upon the existence of independent facts.'"  *Klayman*, 22 F. Supp. 3d at 1256–57 (quoting *Fridovich v. Fridovich*, 598 So. 2d 65, 70 (Fla. 1992) (other citation omitted)).

Plaintiff contends he alleges facts beyond the defamatory publication to support his other tort claims, including that Defendants deprived him of the opportunity to seal the Supplement,

---

[6] The Court does not conduct a choice-of-law analysis on the single action rule/duplicative defense as to these claims, because both New York and Florida law produce the same result.

[7] Duplicative tort claims must be dismissed even if the defamation claim survives. *See Klayman*, 22 F. Supp. 3d at 1257 (holding tortious interference and intentional infliction of emotional distress claims were barred by Florida's single action rule even though defamation claim survived summary judgment); *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 725–30 (S.D.N.Y. 2014) (dismissing tortious interference, emotional distress, and *prima facie* tort claims as duplicative even though defamation claim was not dismissed).

Defendants refused to pull the Article, and Krueger tweeted the Article. (*See* Resp. 19–20). Yet, these facts all relate to the dissemination of the allegedly defamatory statements in the Article.

This case is unlike *Primerica Financial Services, Inc. v. Mitchell*, 48 F. Supp. 2d 1363 (S.D. Fla. 1999), in which the plaintiffs "pled the other circumstances and facts" in support of their tortious interference claim aside from the allegedly untruthful statements. *Id.* at 1368. Here, Plaintiff's non-defamation tort claims arise entirely from the Article's publication. (*See* Am. Compl. ¶¶ 174–201). And the tortious interference, intentional infliction of emotional distress, and invasion of privacy claims all seek the same damages as Plaintiff's defamation claim: recovery for harm to reputation. (*See id.* ¶¶ 178, 186, 193).

Because these claims are premised on the same facts as the defamation claim and seek the same damages, they must be dismissed. *See Tobinick v. Novella*, No. 9:14-cv-80781, 2015 WL 328236, at *11 (S.D. Fla. Jan. 23, 2015) (dismissing tortious interference claim under the single action rule because the claim was based on the allegedly defamatory statements underlying plaintiffs' libel claims); *Ortega Trujillo v. Banco Central Del Ecuador*, 17 F. Supp. 2d 1334, 1339 (S.D. Fla. 1998) (dismissing false light invasion of privacy claim because it was "based on the same facts giving rise to the claim for defamation"); *Klayman*, 22 F. Supp. 3d at 1256–57 (concluding tortious interference and intentional infliction of emotional distress claims were barred by Florida's single action rule); *Restis*, 53 F. Supp. 3d at 725–30 (dismissing tortious interference, emotional distress, and *prima facie* tort claims as duplicative of defamation claim because the entire injury flowed from the defamatory comments to the plaintiffs' reputation); *Travelex Currency Servs., Inc. v. Puente Enters., Inc.*, No. 18 Civ. 1736, 2019 WL 1259102, at *7 (S.D.N.Y. Mar. 19, 2019) (dismissing counterclaim for tortious interference as duplicative of defamation claim because the alleged injuries flowed directly from the alleged defamatory statements);

*Weitsman v. Levesque*, 3:17-cv-00727, 2018 WL 1990218, at *5–6 (N.D.N.Y. Apr. 25, 2018) (concluding trade libel, tortious interference, and intentional infliction of emotional distress claims were duplicative of defamation claim). Under both New York and Florida law, therefore, Counts II, III, and IV must be, and are, dismissed.

2. Conspiracy (Count V)

In Count V, Plaintiff alleges Defendants conspired with Delgado to defame, intentionally inflict emotional distress, interfere with Plaintiff's advantageous business relationships, and invade Plaintiff's privacy. (*See* Am. Compl. ¶ 203). This claim is likewise duplicative under New York law.[8]

Under New York law, "a conspiracy to commit a tort is never itself a cause of action . . . ." *Bahiri v. Madison Realty Capital Advisors, LLC*, 924 N.Y.S.2d 307 (Sup. Ct. 2010) (alteration added; citations omitted). This is because "[w]hile conspiracy allegations may be pled to connect someone to an actionable tort committed by another, *where the substantive tort is already pled against the parties*, like in the instant case, the conspiracy claim will be dismissed as duplicative . . . ." *Id.* (alterations and emphasis added; citations omitted). Indeed, where "the conspiracy cause[] of action in plaintiff's complaint . . . . allege[s] nothing more than the agreement with a co-defendant to commit the substantive tort previously alleged," the "agreement itself is not actionable" because if the conspiracy claim were allowed, Plaintiff, "having recovered on the

---

[8] To the extent there is a conflict between New York and Florida law on civil conspiracy, the Court applies New York law. As discussed in the choice-of-law analysis above (*see supra* at Part III(A)), in applying Florida's "most significant relationship test," the Court considers the location of the parties, where the conduct and injury occurred, and where the relationship between the parties is centered. *See Michel,* 816 F.3d at 694 (internal quotation marks and citations omitted). Both Defendants reside in New York, whereas no parties reside in Florida. (*See* Am. Compl. ¶¶ 18–19, 30). Plaintiff does not allege to have particularly suffered injury in Florida, as he is a Virginia resident and the Article was published online, accessible to viewers worldwide. (*See id.* ¶¶ 18, 12). And the conduct causing Plaintiff's injury — publication of the allegedly defamatory Article — took place in New York. (*See id.* ¶¶ 19–24, 30). New York's law of civil conspiracy therefore applies.

CASE NO. 18-24227-CIV-ALTONAGA/Goodman

substantive tort, would then be permitted a duplicative recovery on the conspiracy cause[] of action with the proof of nothing additional other than the agreement." *Danahy v. Meese*, 446 N.Y.S.2d 611, 614 (App. Div. 4th Dep't 1981) (alteration added; citations omitted).   Plaintiff's civil conspiracy claim must therefore be dismissed as duplicative because it "is premised on the same allegations and the same torts asserted elsewhere in the complaint."   *United States Small Bus. Admin. v. Feinsod*, 347 F. Supp. 3d 147, 168 (E.D.N.Y. 2018) (citations and footnote call number omitted).

As the ample case law illustrates, Plaintiff's civil conspiracy claim is duplicative of his defamation claim.  Count V is therefore dismissed.

### IV.     CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendants, Gizmodo Media Group, LLC and Katherine Krueger's Corrected Motion to Dismiss the Amended Complaint **[ECF No. 44]** is **GRANTED in part** and **DENIED in part**.  Counts II, III, IV, and V of the Amended Complaint are **DISMISSED**.

**DONE AND ORDERED** in Miami, Florida, this 24th day of April, 2019.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record