## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### 1:18-CV-24227-CMA-Altonaga

| | |
|---|---|
| JASON MILLER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| GIZMODO MEDIA GROUP, LLC, | ) |
| a Delaware Corporation, KATHERINE | ) |
| KRUEGER, individually, and WILL | ) |
| MENAKER, individually, | ) |
| | ) |
| Defendants. | ) |

### DEFENDANTS' MOTION FOR PARTIAL RECONSIDERATION AND INCORPORATED MEMORANDUM OF LAW

Defendants Gizmodo Media Group, LLC ("Gizmodo") and Katherine Krueger ("Krueger") (together, "Defendants") respectfully submit this Motion for Partial Reconsideration of the Court's April 24, 2019 Order (Dkt. 110) ("Order") to the extent it held that the Article at issue in Plaintiff's defamation claim was not "fair and true" within the meaning of the Fair Report Privilege codified in Section 74 of New York's Civil Rights Law ("Section 74").

## PRELIMINARY STATEMENT

In its April 24, 2019 Order, this Court held that New York's fair report privilege does not bar Plaintiff's defamation claim arising out of a September 21, 2018 *Splinter* article reporting on the "Mother's Supplement" (the "Supplement" or "Supp.") filed by Delgado in her ongoing custody battle with Plaintiff (the "Article").  More specifically, the Order found that the Article suggests, but the Supplement does not support, that Jane Doe (the alleged victim) had accused Plaintiff of misconduct and that this "tenably bolsters the credibility of the allegations in the Supplement" and may "produce a different effect on a reader than would a report on the Supplement."  Respectfully, the Order both misreads the actual content of the Article and the Supplement and misapplies settled New York law.  It should be reconsidered.  The Order is inconsistent with clear New York precedent, grounded in the First Amendment to the United States Constitution and Article I, Section 8 of the New York State Constitution, that the fair report privilege is to be construed broadly and early disposition of defamation actions is favored.

*First*, the Court's conclusion that the Article does not fairly and accurately report on the Supplement rests exclusively on a three-word attribution clause ("the woman claims") in the Article's opening paragraph.   Read in full, however, the Article is clear that the allegations of misconduct are all sourced from the Supplement, which in turn expressly includes Doe's alleged confirmation of the story to the journalist referred to as Journalist A.  Indeed, the Supplement is peppered with references to statements attributed to Jane Doe, in her own voice or from her own

1

perspective. (*See, e.g.*, Supp. at 1-2, 7-8.)  Most critically, after recapping all the allegations related to Jane Doe, the Supplement alleges that "**Journalist A confirmed the account directly with the victim herself.**  Jane Doe's instant reaction was:  'Yes, that happened to me – how did you know?  Who told you?'"  (*Id*. at 8 (emphasis in original).)  This direct quote attributed to Jane Doe also appears in the Article, accurately sourced to Journalist A.  Accordingly, the Order's key finding that, with the exception of one statement in the Supplement framed by the words "according to Jane Doe," "the Supplement does not attribute *any other accusation* to Jane Doe," was not correct.  Order at 14-15 (emphasis in original).  The Supplement does allege, and the Article accurately reports, that Jane Doe herself "claims" she was surreptitiously dosed with an abortion pill by Plaintiff, leading to the termination of her pregnancy and her hospitalization. As such, the Article is a fair and true report of the Supplement.  Moreover, if there was any question about that substantial accuracy, the Article links to and effectively incorporates the entire Supplement, leaving readers with no doubt as to what was said and how it was attributed in the Supplement.  Because the Article as a whole provides readers with a substantially accurate account of the Supplement, it is indisputably "fair and true."

*Second*, even assuming that the Court's reading of the Article and Supplement are correct, the alleged error in reporting is insufficient to deprive the Article of the Section 74 absolute privilege.  Respectfully, the Order fails to follow the clear directive of the New York Court of Appeals that in assessing whether the privilege applies, "the language used [in the Article] should not be dissected and analyzed with a lexicographer's precision."  *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 68, 424 N.Y.S.2d 165, 168 (1979).  Indeed, the Court of Appeals in *Holy Spirit* upheld the privilege, despite almost the same allegation at issue here: that the article at issue lent undue credibility to

the documents at issue and should not therefore be entitled to the fair report privilege.  Had this Court applied the proper standard, the Article would have been afforded full protections under Section 74.[1]

Accordingly, Defendants respectfully request that the Court reconsider its Order on the issue of whether the Article is entitled to Section 74's fair report privilege, and grant Defendants' motion to dismiss in full.  In the alternative, Defendants respectfully request the Court (1) clarify which allegedly defamatory statements are still at issue in light of its Order, which  addresses only one  of the three statements Plaintiff challenges in his Complaint; and/or (2) certify the Order for immediate appellate review pursuant to 28 U.S.C. § 1292(b).  Immediate appellate review is necessary when, as here, an absolute privilege is at stake, and the issue is one of law and the First Amendment.

