UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:18-cv-24227-CMA

JASON MILLER,

    Plaintiff,

      v.

GIZMODO MEDIA GROUP, LLC,
a Delaware Corporation, KATHERINE
KRUEGER, individually, and
WILL MENAKER, individually,

    Defendants.
_____/

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON FALSITY

Plaintiff, Jason Miller ("Miller"), by counsel and pursuant to Rule 56 and Local Rule 56.1, moves for the entry of a partial summary judgment on the falsity element of his defamation claim against Gizmodo Defendants. In support, Miller states as follows:

### INTRODUCTION

Through this motion, Miller seeks summary judgment on one issue: falsity. Whereas other elements of Miller's defamation claim[1] could be, and Gizmodo Defendants' applicable

---

[1] There are other elements of Miller's defamation claim which he believes cannot be disputed, such as publication and whether the statements at issue are "of and concerning" Miller. In their Answer, Gizmodo Defendants admit the statements in the Article and Supplement concern Miller (*See* Doc. No. 118 ¶ 161), and that Gizmodo published the Article (*See* Doc. No. 118 ¶¶ 160, 163). In her deposition, Katherine Krueger ("Krueger") testified she "published" the Article and that it was "my reporting." (*See* Miller Statement of Material Facts ¶ 3) Miller also believes it may be possible to decide as a matter of law whether the statements about Miller are defamatory *per se*, given that the statements (among other things) charge Miller with serious criminal conduct and are unambiguous and only susceptible to one meaning. *Liberman v. Gelstein*, 80 N.Y.2d 429, 435, 605 N.E.2d 344 (1992) (defamation per se consists of charging plaintiff with a serious crime or tend to injure another in his or her trade, business or profession);

affirmative defenses are, laden with fact issues[2] that will require this case to be tried, there is no dispute that the statements concerning Miller upon which his defamation claim is based are demonstrably false, including the following:

- In 2012, Miller had a sexual relationship with "Jane Doe,"[3] a stripper he met at Rachel's Gentleman's Club in Orlando, Florida—which led to Jane Doe becoming pregnant.

- Miller gave Jane Doe a smoothie containing an abortion pill, which induced an abortion causing the death of Jane Doe's unborn child and almost killing Jane Doe.

- Miller tried to pay Jane Doe off and to get her to sign a non-disclosure agreement in exchange for a payoff.

- Around the same time, Miller was involved with a woman who lives in Clearwater, Florida, with whom he was physically abusive and physically beat "with an open hand."

- Jane Doe (*i.e.,* "the woman") claimed Miller caused her "pregnancy's termination and nearly her death."

The falsity of these statements is established through the sworn declarations of Miller and Jane Doe[4], which Gizmodo Defendants cannot refute. In fact, Gizmodo Defendants conceded that they are not aware of any facts that establish the truth of the accusations about Miller in the

---

*Sprewell v. NYP Holdings, Inc.*, 1 Misc.3d 847, 849-50, 772 N.Y.S.2d 188 (2003) (same); *Pauling v. News Syndicate Co.*, 335 F.2d 659, 663 (2d Cir. 1964) ("If the language of a publication is unambiguous the question whether it is libelous per se is for the court…") (citing *Wright v. Farm Journal*, 158 F.2d 976, 978 (2d Cir. 1947).

[2] Gizmodo Defendants recently indicated they intend to seek summary judgment as to "each element of Plaintiff's purported defamation claim, and…several constitutional arguments." (*See* Doc. No. 143 p. 2). Miller will respond accordingly, specifically identifying the disputed issues of fact and matters that require resolution by the jury.

[3] Pursuant to the Confidentiality Order [Doc. No. 100] entered in this case, "[a]ny pleadings or other papers publicly filed with the court record shall not use "Jane Doe's" legal name or disclose her address or other personal identifying information." (*See* Doc. No. 100 at ¶ 11)

[4] Jane Does. Name is redacted in her Declaration already on file with the Court [Doc. No. 5-1]. Pursuant to the Confidentiality Order [Doc. No. 100], Miller is filing a motion under Local Rule 5.4 to file Jane Doe's unredacted declaration under seal.

