**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**1:18-CV-24227-CMA-Altonaga**

| | |
|---|---|
| JASON MILLER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| GIZMODO MEDIA GROUP, LLC, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND**
**<u>INCORPORATED MEMORANDUM OF LAW</u>**

## PRELIMINARY STATEMENT

This Court should grant this motion and dismiss the action for three independent reasons. First, the Article is privileged under New York law. New York's fair report privilege, contained in Section 74 of New York's Civil Rights Law, provides an absolute privilege against a claim for libel when the press fairly and accurately reports on filed court documents. *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Col,* 49 N.Y.2d 63, 67-78 (N.Y. 1979). It is undisputed that the Supplement was filed in a public court proceeding and the evidence now establishes that the Article fairly and accurately reported on the Supplement. Under the holding of *Holy Spirit,* and the law that follows it, the Article is a fair report on the Supplement and is privileged. This Court need go no further than this dispositive issue. Second, and independently, the action fails because the Defendants made no defamatory statements of fact about Miller, but instead reported on allegations contained in a court filing without adopting the truth or falsity of the allegations. Finally, as a public figure, Miller has not established, and cannot establish, that Defendants published the Article knowing their report on the Supplement's filing was substantially false or with serious doubts as to the accuracy of the report. Absent clear and convincing evidence of actual malice, Miller's claim fails and should be dismissed now.

At bottom, Miller seeks to impose liability to the tune of $100 million dollars upon a news organization simply for reporting on allegations made by a public figure against a public figure, in a public court proceeding. Miller argues this consequence is appropriate – and Defendants should be stripped of all their First Amendment protections – first because he attempted to obtain an order sealing the allegations, and second because he believes that three words in the Article's lede paragraph are unclear. These arguments are inconsistent with both the legislative and judicial history of New York's fair report privilege, as well as our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964). For all these reasons, Defendants are entitled to summary judgment on Miller's claims.

## STATEMENT OF FACTS[1]

### A.    Jason Miller

For much of his career, Jason Miller was a communications strategist for pro-life

---

[1] The material facts underlying this Motion are set forth in full in Defendants' Statement of Undisputed Material Facts ("SOF"), filed concurrently herewith.

Republican candidates.  (SOF ¶ 2.)  Early in the Presidential election, Miller was a Senior Communications Advisor for Ted Cruz's presidential campaign.  (*Id*. ¶ 3.)  When Senator Cruz dropped out of the race, Miller took a job as a Senior Communications Advisor for the Trump campaign and became a prominent advocate for President Trump in the media. (*Id*. ¶ 4.)

Miller has been married to Kelly Miller since 2008.  (*Id*. ¶ 5.)  Miller testified that in late 2016 he was living separately from his wife and had serious marital problems, but Mrs. Miller testified that though she was living in California in 2016 to take care of her ailing father, she believed she and Miller had a sound, committed marriage.  (*Id*. ¶¶ 5, 6.)  In the fall of 2016, Mrs. Miller was pregnant with the Millers' second child, who was born on January 6, 2017.  (*Id*. ¶ 7.)

**B.      A.J. Delgado**

In mid-2016, Arlene J. Delgado was a prominent advocate for then-candidate Trump. (*Id*. ¶¶ 9, 10.)  Delgado, a University of Florida and Harvard Law School graduate, is a member of the New York bar.  (*Id*. ¶ 8.)  Since 2013, Delgado has been a high-profile conservative commentator.  Between 2013 and 2017, Delgado appeared on radio and television stations, including Fox News, MSNBC, CNN, Yahoo, al Jazeera, Univision, Telemundo, and NPR.  (*Id*. ¶ 9.)  She has been published in *The American Conservative*; the *National Review*, the *Miami Herald*, the *Washington Post, Breitbart, The Daily Caller*, and FoxNews.com.  (*Id*.)

In August 2016, the Trump campaign hired Delgado to work as a surrogate, i.e. someone who spoke to the media on its behalf.  (*Id*. ¶ 11.)  Miller was instrumental in hiring Delgado and testified that she was a "very effective communicator." (*Id.* ¶ 11-12, 14.)  As head of the Communications team, Miller, along with Brian Lanza and Boris Epshteyn, was Delgado's supervisor.  (*Id*. ¶ 13.)  Delgado has been described as "the perfect campaign surrogate" and even MSNBC touted her as Trump's "most cogent, formidable surrogate" on television.  (*Id*. ¶ 12, Exs. 6 at 7, 26.[2])  Sean Hannity of Fox News said she has "incredible communication skills.  She is not only a Harvard grad who is brilliant, but she has incredible insight and knowledge on every important issue of the day . . . a huge asset to the Trump campaign."  (Exs. 6 at 6-7, 25 at 2.)

**C.      Delgado and Miller Have an Affair**

On October 18, 2016, the night before the third presidential debate in Las Vegas, Miller and Delgado, along with one other Trump staffer and reporters, went to the Sapphire Strip Club.

---

[2] Exhibits cited herein are to the Declaration of Katherine Krueger, Declaration of Timothy Marchman, and Notice of Filing, all filed herewith.

(SOF ¶ 15.)  Miller and Delgado had sex that night and began an affair.[3]  (*Id*.).

On October 22, 2016, an article appeared in the *Page Six* section of the *New York Post*, reporting on the strip club visit.  (*Id*. ¶ 21, Ex. 3.)  Miller testified that he was reprimanded for attending the strip club by Jared Kushner, and Kushner and Steve Bannon both asked him if he was having an affair with Delgado.  Miller testified that he "lied" to each of them by denying it.  (SOF ¶¶ 22, 24.)  Miller also testified that after Mrs. Miller saw the *New York Post* article she asked him if he was having an affair with Delgado.  (*Id*. ¶ 24.)  Miller "lied" to her, too.  (*Id*.)  Finally, a woman with whom Mr. Miller had had an affair earlier in 2016 also called Miller and asked him if he was having an affair with Delgado.  (*Id*.)  He "lied" to her, too.  (*Id*.)

Miller and Delgado embarked on a romantic sexual affair.  (*Id*. ¶ 15.)  During the affair, Delgado continued to appear as a surrogate for Trump in the media, working on the campaign and on the transition team.  (*Id*. ¶ 20.)   In addition, after Trump's election to the presidency, Miller recommended Delgado for a job working in the White House for the President. (*Id*.)

Just before Thanksgiving, Delgado told Miller that she was pregnant with his child.  (*Id*. ¶ 25.)  Over the ensuing weeks, Delgado repeatedly asked Miller to tell his wife about their affair and the pregnancy, but Miller refused.  (*Id*. ¶ 29.)  Ultimately, on December 17, 2016, Delgado sent an email to Mrs. Miller asking to speak to her.  (*Id*. ¶ 30.)   They did not speak, but later that evening Mr. Miller confessed his affair, and Delgado's pregnancy, to his 9-months-pregnant wife.  (*Id*. ¶ 31.)  Miller testified that from this point forward, Delgado, whom Miller had previously described as effective and a "triple threat" (Ex. 25), and whom he had recommended for the White House even after he found out she was pregnant, was crazy.  (SOF ¶¶ 20, 32.)

On December 22, 2016, then-President-elect Trump announced that Miller would serve as White House Communications Director.  (*Id*. ¶ 35.)  Two days later, Miller announced that he would not be taking the position, and it was widely reported that the resignation was a due to the "scandal" of his affair with Delgado.[4]  (*Id*. ¶ 36.)

_____

[3] Miller and Delgado describe this encounter differently.  While Miller testified it was the beginning of a "dating" relationship, Delgado testified their first encounter was "not entirely voluntary on my part," and that, after a lot of drinks, "I woke up and I wasn't sure what had happened kind of situation."  Delgado testified she felt she "had to be in it" because Miller was her boss.  (SOF ¶¶ 16, 17.)

