## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### 1:18-CV-24227-CMA-Altonaga

| | |
|---|---|
| JASON MILLER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| GIZMODO MEDIA GROUP, LLC, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

I, Katherine Krueger, being of lawful age and otherwise competent to testify in a court of law, hereby declare pursuant to 28 U.S.C. §1746 and under penalty of perjury that the following is true and correct:

1.      I am over the age of eighteen, a resident of Brooklyn, New York and am competent to make this declaration.  I have personal knowledge of the statements set forth below.  I am a defendant in this action and submit this declaration, together with the exhibits annexed hereto, in support of the motion by defendants Gizmodo Media Group, LLC and myself (collectively, "Defendants") for summary judgment in this action.

2.      I am Managing Editor at Gizmodo Media Group, LLC's politics, news, media, and culture website *Splinter*, which is published at the URL www.splinternews.com.  I have held this position since 2016.  As Managing Editor, I act both as an editor, assigning stories and editing copy, and as a reporter, reporting and drafting stories under my own byline.

3.       I authored the story "Court Docs Allege Ex-Trump Staffer Drugged Woman He Got Pregnant With 'Abortion Pill,'" which was published on September 21, 2018 at the URL https://splinternews.com/court-docs-allege-ex-trump-staffer-drugged-woman-he-got-1829233105 (the "Article").  (A true and correct copy of the Article is attached as **Exhibit 1**.)

4.      The Article reported on a document filed in a court proceeding in Miami-Dade County Court, Family Division, captioned *In re: J.M., a/k/a Jason Miller and A.J.D., a/k/a Arlene*

*J. Delgado* (the "Family Court Proceeding").  The document, titled "Mother's Supplement to Mother's March 2018 Motion for Court to Consider Psychological Evaluation of the Father" (the "Supplement"), was filed by Arlene J. Delgado ("Delgado").  The Supplement set out detailed allegations concerning Jason Miller ("Miller"), a prominent Republican strategist and CNN commentator who had worked on the Trump campaign and was President Trump's initial pick for White House Communications Director following his election.

5.     As reported in the Article, the Supplement claimed that in 2012, Miller had engaged in a sexual relationship with a strip club dancer based in Florida, which resulted in the woman – referred to in the Supplement as "Jane Doe" – becoming pregnant.  The Supplement alleged that when Miller learned of this pregnancy, he surreptitiously dosed Jane Doe with an abortion pill dissolved into a smoothie, leading to the termination of her pregnancy and her hospitalization.  As reported in the Article, the Supplement also detailed how Delgado allegedly learned of this information and the steps she took to confirm it.  According to the Supplement, Delgado's efforts culminated in a journalist with whom Delgado had shared the story – referred to as "Journalist A" – finding and speaking directly with Jane Doe, who confirmed that the account did indeed happen.

6.     As set forth more fully below, I obtained a copy of the Supplement from a confidential source, but thereafter confirmed it was an authentic copy of what had been filed in the Family Court Proceeding.  Because I understood the Supplement was a public court filing, I believed I had a legal privilege to report upon its contents, provided the article was fair and accurate.

7.      Consistent with most reports on court filings – where the news is the fact the allegations were made in court – my Article did not state that any of the allegations in the Supplement were in fact true.  I believe to this day that the Article's reporting on the Supplement's existence, the nature of its allegations, and the background I reported regarding Miller and Delgado's relationship, was absolutely accurate.  I had no doubt that the Article was a fair and accurate report on the filing of the Supplement.  Further, as I explain below, I found the allegations in the Supplement to be entirely credible.

**My Background in Journalism**

8.     I have been working in journalism for nine years, starting with a position as a freelance reporter at my hometown daily paper the *Wausau Daily Herald* the summer before I began college.  I attended the University of Wisconsin, graduating in 2014 with a bachelor's degree

2

in journalism.  While at Wisconsin, I became the Editor-in-Chief of the student newspaper, *The Badger Herald.*

9.     Following graduation from the University of Wisconsin, I worked as a fellow at *Guardian U.S.*, the United States offshoot of the U.K.'s *Guardian* newspaper.  In April 2015 I was hired as Front Page Editor for *Talking Points Memo*, a political news website, and was thereafter promoted to Breaking News Editor.  In October 2016, I was recruited by the Univision news website *Fusion*, and held the position of Breaking News Editor at *Fusion* until July 2017, when Univision acquired Gizmodo Media Group.  *Fusion* was thereafter brought under the umbrella of the Gizmodo Media Group properties, and rebranded as *Splinter*.  I held the position of News Editor at *Splinter* until June 2018, when I was promoted to Managing Editor.

10.     Since 2015, my reporting and editing work has focused on national political news, particularly breaking news stories.  My work has given me an in-depth familiarity with national politics and public figures on the political stage. It is the role of political journalists to probe these public figures, and the policies they support, with a critical eye, and report newsworthy information to the public in keeping with that perspective.  Accordingly, our reporting is often critical of politically powerful individuals, both Democrats and Republicans.  At the same time, I have a deep and primary commitment to rigorous and factually accurate reporting.  I would never allow my personal beliefs or viewpoints to interfere with this commitment.

**The Article**

*Communications with my Source*

11.     On September 21, 2018 at 2:28 p.m., I received a Twitter direct message from a source I have known for some time (my "Source").  (A true and correct copy of this September 21 exchange with my Source, GIZMODO-000589-594, is attached as **Exhibit 2**.)  My Source told me about a document recently "filed in court, but no one's noticed it yet."  My Source said the document had been filed by "former [T]rump advisor AJ Delgado" and contained allegations against "CNN contrib and former Trump aide Jason Miller (her baby daddy)."  My Source described the allegations as "INSANE," which I took to mean shocking – as stories regarding the sex lives of politicians or celebrities often are.  A few minutes later, when I began to review the Supplement, I agreed that the allegations in it were shocking – though by no means unbelievable – and wrote to my Source "this shit is WILD."