## BACKGROUND

The Court's Order rests on a comparison of the Supplement to the Article.  (*See* Order at 16 (holding the Article was not fair and true "after comparing the statements in the Supplement with those in the Article").)  We briefly summarize those allegations in the Supplement that relate to Jane Doe.

### The Supplement

---

[1] The Court's error is understandable.  Defendants argued in their opening brief that the Article was fair and accurate (*see* Dkt. 44 at 11-12), but Plaintiff did not even address the issue in opposition and instead focused on the sealing issue.  As a result, the Court did not have the benefit of this more fulsome presentation of the law.  Indeed, by failing to even address, let alone oppose, the issue, Plaintiff waived the argument.  *See Developmental Techs., LLC v Mitsui Chemicals, Inc.,* No. 8:18-CV-1582-T-27TGW, 2109 WL 1598808, at *6 (M.D. Fla. Apr. 15, 2019) (dismissing claim as "abandoned" where "Plaintiff d[id]not expressly respond to [defendant's] argument" raised in their motion to dismiss); *Sapuppo v. Allstate Floridian Ins. Co.,* 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

4845-0976-3990v.3 0109559-000002

The Supplement opens with an eighteen-point summary of Delgado's allegations concerning Miller and Jane Doe, of which Delgado claims she "was informed" in "summer 2018." (Supp. at 1-2.)  In this summary, the Supplement includes several references to Doe's own point of view.  It states that (1) "[s]hortly [after Jane Doe became pregnant], *according to Jane Doe*, Mr. Miller visited her at her apartment with a Smoothie beverage"; (2) adopting Jane Doe's own subjective perspective, "*unbeknownst to Jane Doe*, the Smoothie contained an abortion [p]ill"; (3) "upon leaving the hospital [after the smoothie caused her hospitalization and the termination of her pregnancy], *a rightly enraged Jane Doe* contacted staffers of local politicians with whom Mr. Miller had been in attendance at Rachel's the night they met"; and (4) a private investigator located Jane Doe in 2016 and "record[ed] a conversation with her . . . at the time Jane Doe said she was currently not interested in speaking out as her parents did not know she was a stripper." (*Id.* (emphasis added).)  Indeed, the Supplement later states that Delgado herself subsequently "obtained knowledge of notes and an audio recording" created by the private investigator, which "Jane Doe consented to." (*Id*. at 7.)

The Supplement also describes how Delgado shared the information she had learned with a "renowned investigative journalist" referred to as "Journalist A." (*Id*. at 8.)  It recounts that Journalist A "confirm[ed the] story" "in a painstakingly methodical and responsible process," which included "locating and speaking to [Jane Doe]." (*Id*.)  It states clearly that "**Journalist A confirmed the account directly with the victim herself**." (*Id*. (emphasis in original).)  The Supplement alleges that Journalist A contacted Jane Doe "[v]ia Facebook" and "set[] up a time to talk on May 31st and subsequently on June 1st." (*Id*.)  Turning back to Jane Doe's voice, it alleges her "instant reaction" to being asked about the story by Journalist A was to say "'Yes, that happened to me – how did you know?  Who told you?'" (*Id*.)  The Supplement reports how

4

Journalist A recounted this information to Delgado, and "confirmed what Mr. Miller did to Jane Doe." (*Id*. at 9.)

In the end, the Supplement states that Journalist A "continues to this day" – i.e. September 2018 – to work on his story about Miller's past misdeeds, at the behest of his editors who "required additional information prior to publishing" due to their concerns that Doe would "backtrack and disappear post publication." (*Id*. at 10.)  The Supplement does not include any suggestion that Jane Doe changed or retracted her prior confirmation of the story, or gave any other reason to believe that she had not been truthful in confirming it.  In fact, the Supplement alleges that, in his reporting, Journalist A also contacted a friend of Doe, who asked Journalist A – unprompted – whether the inquiry was "about the abortion."  (*Id.*, *see also* Ex. 7 to Supp. (showing a screenshot of this message Journalist A sent directly to Delgado).)

In sum, the Supplement alleges that Jane Doe personally confirmed, both to a private investigator and to Journalist A, that Miller impregnated her and then surreptitiously dosed her with an abortion pill, leading to the termination of her pregnancy and to her own hospitalization.

## **ARGUMENT**

### I. **RECONSIDERATION IS APPROPRIATE UNDER THE APPLICABLE LEGAL STANDARD**

The Court "possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *Flintlock Constr. Servs., LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1225 (11th Cir. 2013) (citation omitted).  *See also Woodard v. Dasrat*, No. 809CV1194T-30AEP, 2009 WL 3756329, at *1 (M.D. Fla. Nov. 6, 2009) ("Rule 59(e) gives the Court broad discretion to reconsider an order which it has entered," particularly when (as here) that order has not resulted in entry of judgment).  "Reconsideration of a prior order is proper when the moving party establishes . . . the need to correct manifest errors

of law or fact, or . . . patent misunderstanding by the Court of the party's arguments." *F.T.C. v. Capital Choice Consumer Credit, Inc.*, No. 02-21050 CIV, 2004 WL 5141452, at *2 (S.D. Fla. May 5, 2004), *aff'd*, 157 F. App'x 248 (11th Cir. 2005) (*citing Z.K. Marine Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992)). *See also AL-Ghena Int'l Corp. v. Radwan*, No. 13-61557-CIV, 2015 WL 13031991, at *1 (S.D. Fla. Oct. 16, 2015) (granting a motion for reconsideration where "the Court misunderstood at least one of the circumstances surrounding their need for the relief sought"). Here, Defendants respectfully submit that clear errors of fact and law in the Order should be reconsidered.