Article and Supplement.  Consequently, Miller should be granted judgment as a matter of law on the falsity of the statements.

## UNDISPUTED MATERIAL FACTS[5]

**A.     The False Accusations**

On September 21, 2018, Gizmodo Defendants published the article "*Court Docs Allege Ex-Trump Staffer Drugged Woman He Got Pregnant With 'Abortion Pill'*" (the "Article"), and a copy of the "*Supplement to Mother's March 2018 Motion for Court to Consider Psychological Evaluation of the Father*" (the "Supplement"), filed in a pending paternity case between Miller and Arlene Delgado in Miami-Dade Circuit Court.  [SMF ¶¶ 1-3]

Among other things, the Article states that "in 2012, when Miller was working for prominent Republican advertising firm Jamestown Associates," he "carried out an affair with a woman he met at an Orlando strip club…[and that]…when the woman found out she was pregnant, Miller surreptitiously dosed her with an abortion pill without her knowledge, leading, ***the woman claims***, to the pregnancy's termination and nearly her death."  [Doc. No. 5-3 at pp. 7-8 (emphasis added)]  In this passage (the "lead" of the Article), Gizmodo Defendants used the phrase "the woman claims" to differentiate between what she and the Supplement "claimed." [SMF ¶ 15]  The Article also describes "yet another victim of Mr. Miller's who alleged he had been physically abusive."  [Doc. No. 5-3 at p. 7]

Gizmodo Defendants included an image of the following excerpt from the Supplement in the Article:

---

[5] Miller's Statement of Material Facts under Local Rule 56.1(a) is filed contemporaneously herewith and cited herein as "SMF ¶ ____."

> Shortly thereafter, according to Joe Doe, Mr. Miller visited her at her apartment with a Smoothie beverage.
>
> Unbeknownst to Jane Doe, the Smoothie **contained an abortion bill.** [sic]
>
> The pill induced an abortion, and Jane Doe wound up in a hospital emergency room, bleeding heavily and nearly went into a coma.
>
> The unborn child died.
>
> Jane Doe herself was hospitalized for two days, the abortion pill possibly reacting with potential street drugs in her system at the time she drank the Smoothie.
>
> Upon leaving the hospital, a rightly enraged Jane Doe contacted the staffers of local politicians with whom Mr. Miller had been in attendance at Rachel's the night they met.
>
> Mr. Miller then, in a panic, attempted to have Jane Doe sign a non-disclosure agreement ("NDA"), presumably in exchange for a sum of money.

[Doc. No. 5-3 at p. 4]  The Article embedded – and therefore published – the entire Supplement.

[Doc. No. 5-3 at p. 3]

The Supplement itemizes the criminal accusations about Miller's relationship with Jane Doe, which include in part:

> In summer 2018, [Delgado] was informed as follows:
>
> 1.      In 2012, Mr. Miller, while working for Jamestown Associates, was working closely with the firm's Florida clients.
>
> 2.      As part of this, Mr. Miller spent significant time in Orlando, Florida.
>
> 3.      Evenings with clients and colleagues sometimes entailed steakhouse dinners followed by strip clubs and/or patronage of escorts for some of the participants.
>
> 4.      During one such evening, Mr. Miller and other colleagues/clients visited Rachel's Gentleman's Club, a strip club in Orlando (which also has a West Palm Beach location).
>
> 5.      At the time, Mr. Miller was already married to his wife (whom he married in July 2008) and had a 4-year-old daughter (who was born in late 2008).

> 6. Mr. Miller met a stripper that evening, which [sic] will be referred to herein as "Jane Doe" (Mother has individual's full name).
>
> **7. Mr. Miller had sexual intercourse with Jane Doe and continued a sexual relationship with her for some unknown period of time.**
>
> **8. Jane Doe became pregnant.**
>
> 9. Shortly thereafter, according to Jane Doe, Mr. Miller visited her apartment with a Smoothie beverage.
>
> 10. Unbeknownst to Jane Doe, the Smoothie contained an abortion [p]ill.
>
> 11. The pill induced an abortion, and Jane Doe wound up in a hospital emergency room, bleeding heavily and nearly went into a coma.
>
> 12. The unborn child died.