[4] In January 2017, Miller took a job as a managing director at Teneo, a consulting firm in DC. (*Id*. ¶ 37.)  Miller also worked as a commentator for CNN, as a "supporter" of Trump.  (*Id*. ¶ 39.)  At CNN, Miller's honesty was repeatedly questioned by his colleagues.  For example, on April

**D.**      **Delgado Is Interviewed in *The Atlantic* and the Baby's Birth Makes News**

On August 15, 2017, *The Atlantic* published a feature article titled "From Trump Aide to Single Mom." It reports in detail on the affair between Delgado and Miller, including that Delgado claimed she knew that Miller was married, but "he told her at the time he was separated from his wife." (SOF ¶ 68; Ex. 6 at 9.) It reports that Miller disclosed his wife was pregnant only when Delgado told him she was pregnant. (*Id*. at 11.) It reports that "on two separate occasions" Miller asked Delgado to have an abortion, and includes Miller's denial of this claim. (*Id*. at 10-11.) The article also describes the "fallout from [Delgado and Miller's] affair," which "didn't take an equal toll on their lives and careers." (*Id*. at 13.) It discussed that Delgado felt she was painted as a "crazy girl" for wanting to keep her child and get child support from Miller. (*Id*. at 22.) Several other articles about Miller and Delgado were published in the summer of 2017, some reporting on the birth of their son on July 10, 2017. (SOF ¶ 43; Exs. 5, 37).

**E.**      **Delgado and Miller's Custody Dispute Unfolds, in the Public Eye**

Throughout 2017 and 2018, Delgado and Miller's custody dispute played out in open court in Florida, where Miller had commenced an action against Delgado. (*Id*. ¶ 42.) The dispute was covered by the press, as well. On April 7, 2018, *Talking Points Memo* published an article entitled "Ex-Trump Aide Says Jason Miller Forcing Long Custody Battle for Revenge," in which Delgado repeated her claims that Miller told her he was separated when they began their affair, that Miller had not told her his wife was pregnant, and that Miller was disappointed she would not have an abortion. (*Id*. ¶ 69; Ex. 7.) The *TPM* article also aired Delgado's claim that Miller was needlessly complicating the custody battle for revenge, and that she was in financial distress. (Ex. 7.) Two weeks later, the *Daily Mail* published an article entitled "Exclusive: My Trump campaign lover wanted to abort baby we conceived when his wife was pregnant…" (SOF ¶ 69; Ex. 8.) The approximately 80-paragraph article not only recounts Delgado's side of the story, it also includes images of intimate text messages between Miller and Delgado during their affair, the email Delgado exchanged with Miller's wife the night the affair was revealed, and pages of filings from the family court. (Ex. 8.) The Article also reported for the first time Delgado's allegations from the court filings that Miller had physically and sexually abused her, along with Miller's denials. (*Id*. at 2.)

---

12, 2018, Don Lemon said to Miller on air "Don't come on CNN and lie or deflect about what's going on. Come here and be honest with the American people." (*Id*. ¶ 40.)

4822-0349-9929v.16 0109559-000002

On September 14, 2018, Delgado filed a motion entitled "Mother's Supplement to Mother's March 2018 Motion for Court to Consider Psychological Evaluation of the Father" (Ex. 9) (the "Supplement") in the Florida custody proceeding brought by Miller (the "Family Court Proceeding"). (*Id*. ¶¶ 44.) The Supplement alleged that Miller had impregnated a stripper in Orlando in or around 2012 and then gave her a smoothie containing an abortion pill, causing the woman to lose the pregnancy and become ill. (Ex. 9 at 1-2.)[5] It also reported allegations that Miller had physically abused a different woman in Clearwater, Florida. (*Id*. at 9.)[6] Delgado testified she did not file the Supplement under seal, and it has never been sealed. (SOF ¶ 45.) In response to Plaintiff's public statement, Delgado obtained a copy herself on October 17, 2018, without showing ID. (*Id*.)

### F.    Katherine Krueger Obtains the Supplement

On September 21, 2018, Katherine Krueger, Managing Editor at the website *Splinter*, received a message from a confidential source informing her that the Supplement had been filed by Delgado in the Family Court Proceeding. (SOF ¶ 55.) *Splinter* is a publication that focuses on news and political commentary. (*Id*. ¶ 51.) The website has a progressive political point of view, but, as Krueger, and other editors involved with the Article, testified, this point of view does not interfere with the truthful reporting of facts. (*Id*. ¶¶ 51, 52, 54.) Krueger testified that her progressive politics are not in conflict with her careful and accurate reporting. (*Id*.)

After receiving a copy of the Supplement, Krueger reviewed it in full. (*Id*. ¶ 59.) The allegations that Miller attended strip clubs, had an extramarital affair with a stripper, and the idea that he would ask a woman to have an abortion entirely consistent with the press reports that Krueger was already familiar with. (*Id*. ¶ 63-71.) In particular, Krueger had read the *Atlantic* article around the time it was published and knew that Delgado claimed Miller had asked her "on two separate occasions" to have an abortion. (*Id*. ¶ 68.) Krueger was also able to quickly corroborate that, as identified in the Supplement, Miller previously worked for Jamestown Associates. (*Id*. ¶ 70.) The way the Supplement was written also lent credibility to its contents because it was forthright in its description of how Delgado came to know the key allegations,

---

[5] Miller testified to going to strip clubs frequently in the last 10 years, including Rachel's in Orlando, the club identified in the Supplement. (SOF ¶ 23.)

[6] The content of the Supplement and Article have been described in detail in Defendants' Motions to Dismiss and Reconsider, incorporated herein by reference. (Dkts. 44, 54, 117, 138.)

4822-0349-9929v.16 0109559-000002

including that some of the information was originally unverified.  (*Id*. ¶ 72.)  Krueger believed that the Supplement was credible and did not have serious doubts about the accuracy of the allegations.  (*Id*. ¶¶ 63-78, 96-97.)  There was no doubt that the filing of the Supplement, and its allegations, were highly newsworthy, and Krueger started to work on an article.  (*Id*. ¶¶ 63, 80.)

Krueger reached out to Tim Marchman, Special Projects Editor for Gizmodo, in part to try and independently obtain a copy of the Supplement from the court and to determine whether it was filed under seal.  (*Id*. ¶ 60.)  Ultimately, she and Marchman came to understand that as of September 21, 2018 the Supplement was not sealed.  (*Id*. ¶ 62.)  Krueger and her editors agreed that the Supplement was credible and newsworthy and that Krueger should do a "straight" report closely tracking its allegations.  (*Id*. ¶¶ 81, 86.)  Krueger's intent was to write a story on the court filing itself, not on the truth or falsity of its allegations.

As part of reporting the Article, Krueger reached out to the identifiable individuals in the Supplement.  (*Id*. ¶ 82.)  She contacted Miller personally, and his counsel of record in the Family Court Proceeding, to ask for comment, but neither responded prior to the publication of the Article.  (*Id*.)  Krueger contacted Delgado, who confirmed that the Supplement Krueger received was an authentic copy of the one she filed, and that it was not sealed.  (*Id*.)  Krueger also contacted Yashar Ali – a journalist her source said was referred to in the Supplement under the pseudonym "Journalist A" – via Twitter message, but was unable to speak to him substantively before publication of the Article.  (*Id*.)  Krueger then drafted a report on the Supplement, and Chan and Mirkinson provided edits – all with the express intention of presenting a straightforward, fair, and accurate report of the Supplement's allegations.  (*Id*. ¶ 86.)

## G. The Article Is Published and Updated

On September 21, 2018, at 8:14 pm, *Splinter* published the article "Court Docs Allege Ex-Trump Staffer Drugged Woman He Got Pregnant With 'Abortion Pill'" (Ex. 1) (the "Article").  (SOF ¶ 90.)  The Article, which embedded a full copy of the Supplement, reports, without embellishment, on the allegations contained in the Supplement.  (*Id*. ¶ 91; Ex. 1.)  When published, Krueger and her editors had no information to cause serious doubt about the accuracy of the Article.  (*Id*. ¶¶ 96-97.)  After publication, Miller's counsel contacted Gizmodo about the allegedly "false accusations" contained in Delgado's filing.  (*Id*. ¶ 92.)  Within an hour, Gizmodo updated the Article to include Miller's denial.  (*Id*.)  The next day, September 22, Miller in a Twitter thread announced there is "no validity to the false accusations made" in the Supplement.

(*Id.* ¶ 93.)  Gizmodo updated the Article to include this denial, as well.  (*Id.* ¶ 95.)  Soon after, Ali tweeted, "I have not disproven such claims and to say so is inaccurate" and "[i]t is indeed accurate that I spoke to two women in Florida who made claims similar to the ones listed in Ms. Delgado's filing."  (*Id.* ¶ 94.)  Gizmodo updated its article to include these tweets.[7]  (*Id.* ¶ 95.)