12.     At the very outset of our conversation, my Source also said that "according to the document, a reporter (whom A.J. does not name, but I know is Yashar)" – referring to journalist Yashar Ali – "went down to Florida and confirmed the story with the victim herself. but then never ran the story."  I asked "wonder why?"  My source responded "i didn't read all the way through, but i think yashar sat on it because something happened when he went to jason miller for comment."  I understood this to mean that my Source did not have independent knowledge as to why Ali had not published a story, and that the story may have been held for any number of reasons.  Of course, my Article was in a different context, a report on a public court filing, not an investigative report on the underlying allegations.

13.     My Source then shared a copy of the Supplement with me via a dropbox.com link.  I immediately began reviewing the document.  Over the course of our conversation, which lasted until approximately 2:46 p.m., my Source told me that the copy of the Supplement had come from Delgado, but also provided me with the docket index number of the Family Court Proceeding.  My Source also told me that "AJ thinks Miller is gonna try to get the court to seal this document on Monday."  My Source then shared Delgado's phone number and email address with me.

14.     Through our long-running relationship, my Source and I have developed an agreement that we would share information with one another on the condition that our communications would remain confidential.  My Source certainly would never have initiated the September 21 conversation or shared information with me in that conversation if my Source had not been confident that I would keep his or her identity confidential.  Accordingly, I have never shared my Source's identity with anyone other than my attorneys in this matter.

### Prior Familiarity With Miller and Delgado

15.     The Supplement and its allegations did not arrive, on September 21, 2018, in a vacuum.  As prominent spokespeople for Trump's presidential campaign and transition, I was familiar with both Miller and Delgado's public personalities.   I was also aware of their affair on the campaign trail when Miller was Delgado's direct supervisor, and the ensuing public controversy when it was revealed in December 2016 that both Delgado and Miller's wife were pregnant at the same time, resulting in Miller not taking the job of Communications Director in the Trump White House.  While these events had been reported on at the time, almost two years later they took on new significance in the context of the #MeToo movement, which came to prominence in late 2017.  Let me explain.

4

16.     Before September 21, 2018, I was well aware of who Jason Miller was.  As noted above, Miller was a Republican strategist who served as the head of communications for the Trump campaign.  In that role, Miller was a prominent Trump campaign official, appearing regularly on television and in the news.  After the election, he was tapped to be White House Communications Director.  And even after he stepped away from the White House position, he remained a significant voice for the Trump presidency, appearing as a regular commentator on CNN.

17.     I also had a general familiarity with Delgado through her role as a surrogate for the Trump campaign.  She was a key Hispanic supporter of Trump, and was an articulate and effective spokesperson.  I recalled her being quoted often by media outlets in that capacity during the lead-up to the 2016 presidential election.

18.     But the Miller/Delgado saga independently generated news.  Miller and Delgado's names were first linked in an October 22, 2016 "Exclusive" Page Six item that appeared in the *New York Post*, which I read at the time. (A true and correct copy of the *New York Post* article is attached as **Exhibit 3**).  Headlined "Trump Advisors went to Strip Club with Members of Media," the *New York Post* reported that "Trump campaign senior communications adviser Jason Miller – along with female colleagues including senior adviser and surrogate A.J. Delgado and deputy communications director Jessica Ditto – went with several members of the media . . . to Sapphire Las Vegas Strip Club." The article observed that the Trump advisors' fixation on a "different type of 'pole' the night before Trump's final debate" was a "serious lapse in judgment."

19.     Next, in late December it was revealed that Miller was not going to join the Trump White House.  Just a week earlier, Miller had announced that he would be serving as the White House Communications Director, with the press noting that this position had "mark[ed] an apex in Miller's meteoric rise."  (True and correct copies of a series of news articles published on December 25-26, 2016 in *Politico, New York Post* and *Daily Beast* are attached as **Exhibit 4**.)

20.     Following the announcement of Miller's new position, as the press documented, Delgado issued a series of Tweets congratulating Miller as "the baby-daddy" on his promotion and cryptically noting that he was "The 2016 version of John Edwards" (the presidential candidate who infamously had an extramarital affair, resulting in a child).  Days later, Miller did an about-face and released a statement announcing that he would not be taking the Communications Director position, citing "family obligations" and the fact that his wife was expecting their second daughter in January.  The actual situation was more complicated, which was not lost on the press,

with the *New York Post* calling it a "sex scandal" and concluding that the "rumors of Delgado's relationship with Miller, her direct supervisor, forced his resignation." (*See* Ex. 4.)

21.     Months later, in August, it was reported that "Ex-Trump staffers reveal love child after Campaign trail sex scandal." (A true and correct copy of an August 9, 2017 article in the *New York Post* is attached as **Exhibit 5**.)

22.     Following the initial flurry of press in December 2016, Delgado went silent but I continued to regularly see Miller on television as he segued into a Trump spokesman and a regular CNN commentator. I recall that other contributors on CNN would often call him out for lying or for repeating President Trump's established falsehoods.

23.     I do not remember hearing anything more from or about Delgado until the *Atlantic* published a feature article concerning her on August 15, 2017, which I read around the time it was published. (A true and correct copy of the *Atlantic* article, GIZMODO-000222-248, is attached as **Exhibit 6**.) The *Atlantic* article reported in detail on the affair between Delgado and Miller. It also fleshed out Delgado's back-story. The article described how she grew up in a "Blue-collar home in Miami's Little Havana neighborhood, a daughter of Cuban immigrants," and worked her way through college before landing at Harvard Law School.

24.     After graduating from Harvard, Delgado spent "several years at a white-shoe law firm in Manhattan" before she returned to Florida to work in political commentary. As reported in the *Atlantic* article, Delgado's rise to media prominence garnered glowing compliments from both ends of the political spectrum, Fox News' Sean Hannity and CNN's Chris Hayes, as well as Miller himself, who called her a "triple threat" with ample "conservative street cred."

25.     The *Atlantic* article described how Delgado and Miller's affair began when both were working for the Trump campaign. In the article, Delgado claimed she knew that Miller was married, but "he told her at the time [of the affair] he was separated from his wife." When Delgado unexpectedly became pregnant, the article reported, Miller disclosed for the first time that his wife was also pregnant, and then urged Delgado "on two separate occasions" to have an abortion, but Delgado refused because she is a "conservative Catholic."