## II.   THE ARTICLE ACCURATELY REPORTS ON THE SUPPLEMENT

The Order holds correctly that New York law applies on the question of whether the fair report privilege shields the Article from liability. Applying New York law, the Order finds "Plaintiff plausibly alleges the Article was not a fair and true report of the Supplement," and that New York's Section 74 fair report privilege therefore does not apply. Order at 13.[2] The Order identifies the Article's statement that "the court documents claim, when the woman found out she was pregnant, Miller surreptitiously dosed her with an abortion pill without her knowledge, leading, *the woman claims*, to the pregnancy's termination and nearly her death." Order at 14 (quoting Article at 3 (emphasis added)). In particular, the Court found that it was inaccurate for the Article to use the phrase "the woman claims." According to the Order, the Supplement *only*

---

[2] Because of this holding, the Court does not reach the issue of whether the Supplement was sealed, and whether any such sealing would preclude the application of Section 74. As set out in Plaintiffs' Motion to Dismiss, Section 74 applies to *all* court filings, with the narrow exception – not applicable here – of sealed "records or proceedings in an action for divorce or separation" covered by the blanket sealing provision of New York Domestic Relations Law § 235(1). *Shiles v. News Syndicate Co.*, 27 N.Y.2d 9, 18, 313 N.Y.S.2d 104, 110 (1970). The same day the Court issued its Order, the Second Circuit affirmed that the *Shiles* exception must be read narrowly. *See Zappin v. NYP Holdings Inc.*, No. 18-647, --- F. App'x. ----, 2019 WL 1782635, at *1 (2d Cir. Apr. 24, 2019). *See also* Motion to Dismiss at 15.

attributes the fact that "Miller visited [Jane Doe] at her apartment with a Smoothie beverage," as being "according to Jane Doe" and otherwise "the Supplement does not attribute *any other accusation* to Jane Doe." Order at 14-15 (emphasis in original). The Order concludes that because "the Supplement, unlike the Article, does not state Jane Doe 'claims' Plaintiff gave her an abortion pill without her knowledge," the attribution of this allegation to Jane Doe "tenably bolsters the credibility of the allegations in the Supplement," thereby allowing it to potentially "produce a different effect on a reader than would a[n accurate] report." *Id*. at 15. Respectfully, these findings inaccurately depict both the Supplement and the Article.[3]

Significantly, the Court ignores that the Supplement *does* include Doe's confirmation of the story. Instead, the Order focuses exclusively on three words contained in the Article's opening paragraph, or its "lede." The lede paragraph in a news article is meant to introduce, summarize, and draw readers in to the full report that follows, not to be read in isolation. There is no basis for not reading the lede in conjunction with the body of the Article.[4] In this vein, the Article's lede properly cautions readers about the context of the "explosive new court filing": the "ongoing custody battle" between Miller and Delgado that has "taken another nasty turn." (Article at 1.) Then, underscoring the source of the information, the Article's lede also makes it clear that the allegations to follow come from "court documents" submitted by "Delgado's team." (*Id*.) Finally, the lede briefly summarizes the allegations, including that "the woman claims" Miller surreptitiously "dosed her with an abortion pill" which led to "the pregnancy's

---

[3] From its outset, the Article makes clear that it is doing nothing more than reporting on the Supplement's allegations. This transparent reporting continues throughout the Article, with near-constant references to the "allegations," the "filing," and the "court documents." (*See, e.g.*, *id*. at 1-2 (showing at least five attributions to the underlying documents in the Article's second and third paragraphs).)

[4] The law is clear that the Article must be read as a whole; one does not consider a clause or a paragraph in isolation from the whole. *See infra*, at 11-12.

7

termination and nearly her death."  (*Id.*)

The rest of the Article fills out the Supplement's allegations that are foreshadowed in the lede paragraph. After explaining "[a]ccording to the court documents" how the relationship between Miller and Jane Doe started, the Article includes verbatim recitations from several of the Supplement's bullets summarizing the key contentions, including those reflecting Doe's point of view.  (*Id.* at 2.)  Later, turning to the basis for the lede's allegations concerning the abortion pill and hospitalization, the Article reports, directly from the Supplement:

> "Delgado relayed the allegations about Miller and Jane Doe to [Journalist A], who spoke with Jane Doe.  The Supplement highlights that Doe confirmed the details about of the story. Specifically, when the journalist asked about the account, the filing says, 'Jane Doe's instant reaction was:  Yes, that happened to me – how did you know?  Who told you?'"