(*See* Doc. No. 110 at pp. 3-4 (citing Supplement pp 1-2)).

The Supplement bluntly describes its accusations against Miller as "felonious criminal acts, including illegally obtaining an "abortion pill;" illegally administering said medication, administering medication to an individual unbeknownst to said individual; and causing the death of an unborn child via a forcibly induced abortion." (Supplement p. 2)  The Article's author, Krueger, acknowledged the Supplement talked about Miller "murdering a baby with an abortion pill by slipping it into a smoothie."  [SMF ¶ 14]

The accusations in the Supplement about Miller and Jane Doe emanated from an unidentified man ("Gentleman A") Delgado met on Twitter, who told Delgado he received information about Jane Doe from "multiple sources" who were "unverified by him," and he was unable to "vouch for its veracity."  (*See* Doc. No. 110 at p. 4 (citing Supplement p. 6))  The Supplement also claims "Journalist A" (Yashar Ali) "confirmed" the Jane Doe story "with the victim herself." (Supplement p. 8)

In addition to the Jane Doe accusations, the Supplement accuses Miller of beating another unidentified woman and trying to cover up the crime. (*See* Doc. No. 110 at p. 4 (citing Supplement p. 9)). Specifically, the Supplement states that "Journalist A" told Delgado about "yet another victim of Mr. Miller's, in addition to Jane Doe – this time, a woman Mr. Miller was involved with, seemingly around the same time period as Jane Doe, with whom he was physically abusive… [and]… physically beat her ("with an open hand")." (*See* Supplement p. 9)

### B.    Indisputable Proof of Falsity

The only witnesses with the personal, first-hand knowledge necessary to establish the truth or falsity of the accusations are Miller and Jane Doe[6]; both of whom confirmed under oath that the accusations are false. Delgado and her cited sources for the accusations, "Gentleman A" (who remains unidentified) and "Journalist A" (Yashar Ali), have no first-hand knowledge of whether any of subject accusations against Miller are true. In fact, Gizmodo Defendants conceded they do not have knowledge of any facts establishing the truth or falsity of any of the accusations they published about Miller. [SMF ¶¶ 11-12]

#### 1.    Miller's Unrefuted Denial of the False Accusations

As more specifically set forth in his Declaration [Doc No. 106-9], Miller did not have any relationship, sexual or otherwise, with Jane Doe. [SMF ¶ 5(a), (d)] Miller never met Jane Doe. [SMF ¶ 5(b)] Miller did not impregnate Jane Doe. [SMF ¶ 5(e)] Miller did not secretly dose Jane Doe with an abortion pill in a smoothie. [SMF ¶¶ 5(f)-(h); 6] Miller did not payoff Jane Doe or try to silence her with a non-disclosure agreement. [SMF ¶¶ 5(j)-(k)]

Miller did not physically abuse a woman who lives in Clearwater, Florida, and never dated a woman from or currently living in Clearwater. [SMF ¶¶ 8-9] On August 8, 2018,

---

[6] The referenced "woman from Clearwater" has never been identified.

Yashar Ali informed Miller that the accusation about the woman from Clearwater came from Delgado, who failed to give Yashar Ali any information to substantiate this false claim. [SMF ¶ 10]

### 2. Jane Doe's Confirmation that the Accusations are False

Jane Doe confirmed in her Declaration [Doc. 5-1] that the events described in the Article and Supplement never occurred. Gizmodo Defendants never sought to depose Jane Doe—thus conceding the veracity of her Declaration.