## ARGUMENT

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party seeking summary judgment" must show an "absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (citation omitted).

As the Eleventh Circuit has recognized, summary dismissal of defamation cases is particularly appropriate because "there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation."  *Michel v. NYP Holdings*, 816 F.3d 686, 702 (11th Cir. 2016) (holding that actual malice must be pled plausibly pursuant to *Iqbal/Twombly*).  In other words, "because of the importance of free speech, summary judgment is the 'rule,' and not the exception, in defamation cases."  *Guitar v. Westinghouse Elec. Corp.*, 396 F. Supp. 1042, 1053 (S.D.N.Y. 1975) (citing *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858 (5th Cir. 1970)), *aff'd*, 538 F.2d 309 (2d Cir. 1976).

## I.    DEFENDANTS' PUBLICATION IS PRIVILEGED AS A FAIR REPORT

The Article is absolutely privileged under New York's fair report privilege, Civil Rights Law § 74.[8]  Consistent with longstanding precedent, New York's privilege is construed broadly.

---

[7] Miller has remained a controversial figure. This past weekend, he tweeted and subsequently deleted a series of obscene insults directed at Democratic Congressman Jerry Nadler.  Those tweets were widely republished on Twitter.  The Tweets, and Miller's subsequent deactivation of his Twitter account and departure from Teneo, were discussed in various online publications, including *The New York Times* and the *Washington Examiner*.  (SOF ¶ 37.)

[8] The Court has already held that New York law, including Section 74, applies to Plaintiff's libel claims.  *See* April 24, 2019 Order on Motion to Dismiss (Dkt. 110) ("MTD Order") at 13.

*Holy Spirit,* 49 N.Y.2d at 67. "Were it otherwise, the narrow and confining application of the libel laws would entirely defeat the purposes of the First Amendment and statutes like section 74 of the Civil Rights Law, and the public's right to know would be seriously threatened." *Gurda v. Orange Cty. Publications Div. of Ottaway Newspapers, Inc.*, 81 A.D.2d 120, 133 (N.Y. App. Div. 2d Dep't 1981) (dissenting opinion, adopted by Court of Appeals in reversing, 56 N.Y.2d 705 (1982)). Here, the Article is privileged from liability under Section 74 because it is a "fair and true report" of a court document filed in a "judicial proceeding" and, even assuming the Supplement became "sealed," the broad privilege is not lost.

### A.    Defendants' Report Was "Fair and True"

Once Section 74 attaches, as it does here, it can be defeated only when the challenged report is not a "fair and true" report of the underlying court document. Several well-settled principles inform this analysis. First, New York courts consistently hold that the privilege does not require exacting precision in reporting the substance of a judicial proceeding; only that the report be "substantially accurate." *Holy Spirit Ass'n*, 49 N.Y.2d at 67; *Becher v. Troy Pub. Co.*, 183 A.D.2d 230, 233 (N.Y. App. Div. 3d Dep't 1992); *Nix v. ESPN, Inc.*, 2019 WL 2142038, at *4 (11th Cir. May 15, 2019) ("report should not be 'parsed and dissected on the basis of precise denotive meanings,'" quoting *Holy Spirit,* 49 N.Y.2d at 68). And a report is "substantially accurate" if, despite inaccuracies, it does "not produce a different effect on a reader than would a report containing the precise truth." *Silver v. Kuehbeck*, 2005 WL 2990642, at *16 (S.D.N.Y. Nov. 7, 2005) (quotation marks and citation omitted), *aff'd*, 217 F. App'x 18 (2d Cir. 2007).

Next, whether a report is "fair and true" focuses on the alleged misconduct at issue, specifically whether a report "attributes to [plaintiff] misconduct beyond that alleged" in the applicable court document. *Gubarev v. BuzzFeed, Inc.*, 340 F. Supp. 3d 1304, 1318 (S.D. Fla. 2018); *Nix*, 2019 WL 2142038, at *4 (same). *See, e.g.*, *Pisani v Staten Island Univ. Hosp.*, 440 F. Supp. 2d 168 170 (E.D.N.Y. 2006) (statement that hospital *admitted* to regrettable "misconduct" by its executives was not fair and true where the hospital in fact *denied* wrongdoing). In other words, the key question in evaluating a report under Section 74 is whether it accurately conveys the *wrongdoing* alleged in the underlying court filing.

Finally, in any fair report analysis, the court must read challenged statements "in the context of the entire statement or publication as a whole." *Aronson v. Wiersna*, 65 N.Y.2d 592, 594 (N.Y. 1985). *See also Fraser v Park Newspapers of St. Lawrence*, 246 A.D.2d 894, 895-96

8

(N.Y. App. Div. 3d Dep't 1998) (for Section 74, "the defamatory potential of a particular . . . statement is to be ascertained by considering the challenged publication in its entirety; only after doing so can one then determine whether, and to what extent, the falsehood affects the overall impression left on the average reader").

Applying these principles, the Article is a fair and true report of the Supplement.  To reach this conclusion one need go no further than the undisputed fact that the Article includes a complete copy of the Supplement and affirmatively invites readers to "[r]ead the full court filing below."  (SOF ¶ 91; Ex. 1 at 5-6.)  *See also Gubarev,* 340 F. Supp. at 1318 (embedding copy of document into Article was publication of the document for Section 74 purposes).  Since the full text of the Supplement is embedded in the Article, it neutralizes any possible misapprehension of the nature, severity, or circumstances of Delgado's allegations.  An average reader, reviewing the Article and Supplement together – or, the "publication as a whole" – would have an accurate and complete understanding of the Supplement's allegations.  *Aronson,* 65 N.Y.2d at 594.

But even considering the text of the Article divorced from the embedded Supplement, it remains a substantially accurate report.  There is no dispute that the Article discloses the source of its reporting and properly attributes the allegations to the recently filed Supplement.  Together with the headline – which itself begins "Court Docs Allege" – the Article includes no less than nineteen (19) separate attributions to "court documents," "claims" or the "filing."  (Ex. 1.)  Nor is there any dispute that the Article faithfully and accurately – in a block quote directly from the Supplement – describes Miller's alleged wrongdoing.   Remarkably, Miller affirmatively *admits* this key and dispositive fact.  (Opp. to Mot. for Reconsideration (Dkt. 137) ("Opp. Rec.") at 7) ("[t]he issue here is not the description of the alleged 'wrongdoing' itself.").

 Instead, Miller argues that Defendants should be stripped of New York's absolute privilege because the Article makes "omissions" that create a "false impression" that the victim herself made a direct claim of criminal conduct instead of an "adverse, biased party in an acrimonious paternity case." (Opp. Rec. at 7).   The problem with this argument is that it fundamentally misstates the Article and the Supplement.   The Article is clearly reporting on Delgado's filing in what is described in the Article's first paragraph, as an "ongoing custody battle" between Miller and Delgado, that has "taken a nasty turn," with an "explosive new court filing." (Ex. 1 at 1).  Indeed, after reminding readers of Miller and Delgado's tangled history, the Article states that the relationship had been marked by "acrimony" since their 2016 affair. (*Id.* at

9

1, 2-3).   In short, the Article expressly informs the reader that Delgado is "biased."

The Article also makes plain the second-hand nature of the Supplement's allegations. It describes how Delgado first learned of the story from an anonymous source, a person referred to as "Gentleman A."   And the Article reports that the "court filing" "details Delgado's interactions with an unnamed "Journalist A," explaining that "Delgado relayed the allegations about Miller and Jane Doe to the journalist" who, in turn, "spoke with Jane Doe to confirm details about the story."   (*Id*. at 3.)   Far from misleading readers, the Article accurately reports the context of the Supplement's allegation (an acrimonious custody battle), and the indirect sources of the allegations (the unnamed Gentleman A and Journalist A).   In sum, the Article accurately relates the wrongdoing by Miller alleged in the Supplement, as well as the nature of the proceeding between Miller and Delgado and the Supplement's sourcing.