26.     The *Atlantic* article went on to describe the "fallout from [Delgado and Miller's] affair," which "didn't take an equal toll on their lives and careers." Miller, according to the article, joined a prominent consulting firm and continued to appear on CNN and "advise the White House

in an informal capacity," while Delgado "stopped getting booked" on television and moved in with her mother.

27.     The *Atlantic* article reported that Delgado and Miller hadn't spoken since a few weeks after she told him of her pregnancy, and he didn't reach out or provide her any financial support during her pregnancy, but then "demanded a paternity test shortly after [the child] was born."  The article also reported how Delgado was made to feel like a "crazy girl" and accused of "overreacting" and "hormonal" after her decision to keep her baby and "stand[] up for herself." The *Atlantic* article also referred to a *New York Post* article which had characterized Miller and Delgado's affair as a "one night stand in Las Vegas."  (*See* Ex. 5.)  Delgado explained in the *Atlantic* article that she was hurt by this characterization, which made what she believed had been a "sweet relationship" appear "vulgar," leading her to decide to give an interview to the *Atlantic* because "she didn't want a tabloid story to be the final word on the matter."

28.     One of my takeaways from reading the *Atlantic* article was that Miller had behaved dishonestly and hypocritically in the course of his relationship with Delgado, but Delgado was the one who had her entire life upended.  Then, when I was provided the Supplement, and looking back again on the *Atlantic* article through the lens of the #MeToo movement, I was struck how no one seemed to express any public outrage over the fact that Miller had embarked on an affair with his direct subordinate.

29.     While the *Atlantic* included a denial from Miller concerning the abortion demand, the allegations were repeated the following year in articles in *Talking Points Memo* ("*TPM*") and in the *Daily Mail*, which each presented consistent portraits of Delgado as having been lied to and unfairly treated, and included even more damning details concerning her relationship with Miller.

30.     The *TPM* article, published April 7, 2018, reiterated in detail Delgado's account of being lied to and mislead by Miller about his marital status.  The article reported that Delgado believed Miller had commenced the Family Court Proceeding against her for "revenge" because "[h]e blames me for not terminating the pregnancy or not keeping it confidential."  The article also reported that Miller's aggressive litigation tactics had "drain[ed] [Delgado] financially."  As reported in the *TPM* article, Miller would not initially respond to requests for comment, but provided a statement after publication that did not deny Delgado's assertions, but claimed he had decided to "refrain[] from responding."  (A true and correct copy of the *TPM* article is attached as **Exhibit 7**.)

7

31.     The *Daily Mail* article, published April 24, 2018, also reported Delgado's claim that Miller had urged her to have an abortion.  Notably, the *Daily Mail* relied on a Delgado court filing in the Family Court Proceeding, and included screenshots from the filing (similarly to how *Splinter* embedded a full copy of the Supplement in the Article).  The prior court filing alleged Delgado's affair with Miller had included "physical and sexual abuse."  The *Daily Mail* article reported that Miller "drinks excessively."  I also noted that the *Daily Mail* drew the same conclusion I had reached that Miller appeared to suffer few consequences from the affair, while Delgado's entire life and career was upended.  Reporting that Miller "bounced back" after he lost the White House job following news reports of his affair with Delgado, and the resulting pregnancy, the article contrasted how Delgado now earns much less, works for a non-profit, and moved in with her mother.   (A true and correct copy of this *Daily Mail* article is attached as **Exhibit 8**.)

32.     I could not help but conclude that the entire affair smacked of an abuse of power with, typically, the woman bearing most of real consequences. The lies and duplicity surrounding Miller's marriage and the two pregnancies alone spoke volumes about his character, and the hypocritical nature of Miller publicly working for pro-life politicians, but in his personal life asking a mistress to have an abortion, together underscored the newsworthiness of the Supplement.  I believed Delgado's account.  She came across in these press reports, particularly in the *Atlantic* article, as thoughtful, intelligent, and well-reasoned.

33.     As I contemplated publishing the Supplement's allegations, it was important to me that, not only had Delgado been a trusted public spokesperson for the Trump campaign, she appeared regularly in and on a wide range of media.  Most importantly, I noted first that she had been relied upon and taken seriously as a source by an outlet like the *Atlantic*, which is highly respected, even venerated, in the journalism community, and second that a prior court filing in the Miller/Delgado Family Court Proceeding had been relied on and published by the media.

### *Contents of the Supplement*

34.     As soon as I received the Supplement from my Source, I began to carefully review it.  (A true and correct copy of the Supplement is attached as **Exhibit 9**.)   The first page of the Supplement set out detailed allegations against Jason Miller, accusing him of having an affair with a stripper in Florida referred to as "Jane Doe," impregnating that woman, and thereafter surreptitiously dosing her with an abortion pill dissolved into a smoothie.  According to these

4830-7780-2393v.6 0109559-000002

opening allegations, Jane Doe had an adverse reaction to the drug, leading to her being hospitalized, as well as the termination of her pregnancy.  I was initially shocked by the allegations, though I at no point believed they were false.  Moreover, after reading through the Supplement in full, I came to the conclusion that the allegations were credible, for a number of reasons.

35.     First, the Supplement contained several details that matched Miller's background.  I was able to quickly confirm that Miller had worked for an organization called Jamestown Associates, as noted in the Supplement.  Second, I was already familiar with press reports about Miller attending a strip club, and it was well known that he had an extramarital affair with Delgado (who also became pregnant), making the allegations that he attended strip clubs and had an extramarital affair with a stripper seem entirely plausible.

36.     Next, the idea that he would ask a woman to have an abortion was entirely credible, given the report in the *Atlantic* article.  Finally, the Supplement noted that following these events, Miller had attempted to have Jane Doe sign a nondisclosure agreement.  I know from my work in news reporting that nondisclosure agreements were common, particularly in politics.  It was therefore plausible to me that a person working in politics would seek to conceal his misconduct using a nondisclosure agreement.  This consistency of the Supplement's story with these previously known facts about Miller caused the Supplement's allegations to ring true to me.

37.     What particularly added to the Supplement's credibility was its detailed recitation of exactly how Delgado allegedly learned of this story.  The Supplement explained that Delgado first learned of the Jane Doe story through an individual referred to as "Gentleman A." He first responded with cryptic allegations to Miller and then to his wife Kelly via their public Twitter pages, prompting Delgado to contact him directly.  (Ex. 9 at 3-4.)