*Id.* at 3.  In short, the Article's opening use of the clause "the woman claims" in the context of the entire Article, is referring directly to the Supplement's underscored statement that Journalist A "<u>confirmed the account directly with the victim herself</u>," along with Jane Doe's "instant reaction" that "Yes, that happened to me . . ." (Supp. at 8 (emphasis in original); Article at 3.) And, the Article is clear that Jane Doe confirmed the story to Journalist A, not Delgado herself.

In limiting its analysis to the Article's lede, the Order ignores entirely the Article's full explanation of the information previewed in its opening paragraph.  Most critically, the Order makes no reference to the fact that the Article, based on the Supplement, described how Journalist A obtained an express confirmation of the allegations from Jane Doe, including a direct and vivid quote from her.  And, as established above, these reported allegations are indisputably a full and accurate summary of the Supplement.  Beyond the three words in the lede, Plaintiff does not challenge that the rest of the Article accurately reports on the Supplement.

4845-0976-3990v.3 0109559-000002

Indeed, if there was any possible confusion, the Article embeds the *entirety* of the Supplement at its end, allowing readers to review the filing in full and draw their own conclusions as to the credibility of the allegations set forth therein.  (Article at 5-6.)  *See Patriarch Partners, LLC v Mergermarket (U.S.) Ltd*., No. 160379/2016, 2018 WL 1587674, at *5 and n.8 (Sup. Ct. N.Y. Cty. Apr. 02, 2018) (in holding Section 74 applied to a report alleged to have gone beyond underlying official documents, noting favorably that the report included hyperlinks to the documents, so its readers "could review them in order to make their own assessments."); *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.3d 32, 38, 925 N.Y.S.2d 407, 411 (1st Dep't 2011) (hyperlinks to source material included in a challenged publication "provide the reader with the facts and allow the reader to arrive at his or her own conclusions").

In short, not only does the Article accurately rely on Doe's alleged confirmation in the Supplement, it properly credits this information to Journalist A.  Nonetheless, the Order attempts to explain its conclusion that the Supplement "belies the contention Jane Doe was the source of those allegations" and it does so based on a "careful review" of the court filing.  (Order at 15.) The Order finds that the Supplement states that "when [the] private investigator reached out to Jane Doe, she failed to confirm the allegations."  (*Id*.)

Respectfully, the Supplement simply does not say that.  Instead, the Supplement states that Jane Doe told the private investigator she "was not interested in ***speaking out***" (since her parents did not know she was a stripper).  (Supp. at 2, 7 (emphasis added).  The Supplement reinforces the reasonable conclusion that Jane Doe *did* confirm her account to the private investigator, but was unwilling to speak *publicly* (i.e. "speak out") about the events, by its allegation that Delgado later "obtained knowledge of notes and [the] audio recording" taken by the investigator and was "shaken to her core."  *Id.* at 7-8.

9

Next, the Order finds that "a journalist who investigated the story did not publish a report because of his editors' concerns Jane Doe would 'backtrack' from the allegations." (Order at 15.) Yet, the Supplement actually alleges that Journalist A, the same one who obtained a direct confirmation of the story from Doe, "continues to this day [September 14, 2018] working on [the story]" and concludes that "**Journalist A continues working on the report**." Supp. at 10 (emphasis in original). Finally, the Order brushes aside the account conveyed to Delgado by Gentleman A, noting that this information came "from 'multiple sources' that were 'unverified by him.'" The Order omits the Supplement's explanation (in the very same sentence), that Gentleman A identified "all" these sources as "**credible**" (and described the *account* as "unverified by him," not the sources). (*Compare* Order at 15, *with* Supp. at 6 (emphasis in original).)

Independent of the source issue, no one disputes that the Article accurately reports on Miller's alleged *wrongdoing,* as accused in the Supplement. This alone is sufficient to confer protection under Section 74, which focuses on the substance of the wrongdoing alleged, not the manner of the allegation. *See Fuji Photo Film U.S.A., Inc. v McNulty,* 669 F. Supp. 2d 405, 415 (S.D.N.Y. 2009) (statements were privileged under Section 74 where they did not imply that plaintiff "engaged in any misconduct other than that alleged in the Complaint"); *Lacher v. Engel,* 33 A.D.3d 10, 17, 817 N.Y.S.2d 37, 43 (1st Dep't 2006) ("Comments that essentially summarize or restate the allegations of a pleading filed in an action are the type of statements that fall within Section 74's privilege"). The alleged misconduct by Miller described in the Article – impregnating a woman, giving her an abortion pill without her knowledge, and consequently causing the termination of the woman's pregnancy and her own near-death – is *identical* to the misconduct alleged in the Supplement. (*Compare* Article at 1-2 *with* Supp. at 102, 607). Section

74 requires nothing more.

For all these reasons, the Order was incorrect in its holding that "the Supplement, unlike the Article, does not state Jane Doe 'claims' Plaintiff gave her an abortion pill without her knowledge." (Order at 15.) The Supplement does state that Jane Doe herself confirmed this account, and the Article reports accurately on the degrees of separation between Delgado, the Supplement's author, and Jane Doe. The Article is therefore an accurate report on the Supplement, entitled to full protection under Section 74.