Jane Doe confirmed she does not know Jason Miller, never had a relationship with Miller, and never became pregnant as a result of sexual relations with Miller. [SMF ¶¶ 5(a), (d)-(e)] She never drank a smoothie given to her by Miller, and did not lose a pregnancy, become sick, or become hospitalized because of anything given to her by Miller. [SMF ¶¶ 5(f)-(i)] Jane Doe never lived or worked in Orlando, Florida (where the Article and Supplement assert the relationship with Miller occurred). [SMF ¶ 5(c)] Jane Doe also confirmed Miller never tried to silence her or pay her off. [SMF ¶¶ 5(j)-(k)]

Contrary to the assertion in the Supplement that Journalist A (Yashar Ali) confirmed the story about Miller with Jane Doe, Jane Doe verified that she spoke on the phone with Yashar Ali and told him "in no uncertain terms" that she "did not know Jason Miller, did not have a relationship with a man by the name of Jason Miller and the event that [Ali] described about a smoothie with an abortion pill that terminated an alleged pregnancy were completely false and had nothing to do with [her] life." [SMF ¶ 7]

### **MILLER IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON FALSITY**

The elements of a claim for defamation are: (1) a written defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault (either negligence or actual

malice depending on the status of the libeled party); (4) falsity of the defamatory statement; and (5) special damages or per se actionability (defamatory on its face). *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 176 (2d Cir. 2000); *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104-105 (2d Cir. 2017).

For purposes of the falsity element of the claim, a false statement is one that "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237, 247 (2014) (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991)); see also *Greenberg v. Spitzer*, 155 A.D. 3d 27, 42, 62 N.Y.S.3d 372 (2017) ("The test to determine whether a statement is substantially true 'is whether [the statement] as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'") (citing *Fleckenstein v. Friedman*, 266 N.Y. 19, 23 (1934); *Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 94 (2015)). "Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified." *Masson*, 501 U.S. at 517.

Gizmodo Defendants published the Article and Supplement, which state that Miller impregnated Jane Doe, slipped her an abortion pill, killed her unborn child, almost killed her, and that Miller physically abused another woman from Clearwater, then tried to cover up these crimes. These statements are demonstrably false and cannot be construed as "minor inaccuracies." The truth—that Miller did not impregnate Jane Doe and secretly dose her with an abortion pill, kill her unborn child, and almost kill her; did not physically abuse a woman from Clearwater; and did not try to cover up these crimes—would have a much different effect on the mind of the reader than the statements Gizmodo Defendants published. Consequently, Miller is entitled to judgment as a matter of law on falsity.

For purposes of this motion, it is important to recognize that (*absent the protection of a privilege*) Gizmodo Defendants are legally responsible for publishing any statements in the Article and Supplement that are false. They cannot claim to have published the "truth" by arguing that they accurately described what the Supplement alleges or by publishing the Supplement itself. *Condit v. Dunne*, 317 F.Supp.2d 344, 364 (S.D.N.Y.2004) (although statements were "literally true because defendant clarifie[d] that he [was] merely retelling stories told to him[,]" defendant was not "immune from a slander suit" because "the stories themselves [were] false and defamatory").

When a publisher is not protected by privilege, it stands in the same shoes as anyone else who publishes false accusations made by a source: "the black-letter rule [is] that one who republishes a libel is subject to liability just as if he had published it originally, ***even though he attributes the libelous statement to the original publisher, and even though he expressly disavows the truth of the statement.***" *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 60-61 (2d Cir. 1980) (quoting *Hoover v. Peerless Publications, Inc.*, 461 F.Supp. 1206, 1209 (E.D. Pa. 1978) (emphasis added). "This rule has been widely recognized." *Id.* at 61 (citing Restatement Second, Torts § 578 (1977) ("one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it."). "The law affords no protection to those who couch their libel in the forms of reports or repetition…***the repeater cannot defend on the ground of truth simply by proving that the source named did, in fact, utter the statement***." *Id.* (citing *Olinger v. American Savings and Loan Assoc.*, 409 F.2d 142, 144 (D.C. Cir. 1969) (emphasis added).