The only alleged "error" identified by Miller was a three-word attribution phrase – "the woman claims" – that Miller argues, and the Court said, "tenably bolsters the credibility" of the Supplement and misleads the reader.  (MTD Order at 15.)  With respect, this is not a fair reading of the Article as a whole.  This clause in the lede does nothing more than foreshadow what is later discussed in detail in the Article:  The Supplement *did* include Doe's alleged confirmation of the events to Journalist A, along with her quote as reported by Journalist A, "Yes, that happened to me – how did you know?  Who told you?" (Ex. 1 at 3; Ex. 9 at 8.)  And the Article expressly and correctly attributes Doe's confirmation as a statement to Journalist A, who in turn told Delgado.  (*Id.*)  Grasping to find support for his claim that the phrase "the woman claims" was intended to "connote two very different sources of the accusations about Miller," Miller points to testimony from Gizmodo editor Tim Marchman.  (Opp. Rec. at 10-11.)  Miller misleadingly argues that Marchman confirmed that in the relevant sentence the phrase "'court documents claim' does not mean the same thing as 'the woman claims,'" but Miller obscures Marchman's actual testimony.  Marchman said that "the woman claims" was a "subordinate clause," so that the two attribution clauses should be read as only differentiating "what the [court] documents claim" from "what the woman claims **in the [court] documents**"  (Opp. Rec., Ex. 4 at 124:25-25:1-3 (emphasis added).)  Marchman's actual testimony, far from supporting Miller's argument, instead confirms the accuracy of Gizmodo's reporting.

Even if, as the Court said, the Article "tenably bolsters the credibility" of the Supplement by using the phrase "the woman claims" in the lede, New York law, as affirmed just last month

10

by the Eleventh Circuit, still requires dismissal.  Under New York law, errors in terms of credibility do not strip a report of the privilege, provided the article accurately describes the wrongdoing at issue (as Miller admits was done).  In fact, the seminal New York case, *Holy Spirit*, held that the privilege applied despite the plaintiff's claims, similar to those at issue here, that describing the document at issue as "confirmed" when it was not, "distorted the import" of the document and implied it "had been verified by independent sources."  49 N.Y.2d at 65-66, 68.[9]  Following *Holy Spirit,* the Eleventh Circuit recently held that New York's privilege applied despite the plaintiff's claim that an article falsely implied he admitted to using illegal drugs, when he only admitted to using a natural substance, thereby wrongly increasing the import of his admission.  *Nix*, 2019 WL 2142038.  There is simply no way to reconcile this Court's prior finding that Defendants are deprived of the privilege because the Article "tenably bolsters the credibility" of the Supplement's allegations with the holdings of *Holy Spirit* and *Nix*.[10]

Finally, Miller argued in opposition to the reconsideration motion – but did not allege in his Complaint – that the Article contains additional misrepresentations or omissions sufficient to deprive it of New York's absolute privilege.  Yet, Miller identifies no misstatements which, if corrected, would alter the "gist" of the allegations at issue.  Instead, Miller focuses on trivial statements.  For instance, Miller claims that saying the Supplement was filed by "Delgado's legal team" is incorrect because Delgado filed the document herself.  But the identity of the filer has nothing to do with whether a report on a court filing accurately relays its allegations.  And the Article is peppered with references to Delgado "says" or "claims" so there is no confusion as to who is making these allegations.  Further, Delgado is an attorney, who must comply with her ethical obligations.  (SOF ¶ 45.)  Miller similarly claims that the Article somehow "suggests to readers that [Defendants] independently investigated" its allegations. (Opp. Rec. at 12).  Yet, this language appears nowhere in the Article.

---

[9] *See also Tacopina v. O'Keeffe*, 645 F. App'x 7, 8 (2d Cir. 2016) (article that "misattributed the source of the . . . allegations" by reporting that "two former clients, instead of one, alleged that Tacopina abused drugs" was fair); *Becher*, 183 A.D.2d at 233 (article that stated plaintiff had been indicted on felony charges when he had been charged with misdemeanors was privileged).

[10] *See also Weiser v. Gannett Suburban Newspapers,* 25 Media L. Rep. 2174, 2176 (N.Y. App. Div. 1st Dep't Dec. 17, 1997) (article substantially accurate even though it erroneously stated that plaintiff was arraigned on 22 felony charges, rather than one); *Alf v. Buffalo News, Inc.*, 100 A.D.3d 1487, 1488-89 (N.Y. App. Div. 4th Dep't 2012), *aff'd*, 21 N.Y.3d 988 (N.Y. 2013) (articles' falsely implying that plaintiffs *admitted* to cheating the government were privileged.)

Miller also ignores the undisputed fact that each time Miller or his lawyers issued a denial, the Article was updated within the hour to include the substance of, and even significant quotations from, those denials. (SOF ¶¶ 92, 95; Ex. 1 at 2-5.)  *See also Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955, 961 (2d Cir. 1988) (news report was "fair" under Section 74 where an allegedly false and defamatory quotation from the FBI "was balanced by eight interviews in the same broadcast which challenged" the basis for the FBI's conclusions.).  Indeed, by fully disclosing that the allegations came from a betrayed ex-mistress, as well as Miller's vehement denials, the Article arguably paints a *more* balanced picture of Miller than the Supplement itself, going *beyond* what New York law requires of a fair report.  In sum, Miller's attempts to deny Defendants of the fair report privilege fail.

Miller conjures up alleged misstatements in the Article that strain reason and grammar, and fly in the face of the New York Court of Appeals' strong warning that the language of a challenged report "should not be dissected and analyzed with a lexicographer's precision."  *Holy Spirit,* 49 N.Y.2d at 68.[11] The Article is privileged consistent with New York's law.

### B.      Section 74 Applies Regardless of Whether the Supplement was Under Seal

Miller admits that the Supplement was originally filed in the open public files of the Florida family court and remained there for three days. (SOF ¶ 46.) And he does not dispute that the Supplement's allegations were discussed in open court.  (*Id*. ¶ 47). Miller contends, however, that since he filed a motion to seal the Supplement before the Article was published – a motion that he concedes was never granted – the document should be treated as sealed.  Defendants dispute this.[12]  Nonetheless, for the purposes of this motion only, Defendants will assume the Supplement was sealed because whether it was sealed or not does not matter for purposes of invoking New York's Section 74 fair report privilege.  As this Court has already held, "New

---

[11] In a final attempt to avoid application of the fair report privilege, Plaintiff proposes the Article was not "under the exigencies of a publication deadline," somehow depriving it of *Holy Spirit*'s liberal "fair and true" standard.  Defendants have been unable to identify a *single case* interpreting this language from *Holy Spirit* as a limiting principle.  Plaintiff also cites to *Nix* to bolster this unfounded claim, but the Eleventh Circuit did not find ESPN's report was made under some deadline (nor did the court below).  *Nix*, 2019 WL 2142038; *Nix v. ESPN, Inc.*, No. 1:18-cv-22208-UU (ECF No. 27) (S.D. Fla. Aug. 30, 2018).  (*See also* Opp. Rec. at 8, n.8.)

[12] The undisputed facts show the Supplement was not "sealed" because (1) no sealing order was entered; and (2) on October 16, 2018, the Defendants obtained a certified copy of the Supplement from the Court.  (*See also* Dkt. 44 at 5-6, 12 & Dkt. 44-10 (Ex. J).).

York's statutory privilege generally applies to reports of confidential proceedings."  (MTD Order at 9, citing a long line of cases).  *See also Gubarev*, 340 F. Supp. 3d at 1314 (New York courts apply Section 74 to any official proceeding, "even if it is not open to the public").

To avoid this precedent Miller argues that there is an exception to the well-established rule that New York's fair report privilege applies regardless of whether the court filing is confidential or under seal.  Extrapolating from one of the animating principles behind the fair report privilege, i.e. to advance the "administration of justice," Miller argues that this becomes a restriction that precludes the application of Section 74 to sealed court filings involving private parties dealing with private, non-government matters.  (*See* Dkt. 53 at 9-10.)  This argument is invented out of whole cloth.   As an initial matter, Miller's effort to claim that Miller and/or Delgado are private parties or that the paternity action is a private matter is specious at best.  There is no question that Miller and Delgado are public figures – in fact, Miller concedes he is one.  And Miller cannot reasonably claim his relationship with Delgado is private.  It has been discussed by both Miller and Delgado on their public Twitter accounts, in the *New York Post*, the *Atlantic*, the *Daily Mail* and other publications.  (SOF ¶¶ 33, 36, 43.)  Accordingly, even if Miller's proposed "exception" to Section 74 existed, it would not apply here.