38.     The Supplement did not just rely on Delgado's characterization of these exchanges.  It included the full exchange between Delgado and Gentleman A, and was upfront about his characterization of the information he possessed as "hearsay."  (*Id*. at 4.)  It alleged that Delgado then had a phone call with Gentleman A, and fully disclosed Gentleman A's statements that the story he had heard was "unverified by him" and he "was unable to vouch for its veracity," but that he had heard the story from "separate, 'multiple' source – all of which were 'credible' sources." (*Id*. at 5.)

39.     The Supplement alleged that Gentleman A shared Jane Doe's actual name with Delgado, and Delgado was able to locate the woman the same day.  (*Id*. at 6.)  Gentleman A also

allegedly told Delgado that a private investigator had contacted Jane Doe in late 2016, but she had declined to speak out "because her parents did not know she was a stripper."  (*Id*. at 7.)

40.     According to the Supplement, Delgado then enlisted help to try to confirm Gentleman A's story from a "renowned investigative journalist" referred to in the Supplement as "Journalist A."  (*Id*. at 8.)  From my Source, I knew this journalist was Yashar Ali.  I was familiar with Ali on a professional level, and I hold his journalistic work in high esteem.

41.     According to the Supplement, Ali traveled to Florida and spoke to Jane Doe directly, and Jane Doe confirmed the account, saying "Yes, that happened to me – how did you know?  Who told you?"  (*Id*.)  Ali later contacted a friend of Jane Doe's, the Supplement alleged, and without prompting the friend had written "Is this about the abortion?"

42.     The Supplement also claimed that Ali had identified and contacted another woman in Florida, who said that she also had a relationship with Miller, and he was "physically abusive" with her.  The Supplement alleged that Ali intended to publish a story on these events, but had not yet done so because his editors "were concerned, perhaps understandably, that Jane Doe would backtrack and disappear post publication" – a claim that struck me as plausible given the adverse attention Jane Doe would no doubt be subjected to if she made public allegations of wrongdoing against a powerful person like Jason Miller.  The Supplement noted, however, that Ali "continues working on the report."

43.     Further adding to the credibility of all these claims, the Supplement included a number of exhibits, including copies of the tweets Gentleman A sent to Jason Miller and his wife, Kelly, direct messages between Delgado and Gentleman A, and correspondence between Delgado and Yashar Ali.  It even included a screenshot Ali purportedly sent Delgado, showing Jane Doe's friend asking via text, "Is this about the abortion?"  (*Id*. at 14-22.)

44.     That Delgado had taken pains to disclose all this evidence underscored for me both the credibility of the allegations she was levying, and her own credibility.  Also supporting Delgado's credibility, in my mind, was the manner in which she acknowledged the initial second-hand nature of the allegations.  The Supplement never attempted to characterize Gentleman A's story as more than second-hand information he had heard, but considered nonetheless believable. The Supplement only treated the account as verified in light of Yashar Ali's direct communications with Jane Doe, in which she confirmed the veracity of the account.

4830-7780-2393v.6 0109559-000002

*Reporting the Article*

45.     After reviewing the Supplement I received from my Source, I had no doubt that this was newsworthy and should be reported.  I was aware that the Family Court Proceeding between Miller and Delgado had already been reported on, as had their affair and the birth of their child. Serious and credible allegations made in a formal court filing made by one well known former Trump spokesperson against an even better known former Trump spokesperson were of high news value.

46.      Based on what my Source told me, I knew the Supplement had been filed a week earlier, and had just been obtained by my Source.  I did not know if the document had circulated more widely, or if any other reporters had since obtained it.  What I did know was that no other outlets had yet reported on the story, and that my report could potentially be breaking news.  I did not want to waste time in seeing the Article published.

47.     My first act was to confirm the Supplement had in fact been filed in court and to determine that my copy was an authentic copy of the actual filed document.  While there was nothing on the face of the Supplement that indicated that it was confidential or sealed, I also wanted to determine whether it was a sealed filing.  My Source indicated that the document had not been sealed.  I knew that I had legal protections in reporting on a court document.  If the Supplement was sealed, I believed I could still report on it, but I would likely need to consult further with my editors and possibly our in-house counsel.

48.     I decided to contact Tim Marchman, then-Special Projects Editor for Gizmodo. Tim is an experienced investigative journalist, who had a lot of experience around court dockets, and I thought he could help me find and review the Florida family court dockets.  At 2:53 p.m. on September 21, I sent Marchman a message on Slack, a platform used by Gizmodo employees for messaging communications, and asked him for help in searching the relevant court dockets.  (A true and correct copy of my Slack exchange with Tim Marchman, GIZMODO-000001-8, is attached as **Exhibit 10**.)  Marchman initially couldn't find the court docket, and suggested I call the Miami-Dade court clerk.  I did call the clerk, around 3:20 p.m., but was sent to a voicemail recording that informed me the clerk's office closed at noon on Fridays due to a "funding shortfall."

49.     At 3:38 p.m., Marchman messaged me that he had finally found the case docket. He sent me a screenshot of a page from the docket via Slack.  (A true and correct copy of this

screenshot document, GIZMODO-000009, is attached as **Exhibit 11**).  The screenshot showed that a document with the same title as the Supplement had been filed on September 14, 2018, a motion had thereafter been filed on September 17, 2018 "To Determine Confidentiality and to Seal Court Records," and a status hearing was scheduled for September 24, 2018.  While the September 17 motion came after the Supplement, its docket entry did not appear to reference the Supplement, so it was unclear whether the motion to "Seal Court Records" referred to the Supplement.

50.     There was nothing on the docket that indicated that a sealing order had issued concerning the Supplement.  And there was no "lock" image on the docket. I asked Marchman what he understood from these docket entries and he indicated that the Supplement "might be" sealed.  Marchman suggested we contact our in-house counsel to ask for insight, and thereafter arranged for us to have a call with counsel.  I ultimately came to the understanding that the Supplement was not under seal.