## III. EVEN ASSUMING THE ARTICLE'S REPORTING MISSTATED THE ALLEGATIONS IN THE SUPPLEMENT, IT WOULD STILL BE PRIVILEGED UNDER SETTLED NEW YORK LAW

Even if the Article's use of the phrase "the woman claims" in its lede paragraph was incorrect, this error would not be sufficient to strip the Article of the Section 74 privilege under well-established New York law. At most, the alleged error went to the credibility of the person making the charge of misconduct, not the nature of the misconduct at issue, and the law is clear that such an error is not sufficient.

New York courts have consistently held that the fair report privilege does not require exacting precision in reporting the substance of a judicial or administrative proceeding; only that the report be "substantially accurate." *Holy Spirit Ass'n*, 49 N.Y.2d at 67, 424 N.Y.S.2d at 167; *Becher v. Troy Pub. Co.*, 183 A.D.2d 230, 233, 589 N.Y.S.2d 644, 646 (3d Dep't 1992). In addition, the court must read challenged statements "in the context of the entire statement or publication as a whole." *Aronson v. Wiersna*, 65 N.Y.2d 592, 594, 493 N.Y.S.2d 1006, 1007 (1985). *See also Fraser v Park Newspapers of St. Lawrence*, 246 A.D.2d 894, 895-96, 668 N.Y.S.2d 284, 286 (3d Dept 1998) ("In evaluating substantial accuracy under Section 74, the defamatory potential of a particular . . . statement is to be ascertained by considering the challenged publication in its entirety; only after doing so can one then determine whether, and to

11

what extent, the falsehood affects the overall impression left on the average reader").

For this reason, the Court of Appeals has given specific instructions that courts construing the fair report privilege must avoid exactly the kind of analysis this Court undertook. It has held:

> When determining whether an article constitutes a 'fair and true' report, the language used therein should not be dissected and analyzed with a lexicographer's precision. This is so because a newspaper article is, by its very nature, a condensed report of events which must, of necessity, reflect to some degree the subjective viewpoint of its author. Nor should a fair report which is not misleading, composed and phrased in good faith under the exigencies of a publication deadline, be thereafter parsed and dissected on the basis of precise denotative meanings which may literally, although not contextually, be ascribed to the words used.

*Holy Spirit Ass'n*, 49 N.Y.2d at 68, 424 N.Y.S.2d at 168.  *See also Sbarbati v. New York Post*, 92133/83, 02649/83, 10 Media L. Rep. 2190, 2191 (Sup. Ct. N.Y. Cty.  July 25, 1984) ("[T]he courts have exercised a fair amount of 'liberality' in interpreting Section 74 . . . holding that an article need not be a verbatim account or even a precisely accurate report of such a proceeding."); *McKesson v Pirro*, No. 160992/2017, 2019 WL 1330910, at *8 (Sup. Ct. N.Y. Cty. Mar. 25, 2019) (a "minor imprecision in word choice is acceptable under Section 74"); *Becher*, 183 A.D.2d. at 234, 589 N.Y.S.2d at 646-47 ("Newspapers cannot be held to a standard of strict accountability for use of legal terms of art in a way that is not precisely or technically correct by every possible definition. . . .  Hence, in areas of doubt and conflicting considerations, it is almost always preferable to err on the side of free expression").

*Holy Spirit* is entirely controlling here.  In that case, the plaintiff contended – closely mirroring Plaintiff's claims here – that a series of articles reporting on intelligence documents released by the U.S. Government lent undue credibility to those documents.  Though they were not "'untrue' in the sense that they contain misquoted material," the plaintiff argued, "by failing to characterize properly the nature of the intelligence reports, [the articles] distorted the import of

these documents to the detriment of plaintiff." 49 N.Y.2d at 65-66, 424 N.Y.S.2d at 166-67. In particular, the plaintiff argued that the articles' use of terms like "confirmed" to describe allegations in a document that at the time were *not* confirmed (but which had been implicitly confirmed in subsequent documents) "implies that the information contained in the [earlier] document . . . had been verified by independent sources, and, thus, its usage was patently unfair." *Id*. at 67, 424 N.Y.S.2d at 167. The Court of Appeals disagreed, concluding that while the articles' phrasing may "denote to some degree, a sense of legitimacy which, in hindsight, could be characterized as imprudent given the unverified nature of the reports, this observation does not, in and of itself, render the newspaper articles unfair," and held that Section 74 protected the articles. *Id*. at 68, 424 N.Y.S.2d at 168.