The republication rule applies to the press, as it does to others. *Id.* (citations omitted). "Any different rule would permit the expansion of a defamatory private statement, actionable but

without serious consequences, into an article reaching thousands of readers, without liability on the part of the republisher." *Id.* (citations omitted).

*Shiles v. News Syndicate Co.*, 27 N.Y.2d 9 (1970), illustrates how this principle applies to the facts at issue in this case. In *Shiles*, the plaintiff's wife gave her sealed family court filing to the press. 27 N.Y.2d at 10, n.1. The court correctly rejected the fair reporting defense (because the wife's filing was exempt from public view), and treated the media defendant the same way any other person or entity who republished a false and defamatory statement made by another would be treated:

> It is apparent, therefore, that the privilege created by section 74 of the Civil Rights Law does not attach to the publication of a report of matrimonial proceedings.
>
> This does not mean to say that a party may not publish details of divorce or separation suit based on files obtained without a court order, or that the courts would interfere with the constitutional right of any one to publish such details, ***but it does mean that, if he does, he will be held accountable and liable if those details are not truthful…***
>
> As the quoted passage makes clear, the fact…that the defendant in the present case "did not inspect the court files but obtained its information from outside sources," ***will not protect the defendant from liability for the consequences resulting from the publication of false and defamatory statements***.

27 N.Y.2d at 15 (emphasis added).

*Shiles* relied on *Danzinger*, in which the New York Court of Appeals held New York's judicial rule (Rule 278 of the Rules of Civil Practice [7]) prohibiting court officials or clerks from releasing information from matrimonial court files is not a prior restraint:

> The defendants assail rule 278 as a violation of the constitutional guarantees of freedom of the press. This criticism of the rule fails,

---

[7] Rule 278 of the New York Rules of Civil Practice (like Rule 2.420) prohibited "an officer of the Court" from permitting a copy of any pleadings or testimony in a matrimonial action. *Danzinger*, 304 N.Y. at 248.

> we think, to take proper account of its scope and purpose. The rule is addressed to officers and clerks of the New York Supreme Court. It does not prohibit access to the minutes of the clerk of the court and thus does not interfere with the right of any person to obtain information in respect of the pendency or result of any matrimonial action. ***Nor does the rule prohibit publication of the details of a matrimonial action that are obtained from a source other than the files of the court. Of course, such a publication is actionable if defamatory. But this liability for indefensible defamation cannot be taken to be an unconstitutional restriction of freedom of the press.***

304 N.Y. at 248-49 (emphasis added).

Miller maintains the issue of whether the fair reporting privilege applies is one the jury must decide. However, it cannot be disputed that the accusations about Miller in the Article and Supplement which Gizmodo Defendants published are false. Accordingly, it is appropriate for the Court to enter a partial summary judgment in favor of Miller on the issue of falsity.

WHEREFORE, Plaintiff, Jason Miller, respectfully requests that the Court enter a partial summary judgment in his favor on the falsity of the following statements in the Article and Supplement:

- In 2012, Miller had a sexual relationship with "Jane Doe," a stripper he met at Rachel's Gentleman's Club in Orlando, Florida—which led to Jane Doe becoming pregnant.

- Miller gave Jane Doe a smoothie containing an abortion pill, which induced an abortion causing the death of Jane Doe's unborn child and almost killing Jane Doe.

- Miller tried to pay Jane Doe off and to get her to sign a non-disclosure agreement in exchange for a payoff.

- Around the same time, Miller was involved with a woman who lives in Clearwater, Florida, with whom he was physically abusive and physically beat "with an open hand."

- Jane Doe (*i.e.,* "the woman") claimed Miller caused her "pregnancy's termination and nearly her death."

Respectfully submitted,

*/s/ Shane B. Vogt*
Kenneth G. Turkel – FBN 867233
E-mail: kturkel@bajocuva.com
Shane B. Vogt – FBN 257620
E-mail: svogt@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 443-2199
Fax: (813) 443-2193

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 27, 2019, the foregoing document was filed with the Court's CM/ECF system, which will send electronic notice to all counsel of record.

*/s/ Shane B. Vogt*
Attorney