Further, Defendants are not aware of any case – and Miller has cited none – decided under Section 74 that applies the "administration of justice" as a limiting principle precluding the assertion of the privilege over press reports on sealed court documents involving private parties.  To the contrary, the cases Miller relies on never even entertain this manufactured exception, and instead reaffirm Section 74's broad application.  *See Keogh v. N.Y. Herald Tribune*, 51 Misc. 2d 888, 891 (Sup. Ct. N.Y. Cty. 1966) (rejecting plaintiffs' argument that because grand jury proceedings may not legally be made public, Section 74 should not apply, concluding "[t]he statute . . . contains no such exception); *Freeze Right Refrig. & A.C. Serv. V. The City of New York*, 101 A.D.2d 175, 183 (N.Y. App. Div. 1st Dep't 1984) (rejecting plaintiff's contention that non-public nature of underlying documents called Section 74's applicability into question); *Komarov v. Advance Mag. Publs.*, 180 Misc. 2d 658, 660 (Sup. Ct. N.Y. Cty. 1999) (same); *Gardner v. Poughkeepsie Newspapers, Inc.*, 68 Misc. 2d 169, 170 (Sup. Ct. Duchess Cty. 1971) (rejecting argument that "[t]he fact that the file pertaining to this youthful offender was not open to the public view" might "deprive the defendants of the statutory protection").  Nor has any such limiting factor been considered in applying Section 74 to "private" domestic matters.

*Zappin v. NYP Holdings Inc.*, 2019 WL 1782635, at *1 (2d Cir. Apr. 24, 2019) (holding that a Section 74 applied to reports on divorce court proceedings from which the press had not been barred, even when the entire case docket was under seal by operation of statute).

Miller's argument to the contrary rests on inapplicable or outdated law. First, he invokes an "administration of justice" limitation as articulated in the *Cox Broadcasting* line of cases, which concern the *constitutional* right under the First Amendment to publish information "released to the public in official court records." *Cox Broad. Corp. v Cohn,* 420 U.S. 469, 496 (1975). However, this limitation does not apply to New York's statutory privilege. New York's statute was amended in 1956 to remove language limiting the privilege to "public" proceedings and consequently no limitation is put on the fair report privilege beyond the statutory requirements. Indeed, the "protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by" the Federal Constitution. *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 245 (N.Y. 1991) (quoting *Oneil v Oakgrove Const. Inc.,* 71 N.Y.2d 521, 528-529 and n.3 (N.Y. 1988)). (*See also* Dkt. 44 at 14-16; Dkt. 54 at 6-8.) Accordingly, it does not matter whether the constitutional privilege articulated in *Cox Broadcasting* cases only applies when the information is publicly available or reports "advance the administration of justice." Such a limitation does not apply to New York's independent statutory privilege.

Next, Miller looks to outdated and strictly cabined New York law that has no application here. Miller's patchwork argument is based on a collage of quotations taken out of context from two New York Court of Appeals cases, *Stevenson* and *Shiles.* But those cases do not support his arguments. *Stevenson v. News Syndicate Co*., 276 A.D.2d 614 (N.Y. App. Div. 2d Dep't 1950), *aff'd*, 302 N.Y. 81 (N.Y. 1950), was decided in 1950 and concerns a prior version of New York's fair report statute (Civil Practice Act § 327), since repealed, that expressly applied *only* to reports of "public" proceedings. *Id*. at 617-18. As noted, years later, the New York legislature removed the requirement that official proceedings had to be "public" for the statutory fair report privilege to apply. New York courts have since acknowledged uniformly that by this 1956 amendment, "[t]he legislature . . . made clear its intent that the absolute privilege shall apply to fair and true reports of judicial and other official proceedings, ***regardless of whether they are public or nonpublic***." *Keogh.*, 51 Misc. 2d at 891. *Stevenson*'s rationale has thus been rejected both by the New York legislature and New York courts. It simply cannot be said to inform the

14

application of Section 74.  Miller has no more success with *Shiles v. News Syndicate Co.*, 27 N.Y.2d 9, 14 (N.Y. 1970).  The *Shiles* court held that the fair report privilege did not apply to the publication of information *automatically* sealed in matrimonial proceedings by operation of New York's Domestic Relations Law ("DRL") § 235.  *Shiles* has been strictly limited to just that provision of the DRL.  In fact, the express and narrow reach of *Shiles* was just affirmed by the Second Circuit.  *Zappin v. NYP Holdings Inc.*, 2019 WL 1782635, at *1 (2d Cir. Apr. 24, 2019) (holding that Section 74 "applies to reports of matrimonial proceedings," *except* with regard to records explicitly sealed by operation of the DRL).  *See also Zappin v. Daily News, L.P.*, 2017 WL 3425765, at *9 (S.D.N.Y. Aug. 9, 2017) (a "nuanced inspection of the [*Shiles*] decision's facts, analysis, and foundational authorities confirms that *Shiles* does not render the § 74 privilege categorically inapplicable to public judicial proceedings in a matrimonial action"); (Dkt. 44 at 12-15; Dkt. 54 at 2, 7-8).

For this reason, courts have *not* extended the *Shiles* exception to family law or matrimonial matters other than those specifically covered by DRL § 235.  And in applying Section 74's privilege to such proceedings, courts do not consider the private figure status of the litigants or government involvement as a factor.  For Section 74, the controlling foundation is that the report is on a judicial or other official proceeding.  *Uzamere v. Daily News, L.P.*, 34 Misc. 3d 1203(A), at *3 (Sup. Ct. N.Y. Cty., 2011) (applying privilege to article that recited statements from affidavit filed in plaintiff's divorce); *Mills v. Raycom Media, Inc.*, 34 A.D.3d 1352, 1352-53 (N.Y. App. Div. 4th Dep't 2006) (applying privilege to broadcast on family court neglect proceeding); *Gillings v. New York Post*, 166 A.D.3d 584, 586 (N.Y. App. Div. 2d Dep't 2018) (applying privilege to article on divorce action against the plaintiff by his former wife).

The law of New York is clear.  Section 74 applies to both sealed and public court documents, except in the limited case of documents sealed by operation of New York's Domestic Relations Law § 235 in matrimonial actions.[13]  Rather than asking this Court to apply an exception, Miller is asking the Court to create one.  This the Court should not do.  Miller's manufactured limiting principle is inconsistent with the requirement that the fair report privilege be construed broadly.  *See Holy Spirit*, 49 N.Y.2d at 68; *see also Cholowsky v. Civiletti*, 69

---

[13] It would be an even more dramatic extension of the limited *Shiles* exception to have it apply to documents filed in a family court proceeding in Florida where the entire action is on the public record and a pending application to seal had not been ruled on (and never was).  (SOF ¶ 46-49.)

A.D.3d 110, 114 (N.Y. App. Div. 2d Dep't 2009) ("The case law has established a liberal interpretation of the 'fair and true report' standard of Civil Rights Law § 74").  Accordingly, even if the Supplement had been effectively under seal at the time the Article was published, Section 74 would still apply as a matter of law.

## II.   DEFENDANTS MADE NO DEFAMATORY STATEMENTS OF FACT

There is no dispute that Defendants uniformly understood that the Article was a straightforward report on Delgado's filing of the Supplement and the allegations contained in the Supplement.  The Article never adopted Delgado's allegations as being "true" and never represented that the publisher had independently verified them.  And there is no question that the reasonable reader would have understood the Article that way.  In other words, by reporting on allegations indisputably made against Miller in a court filing, Defendants did not publish any "defamatory statement of fact about the plaintiff", as New York law requires to be actionable. *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).  Whether words are capable of bearing a defamatory meaning is "a legal question to be resolved by the courts in the first instance." *Id.*; *Keller v. Miami Herald Publ.*, 778 F.2d 711, 714 (11th Cir. 1985). Importantly, the court must consider the statements in the context of the publication as a whole. *Dillon v. City of N.Y.*, 261 A.D.2d 34, 38 (N.Y. App. Div. 1st Dep't 1999). Here, the Article's context was made clear to the reader:  it was a report on the allegations contained in the latest filing in the acrimonious dispute between Delgado and Miller.  It is well-settled that raising questions, without providing answers, is not a "defamatory statement of fact" – rather, it "indicate[s] a defendant's 'lack of definitive knowledge about the issue.'"  *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338 (D.C. Cir. 2015).  As a result, a question is only defamatory if it can "be reasonably read as an *assertion* of a false [and defamatory] *fact*; inquiry itself, however embarrassing or unpleasant to its subject, is not accusation."  *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1994) (emphasis added).