51.     At 3:17 p.m. on September 21, during the course of my exchange with Marchman, I also reached out to Yashar Ali via Twitter direct message to see if he could talk.  I told him I "got a tip about some docs and was hoping to run them by you."  At 3:26 p.m. Ali responded that he couldn't talk right then, but asked "what are the docs?"  A few minutes later, I responded "family court docs in miami-dade. there's a journalist mentioned and have heard it's you, was hoping you could confirm or tell me anything you know, even off the rec."  Ali did not respond until the next day after the Article was published.  Prior to the publication of the Article, I had no further communications with Ali.  (A true and correct copy of my exchange with Ali, GIZMODO A000042- 43, is attached as **Exhibit 12**.)

52.     At 3:40 p.m. on September 21, I sent an email to Delgado, asking if she could verify the authenticity of the document I had received from my Source, and provide any further comment. (A true and correct copy of my email exchange with Delgado, GIZMODO-000045-48, is attached as **Exhibit 13**.)  Delgado responded in less than 30 minutes, and said she "probably shouldn't make any comment [on the record] past confirm the authenticity of the docs," but was willing to review them if I sent them by email.  Delgado also mentioned that Miller "is looking to have this document sealed from public view / is asking the court to seal it."

53.     I responded to Delgado and attached my copy of the Supplement for her to review. I also asked her "Do you know if this filing has already been sealed?  Or is that what your court date on Monday is about?"  Within an hour, at 5:03 p.m., Delgado responded and confirmed "this

does appear to be a legitimate copy of what I filed." Delgado also said "it isn't sealed. The hearing on Monday is a standard case management conference but they are hoping to have the Judge rule on whether it should be sealed." This statement further confirmed my understanding that the Supplement was not under seal. Delgado also stated in her email that she didn't want to comment further. About an hour later, at 6:06 p.m., Delgado followed up to reiterate that my copy of the Supplement "is legitimate bc I compared it to what I filed and it is exact."

54.     By this time, I had obtained an email address for Jason Miller. At 5:45 p.m. on September 21, I wrote to Miller that I was working on a story about the Supplement, and said "I'd like to give you the opportunity to respond to the allegations contained in that filing: that you forced a woman to have an abortion against her will and were physically abusive with another woman." I asked for Miller to "let me know if you have any comment as soon as you can," and offered to speak on the phone at his convenience. (A true and correct copy of this email, GIZMODO-000051, is attached as **Exhibit 14**.) Miller never responded to this email.

55.     At some point in the late afternoon of September 21, I also attempted to call Miller's attorneys of record in the Family Court Proceeding. I could not reach anyone.

56.     Within hours after receiving the Supplement, I had contacted or attempted to contact every identifiable person referred to in the Supplement, and had either received comment or had received no response. Separately, I had also identified and reviewed several news articles regarding Miller and Delgado, including the *Atlantic* article, and had refreshed my recollection of the background of their relationship and legal dispute. All of this gave me further confidence in the credibility of the Supplement and its status as a publicly filed court document.

### Drafting the Article

57.     Throughout the afternoon, while I was reaching out for comment, I was also working on drafting the Article, beginning at 3:59 p.m. From the outset, we intended the Article to be a straight forward report on a filed court document concerning Trump campaign officials. As a result, I tried to closely track the allegations made in the Supplement. As I observed to Marchman: "I think I'm mostly gonna let [the allegations] speak for themselves? And just hew closely to the doc as filed…" He agreed that this is "one to play straight." (*See* Ex. 10 at GIZMODO-000006).

58.     With that goal in mind, and to avoid any confusion regarding the actual contents of the Supplement, it was agreed among my editors and I that we would embed the entire Supplement

at the end of the Article.  This is commonly done by news organizations, particularly to underscore that they are reporting on court records that the public is entitled to see.  Embedding the entire filing not only allows readers to review the actual filing and draw their own conclusions, it also authenticates and verifies our reporting upon it.   Here, we encouraged readers to read the Supplement.  The Article ends with this directive:  "Read the full court filing below:"  By doing that, we made the Supplement a part of the Article.

59.     By 5:51 p.m., I had completed my initial draft, which was then passed on to *Splinter* Deputy Editor Jack Mirkinson, and thereafter to *Splinter* Editor-in-Chief Aleksander Chan.  I was in frequent contact with Mirkinson and Chan regarding the story as they edited, providing additional information and thoughts.  Some of these conversations happened over Slack, but most occurred in person, as Mirkinson, Chan, and I have desks very close to one another in the Gizmodo offices. Having not received a response from Miller or his counsel to my requests, the Article was posted online at 8:17 p.m. on September 21, 2018.

### The Published Article

60.     The opening paragraph to an article is often called the "lede" in journalism. The lede's purpose is to briefly summarize the article and to get the reader interested in what they are about to read afterward.  The Article's lede followed this standard path.

61.     While the lede went through a number of edits before publication, as is common, its very first sentence put the filing of the Supplement in context.  "The ongoing custody battle between former Trump campaign operatives Jason Miller and A.J. Delgado has taken another nasty turn."  Thus, before turning to a quick summary of the Supplement's allegations, the reader was on notice that this was filed in a custody battle – which commonly comes with charges and counter-charges – and that the Supplement reflected a new "nasty turn."   Later in the Article, we underscored this point, noting the "acrimony between [Miller and Delgado] appears to only have grown" with the ongoing custody battle.

62.     The lede of the Article then briefly summarizes the Supplement's allegations.  It states that the "nasty turn" is an "explosive new court filing" filed by "Delgado's legal team" alleging that "Miller – prior to [Miller and Delgado's] own high-profile extramarital romance – carried out an affair with a woman he met at an Orlando strip club."  The lede thereby drew the obvious connection between Miller's extramarital affair with Delgado and the alleged extramarital affair discussed in the Supplement.

4830-7780-2393v.6 0109559-000002

63.     The lede then repeats that these allegations come from "court documents" which "claim" that, "when the woman found out she was pregnant, Miller surreptitiously dosed her with an abortion pill" "leading, the woman claims, to the pregnancy's termination and nearly her death." The clause "the woman claims" was added in the editing process to replace what was my confusing prior reference to "she claims."  As edited, the "woman claims" is a proper subordinate clause to the sentence's prior reference to "the court documents claim." And, as is made clear later in the Article, the Supplement does in fact include Doe's confirmation of the story.