This reasoning applies directly to the case at hand: This Court's Order found that the Article "exceeds the scope of the Supplement" and thereby "tenably bolsters the credibility of the [the Supplement's] allegations." (Order at 15.) As Magistrate Judge Goodman put it, the Article added "gloss" to the Supplement. (*See* Dkt. 112 at 4.) This is the same argument that the Court of Appeals in *Holy Spirit* rejected, making it clear that such a "gloss" – one attributing a slight, if undue or "imprudent," attribution of "a sense of legitimacy" to allegations in underlying documents – *does not* render an article "unfair." *Holy Spirit Ass'n,* 49 N.Y.2d at 68, 424 N.Y.S.2d at 168. Thus, according to New York's highest court, the Article here must be construed as "fair and true," and therefore protected by Section 74. [5]

---

[5] The high bar for depriving a report on a court filing of Section 74's protections is in keeping with the well-established principle in New York that cases implicating the First Amendment should not proceed to discovery, let alone a jury, without good cause. New York courts recognize that "[t]o unnecessarily delay the disposition of a libel action is not only to countenance waste and inefficiency but to enhance the value of such actions as instruments of harassment and coercion inimical to the exercise of First Amendment rights." *Immuno AG. v. Moor-Jankowski*, 145 A.D.2d 114, 128, 537 N.Y.S.2d 129, 137 (1st Dep't 1989), *aff'd*, 74

Indeed, even assuming that the Article's attribution to Jane Doe went beyond a mere characterization and amounted to an affirmative misstatement of fact (though Defendants strongly dispute any such reading), that would *still* be insufficient to deprive the Article of Section 74's protections.  Under New York law, a report is "substantially accurate" and therefore absolutely privileged, if despite some inaccuracies, the report does "not produce a different effect on the reader than would a report containing the precise truth."  *Silver v. Kuehbeck*, No. 05-Civ-35(RPP), 2005 WL 2990642, at *16 (S.D.N.Y. Nov. 7, 2005) (internal quotation marks and citation omitted), *aff'd*, 217 F. App'x 18 (2d Cir. 2007); *Sharon v. Time*, *Inc.,* 609 F. Supp. 1291, 1294 (S.D.N.Y. 1984) ("Defendant is permitted to prove the substantial truth of this statement by establishing any other proposition that has the same 'gist' or 'sting' as the original libel, that is, the same effect on the mind of the reader."); *Posner v. N.Y. Law Publ'g Co.*, 228 A.D.2d 318, 318, 644 N.Y.S.2d 227, 227 (1st Dep't 1996) (minor inaccuracies in a substantially accurate article about a court decision did not remove the article from the protection of the Section 74 privilege).  New York's standard is consistent with the Supreme Court's directive that, in ruling on libel claims, courts must "overlook[] minor inaccuracies and concentrate[] upon substantial truth."  *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496, 516-17 (1991).

Applying these well-settled principles, New York courts have affirmed repeatedly that Section 74's protections do not disappear where a report, for instance, mischaracterizes the degree or circumstances of the wrongdoing alleged.  *See, e.g.*, *Weiser v. Gannett Suburban Newspapers*, 25 Media L. Rep. 2174, 2176 (1st Dep't Dec. 17, 1996) (article was substantially

---

N.Y.2d 548 (1989), *vacated*, 497 U.S. 1021 (1990), *aff'd*, 77 N.Y.2d 235 (1991).  Thus, New York law encourages the disposition of defamation cases at the earliest appropriate stage, often on a motion to dismiss.  *See*, *e.g.*, *Shiamili v. Real Estate Grp. of N.Y., Inc.*, 17 N.Y.3d 281, 929 N.Y.S.2d 19 (2011); *Brian v. Richardson*, 87 N.Y.2d 46, 637 N.Y.S.2d 347 (1995).

14

accurate even though it erroneously stated that plaintiff had been arraigned on twenty-two felony charges and charged with eight misdemeanors when he had actually been arraigned on only one felony charge); *Becher*, 183 A.D.2d at 233, 589 N.Y.S.2d at 646 (article was fair and true report under Section 74 when it stated plaintiff had been indicted on felony bribery charges when he had only been charged with misdemeanors); *Cholowsky v. Civiletti*, 16 Misc. 3d 1138(A), at *3, 851 N.Y.S.2d 57 (Sup. Ct. Suffolk Cty. 1992) ("gist" of statement remained accurate even though article reported plaintiff "illegally dump[ed] hazardous waste," when in fact he was only "planning" to do so), *aff'd*, 69 A.D.3d 110, 887 N.Y.S.2d 592 (2d Dep't 2009); *Alf v. Buffalo News, Inc.*, 100 A.D.3d 1487, 1488-89, 953 N.Y.S.2d 797, 799-800 (4th Dep't 2012), *aff'd*, 21 N.Y.3d 988, 972 N.Y.S.2d 206 (2013) (affirming dismissal under Section 74 despite articles' inaccuracies, which included falsely implying that plaintiffs admitted to cheating the government over a period of years); *SentosaCare LLC v. Lehman*, 58 Misc. 3d 1216(A), at *9, 95 N.Y.S.3d 126 (Sup. Ct. N.Y. Cty. 2018) (statement that authorities "discovered" criminal conduct, where conduct was in fact self-reported by plaintiff, did not imply additional wrongdoing since "the fact remains that this conduct occurred . . . regardless of who reported it").