Applying these principles, numerous courts have affirmed that, for instance, a statement that a plaintiff has been *accused* of wrongdoing or is *under investigation* is not defamatory where the existence of the accusation or investigation is not under dispute, even if plaintiff denies the underlying wrongdoing.  *See, e.g.*, *Cabello-Rondon v. Dow Jones & Co., Inc.*, 2017 WL 3531551, at *5 (S.D.N.Y. Aug. 16, 2017), *aff'd*, 720 F. App'x 87 (2d Cir. 2018) (report that plaintiff was being investigated on suspicion of drug trafficking and money laundering could not

be read as defamatory where plaintiff did not "challenge[] the 'gist or substance' of those statements – that he is, in fact, under investigation.").[14]

Here too, the Article merely reports that Delgado's filing made the accusations against Miller, not that the wrongdoing *in fact* occurred.  Miller does not contest that the Supplement was filed (SOF ¶ 44), or that the Article accurately depicted the alleged wrongdoing contained in the Supplement.  (*See* Opp. Rec. at 7.)  Even the Article's headline specifies that "Court Docs *Allege*" wrongdoing by Miller, and clear attributions to the Supplement are made consistently throughout the Article.  The Article thus clearly "indicate[s] [Defendants'] lack of definitive knowledge about the issue."  *Abbas*, 783 F.3d at 1338.  The Article is a paradigmatic example of a "story constructed around questions, not conclusions," which "does not ultimately adopt any particular answer as correct."  *Chapin*, 993 F.2d at 1098.  Just as "[r]easonable readers understand that some people who are arrested are guilty and that others are not," *Martin v Hearst Corp.*, 777 F.3d 546, 553 (2d Cir 2015), reasonable readers also understand that some people who are accused of wrongdoing – particularly in an acrimonious custody dispute – actually committed that wrongdoing, and some did not.  Because the Article does not come to a conclusion one way or the other, but simply reports on allegations made, as a matter of law Defendants did not publish as fact the challenged statements in this action.  For this independent reason, the action should be dismissed.

### III.     THE ARTICLE WAS NOT PUBLISHED WITH ACTUAL MALICE

Public figures like Miller "must prove that the defendant acted with actual malice to establish liability."  *Silvester v. American Broad. Cos.*, 839 F.2d 1491, 1493 (11th Cir. 1988) (citing *N.Y. Times*, 376 U.S. 254).[15]  The actual malice requirement reflects this country's "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open."  *N.Y. Times*, 376 U.S. at 270.  It secures the "breathing

---

[14] *See also Levin v. McPhee*, 917 F. Supp. 230, 241 (S.D.N.Y. 1996), *aff'd*, 119 F.3d 189 (2d Cir. 1997) (dismissing libel claims based on a report that "suggest[ed] that [plaintiff] may have been involved with" a crime, but did "not suggest that [the author] possesses facts unknown to the reader that prove" it); *Glob. Relief Found., Inc. v. New York Times Co.*, 390 F.3d 973, 980, 982 (7th Cir. 2004) (rejecting defamation claims where "the gist of each article[,] that the government was investigating [plaintiff] for links to terrorism," was true, notwithstanding plaintiff's claim that "that the gravamen of the reports was . . . that [he] was actually involved in funding terrorist operations.").

[15] Miller concedes he is a public figure.  (SOF ¶ 1.)

space" required to write critically about powerful individuals who seek to silence and suppress legitimate investigations into their corrupt activities. *Id.* at 272.

"The standard of actual malice is a daunting one." *Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002) (quoting *McFarland v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996)). A libel plaintiff "must show that [Defendants] acted with knowledge that [the defamatory statement] was false or with reckless disregard of whether it was false or not." *Silvester*, 839 F.2d at 1498 (quotation marks omitted). The First Amendment provides publishers with an additional safeguard by requiring libel plaintiffs "to prove actual malice by clear and convincing evidence." *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1239 (11th Cir. 1999) (citing *Gertz v. Robert Welch*, 418 U.S. 323, 342 (1974)). This standard of proof imposes "a heavy burden [on plaintiffs] far in excess of the preponderance sufficient for most civil litigation." *Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1252 (9th Cir. 1997). The test for actual malice is strictly subjective and asks whether the publisher actually believed that the statement at issue was false or very likely to be false at the time of publication, but published it anyway. *Id.*; *Bose Corp. v. Consumer Union of U.S., Inc.*, 466 U.S. 485, 512 (1984). "[K]nowledge of falsity is self-explanatory" and requires proof that the defendant was *actually* aware that the statement in suit was false when it was published. *Silvester*, 839 F.2d at 1498.

For actual malice purposes, "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that defendant *in fact* entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added).[16] Thus, neither "the failure to investigate" nor even a "departure from reasonable journalistic standards" are sufficient to establish actual malice. *Michel*, 816 F.3d at 703-04. *See also Meisler*, 12 F.3d at 1030 ("[N]egligence is not the appropriate standard for proving actual malice."). This standard is high that, in reviewing public figure libel cases against media defendants, the Eleventh Circuit last found a triable issue of fact in 1983.[17]

---

[16] *See Klayman v. City Pages*, 650 F. App'x. 744 (11th Cir. 2016) (same); *Levan*, 190 F.3d 1230 (reversing trial court judgment and entering judgment for defendant); *Meisler v. Gannett Co., Inc.*, 12 F.3d 1026 (11th Cir. 1994) (affirming summary judgment); *Cf. Hunt v. Liberty Lobby*, 720 F.2d 631 (11th Cir. 1983).

[17] Even if this Court were to reject the application of the fair report privilege, this is not evidence of actual malice. *See, e.g., McFarlane v. Esquire Magazine*, 1994 WL 510088, at *13 (D.D.C.

### A.       There Is No Evidence That Defendants Acted With Actual Malice

Applying this exacting standard, there is no evidence whatsoever that Defendants published the Article knowing the challenged statements were false, or even having serious doubts about the allegations.  The evidence uniformly establishes that Defendants published the Article believing that it accurately and responsibly reported on the filing of the Supplement, its allegations and the events surrounding the acrimonious custody dispute between Delgado and Miller.  (*Id*. ¶¶ 63-97.)  No one involved in publishing the Article had doubts – let alone serious doubts – about the accuracy of the Article.  (SOF ¶¶ 96-97.)

Defendants' good faith belief had a solid foundation.  First, the Supplement was a publicly filed court pleading (SOF ¶ 46), not a passing remark on the street or in a bar.  Next, Defendants had no reason to doubt the credibility of Delgado and every reason to believe her. Prior to publishing the Article, Defendants knew that (1) Delgado was a Harvard-educated lawyer who practiced law at prestigious firms in New York prior to joining then-candidate Donald Trump's presidential campaign as a spokesperson (SOF ¶¶ 73-74), (2) during Trump's campaign, the news media relied on Delgado as a credible source of information regarding then-candidate Trump, even referring to her as Trump's "most cogent, formidable surrogate" (*id*.; Ex. 6 at 7-8), and (3) the media relied on Delgado as a credible source concerning her relationship with Miller (SOF ¶ 77).  In particular, the *Atlantic* – a highly respected publication – published a feature article with Delgado as its primary source, reporting that Miller lied to Delgado and twice pressed her to have an abortion.  (SOF ¶ 77.)  It is undisputed that Defendants relied on the *Atlantic* article (and hyperlinked it) in publishing the Article.  (SOF ¶ 83.)

But that is not all.  The Supplement itself had all the indicia of a credible story that should be taken seriously.  It included a detailed description of how Delgado first learned of the allegations concerning Miller and the methodical steps she undertook to investigate them.  In particular, the Supplement describes how a well-known and respected journalist, who Krueger understood to be Yashar Ali and whose reporting Krueger had great confidence in, confirmed the

---

June 8, 1994) (finding the fair report privilege did not apply but granting defendant's motion for summary judgment on lack of evidence of actual malice), *aff'd,* 74 F.3d 1296 (D.C. Cir. 1996); *Durando v. Nutley Sun*, 209 N.J. 235, 253–54 (N.J. 2012) (denying motion to dismiss on fair report grounds but granting motion for summary judgment on actual malice grounds).

allegations with the alleged victim.[18]  At every step, the Supplement appears to document the basis for its allegations, attaching emails and text messages supporting the events described or links to news articles confirming background information.  Adding further credibility to the allegations, the Supplement is cautious to not speculate if facts are unknown and affirmatively reveals when information is second-hand or "unverified."  (SOF ¶ 72; Ex. 9.)