64.     The rest of the Article summarizes – and directly quotes from – the Supplement's key allegations, along with providing context and history concerning Miller and Delgado's relationship, including hyperlinks to the 2017 *Atlantic* article and the 2018 *TPM* article.

65.     The Article includes a summary of the Supplement's description of Delgado's efforts to confirm the story that she first heard from Gentleman A.  Specifically, the Article makes clear that Delgado understood from Journalist A that he "spoke with Jane Doe to confirm details about the story."  The Article  reports, again quoting the Supplement, that "[w]hen the journalist asked about the account, the filing says, Jane Doe's instant reaction was 'Yes, that happened to me—how did you know?  Who told you?'"

66.     The Article closely tracks the information contained in the Supplement or information already reported concerning Miller's affair with Delgado and the birth of their child. All told, including the headline, the Article includes nineteen (19) separate references to "court documents," the "filing," and the like.  And again, the Article embeds the entire Supplement as part of the body of the Article.

### Updating the Article

67.     At 9:14 p.m., I received an email from Shane Vogt, Miller's attorney.  (A true and correct copy of this email, as well as a subsequent follow-up email from Vogt, GIZMODO-000359-60, is attached as **Exhibit 15**.)  On behalf of Miller, Vogt denied the allegations of the Supplement, writing that the accusations were false, the journalist referenced in the Supplement had "confirmed to Mr. Miller that these defamatory accusations could not be verified," and that Jane Doe had been identified and Miller did not know her.  Vogt also demanded that I "retract the story immediately, issue a public apology, confirm how [I] obtained the filing," and preserve all relevant records.

68.     Less than an hour after receiving Mr. Vogt's email, I updated the Article to reflect that Miller "strongly disputed the claims made in the filing," and included three separate quotations from Vogt on each of the three points of refutation he had included in his email.  Because I was confident the Article reported accurately on the contents of a court filing, and believed firmly the matter was newsworthy, after consulting with my editors, we did not believe a retraction or apology were warranted.

### *Post-Publication Events and Further Updates*

69.     At 9:30 p.m., at the suggestion of my boss, then-Gizmodo Media Group Editorial Director Susie Banikarim, I sent an email to Allison Gollust, Chief Marketing Officer at CNN, to inquire as to whether CNN would keep Miller on as a commentator in light of the serious allegations made by Delgado in the Supplement.  The purpose of this inquiry was simply to follow up on my reporting, and determine what, if any, impact the court filing's claims would have.  I did not hear back from Gollust.

70.     The next day, September 22, 2018, Miller also responded to the Article in a series of six tweets posted to his public Twitter account.  Between 12:30 p.m. and 12:34 p.m., Miller tweeted six specific contentions regarding the Article and the Supplement's contents.  (A true and correct copy of the tweets Miller posted on September 22, 2018 is attached as **Exhibit 16**.)  In one of these tweets, Miller stated:

> Splinter also failed to do anything to corroborate the accuracy of Ms. Delgado's defamatory accusations, which have already been disproven by at least one reporter whom Ms. Delgado attempted to involve in her continuous attempts to smear me.

71.     Only a few minutes after Miller's posting, however, Yashar Ali posted two tweets on his own account that appeared to directly contradict a key point in Miller's denials.  At 12:49 p.m., linking to Miller's tweet quoted above, regarding the accusations in the Supplement having "been disproven by at least one reporter whom Ms. Delgado attempted to involve in her continuous attempts to smear me," Ali wrote, "Jason is referring to me in this tweet. I have not disproven such claims and to say so is inaccurate. The only way to disprove such a claim is to definitely prove that Jason was not in the state of Florida during the time period."  At 1:04 p.m., Ali continued, "2. It is indeed accurate that I spoke to two women in Florida who made claims similar to the ones listed in Ms. Delgado's filing. That is all I am at liberty to say right now."

72.     I understood from Ali's Tweets that he not only confirmed that he was the "Journalist A" referred to in the Supplement – as I had previously understood – they also confirmed

that Ali had in fact spoken to a woman who alleged Miller induced her to have an abortion without her consent, and another woman who alleged Miller had been physically abusive with her, as alleged in the Supplement.

73.     Ali's tweets also called Miller's denials into question, since Miller had apparently lied outright about a conversation he claimed to have had with Ali.  I saw no reason to disbelieve Ali's side of the story, as there was no benefit to him in coming forward and making these statements.  A few hours later, apparently to clarify any ambiguity, Ali also tweeted "3. And to be clear for the people who have asked me, the two women I spoke to in Florida made these abuse claims against Mr. Miller which he denied to me directly. No further comment from me on this." (A true and correct copy of this series of three tweets is attached as **Exhibit 17**.)

74.     At 1:22 p.m. on September 22, 2018, I updated the Article again to reflect Miller's tweeted denial of the allegations in the Supplement.  I also embedded Ali's two subsequent tweets in response to Miller's tweeted claim that "a reporter" had "disproven" the Supplement's allegations.

75.     At 7:18 p.m. on September 22, 2018, Miller posted another tweet stating that he had "decided to step away from my role as a Political Commentator at CNN," and reiterating his denial of the claims made in the Supplement.  At 7:51 p.m., I updated the Article once again to reflect this statement, and embedded Miller's tweet.

**Miller's Claims Regarding My Reporting**

76.     In this action, I understand that Miller has challenged the main allegations of the Supplement:  He denies he induced a woman to have an abortion without her permission; that he pressured that woman to stay silent; and that he physically abused a different woman.  While I considered the Supplement's allegations regarding these matters to have been presented credibly, and I did not doubt the Supplement's accuracy, I do not have personal knowledge of the truth or falsity of the underlying allegations.

77.     When I wrote the Article, I understood that I was reporting on the contents of a public court document, which concerned a highly newsworthy matter involving public figures.  In that capacity, it was not my role to probe the truth or falsity of the underlying allegations.  My role was to fairly and accurately report on the Supplement that had been filed in the family court proceeding.

17

78.     I also understand that Miller has challenged the accuracy of my report on the Supplement, claiming that the Article lent undue legitimacy to the Supplement's allegations through several misstatements, and by omitting certain details.  I will address these arguments in turn.