By contrast, the two cases this Court relied on to support its ruling involved more than mere errors of degree related to the credibility of the sourcing.  (Order at 15-16); *Pisani v. Staten Island Univ. Hosp.*, 440 F. Supp. 2d 168, 170 (E.D.N.Y. 2006) (press release by a hospital regarding a criminal settlement in which the hospital <u>admitted</u> to regrettable "misconduct" by its executives was not fair and true where hospital had in fact <u>denied</u> wrongdoing in the underlying proceeding, and admission implied firsthand knowledge by the hospital of wrongdoing); *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir. 2005) (report that plaintiff had wrongly caused a town to be charged for more than $170,000 of bills for a golf course he managed was not

substantially accurate, when in fact the bills had been properly paid by the town but the record keeping was insufficient).  *See also Gubarev v. BuzzFeed, Inc.*, 340 F. Supp. 3d 1304, 1318 (S.D. Fla. 2018) (distinguishing *Karedes* as a case where the misstatement at issue "attributes to [plaintiff] misconduct beyond that alleged").  Here, the "gist" of the misconduct alleged – that Plaintiff dosed a woman with an abortion pill without her knowledge, leading to her hospitalization and the termination of her pregnancy – is identical as between the Article and the Supplement.

In fact, where, as here, a report *as a whole* paints a substantially fair and accurate picture of an underlying official document, New York courts are even less inclined to allow a single mischaracterization to defeat Section 74's protections.  *See, e.g.*, *Becher*, 183 A.D.2d at 236, 589 N.Y.S.2d at 648 ("The presence of such a misstatement in an article does not necessarily mean, however, that there is a triable issue of fact as to whether the article was false and unfair. The article as a whole may nevertheless be substantially accurate so as to qualify as a fair and true report.").  For example, in *Ford v. Levinson*, 90 A.D.2d 464, 454 N.Y.S.2d 846 (1st Dep't 1982), a New York appeals court affirmed that a series of statements regarding a lawsuit were protected under Section 74, even when one statement went beyond the allegations of the underlying court filing and attributed a specific motive to the misconduct alleged.  *Id*. at 465, 454 N.Y.S.2d at 848.  The court reasoned that this statement "constitute[d] background to the misconduct attributed to the [plaintiffs] in the complaint rather than a separate and independently defamatory accusation," and on that basis found it privileged on the same grounds as the other statements.

The *Ford* court's reasoning applies equally here.  The Order finds that the Article in one instance goes beyond the allegations of the Supplement, and characterizes certain allegations as having been alleged by Jane Doe directly.  *See* Order at 15.  But a "reasonable reader" viewing

the Article as a whole would encounter repeated references to the allegations having been made *by Delgado* in her court filing, based on a story Delgado had heard initially as a rumor, which was then investigated by a reporter she knew, who told her that *he* had spoken to Jane Doe and confirmed the story. And indeed, the reader could even review the complete Supplement, which is embedded in the Article. Read as a whole, the Article does not state, or give any impression, that Jane Doe spoke directly to either Delgado or to *Splinter*. The Court's holding otherwise is employing the very "lexicographer's precision" that New York's Court of Appeals rejected. Under these circumstances, New York's Section 74 privilege indisputably applies.

## IV.   ALTERNATIVELY, DEFENDANTS REQUEST CLARIFICATION ON WHICH STATEMENTS ARE STILL AT ISSUE

In the alternative, Defendants respectfully request the Court clarify which portions of the Article are still at issue, in light of the Order. While the Order addresses the applicability of Section 74 to the opening paragraph's summary of the Supplement's allegations, it does not specify whether Section 74 would apply to any other statements at issue. The law is clear that the presence of a single non-"fair and true" statement in a publication does not preclude the applicability of Section 74 to other challenged statements therein. *See Greenberg v. Spitzer*, 155 A.D.3d 27, 49-52, 62 N.Y.S.3d 372 (2d Dep't 2017) (holding that certain statements made by the defendant during an interview were protected by Section 74, while others were not.)

In particular, the Order appears to acknowledge (but does not directly hold) that, to the extent some portions of the Article do *not* mischaracterize the Supplement, those portions would be protected by Section 74. By this measure, the Article's inclusion of the full text of the Supplement would seem to be categorically privileged, as this is an exact copy of the underlying court filing, and therefore indisputably an "accurate" rendition subject to Section 74 protections. *See Gubarev*, 340 F. Supp. 3d at 1318 (embedded full copy of document under official

investigation was protected by Section 74).  Thus, Plaintiff's claims arising out the Supplement should be precluded, but the Order does not state this. (*See* Compl. ¶ 162 (alleging that the Article "*and Supplement*" defamed him) (emphasis added).)  Accordingly, Defendants first ask for clarification of whether Plaintiff may continue to pursue his claims with regard to the Supplement alone.

Moreover, in addition to challenging the Article's statement that "Jane Doe 'claims' Miller's actions led to her pregnancy's termination and nearly her death," (Compl. ¶ 162), Plaintiff also challenges two other statements in the Article "concerning… [1] his attempts to silence and coerce [Jane Doe], and [2] his physical abuse of another woman." (*Id*.)  These alleged statements in the Article are based on, and attributed to, the Supplement.  Yet, the Order does not indicate whether the Article's quotation from the Supplement that Miller "attempted to have Jane Doe sign a non-disclosure agreement." is also somehow removed from Section 74's privilege.  (*See* Article at 2.)  Nor does the Order indicate, with regard to the second challenged statement, that Article in any way mischaracterized the Supplement's allegations regarding the other alleged "victim" of physical abuse by Miller.  (*See* Article at 3.)  Defendants therefore request clarification on whether these two statements are protected by Section 74.