Perhaps most important, many of the Supplement's allegations were consistent with widely published information concerning Miller.  As the Eleventh Circuit has made clear, facts and events do not "occur in a vacuum but as part of a series of ongoing events."  *See, e.g., Dunn v Air Line Pilots Ass'n*, 193 F.3d 1185, 1200 (11th Cir. 1999).  Here, key elements to the Supplement's story mirrored the news reports surrounding Miller and Delgado:  the fact the Miller worked for Jamestown, he had a prior extra-marital affair, frequented a strip club, and pushed his mistress to have an abortion when that affair resulted in a pregnancy.  (*See* SOF ¶¶ 36, 43, 83, 84; Exs. 3, 5-8, 37.)  This factual overlap with known events caused the Supplement to "ring true."  (*Id*. ¶ 71.)  To be sure, the Supplement's allegations went beyond those previously published facts – alleging Miller gave the stripper a smoothie to induce an abortion, which resulted in the hospitalization of the woman – but the credibility of the story was informed by so many facts that were entirely consistent with Miller's public persona.

It was against this backdrop – over a year of prior reporting that Miller was unfaithful, untruthful, someone who frequents a strip club and who has asked his mistress to get an abortion – that Defendants viewed the allegations in the Supplement and found them to be credible.  (*Id*. ¶¶ 63-71.)  But Kreuger's reporting did not end with reading and evaluating the Supplement as against her prior knowledge.  She spoke with Delgado and verified that it was authentic, she reached out to the Miami-Dade court clerk, she sought comment from Ali, the journalist, and from Miller, both personally and through his attorney.  (*Id*. ¶ 82.)   At no time did she learn any information that caused her to have any, let alone serious, doubts about the Supplement.  (*Id*. ¶ 96-97.)

Moreover, when Defendants published the Article, they took care to fully disclose the context in which the Supplement was filed – as part of an "ongoing custody battle between"

---

[18] The Supplement also made it clear that although Ali had confirmed the account in the Supplement with the victim, he had not published a story on his investigation because of his editor's concern that she might "backtrack and disappear" post publication.  (Ex. 9 at 10.)

Miller and Delgado where "the acrimony between the two appears to have only grown since" their 2016 affair.  (Ex. 1 at 1, 3.)  The Article also describes the originally anonymous nature of the allegations and the role of the unnamed "Journalist A" in communicating directly with Jane Doe.  (*Id*. at 3-4).  The Article never presents the allegations in the Supplement as established fact and directed readers to the full Supplement embedded in the Article.  "Where a publisher gives readers sufficient information to weigh for themselves the likelihood of an article's veracity, it reduces the risk that readers will reach unfair (or simply incorrect) conclusions, even if the publisher itself has."  *Michel,* 816 F.3d at 703 (citations omitted).  Then, perhaps most telling, shortly after the Article was published, Miller's lawyer sent a letter disputing the allegations in the Supplement and the next day Miller himself published a statement challenging the story.  In each case, with an hour, Defendants amended the Article to add the denials.  (*Id*. at 2, 4-5; SOF ¶¶ 91, 95).

Time and again, courts have dismissed defamation claims at the summary judgment stage on facts comparable to these.  Perhaps most instructive is the seminal Supreme Court decision *St. Amant*, 390 U.S. 727 (1968).  In *St. Amant*, a reporter relied solely on a source's affidavit in reporting the plaintiff engaged in bribery.  The affidavit was made in the context of a contentious labor dispute and it was undisputed that the reporter had no knowledge of the source's reputation for veracity.  *Id.* at 729, 733.  While the reporter was able to confirm other aspects of the affidavit, he neither independently investigated the source's serious charge of bribery nor tried to confirm that charge with others who may have had knowledge.  Indeed, the evidence showed that the reporter "gave no consideration to whether or not the statements defamed [plaintiff] and went ahead heedless of the consequences and mistakenly believed he had no responsibility for the broadcast because he was merely quoting [the source's] words."  *Id.* at 730.  Notwithstanding this evidence, the Court found no support for a finding of actual malice as nothing in the record "indicate[d] an awareness by [the reporter] of the probable falsity of [the affidavit's] statement about [plaintiff]. Failure to investigate does not in itself establish bad faith."  *Id.* at 733.

Here, of course, Krueger *did* seek confirmation of the facts from the key identified witnesses with knowledge and *did* have compelling reasons to find Delgado highly credible.[19]

---

[19] In particular, Defendants' reliance on prior news articles that were consistent with key background facts weighs strongly against a finding of actual malice.  Indeed, "good faith reliance on previously published reports in reputable sources … precludes a finding of actual malice as a

Yet, as in *St. Amant*, Defendants believed (even if mistakenly) that they were entitled to report on Delgado's court filing as privileged and credited the Supplement as a court document much as the reporter in *St. Amant* credited the fact that his source provided sworn testimony. *Id* at 733. Here, the evidence is more compelling than what the *St. Amant* Court found insufficient to establish actual malice and scores of cases that have followed in its wake.[20]

Respectfully, this is not a close case on actual malice. Courts around the country routinely grant summary judgment to defendants for a lack of actual malice where plaintiffs offer far more damning evidence. *See, e.g.*, *Levan*, 190 F.3d at 1241 n.33, 1243 (no actual malice where reporter stated "[the] truth is irrelevant to me" chose "not to include statements" favorable to the plaintiff, and knew that there was a "[d]ifference of opinion as to the truth" of the allegations); *Reuber v. Food Chem. News*, 925 F.2d 703, 714-18 (4th Cir. 1991) (no actual malice where defendant relied upon a biased source, "made a conscious decision not to inquire into the truth or falsity of [the] allegations" in a letter provided by that source which was the subject of the article, and failed to resolve potentially contradictory information); *Tavoulareas*, 817 F.2d at 834 (no actual malice where editor instructed his reporters to produce "holy shit" stories and a fact checker found the "story's theme impossible to believe" and raised "serious doubt" about the article). Taken together, these cases underscore that actual malice is an extremely high bar – and the evidence offered by Plaintiff falls far short of it.[21]

### B.    The Supplement Was Not "Inherently Improbable"

Plaintiff will undoubtedly argue that the allegations in the Supplement are "so inherently improbable that only a reckless man would have put them in circulation." *Michel*, 826 F.3d at 703 (quoting *St. Amant*, 390 U.S. at 732). But he confuses inherent improbability with the "explosive" nature of the allegations. Many things are explosive without being inherently

---

matter of law." *Liberty Lobby v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988) (finding no actual malice); *Tobinick v. Novella*, 848 F.3d 945, 947 (11th Cir. 2017), *cert denied*, 138 S. Ct. 449 (2017) (a publisher's reliance on "trustworthy sources demonstrates his lack of subjective belief that the [allegedly defamatory] articles [in suit] contained false statements").

[20] *See Tavoulareas v. Piro,* 817 F.2d 762, 790 (D.C. Cir. 1987) (reliance on a source plaintiff contends was biased does "not come close to approaching the level of recklessness required by the Supreme Court"); *Woods v. Evansville Press Co.*, 791 F.2d 480, 488-89 (7th Cir. 1986) (no actual malice where reporter relied on a credible source whose "comments were consistent with facts known to [reporter] at the time the contested column was published.").

[21] *See also Lohrenz v. Donnelly*, 350 F.3d 1272, 1284 (D.C. Cir. 2003) (no actual malice where evidence that defendants "acted on the basis of a biased source and incomplete information").

improbable.  The news is awash in "incredible" stories that prove to be absolutely true.  Consider Anthony Weiner's sexting photos with a minor, Governor Spitzer's relationship with a prostitute, or Governor Sanford's "hiking the Appalachian trail."  Describing such news as "insane," "wild," "stunning," and the like is nothing more than a common human reaction.  And the Article did not shrink from this common sense reaction.  It described the allegations as "explosive," but provided readers with all the information they needed to evaluate the credibility of the allegations (including embedding the full Supplement).