### The Article's Accuracy

79.     More specifically, I understand that Miller claims that three brief references in the Article were inaccurate:  (1) the Article's reference to the Supplement having been filed by "Delgado's legal team," when she filed the document *pro se*; (2) the use of the phrase "the woman claims" in the Article's second sentence, which Miller claims inaccurately attributed allegations directly to Jane Doe; and (3) the Article's statements that Splinter "obtained" the Supplement and Delgado verified its "authenticity," which Miller claims suggested that I had independently investigated the Supplement's allegations.  I stand by my reporting in the Article as confidently today as the day I drafted the Article.  Based on a reading of the Article as a whole, including the embedded Supplement itself, I do not agree that any of the references Miller identifies – or indeed any other passage in the Article – misrepresented the content or context of the Supplement.

80.     First, as to Miller's claim regarding the phrase "Delgado's legal team," I believe this is an accurate characterization of who was responsible for the Supplement.  While I now understand Delgado filed the document herself as a *pro se* plaintiff, I do not recall whether I understood that at the time.  This appears to be a distinction without a difference.  The Article over and over makes it clear to the reader that these are "Delgado's" allegations, that "Delgado says," and that it is "Delgado" who is asking the court to order Miller to have a psychological examination, not some unnamed lawyer representing Delgado.

81.     Moreover, I knew that Delgado was a Harvard-educated attorney, and she was fully qualified to act as part (or indeed all) of her own legal team.  I also understood that Delgado had been previously represented by at least one other lawyer in the Family Court Dispute, as this was mentioned in the *Atlantic* article, and the Supplement bore no indication of whether any other attorneys had participated in its drafting.  In short, I believe it was accurate to refer to the allegations in the Supplement as having been made by "Delgado's legal team."

82.     Second, as to Miller's claim regarding the use of the phrase "the woman claims." As I noted above, this phrase was added during the editing process to clarify an ambiguous attribution I had composed.   I believe it was and is an accurate description of the contents of the

Supplement.   Importantly, the full sentence at issue is as follows:   "Additionally, the court documents claim, when the woman found out she was pregnant, Miller surreptitiously dosed her with an abortion pill without her knowledge, leading, the woman claims, to the pregnancy's termination and nearly her death."   The sentence begins by referring to the contents of the Supplement, and only then refers to what "the woman claims."   I understand this to indicate that what "the woman claims" is alleged in the Supplement.   Read in context, the phrase is therefore absolutely accurate.

83.   According to the Supplement, and as I reported in the Article, when contacted by "Journalist A," Jane Doe directly confirmed the account regarding Miller inducing her to have an abortion without her consent.   The Supplement even includes a direct quote attributed to Jane Doe herself.   Thus, according to the Supplement, *Jane Doe claims* that Miller's conduct led to the termination of her pregnancy.   Moreover, the Article is absolutely clear that *all* the allegations against Miller are drawn from the Supplement.   The Article thus makes it evident to readers what Jane Doe claimed, who she made these claims to, and how Delgado acquired this information, as set out in the Supplement.

84.   Finally, as to Miller's claim that the Article somehow gives the impression that I independently investigated the Supplement's allegations by reporting that Splinter "obtained" the Supplement and Delgado verified its "authenticity."   This reading stretches the plain meaning of the words beyond reason.   It takes the Article's actual language out of context and, by doing so, distorts its meaning.   The Article actually states that the "court documents – which were filed in Miami-Dade Circuit Court on Sept. 14 and obtained by Splinter."   That language can have but one meaning:   we obtained a copy of the document that had been filed in Miami-Dade Circuit Court. It says absolutely nothing about verification of the underlying allegations.

85.   Several paragraphs later, and after identifying the core allegations contained in the Supplement, the Article simply states that "Delgado confirmed the document's authenticity to Splinter *but declined to comment further.*"   (*Id.* at 2 (emphasis added).)   Again, this language has but one meaning.   Delgado confirmed that this was a copy of the actual document she filed in court but she was not going to comment on the allegations or the contents of the filing further.

86.   Far from implying that there had been some independent verification, I was telling readers that I had obtained the document through means other than the court docket.   I would not have needed to "confirm the document's authenticity" if I had obtained it directly from the Court.

19

I do not see how these passages can be read to imply that I independently investigated the Supplement's allegations, nor did I ever have any intention to give readers that impression.

### The Alleged Omissions

87.     I understand Miller also claims I omitted material information from the Article, including certain references from the Supplement and certain information from my reporting, that he believes would have undermined the credibility of the Article and the Supplement.

88.     Preliminarily, I dispute that the Article omitted any material information from the Supplement and most certainly did not omit anything that would create an unfair and inaccurate summary of the allegations of the Supplement and the context in which it was filed.  In my experience, subjects of articles always believe that there are other facts that should have been included in an article about them.  But, here, Miller's position goes beyond this common gripe and rests on particularly weak ground.  Once again, the Article included the *entire* Supplement as an embedded file, so readers could review it in full and judge for themselves whether there was additional information in the Supplement that might change their view regarding the allegations. Thus, Miller's contention that I omitted any information from the Supplement is specious.

89.     Nonetheless, I understand that Miller specifically believes that we should have included in the Article's text the fact that the Supplement reports that Gentleman A described his allegations as "unverified."  First, any reader of the Article would understand that the allegations were not fully verified, since the Supplement and the Article only refer to unidentified individuals, like "Gentleman A," "Jane Doe," and "Journalist A" and it over and over makes clear that Delgado is reporting information told to her.

90.     Moreover, the Article notes the "cryptic" nature of Gentleman A's initial messages, underscoring that the information originated as an unconfirmed rumor.  Miller's position also ignores that the actual quote from Gentleman A in the Supplement is that he described the allegations as "unverified by him," though he had heard the story from "separate, 'multiple, sources – all of which were 'credible' sources." More important, Delgado did not file the Supplement based only on Gentleman A's allegations.  As the Supplement makes clear, Delgado filed the Supplement only after she alleges the account was independently verified by Journalist A after speaking directly with Jane Doe.  I did not see how I omitted anything of material substance from the Supplement regarding the verification of the information.