Defendants do not mean to burden the Court, but should the Court decline to reconsider its ruling and hold the entire Article is protected by New York's fair report privilege, the parties need clarification as to what issues remain in the case.  The parties are engaged in active discovery, and a clearer understanding of the actual statements still at issue in this matter will have a direct impact on the scope of that discovery, particularly with regard to substantial truth and actual malice.  Accordingly, should the Court deny Defendants' motion for reconsideration of the Order, Defendants request that it nonetheless clarify which statements in the Article are

still at issue in this case.

## V.   IN THE EVENT THE COURT DECLINES TO RECONSIDER ITS ORDER, IT SHOULD CERTIFY THE ORDER FOR INTERLOCUTORY APPEAL

If the Court declines to reconsider its Order, then Defendants respectfully request that the Court certify the Order for immediate review pursuant to 28 U.S.C. § 1292(b).  A district court may certify an order for interlocutory appeal where "(1) the issue is a pure question of law, (2) the issue is 'controlling of at least a substantial part of the case,' (3) the issue was specified by the district court in its order, (4) 'there are substantial grounds for difference of opinion' on the issue, and (5) 'resolution may well substantially reduce the amount of litigation necessary on remand.'" *Mamani v. Berzain*, 825 F.3d 1304, 1312 (11th Cir. 2016).  This is such a case.

*First*, the Court's Order hinges on a pure and controlling question of law – namely:  Is the Article's use of the phrase "the woman claims" in its first paragraph sufficient to deprive the Article of Section 74's absolute privilege?  This question is an "abstract legal issue[]" that the "Court of Appeals can decide quickly and cleanly . . . without having to delve beyond the surface of the record in order to determine the facts."  *McFarlin v. Conseco Servs.*, 381 F.3d 1251, 1258-59 (11th Cir. 2004).  This question relates to the proper standard of "fair and true" under New York's Section 74 privilege, and can be resolved as a matter of law by reference solely to the Article and Supplement.

*Second and third*, the Court confronted or was required to confront this controlling issue in its Order – and indeed the Order's determination on Plaintiff's defamation claim did hinge entirely on this question.

*Fourth*, there is plain and substantial ground for difference of opinion with this Court. *McFarlin*, 381 F.3d at 1258.  As set out in Sections II & III, *supra*, many courts have ruled on Section 74 cases in a manner directly contrary to the Court's Order here.

*Fifth*, a decision on these issues will dispose of Plaintiff's entire case, thus obviating the need for trial, and therefore materially shortening the time, effort, and expense of litigation. *Id.* at 1259.  Courts have long recognized that interlocutory review in libel lawsuits is "a salutary step towards minimizing the expenditure of finite resources" on unnecessary litigation, thus reducing the chilling impact of such lawsuits on speech.  *Time, Inc. v. McLaney*, 406 F.2d 565, 566 (5th Cir. 1969) (granting § 1292(b) appeal from denial of summary judgment because "the failure to dismiss" might "necessitate long and expensive trial proceedings" that offend First Amendment principles "if not really warranted").

## CONCLUSION

For the reasons set out above, Defendants respectfully request the Court reconsider its Order and dismiss Plaintiff's defamation claims on fair report grounds.  In the alternative, Defendants request the Court clarify the applicability of its Order to each of the statements at issue, and/or certify the Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

Respectfully submitted,
May 6, 2019

/s/ *Elizabeth A. McNamara*
Elizabeth A. McNamara (*pro hac vice*)
Katherine M. Bolger (*pro hac vice*)
Claire K. Leonard (*pro hac vice*)
DAVIS WRIGHT TREMAINE
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 489-8230
lizmcnamara@dwt.com
katebolger@dwt.com
claireleonard@dwt.com

*Attorneys for Defendants Gizmodo Media Group, LLC and Katherine Krueger*

/s/ *Deanna K. Shullman*
Deanna K. Shullman (Florida Bar No. 514462)
Rachel Fugate (Florida Bar. No. 144029)
Giselle M. Girones (Florida Bar. No. 124373)
SHULLMAN FUGATE PLLC
2101 Vista Parkway, Suite 4006
West Palm Beach, FL 33411
Telephone: (561) 429-3619
dshullman@shullmanfugate.com
rfugate@shullmanfugate.com
ggirones@shullmanfugate.com

*Attorneys for Defendants Gizmodo Media Group, LLC and Katherine Krueger*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 6, 2019, a true and correct copy of the foregoing has been served by CM/ECF on all counsel or parties of record on the service list.

*/s/Deanna K. Shullman*

Deanna K. Shullman
Florida Bar No. 514462

21

4845-0976-3990v.3 0109559-000002