Given the context of Miller's reputation for affairs, untruths, and pressing another mistress to have an abortion, and the methodical investigation described in the Supplement, the allegations were far from "inherently improbable."  *See Levesque v. Doocy,* 560 F.3d 82, 90-1 (1st Cir. 2009) (no malice where "the two actionable statements []were certainly absurd, but the [] article presented them within larger, accurate comments that could be corroborated.")  *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F. Supp. 947, 958 (D.D.C. 1976) (no malice where "the factual backdrop of the article" did not render the defamatory statements 'inherently improbable.'").  As Krueger affirms, she understood her source's characterization of the allegations as "insane" to mean nothing more than shocking, similar to her own immediate response.  (SOF ¶ 75-76.)  There is no evidence to the contrary.

**C.    Delgado's Alleged Lack of Credibility**

Miller will argue that Defendants should have known Delgado was "crazy" and they never should have relied on any allegations she filed, even if made in a court pleading as an attorney with ethical obligations.  But what Miller fails to establish is that any of Defendants were aware of, or believed, that Delgado was actually mentally unstable or not credible.  In fact, the uniform evidence is to the contrary.  (*id.* ¶ 75-78.)  While Miller is an admitted liar – to his bosses, colleagues, wife, and mistresses – the claim that Delgado is "crazy" is unsupported by record evidence.  (*see* SOF ¶¶ 24, 28-29, 40.)[22]  Even if Delgado was deemed unreliable, the prior reports relied on by Defendants and the facial credibility of the Supplement itself belies any inference of actual malice by Defendants.  Where, as here, information gleaned from a source is otherwise sufficient to be relied upon, actual malice cannot be established even by showing that the source was unreliable in the past.  *See McFarlane v. Sheridan Free Press*, 91 F.3d 1501,

---

[22] Similarly, that Krueger's source referred to Delgado as "kind of nuts" is also not evidence of Krueger's subjective belief that the Supplement was likely false.  (SOF ¶ 75-76.)

4822-0349-9929v.16 0109559-000002

1509 (D.C. Cir. 1996) (reporter did not act with actual malice, as a matter of law, in publishing the otherwise credible allegations of a source who had a known "propensity to exaggerate and even to lie"); *see also Cobb v. Time, Inc..*, 278 F.3d 629, 638 (6th Cir. 2002) (no actual malice where journalist relied on source who was a drug user with "criminal background" and who was "paid" to provide "bizarre" information); *Reuber*, 925 F.2d at 715 ("Actual malice cannot be proven simply because a source of information might also have provided the information to further the source's self-interest."). And as already discussed, Defendants alerted readers to Delgado's potential bias, making it clear the Supplement was filed as part of an acrimonious custody dispute. *See supra* at 10; Ex. 1; *Turner v. Wells*, 879 F.3d 1254, 1274 (11th Cir. 2018) (inclusion of "information [cutting] against [] Defendants' general conclusions" allows "readers to decide for themselves what to conclude" and makes "any allegation of actual malice less plausible").

Miller's frontal assault on Delgado and her supposed mental instability, in the press and in his Complaint, only reaffirmed Krueger's firm conviction that the Supplement was believable and newsworthy in the first place. Miller was Delgado's boss when the affair began, and he admits that Delgado was fully capable of being an effective surrogate for a presidential candidate, as well as a member of Trump's White House. Miller only came to consider Delgado "mentally unstable" *after* they broke up and *after* she refused to abort their baby. (SOF ¶ 32).[23] The "Delgado is crazy" argument does not support actual malice.

### D.    Splinter's Ideology Is Not Evidence Of Actual Malice

Miller's focus on the political ideology of Defendants' website *Splinter* and Krueger's purported personal animus towards Plaintiff also misses the mark. Even if Defendants *were* biased against Miller – and they were not – that would not be sufficient. The actual malice standard "directs attention to the defendant's attitude toward the truth or falsity of the material published [not] the defendant's attitude toward the plaintiff.'" *Reader's Digest Ass'n v. Superior Ct.*, 37 Cal. 3d 244, 257 (Cal. 1984). The Eleventh Circuit has expressly held that evidence of

---

[23] Miller has launched a frontal assault on Delgado and her supposed mental instability. He has admitted to planting at least one story to make her look unstable (SOF ¶ 33), and it is a dominant theme in his Complaint. Miller is doing what powerful men have been doing for hundreds of years to discredit allegations raised by women – a ploy that has been widely discussed in the #MeToo movement – he tars Delgado as a hysterical and "crazy" ex-lover capable of resorting to false allegations to harm a man who scorned her. This trope is as old as the hills.

4822-0349-9929v.16 0109559-000002

the defendant's "[i]ll-will, improper motive or personal animosity plays no role in determining whether a defendant acted with 'actual malice.'"  *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1198, n.17 (11th Cir. 1999) (affirming summary judgment for defendants); *Klayman*, 650 F. App'x at 750-51 (finding evidence of ill-will to be "immaterial as to whether [defendants] actually had doubts about the veracity of the statements or alleged implications").  And as conceded by Plaintiff, one can hold certain political views while also accurately reporting on a story.  (SOF ¶ 53.)  *See also Lohrenz*, 350 F.3d at 1284 ("[e]vidence that the publishers of the alleged defamatory statements were on a mission to reinstate the ban against women being assigned to combat positions in the military" did not demonstrate actual malice).

       **E.**      **Defendants Did Not "Avoid the Truth"**

       Finally, Miller will no doubt argue that Defendants avoided further investigation into the Supplement in order to "avoid the truth."  This argument is insufficient as a matter of law *and* unsupported by the record.  *See Michel*, 816 F.3d at 703-04 (a failure to investigate is not evidence of actual malice); *N.Y. Times*, 376 U.S. at 287-288 (Times not liable even though the evidence of the falsity of the story at issue would have been evident had the Times checked its own news files).  As is clear from the record, Defendants reviewed the Supplement, finding it credible, spoke with Delgado and verified that the Supplement was authentic, reached out to the court to inquire about the Supplement directly, sought comment from Ali, and from Miller, both personally and through his attorney.  (SOF ¶¶ 82, 96.)  At no time did Krueger learn any information that caused her to have serious doubts about the Supplement or suggest that she purposefully avoided the truth.  (SOF ¶ 96-97.)  This is a far cry from *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 682-85 (1989) (publisher opted not to interview the "one witness who was most likely to confirm . . . the events" and did not review a tape in its possession that would have revealed the falsity of the allegations).  Unlike *Harte-Hanks,* Defendants here had *no* doubts to dispel, and did not look the other way in fear of finding contradictory information.

       Because there is no evidence of actual malice, summary judgment is warranted.

## <u>CONCLUSION</u>

       For the reasons stated herein, Defendants respectfully request that summary judgment be entered for Defendants.

4822-0349-9929v.16 0109559-000002

Respectfully submitted,

June 27, 2019

**Elizabeth A. McNamara**
Elizabeth A. McNamara (*pro hac vice*)
Katherine M. Bolger (*pro hac vice*)
Claire K. Leonard (*pro hac vice*)
Abigail B. Everdell (*pro hac vice*)
DAVIS WRIGHT TREMAINE
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 489-8230
lizmcnamara@dwt.com
katebolger@dwt.com
claireleonard@dwt.com
abigaileverdell@dwt.com

*Attorneys for Defendants Gizmodo Media Group, LLC and Katherine Krueger*

**Deanna K. Shullman**
Deanna K. Shullman (Florida Bar No. 514462)
Rachel Fugate (Florida Bar. No. 144029)
Giselle M. Girones (Florida Bar. No. 124373)
SHULLMAN FUGATE PLLC
2101 Vista Parkway, Suite 4006
West Palm Beach, FL 33411
Telephone: (561) 429-3619
dshullman@shullmanfugate.com
rfugate@shullmanfugate.com
ggirones@shullmanfugate.com

*Attorneys for Defendants Gizmodo Media Group, LLC and Katherine Krueger*

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2019, a true and correct copy of the foregoing has been served by CM/ECF on all counsel or parties of record on the service list.

**Deanna K. Shullman**

Deanna K. Shullman
Florida Bar No. 514462

## SERVICE LIST

Kenneth G. Turkel, Esq.
Shane B. Vogt, Esq.
Bajo Cuva Cohen Turkel
100 N. Tampa Street, Ste. 1900
Tampa, FL 33602
Phone: 813-443-2193
kturkel@bajocuva.com
shane.vogt@bajocuva.com
*Attorneys for Plaintiff*

26