20

91.     Next, I understand that Miller claims the Article fails to report that Journalist A did not publish the story because his editors were concerned Jane Doe would "backtrack." Yet, this ignores that the Article accurately reports directly from the Supplement that Journalist A and his publication are, "still working on their story for an undisclosed outlet."

92.     I also did not report that Journalist A was concerned Jane Doe would "backtrack" because the Supplement does not say this. The Supplement alleges that Journalist A's "editors" were concerned that Jane Doe would "backtrack and disappear post publication," but never gives any suggestion that Journalist A – who I understood was Yashar Ali – had any doubts about the truth of Jane Doe's story. And my understanding was confirmed by Ali after the Article was published.

93.     In sum, Miller has not identified any material omission from the Supplement in the Article.

94.     Next, Miller suggests that I should have included information in the Article concerning what my Source said about Delgado and my personal views concerning Miller. In this vein, Miller contends that I should have disclosed that my Source called Delgado "kind of nuts" in our conversation. I did not consider my Source's comment to be a literal assessment of Delgado's reliability, nor did I have any reason to believe Delgado was mentally ill or unreliable. Indeed, as set out in more detail above, my impression of Delgado was of an intelligent, cogent, and forthcoming woman, who had been unfairly painted as a "crazy," scorned woman, in part due to Miller's own self-serving efforts to smear her. Even my Source considered Delgado reliable enough to communicate regularly with her and share information learned from her. And I was well aware that Delgado had been regularly relied on as a source and spokesperson by a wide spectrum of the news media, including some of the most respected news organizations.

95.     I did not tell readers that I had described the Supplement's allegations to colleagues as "insane," "wild," and "stunning," because these adjectives plainly reflected my initial emotional reaction to the severity of the allegations in the Supplement. They were not statements of fact or evaluations of credibility. In my experience this is a common reaction to surprising news, similar to how I (and others) reacted to the news that Anthony Weiner was texting photos of his penis to an underage girl. One naturally would say, this is "insane" or "wild." Too often, the most "stunning" news is entirely accurate. In the Article, I *did* describe the Supplement as "explosive," which I believe it was and which was consistent with those preliminary observations.

21

96.     I understand that Miller also argues that I should have revealed Yashar Ali's identity in the Article.  Ali's identity was outside the scope of my Article.  I was preparing a report on allegations made in a public court document, not an investigation into the truth of those allegations or the identities of various pseudonymous individuals cited therein.  In the Supplement, Ali was referred to as "Journalist A" and that is the same way that I referred to him in the Article, because I was reporting on the allegations in the Supplement.  For the same reason, I considered it of little importance that Ali had not yet responded to my request to talk to him about the Supplement.  While I was of course interested in what Ali had to say, I had told him I was looking into the Supplement, and he had chosen not to respond.

97.     It is even more peculiar that Miller argues that we did not hold off on publishing the Article because Ali later offered to speak with me.  When Ali made that offer, I promptly sent him my phone number, and he never called me.  This argument ignores that the exchange Miller cites occurred *after* the Article was published, and so could not possibly be an argument for why the Article should have been held before publication.

98.      I gather Miller also argues that not revealing that Journalist A was Yashar Ali lent undue credibility to the Supplement's allegations.  This is nonsensical.  If I had identified Journalist A as a known and credible journalist, this would have *bolstered* readers' perception of the document's credibility, given the Supplement's allegation that he had confirmed the story directly with Jane Doe.

### *My Personal Feelings Towards Miller*

99.     Finally, I reject Miller's contention that I "hate" him and should have revealed this in the Article.  For someone as sophisticated as Miller is concerning the press and the practices of journalists, this is a bizarre contention.  Of course journalists have personal views concerning people or events that they report on, but their job is to report events accurately.  They have no duty to reveal their personal and private views.

100.    And I did not "hate" Miller at the time the Article was published.  I had never met the man and had never communicated with him, except in my email asking for comment on the Article.  At the time I was drafting the Article, I was familiar with Miller only from his public appearances as a surrogate for Trump.  I was not a supporter of Trump or his policies.  To the degree Miller acted as a spokesperson for those policies, I did not agree with him.  When

22

publishing the Article, my personal views had nothing to do with it as I wanted the Article to be entirely accurate.

101.    At my deposition, I testified that I believe President Trump is a liar, a racist, and a xenophobe.  These opinions are formed by my public perception of President Trump, who has made many demonstrably false statements to the public, and who has used rhetoric and instituted policies I believe are racist and xenophobic.  I also testified that I consider people who speak for the President in support of these false statements and policies to be, by virtue of such spokesmanship, liars, racists, and xenophobes.  Plainly, my meaning was that I believe anyone who publicly endorses or excuses lies and racism to be in part responsible for the underlying lies and racism.

102.    These beliefs reflect my personal political opinions, which I am entitled to hold vigorously.  However, my having a political opinion does not mean that I would falsify or ignore facts in my reporting.  I treat my professional obligations as a journalist with the utmost seriousness.  However I personally felt about Miller's public statements in support of President Trump and his policies, this would *never* lead me to derogate from my rigorous and factual approach to reporting.

103.    Further, what I knew about Miller's relationship with Delgado, particularly that he betrayed his wife and embarked on a relationship with someone who reported directly to him, led me to believe that Miller had behaved dishonestly, inappropriately and possibly illegally.  However, these were nothing more than evaluations of Miller's character and integrity, based on his reported actions.  I did not possess any personal animus towards Miller, and even if I did have such animus (which I did not), it played no role in my Article on the Supplement.

104.    My interest in reporting news relating to Miller was the same as my interest in reporting news relating to any public figure:  I believe that part of my responsibility as a journalist is to apprise the public of newsworthy events involving individuals who hold an outsize influence in society and government.  If the Supplement had made the same allegations against a public figure I agreed with politically, I would not have hesitated to publish a report on those allegations.  They would have been just as newsworthy.

23

105.    In sum, at the time I published the Article, I believed it to be a fair and accurate report on a filed court document concerning two public figures and involving issues of utmost concern to the public, including domestic abuse, assault, and abortion.  In addition, at the time I published the Article, I had no information that caused me to doubt the accuracy of the allegations in the Supplement.  In fact, the allegations were in many ways consistent with what I knew about Miller.

KATHERINE KRUEGER

24