# EXHIBIT 20

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

- - - - - - - - - - - - - - - - -X

JASON MILLER, :

Plaintiff, :

vs. : Case No.

GIZMODO MEDIA GROUP, LLC, a : 1:18-cv-24227-CMA

Delaware Corporation, :

KATHERINE KRUEGER, :

individually, and WILL :

MENAKER, individually, :

Defendants. :

- - - - - - - - - - - - - - - - -X

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Videotaped Deposition of JASON MILLER

Washington, D.C.

Wednesday, May 30, 2019

10:11 a.m.

Job No. 271563

Pages: 1 - 372

Reported by: Dana C. Ryan, RPR, CRR

Q Okay. So, Mr. Miller, you're married to Kelly Miller; correct?

A Correct.

Q And is she the only woman you've ever been married to?

A Yes.

Q Okay. And I think Ms. Miller testified yesterday you've been married since 2008; correctly -- correct?

A Correct.

Q Okay. And you have two daughters with Ms. Miller; correct?

A Yes.

Q And REDACTED is ten and REDACTED is two?

A Correct.

Q Okay. And you live in Arlington; right?

A Yes.

Q And how long have you lived in Arlington?

A Since 2012. We purchased the house and then rented it to the people that we were buying it from. So I forget the exact move-in date. It may have been a summer purchase but then maybe move-in date maybe in late summer or early fall,

companies over the life of your time at Teneo?
A I brought on Ambac -- I believe that was last spring -- last winter or last spring, but I've worked pretty consistently with UBS since I first joined the firm, and Qualcomm, I believe, came on board in the spring of 2017.
Q What is your title at Teneo?
A Managing director.
Q And how long have you -- I know you testified to this earlier, and I do apologize for asking this again, but when did you arrive at Teneo?
A I joined -- I believe it was February 1st, 2017.
Q Okay. And how did you come to be employed at Teneo?
A A friend who I went to -- bumped into a friend of mine who I went to college with, and -- at an off-season Washington Nationals event. And I had my family with him, and he was with his family, and I hadn't seen him in a number of years.
He asked what I was planning on doing next, and at the time I was still leaning toward going into the White House. And then after I

stepped away from that, I reached back out and asked if they were still interested in talking, and he said, yes. And then I began an interview process after that.
Q Okay. And who was the college buddy?
A Nate Tamarin.
Q Is he SAE buddy -- an SAE brother?
A Correct.
Q You said it was an off-season Nationals event. Do you know what month that was?
A It was after the election, so I believe it was maybe early December.
Q It was before you were appointed and then resigned from the communications director job; correct?
A Correct.
Q Okay. Before you were at Teneo, you worked at a company called Jamestown; right?
A Correct.
Q And what was that?
A Made TV commercials for Republican political candidates. Also offered some general consulting and also do direct mail advertising.
Q Okay. I guess I misspoke. In between Jamestown and Teneo, you worked with and for the

Trump campaign and the Trump transition team; right?

A Yes.

Q Okay.

A I was -- there were several of us from Jamestown who essentially all went in-house to the Trump campaign. And, so, there was a -- so the Trump campaign essentially paid Jamestown a fee, and then I still took my regular draws from Jamestown. And then -- so I was -- I was still paid by Jamestown, not directly by the Trump campaign.

Q Okay. And was that for the life of your time in the Trump campaign? So, in other words, I know you went over to the Trump campaign in July of 20- -- June of 2016 and obviously left it in Jan- -- well, it became the Trump transition team and you left in January 2017.

During the whole life of that time, were you paid by Jamestown?

A Either Jamestown directly or possibly might have been -- I don't remember the exact monthly, excuse me, pay schedule. We had a -- kind of a subsidiary, Courageous Media. I don't remember if -- a couple of the checks during that

time frame may have been cut from the Courageous Media account. But all revenues and profits from Courageous Media went into Jamestown.

Q So you're never paid for by the Trump campaign -- you were never paid by the Trump campaign?

A Not directly, not that I recall.

Q What was Courageous Media or what is Courageous Media?

A Courageous Media was essentially a separate entity that we set up because when we're working with Ted Cruz in the primary, they didn't want to cut checks to Jamestown because we were firewalled off, and I was doing the Cruz work and my partner Larry Weitzner -- my former partner Larry Weitzner was working with Governor Christie on his effort.

Q Okay. So if I -- if I can just see that I understand that. So you worked at Jamestown Associates, and one of your partners at Jamestown was working with Governor Christie in his bid to be a Republican nominee; correct?

A Yes.

Q And then you wanted to work with Senator Cruz and his bid to become the Republican

nominee; correct?
A Correct.
Q So you split off an entity called Courageous Media so there wasn't a conflict of interest; correct?
A Correct.
Q Why is it called Courageous Media?
A Because Cruz was the "Courageous Conservative"; that was one of his -- his taglines.
Q And you said Jamestown was a Republican -- I'm sorry. I can't remember the phrase you used. It was a Republican strategist firm. What did you -- how did you describe it?
A Jamestown Associates is a political consulting firm that focuses on making TV ads and offering general consulting to candidates and also direct mail for direct mail advertising.
Q Okay. Great.
You did more for that -- than that for the Cruz campaign; right? More than just make television commercials and offer direct mail campaigns?
A Correct. I was much more involved in the day-to-day strategy and oversaw -- they had a

communications director, but I oversaw the bigger picture messaging strategy.

Q Okay. Why -- why Senator Cruz?

A He was the conservative candidate in the race, and we both had come from more antiestablishment type backgrounds within Republican politics, and so some mutual friends put us together.

Q Okay. Setting aside Senator Cruz's alleged antiestablishment connections, what are your antiestablishment Republican connections?

A I've been willing to work for challenger candidates against incumbents.

Q Is that unusual?

A I would -- I would describe it as -- it's a -- it's a little bit more bold. Not everybody is willing to do that.

Q Okay. Why are you willing to do it?

A I'm a conservative, and I like to see conservative candidates win. And I think we need a lot of new people on Capitol Hill if we're ever going to get some of the gridlock busted, and so I like the -- the outsiders who are trying to come to Washington and make a difference.

Q And, so, as I understand what you're

saying, is that you will back conservative Republicans in, for example, a primary with a more mainstream Republican; is that the -- is that what you're saying?

MR. VOGT: Objection to form.

You can answer.

THE WITNESS: In some cases I have. In some cases I have also worked for more establishment candidates against conservative challengers. So I've -- I've worked on a number of -- helped with a number of campaigns back during my consulting days.

BY MS. BOLGER:

Q Okay. You worked on the campaign for Ric Keller; correct?

A Yes.

Q And when was that?

A So Ric Keller -- I started -- after the California primary finished up, so it was spring of 2000, I worked for him and then went into -- be his chief of staff, and I -- I believe I left in maybe, like, June of 2003.

Q Okay. Is Representative Keller still a representative?

A No, he was defeated in 2008.

Q Okay. And he was very conservative; correct? Or is conservative; correct?
A He was the conservative candidate in that primary, yes.
Q Okay. And he's pro-life; correct?
A Yes.
Q You also worked for Jack Ryan?
A Correct.
Q And who was Jack Ryan?
A He was a U.S. Senate candidate in Illinois in the 2004 election cycle.
Q Was he elected?
A He won the primary and then stepped out of the general election.
Q Why was that?
A He had had a custody file or custody battle which there's some allegations that were made about him, and when the sealed custody file was released, he decided to step out of the race.
Q And what did you do for him?
A I was his campaign manager.
Q Was he pro-life?
A Yes.
Q You worked for someone called Mel Martinez?

A Yes.
Q And who's -- who is Representative Martinez?
A So -- and then Senator Martinez, he was the --
Q Sorry. Of course. Senator Martinez.
A -- Secretary of HUD. Also from Orange County -- I think the title was Orange County chairman -- I forget what they -- before he was at HUD, and then he finished up as a U.S. Senator from Florida.
Q And what did you do for Senator Martinez?
A Worked with him in both communications and coalitions.
Q When was that?
A That was in the summer of 2004.
Q Okay. And he was pro-life; right?
A Yes.
Q Okay. You represent -- you worked for Tom Coburn; correct?
A Yes.
Q And who is Senator Coburn -- not senator. Who is --
A Former U.S. Senator from Oklahoma.

Q And is he still in office?
A No, he retired.
Q Okay. When did you work for Senator Coburn?
A The fall of 2004.
Q What did you do for him?
A Campaign operations and communications.
Q And he was also notoriously pro-life; right?
MR. VOGT: Objection to form.
BY MS. BOLGER:
Q I'll -- I'll rephrase that.
He was a very prominent pro-life advocate; correct?
A Senator Coburn was pro-life --
Q Yes.
A -- is still pro-life. He's still alive.
Q You worked for Governor Allen; correct?
A Correct.
Q And -- George Allen from Virginia?
A Yes.
Q Okay. And when did you work for Governor Allen?
A In 2005.

Q And on what campaign?
A His U.S. Senate reelect.
Q Okay. And what did you do for him?
A I was the campaign manager.
Q And we talked about Governor Sanford; right?
A Yes.
Q What did you do for Governor Sanford?
A Campaign manager and then deputy chief of staff.
Q Governor Sanford is also pro-life; right?
A Yes.
Q Governor Sanford was also famous for having told his wife he was hiking the Appalachian trail but, in fact, having a relationship with an Argentinian woman who he ultimately married; correct?
MR. VOGT: Object to form.
THE WITNESS: So Governor Sanford is pro-life. There was a nationally -- there's a national story about his disappearance a couple of years after I stopped working for him.
BY MS. BOLGER:
Q Okay. And what's that national story?

A That he had had an affair with a woman from Argentina.

Q But had lied to his wife about it; right?

MR. VOGT: Objection to form.

THE WITNESS: Governor Sanford did, yes.

BY MS. BOLGER:

Q Right.

And he ultimately left his wife and married the -- I can't remember her name -- Maria. I'm sorry. I can't remember her last name. Ultimately married the Argentinian mistress; correct?

A They did not get married.

Q Okay. You worked briefly for Mayor Giuliani's campaign?

A Just under a year.

Q And then we talked a little bit about working for Senator Cruz's campaign; correct?

A (Witness nods head.)

Q And how long did you work for Senator Cruz?

A I was with Senator Cruz -- I started informally helping out in summer of 2014. And

then later on in 2014, I started to get paid by his leadership PAC and then eventually that morphed into the presidential campaign.

Q When you say you got paid by his leadership PAC, do you mean you got paid by his leadership PAC or Jamestown got paid by his leadership PAC?

A Jamestown.

Q Okay. And how long -- so was Senator Cruz your preferred candidate for president in 2016?

A At the time that he got into the race, yes, he was my favorite candidate in the field.

Q For how long was he your favorite candidate in the field?

A I mean, obviously I worked hard to get him elected and fought for him all the way up until the -- the very end.

I had had a very brief interaction with the Trump orbit in 2011 when there were conversations about him possibly running for president in 2012. His team had approached me about managing it. So I had had a little bit of familiarity with the -- with the Trump world as well.

the key issues would be, what I thought a campaign might look like. Kind of -- of those nature.

Q How many conversations did you have with them?

A Two or three.

Q Were they long conversations?

A They're New Yorkers, so I don't think anything went particularly long.

Q I don't understand that. What do you mean?

A They just talk and move very fast, and so I don't remember them being particularly lengthy.

Q Okay. In June of 2016, you came to work for President -- now President Trump; correct?

A Yeah. It was at the end of the month. I think somewhere like the 29th or 30th. I was supposed to start on July 1, but the news leaked out.

Q But wasn't he "Sleazy Donald"?

MR. VOGT: Objection to form.

THE WITNESS: So when I worked for Senator Cruz, I was critical of President Trump which my good friends at places like Media Matters

and left-of-center outlets like to point out to me.

But President Trump knew that I was fighting hard to try to get Senator Cruz elected, and he wanted me to come on board and work for him.

BY MS. BOLGER:

Q Is it your position that left-of-center media outlets can't be truthful?

MR. VOGT: Objection to form.

THE WITNESS: I think that left-of-center media outlets have an inherent -- many of them have an inherent bias towards Republicans or people they view as being out of step with their own ideology.

BY MS. BOLGER:

Q So is it your position they can't be truthful?

MR. VOGT: Objection to form.

THE WITNESS: I -- I would guess I'm not --

BY MS. BOLGER:

Q Are you saying that they're left-of-center ideology means they are not truthful?

MR. VOGT: Objection to form.

THE WITNESS: I've worked with left-of-center reporters in outlets who have been truthful. I've also worked with left-of-center outlets who have been very untruthful.

BY MS. BOLGER:

Q How about right-of-center outlets? Are they always truthful?

MR. VOGT: Objection to form.

THE WITNESS: Not always.

BY MS. BOLGER:

Q Okay. Are they more truthful than left-of-center outlets?

MR. VOGT: Objection to form.

THE WITNESS: I don't know if I've ever sat down and done a -- a full analysis of that, but all news outlets make mistakes in some situations. They didn't do it intentionally.

BY MS. BOLGER:

Q Do you believe right-of-center news organizations make mistakes less frequently than left-of-center news organizations?

MR. VOGT: Object to form.

THE WITNESS: I don't know if I've ever sat down to do a full analysis of it. All --

Q Well, I'm asking you a different question which is when you came to work for CNN, did you come to CNN to espouse the positions of presidential candidate Trump and then President Trump?

MR. VOGT: Objection to form.

BY MS. BOLGER:

Q President-elect Trump?

A So I was brought on to CNN to be someone who was an ally of President Trump's, who understood his thinking in matters and who believed in many of the same policies and positions that he does and to have -- be a commentary voice in their political commentary.

Q Is that a Trumpbot?

A I don't think that I was a -- I think when -- a Trumpbot -- I -- I would disagree with the President on certain issues.

Q I'm sorry. On CNN you -- sorry. Are you saying you disagreed with the President on CNN?

A Yes.

Q When did you do that?

A Oh, a number of times.

Q Name one.

Q Okay. When you worked for the Trump campaign, you lived in New York for five days a week; right?

A Roughly. I was usually there during the week, and then I would try to go home on the weekends, but as it got down to the -- the home stretch of the campaign, then there were a lot of weekends where I wouldn't make it back home.

Q Where did you live?

A Beekman Towers was one of the locations.

Q Beekman Towers is the building on 1st Avenue and 50; is that --

A Correct.

Q -- right?

Well, what role did you have with the Trump campaign?

A Senior communications adviser.

Q What does that mean?

A So I worked both on the communications team overseeing much of the communications strategies, but then also I was part of their advertising team as well. And that's -- that's a role that Jamestown played.

So my former partner Larry Weitzner

would do much more on the commercial side, but I would also work with him on some of those. And then I spent much of my time as spokesperson and overseeing the campaign operations -- excuses me, the campaign's communications operations.

Q Are you familiar with the term "a flack"?

A Yes.

Q What's a flack?

A A spokesperson.

Q Were you a flack for the Trump campaign?

A I was a -- the spokesperson. I was someone who -- I'd say probably most members in the media would probably say that was an accurate description.

Q I don't mean it derogatory. I want to know if you would call yourself a flack.

MR. VOGT: Objection to form.

THE WITNESS: I don't believe I've ever referred to myself as a -- a flack. It just -- it's just not a word I would use to describe myself.

BY MS. BOLGER:

Q In that role, you interacted frequently

with the media; correct?
A Yes.
Q Okay. And you were a source for journalists; right?
A I have been, yes.
Q Okay. Both on and off the record; right?
A Correct.
Q Okay. Have you ever been a source for Jon Levine at The Wrap?
A I believe I've only spoken with Jon one time that I can recall. I believe he had reached out to me about a story of our ongoing custody issue.
Q Okay. Who -- what journalists have you been an on-the-record source for?
A On the record?
Q On the record.
A Many.
Q Name some.
A I mean, it's -- Maggie Haberman from The New York Times, Josh Dawsey from The Washington Post, Rebecca Ballhaus from The Wall Street Journal.
There are a lot.

decisions were being made. That's -- that's more of the -- yeah, more kind of in that realm if that makes sense.

Q Okay. Have you ever been an on-the-record source for Richard Johnson at Page Six?

A I don't know if I've ever been on the record with Richard Johnson. I believe I've spoken with him one time. I believe I just spoke with him one time.

Q What was that one time?

A He called me to see if I wanted to comment on a story that he was writing about my relationship with A.J. Delgado.

Q And your testimony is that he initiated that contact; you did not?

A Either he reached out to me first -- I -- I don't remember the exact order. He -- he reached out to me for -- I remember he emailed me, and then I called him or he called me, and I emailed him back.

I don't remember the exact -- at one point we did speak on the phone, but as far as with the -- the interaction that I -- a friend of mine had initially reached out to -- to him first,

and then -- then he called me.

Q Who was the friend?

A Arthur Schwartz.

Q And who's Mr. Schwartz?

A He's a friend of mine. He's a -- does a number of public affairs type campaigns here in Washington. He does a lot of work with financial services clients, so he's someone I -- I know in social circles.

Q And did you ask Mr. Schwartz to reach out to Mr. Johnson?

A Yes.

Q What did you ask him?

A I asked him to reach out to Mr. Johnson about the -- Ms. Delgado's restraining order.

Q Okay. Can you explain that a little more? What restraining order?

A Ms. Delgado had a five-year restraining order from a gentleman named John DeNeufville for cyberstalking.

Q And, so, why did you want to reach out to Mr. Johnson about that?

A Ms. Delgado had put out a number of particularly inflammatory comments about me over Memorial Day weekend last year, and I wanted

people to realize that she wasn't exactly playing with a full deck. And, so, her attacks against me, there's some real questions as to their credibility.

Q So you asked Mr. Schwartz to plant a negative article about Ms. Delgado with Mr. Johnson?

MR. VOGT: Objection to form.

THE WITNESS: I asked Mr. Schwartz to share the -- the restraining order file with Mr. Johnson, yes.

BY MS. BOLGER:

Q Are you quibbling with me over whether that was negative or not?

MR. VOGT: Objection to form.

THE WITNESS: I'm sorry. There was no attempt to quibble. I just -- I --

BY MS. BOLGER:

Q It's certainly negative; right?

A I missed that --

MR. VOGT: Objection to form.

THE WITNESS: I -- I -- I wanted to -- especially after the accusations, the very inflammatory things that were said about me -- for people to realize that there was -- that her

comments need to be taken with a real grain of salt. There's real credibility issues there.

BY MS. BOLGER:

Q Mr. Miller, it was a negative article about Ms. Delgado; right?

MR. VOGT: Objection to form.

THE WITNESS: I mean, it certainly wasn't -- it wasn't positive and it raised, I think, appropriate issues around her stability.

BY MS. BOLGER:

Q Okay. What's the difference between negative and not positive?

MR. VOGT: Objection to form.

THE WITNESS: I . . .

BY MS. BOLGER:

Q There's none; right?

MR. VOGT: Objection to form.

BY MS. BOLGER:

Q There's no difference between my saying it was a negative article and you're saying it was a not-positive article; right?

MR. VOGT: Objection to form.

THE WITNESS: I mean, I can -- certainly the story that Splinter wrote about me was, I think, something that -- that would

A I really don't remember. I mean, it was --
Q You denied the relationship?
A In that particular conversation, I don't remember if I denied it or not because I -- again, I don't remember if it was just before it blew up or if it was just afterwards, so -- I apologize, but it was a while ago and it was a rather chaotic time. And, so, I don't remember precise details of that conversation.
Q Did you deny your relationship to A.J. Delgado to -- in any conversations?
A With Caputo?
Q With anyone.
A Yes.
Q To whom did you deny your relationship with A.J. Delgado?
A My wife.
Q When was that conversation?
A Mid/late October 2016.
Q Was that conversation brought about by the article in Page Six about your attending strip clubs?
A Yes.
Q Okay. To whom else did you deny your

relationship with A.J. Delgado?
A Steve Bannon.
Q When was that conversation?
A After that article.
Q What -- what was the content of your conversation with Mr. Bannon on this subject?
A He asked me if I was involved in some kind of relationship with her.
Q Is that the word he used?
A I'm doing the best to generalize what he said. I don't remember his exact words. But he asked if there was some kind of relationship between us.
Q Did he ask you using a more explicit word that you don't want to use on the record?
A I don't remember the exact words.
Q Okay. To whom else --
A So the --
Q Go ahead.
A Go ahead.
Q To whom else did you deny your relationship with Ms. Delgado?
A Jared Kushner.
Q What was the context of that conversation?

A I think he rightfully chewed me out for some poor decision making -- I was in Las Vegas -- and asked if there was something going on. And I said, no.

Q What was the poor decision making?

A Went to a strip club with members of the media and two additional campaign staffers.

Q Mr. Kushner yelled at you for that?

A I wouldn't say yell, but he was pretty direct with his unhappiness.

Q You used the phrase "chewed me out."

A Well, that's -- there's -- you can be chewed out without raising your voice.

Q Okay.

And -- and, so, he chewed you out, and he also asked you if something was going on with A.J., and you said, no?

A Correct.

Q And that was a lie?

A Correct.

Q Other than Mr. Kushner, your wife, Mr. Bannon, did you deny your relationship with A.J. Delgado to anyone else?

A I remember those three very clearly. I don't remember if there were other conversations

about it at the time, but I know definitely those three.

Q So let's talk about Ms. Delgado. When did you first meet Ms. Delgado?

A I believe I first met her at the Republican convention in 2016. I think that's right. And then she started flying to New York as being a more formal role on the campaign, maybe in kind of that August or September time frame, maybe early September, maybe around there.

Q And there came a time when she became a -- I'm sorry -- she became -- she came to work for the campaign; right?

A Correct.

Q And what was her job?

A She wore a couple of different hats. One was doing Hispanic outreach and some of it was Florida outreach, and then also working as a -- a surrogate advocating positions of the -- the campaign and supporting the president.

Q So just because that's a -- "surrogate" is a phrase that means something in your world but maybe not to the average viewer, what's a surrogate for a campaign?

A Someone who speaks with the -- the news

media on behalf of the campaign.

Q And you were involved with hiring Ms. Delgado; correct?

A Correct.

Q Okay. Why did you hire Ms. Delgado?

A We were -- she had been a supporter of the President's, and also we needed more women and Latinos -- Latinos in her case -- active with the campaign.

Q Other than the fact she was a Latino, was there anything about Ms. Delgado that made you all seek her out to hire?

A She had been, again, a supporter of the President's and been very effective in media interviews.

Q And did you actually interview her for the job?

A I don't remember the exact process. I know I -- I know I spoke with her several times before doing it, but I think the initial recommendation, I think, may have actually been -- I think the initial recommendation actually may have been Paul Manafort who made the suggestion to -- to look at that. That's what I seem to recall with that.

But obviously then Mr. Manafort departed from the campaign, and then she came on board eventually.

Q And when you -- when Ms. Delgado was hired, did you sort of unilaterally make the decision to hire her, or did you have to consult with other people?

A I would have -- I would have consulted with other people on that. I wouldn't have brought on a -- a new hire without any additional approvals.

Q So who else would you -- did you consult with?

A I don't remember specifically. It's a bit of a fragmented leadership structure within the campaign, but I know I would have -- I would have gotten approval before hiring a new person.

Q Did you do any background checks on Ms. Delgado when you hired her?

A Not to my knowledge.

Q Did you --

A I -- I didn't, but I don't know if -- the Trump campaign didn't necessarily do the -- didn't always run background checks on people. So I don't -- I don't know if one was run on her.

Q Were there any reservations anyone had about hiring Ms. Delgado?
A Not that I recall at the time.
Q Who was her boss?
A For -- if it were things in the surrogate world -- we're talking about kind of the head surrogate wrangler -- that effort was headed by Bryan Lanza and Boris Epshteyn. I obviously would talk and interact with her directly as well because I kind of oversaw the entire department.
If it was regarding Hispanic -- Hispanic outreach, then there was a political coalitions team that was active with that. And then if it was for a Florida politics specific issue, she would have been chatting with Susie Wiles who's our Florida director.
But I dealt with her directly on a number of these issues as I would talk with a number of the surrogates and other talking heads who are advocating on behalf of the campaign.
Q Okay. And during the time frame that she worked for the campaign, so that's -- that's August or September of 2016 until the election of November 8th, what did you think of her professionally?

Page

A Very effective communicator on television, did not have the traditional campaign training for things such as writing up rollout plans or specific documents that are kind of pro forma that most people work on campaigns knew how to go and do and how to -- how to construct.

There became a couple of issues with her adversarial positioning with Hope Hicks which became a -- became a problem. There were some issues in getting along with some of the other people on the -- on the campaign that made it a little more challenging.

Q Did you think at any point in that time period from August until -- let's say the night your relationship began -- your personal relationship began that she was mentally unstable?

A I don't recall my exact thinking at that time.

Q Okay. During that time, she worked with Mayor Giuliani; right?

A I'm sorry. What?

Q During that period of time, she interacted with Mayor Giuliani; correct?

A I know they interacted. I don't know to what extent or how often or how frequent, but I

Page

Q Okay. So then you went to this D.C. party in Las Vegas, and what happened that night?
A We had a number of drinks and then we continued, I believe, to one of the hotel or casino bars. And then at some point someone suggested why don't we go across the street to Sapphire, a gentleman's club, and we went -- there were, I think, five or six members of the media and then myself and Ms. Delgado and Jessica Ditto from the campaign.
Q Okay. You used the phrase "gentleman's club." This is my favorite colloquialism in the whole world.
You mean a strip club; correct?
MR. VOGT: Objection to form.
THE WITNESS: Correct.
BY MS. BOLGER:
Q And after you were at the strip club with Ms. Delgado, what hap- -- and the other group of people, what happened next?
A Myself and Ms. Delgado and Ms. Ditto went to Burger King and then went back to A.J.'s room to watch TV.
Q Okay. What time is it at this point?
A Late.

Page

Q Like early hours in the morning or late night?
A Early hours in the morning.
Q Okay. And then what happened after you watched TV with Ms. Ditto and A.J.?
A Eventually Ms. Ditto left to go back to her room, and within a couple of minutes, Ms. Delgado and I became intimate.
Q Okay. So you had sex with Ms. Delgado that night?
A Correct.
Q Okay. And you had sex with Ms. Delgado many other times; correct?
A Correct.
Q How many times?
A I would be speculating.
Q Well, ten times?
A A number of times.
Q More than ten times?
A I'd be speculating on the exact number, but it was a large number of times. I don't have an exact number.
Q Okay. And after that night, you and Ms. Delgado began a personal relationship; right?
A Correct.

Page

Q Okay. And you both lived in New York during the week; right?

A I don't recall her exact travel schedule, but by the time that -- by the time that the relationship started, I was in New York full-time, and I do not believe I was returning to Virginia or D.C. at all during that stretch that late in the campaign except for -- at least as far as on the weekends.

I -- I think that pretty much stopped in September although I know I made it back that final week of the campaign. I made it back, I believe, for one night to -- to D.C., but that was then when we had a relationship.

Q Okay. Were you spending nights together in New York?

A Most of them, yes.

Q Did you or Ms. Delgado fool around with or have physical intimacy with Ms. Ditto on the night of October 19th when this all began?

A No.

Q Okay. So you did spend most nights together in New York, right, with Ms. -- Ms. Delgado?

A In that -- in that stretch, yes.

Page

Q Okay. And you were doing things like -- having what your wife referred to yesterday as a dating relationship; right?

A That's accurate.

Q Okay. So you would go to dinner together; right?

A Yes.

Q And you'd hang out places together; right?

A It -- went to dinner a few times. We'd usually just go back to my place or her place to -- to hang out.

Q Okay. When you mean "hang out," you mean have sex; right?

MR. VOGT: Objection to form.

THE WITNESS: And watch TV.

MS. BOLGER: Okay. I'm going to ask Dana to mark as Exhibit 3 the document which was produced to us yesterday.

BY MS. BOLGER:

Q So it has no Bates number, but it's the email exchange between Ms. Delgado and your wife dated December 4th at 1:42 p.m.

(J. Miller Deposition Exhibit 3 was marked for identification and attached to the

Page

A After the relationship had started in Las Vegas and then continued in Florida, after a certain point, I -- maybe it's -- we'd maybe gotten together half a dozen times or so. I told her --

Q Is "gotten together" a euphemism for had sex?

A Correct.

-- that my wife and I were not in a good place; we were living apart; we had been for much of the previous year or year and a half. And I -- I didn't think that our marriage was going to last.

Q Okay. Were those statements to Ms. Delgado true?

A Yes.

Q Had you told your wife that your marriage was in a bad place?

MR. VOGT: Objection to form.

Don't answer that question.

MS. BOLGER: Hey, Shane --

MR. VOGT: To the extent it involves -- it involves a communication between he and his wife, he can't answer the question.

MS. BOLGER: Shane, respectfully I

Page

BY MS. BOLGER:
Q Did you tell -- did your wife believe your marriage was in a bad place?
MR. VOGT: Objection to form.
THE WITNESS: I'm sorry. So I answer that, or do I --
BY MS. BOLGER:
Q Yes --
MR. VOGT: You can an- --
BY MS. BOLGER:
Q -- you can --
MR. VOGT: -- -swer the --
BY MS. BOLGER:
Q -- answer that.
MR. VOGT: -- question to the extent that it doesn't call for you to reveal the substance of communications between you and your wife.
THE WITNESS: My wife and I were clearly having some issues in our relationship. I did not think that our marriage was going to last. I don't recall if my wife was in the exact same place that I was, but we had had -- the campaign trail and us living apart for a while had definitely led to a number of conversations, and

Page

it was pretty clear that we were struggling in that space, but I -- where exactly she was coming from at that point, I -- I'm not sure.

BY MS. BOLGER:

Q Well, she was in a very different place than you were because she was eight months pregnant at the time; right?

MR. VOGT: Objection to form.

THE WITNESS: Yes, my wife was pregnant.

BY MS. BOLGER:

Q Okay. So she was pregnant at you -- with your child when you were telling Ms. Delgado that your marriage wasn't going to make it; right?

A Yes.

Q Did you tell her your wife was pregnant?

A Ms. Delgado?

Q Sorry. Yes.

Did you tell Ms. Delgado your wife was pregnant?

A I know I had openly discussed it in front of her, and, in fact, the -- the day of the debate, I had an entire conversation about it with Sarah Sanders while Ms. Delgado was sitting right

Page

as -- as I think every American remembers, and after the election, you moved from the Trump campaign to the Trump transition team; correct?

A Yes.

Q What was your job there?

A The title shifted to communications director.

Q And what was the -- did that involve a change in duties or just a change in title?

A There was a shift away from the advertising and -- component because you no longer needed to do ads after the election.

Q Right.

A And it became more of trying to put things together for the president in advance of his taking office. So the -- the responsibilities were still very similar, but it was a different task and objective that we were then aiming for, if that makes sense.

Q It does. I appreciate that. I didn't (indiscernible) the advertising capacity would work out, but obviously it would.

When A.J. -- when you were moving to the transition team, did -- was A.J. Delgado considered for a -- a role on the transition team?

Page

A She did have a role on the transition team.
Q And what was her role?
A I believe the title was senior adviser. They named a whole bunch of folks as senior advisers as kind of placeholders until there's some real structure put into place.
Q At that point, was there any kind of background check run on Ms. Delgado?
A I can't speak to what the -- if HR or legal did any kind of background check. I -- I don't know if they did.
Q Okay. And your sexual relationship with Ms. Delgado was continuing during this time?
A Correct.
Q And you were still having this sort of dating relationship; correct?
A Yes.
Q At the time, did you think Ms. Delgado was crazy?
A Everything changed on election night, and I had gotten into an argument with my wife that --
MR. VOGT: Don't -- and don't reveal the substance of any communications with your

Page

wife.

MS. BOLGER: I -- I, again, object to that instruction.

BY MS. BOLGER:

Q But you've got to do what you've got to do, Mr. Miller.

A But it wasn't so much that I had -- what we were arguing about. It was just the fact that it -- even though it was election night and it was the -- kind of the end of this big huge journey which should have been kind of a momentous day -- I actually did think that he was going to win so I was one of the few people that actually thought that. And --

BY MS. BOLGER:

Q So did my husband.

A (Indiscernible).

And I think I seemed a little bit down or maybe a little bit off, and Ms. Delgado asked me what was wrong or what was going on. I communicated that I just had some kind of conversation with my wife that kind of put me in a not great mood. And Ms. Delgado flipped out.

Q What did you tell Ms. Delgado about your communication with your wife?

Page

A Just that it -- it had put me in a bad mood and -- I don't remember the exact substance of the conversation with my wife, but whatever it was, it left me in a bad mood or not being as happy as I should have been.

And Ms. Delgado flipped out and -- saying that I was ruining this big, important night for her because I was whining about my wife, and why would I care what my wife said to me. And it just -- that was the first time I really saw that side.

Q Did you have sex with her that night?

A I do not believe on -- I don't think so. On election night, I don't believe so.

Q But you kept having sex with her after that?

A Yes.

Q Why did Ms. Delgado think you shouldn't care what your wife said since you told her you and your wife were separating?

MR. VOGT: Objection to form.

THE WITNESS: Thinking back to what -- she said it was -- at that point I'd be trying to crawl inside her head to think what she was thinking, but I -- clearly she -- I mean, I

remember that night telling her I'm still married. And I think the baby even came up again, I think, that night as well.

I mean, my wife is obviously the mother of my two daughters, so it's not like I'm never going to -- even if we had gone down that path of splitting up, it's not like I was never going to talk to her again. That's my -- the mother of my daughters.

But that was -- that was the first time where I really saw kind of the -- the change. And I --

BY MS. BOLGER:

Q But you didn't stop your relationship with Ms. Delgado?

A No.

Q And Ms. Delgado didn't get fired from the Trump transition team?

A No, she was on the Trump transition team up until -- my understanding is that she basically just disappeared.

Q Okay. There did come a time when Ms. Delgado told you she was pregnant; right?

A Yes.

Q When was that?

Page

A Just before Thanksgiving.
Q And where were you?
A My apartment at Beekman Towers.
Q In the bedroom?
A When she first told me, yes.
Q Okay. What did she say?
A I don't remember exactly, but she informed me -- I think she just came right out and said it.
Q And what was your response?
A I was shocked because I was given the clear indication that she was on the pill or some other form of birth control.
Q What do you mean by "clear indication"?
A Because we did not use protection the first night that we had sex, and so the next morning I brought up the point and said is there anything that we need to worry about here, and she said no.
Q But she didn't say, I'm on the pill? I'm just -- right?
A Correct.
Q Okay. So you were shocked. What else was your response?
A I just remember being totally shocked.

Page

day. It's, like, eight hours later. Hey, I can't stop thinking about you. I wish you'd take my call. You're not alone here.

That's from you to Ms. Delgado on November 23rd; right?

A Correct.

Q Okay. And she didn't respond to that?

A Correct.

Q Then the same night you text her, Good night, beautiful.

Do you see that?

A Yes.

Q Okay. There's no response; right?

A Correct.

Q Okay. So then the next one is November 24th at 10:08 p.m. That's Thanksgiving; right?

A I believe so, yes.

Q So where were you for Thanksgiving?

A I believe I was at my home in Virginia.

Q Okay. So you had Thanksgiving with your wife?

A Yes.

Q Okay.

A I don't -- I don't remember who all was

Page

in attendance, but I know I was with my -- definitely my wife and daughter.

Q Okay. And you were sleeping in your bed with your wife?

A During the transition, I believe I -- I believe I was in the downstairs spare room for all the -- the transition.

Q Okay. Nonetheless, you're sending your -- you're sending Ms. Delgado text messages that say, I miss you, babe; I wish you'd take my call even if just to tell me to get lost; it's killing me; I know I messed up; I wish I was still with you; you're so beautiful; it drives me crazy.

Right?

A Yes.

Q So on Thanksgiving you're telling Ms. Delgado you wished you were with her?

A That's what I said, yes.

Q Okay. The next column over, the text messages are actually dated November 22nd, so we're actually going back in time, and there's a text that says, A.J., I'm so sorry for what I pulled you into, but I won't apologize for how I feel about you. I'm crazy about you and hate being apart. I understand if you don't want to

Page

Q When you spoke to Ms. Delgado again after the holidays, your sexual relationship continued; right?
A Yes.
Q Did you tell her that you were going to leave your wife and you and she were going to have a life together during this time?
A There -- when she returned from Miami, which is where she was over Thanksgiving, she started pressing me about the need for me to tell my wife. And eventually that became a if you don't tell your wife, I'm going to.
And I was scared and embarrassed and was not thinking clearly, and I know that I placated Ms. Delgado as far as saying when I was going to tell my wife, and I'll take care of it soon because I -- I just didn't know what to do.
Q Did you tell Ms. Delgado you were going to leave your wife and be with her?
A I don't recall ever saying that we were going to have some life together. I mean, I knew obviously it was -- didn't know what shape or what direction that might go.
I don't recall ever saying, like, we're going to elope or I'm moving to Miami or -- you

Page

son, so I don't want to be confusing.

Tell me how -- the circumstances of how your sexual relationship with Ms. Delgado came to an end.

A So in the -- things all kind of came to a head in the middle of December. So a couple of weeks after -- a couple few weeks after finding out Ms. Delgado was pregnant, and the level of vitriol started popping up so many times. Like I would get ready to head back to Virginia or go home, it was, are you going to tell your wife; are you going to tell your wife. And she started saying things, like, you know, I don't care if you stay with me, but you can't stay with your wife. You don't really love her.

At one point then there was a -- it just -- there was a big blowup between -- there was a big blowup between Ms. Delgado and Hope Hicks in my office. And afterwards, Ms. Delgado said that if I didn't go and make Hope apologize or get the situation fixed, then she was going to call and tell my wife about -- about the affair and the pregnancy.

And then where it all really blew up is Ms. Delgado wanted to go on one of the -- the

Page

pulling away, I saw the email.

Q What email?

A The email that Ms. Delgado sent my wife saying that we need to talk.

Q So just to unpack a couple of things in that. You said in the beginning that every time you'd go home to Virginia she would ask you to tell your wife.

Were you home between Thanksgiving and November [verbatim] 17th?

A Yes, at least once, but I think it may have been a couple of times.

Q And did you tell your wife that A.J. Delgado was pregnant?

A I did not.

Q Did you tell her you were sleeping with A.J. Delgado?

A I did not.

Q And your wife was, what, by this time? Nine months pregnant?

A Correct.

Q Okay. Then on the plane, did people in the campaign know that Ms. Delgado and you were having a -- a personal fight?

Was it -- was the fact that you guys

Page

line of questioning, and then we can move on in the afternoon.
A Fifteen or 50?
Q One five.
A Okay. That's fine.
Q Great. Sorry. I hear -- understand you.
All right. So you -- there was the email that was sent from Ms. Miller -- Ms. Delgado to your wife, and what did you do when you saw the email?
A The reason why I'm pausing is because I'm trying to remember what I was -- I was in the motorcade, and I was maybe actually in -- I'm not sure if I was in the same car with the president, but I think on the inside I was freaking out, but I was trying to play calm because I was still, like, on the clock and working and staffing the next President of the United States. And I think I just realized that everything was going to be a lot different going forward.
Q Okay. What did you do -- when did you next talk to your wife?
A That evening.
Q Had you communicated with A.J. about

Page

the email before you spoke to your wife?

A When we got back on the plane, she brought up, like, you saw the email; you saw what I sent. And we went back to the FBO in Palm Beach or flew back to. And we broke off from the motorcade, and I was supposed to be in -- at Mar-a-Largo for the rest of that weekend staffing the president.

I -- I think I was doing a Sunday show maybe, even that -- like a day or two later while the president was there for -- having a postelection break.

I don't remember exactly what was said, but I know A.J. brought up the fact that she had emailed my wife and started pressing me on, like, what I was going to do.

Q What did you say?

A I guess I need to sit down and think and make some life decisions here.

Q You were that calm?

A I don't know what my demeanor was. On the inside I was completely panicked and freaking out.

Q I mean, your pregnant mistress had emailed your pregnant wife telling her about your

Page

affair. You would think you would have a memorable reaction to that.

So what -- what did you say to your pregnant mistress after she just told your pregnant wife about your affair?

MR. VOGT: Objection to form.

THE WITNESS: I -- I don't remember the exact words. I --

BY MS. BOLGER:

Q Did you tell her, my wife's going to leave me; I'm angry at you? Did you say, let's run off together? What did you say?

A I think I said I just needed some time to think.

Q And your wife in the meantime was trying to reach you; right?

A I know we ended up talking that night. I don't know -- I don't remember the exact back and forth with my wife or if there were a bunch of phone calls or one phone call or whatever the case, but I know we did end up talking that evening.

Q Did you deny your affair to your wife at that time?

A No.

Page

MR. VOGT: Objection.
Don't answer the question --
MS. BOLGER: Well --
MR. VOGT: -- to the --
MS. BOLGER: -- he's --
MR. VOGT: -- extent --
MS. BOLGER: -- already --
MR. VOGT: -- it would be --
MS. BOLGER: -- testified that he denied his affair to his wife. Shane, he specifically testified he denied his affair to his wife --
MR. VOGT: You asked --
MS. BOLGER: -- which you claim --
MR. VOGT: -- if he told her.
MS. BOLGER: -- now that there is -- no. Earlier in this deposition, he specifically said he denied his affair to his wife. So if you're going to object to the question now, there's clearly been a waiver.
BY MS. BOLGER:
Q Did you deny your affair to your wife at that moment?
MR. VOGT: And I disagree with your characterization of everything on the record.

Page

BY MS. BOLGER:

Q Did you deny your affair to your wife in -- on that evening?

A No.

Q So this is the first time you admitted it?

A Correct.

Q How did you communicate with A.J. during this period of time?

A Can you define period of time.

Q Sure.

Between October 19th and December 17th, how did you communicate with A.J.?

A Phone and text message.

Q Where are those text messages?

A Well, you see most of them here.

Q Ms. Delgado sent those to your wife. What -- what did you do with those text messages?

A I deleted them off my phone.

Q When did you do that?

A I think probably in realtime, probably in -- in realtime. I --

Q So you mean you deleted them constantly as Ms. Delgado texted you?

A I don't know if every single time, but

Page

A Well, reading this, and I'm assuming this is what I sent if it's not altered. I just -- I don't remember exactly, but I'll -- I'll assume this is probably what I sent.

But if she gets lit up publicly, I think what this is saying is that if my -- if my wife gets attacked or -- I think that's what I was referring to, but I -- a lot of that timing kind of that -- that frame right there, I -- I don't remember exactly.

Q Okay. You were made communications director in the White House on December 22nd, 2018; right?

A Correct.

Q And you had arranged in the transition team that A.J. would also have a job in the White House after the transition; correct?

A Yes.

Q And that had been approved by Sean Spicer; right?

A I think it -- I mean, the -- who all signed off -- I know Sean didn't sign off on the communications team plan, but I believe that others had signed off as well. I don't remember who all had to give the formal sign-off. I know

Page

that Sean had agreed with the structure that had been laid out.

Q Okay. So as of when the transition team was in place and you were all planning to move to the White House, A.J. still had a job in the White House; right?

A In the very last org chart that I ever worked on or did, I definitely had her on there.

Q Okay. You resigned on Christmas Eve, December 24th; right?

A Correct.

Q And why was that?

A The -- A.J. had gone public with the affair and the pregnancy, and then I -- I stepped down. I think I formally gave my notice the -- that Friday night, the 23rd, and then we put it out publicly on the 24th.

Q When did A.J. go public, as you put it?

A I believe it was on the -- I think it was on the 22nd, shortly after I had been named.

Q Okay. And there was a flurry of publicity about it; right?

MR. VOGT: Objection to form.

THE WITNESS: Yeah, there was -- there was attention to it, yes.

Page

MR. VOGT: Objection to form.

THE WITNESS: I don't believe I'd ever even met either of the -- of the two you mentioned. I think I just went into -- I just kind of disappeared. I wasn't -- I don't remember trying to shape anything with the media narrative. I just hoped it would go away quietly over the holiday weekend.

MS. BOLGER: Okay. I promised you a break. We can have a break.

We can go off the record.

THE VIDEOGRAPHER: We are going off the record at 1:16 p.m. This ends disk number 2.

(Lunch recess -- 1:16 p.m.)

(After lunch recess -- 2:05 p.m.)

THE VIDEOGRAPHER: We are back on the record at 2:05 p.m. This begins disk number 3.

BY MS. BOLGER:

Q Mr. Miller, other than your relationship with A.J. Delgado, have you been unfaithful to your wife?

A Yes.

Q When were you unfaithful to your wife?

A I've been unfaithful to my wife -- I had a relationship with REDACTED in the

spring of 2016.

Q Who is REDACTED?

A She worked with me on the Ted Cruz campaign.

Q And how long did you have a relationship with Ms. -- Ms. REDACTED?

A A couple of months, I believe.

Q Did you have sex with Ms. REDACTED?

A I did.

Q More than once?

A Yes.

Q And how did that relationship begin?

A We both attended the White House correspondence dinner and ended up getting together afterwards.

Q Are you using the phrase "getting together" to mean sex?

A Not that night.

Q Okay. And what do you mean by "getting together afterwards"?

A Just kissing.

Q Okay. But you -- were you drunk?

A I don't recall.

Q Would you characterize yourself as drinking a lot, Mr. Miller?

Page

BY MS. BOLGER:
Q Are you going to answer the question?
A I'm going to follow the advice of counsel.
Q Okay. How did the relationship with -- did you end the relationship with Ms. REDACTED or did it just stop?
A I -- she called -- she called after the first Page Six story came out and was -- gave me an earful, so I'd say if it hadn't formally been ended, then that was -- I think that's -- I don't know if that was the last time I spoke with her, but it was definitely definitively done by that point.
Q Okay. The first Page Six story you referred to, that's the Page Six story that said you went to strip clubs with Ms. Delgado and some media people; right?
A Correct.
Q And what was the earful that REDACTED gave you about that story?
A She was wondering if there was a relationship between me and the other women named in the story.
Q So she -- REDACTED, your

mistress, got mad at you because she thought you were sleeping with A.J. Delgado, your mistress; correct?

MR. VOGT: Objection to form.

BY MS. BOLGER:

Q Is that correct?

A Yes.

Q Did you ever go to a strip club with Ms. REDACTED?

A No.

Q What else did she say when she gave you that earful?

A I don't recall.

Q How long was the conversation?

A Pretty brief.

Q Did you tell Ms. REDACTED that you were sleeping with Ms. Delgado?

A I told her I was not.

Q So you lied to Ms. REDACTED about sleeping with Ms. Delgado?

A Correct.

Q And you lied to your former mistress about sleeping with your current mistress -- your then current mistress; right?

MR. VOGT: Objection to form.

Page

BY MS. BOLGER:
Q Right?
A Correct.
Q Did Ms. Delgado know about Ms. REDACTED?
A No.
Q Did you ever sleep with Ms. REDACTED while you were also sleeping with Ms. Delgado?
A No.
Q How long was the break between sleeping with Ms. REDACTED and sleeping with Ms. Delgado?
A I think maybe two months, I believe.
Q So other than your affair with REDACTED and other than your affair with Arlene -- sorry.
Did anybody know about your relationship with A.J. -- with Ms. REDACTED?
A Not that I'm aware of. I don't remember ever sharing that with anybody else.
Q Did Ms. REDACTED know you were married?
A Yes.
Q Did you tell Ms. REDACTED that you were separated from your wife and you didn't know if your marriage was going to survive?
A No.
Q What did you tell her about your

the -- the paid escorts?
A No.
Q You go to strip clubs?
A Used to.
Q What do you mean by "used to"?
A I'm trying to be a better person, and that's not something that I do anymore.
Q But you did formerly -- formerly go to strip clubs?
A Correct.
Q For what period of time of your life did you go to strip clubs?
A I would say, like, 2000 is probably the -- I mean, I probably went to one before the year 2000. And then I guess the last time I've been was the night in Vegas, 2016.
Q About how many times in those 16 years when you were going to strip clubs did you go to strip clubs?
A I don't have an exact count.
Q More than ten?
A Maybe right around that number. I don't -- it wasn't something that I tracked that closely. It wasn't -- it wasn't a number that I was keeping track of.

Page

Q Did you go by yourself to strip clubs?
A No, I'd go with a friend.
Q What friend?
A That depends where I was at. If in -- to the extent that I went in Tampa or Orlando, a friend of mine named Mele Ribar --
Q Could you spell that?
A Yeah. His first name is Robert; his middle name is -- that he goes by is Mele, M-E-L-E, and the last name Ribar, R-I-B-A-R.
Q Where did you meet Mr. Ribar?
A Met him through mutual friends in Orlando.
Q Who were those mutual friends?
A Mike Miller, a former state representative from the Orlando area.
Q Are you still friends with Mr. Ribar and Mr. Miller?
A I haven't seen them in quite some time, so I don't talk with them regularly, but they're still on the Christmas card list.
Q I don't think I've ever had a conversation that involves strip clubs and Christmas cards before, Mr. Miller. I think this is a first.

You said you went to strip clubs in Tampa?

A Correct.

Q What strip clubs did you go to in Tampa?

A The Dollhouse and 2001 Space Odyssey [sic] were two that I recall.

Q When were you going to the Dollhouse and 2001 Space Odyssey?

A I went in 2012 and 2013.

Q To both of those locations?

A I think so.

Q More than once?

A 2012, I went twice to each. Then once to each in 2013.

Q Did you get lap dances at the Dollhouse?

A I don't recall.

Q You don't recall getting lap dances?

A At the Dollhouse, I don't recall.

Q Have you ever gotten a lap dance?

A Yes.

Q Where?

A 2001.

Q How many times did you get a lap dance?

Page

A I don't recall.
Q It seems kind of incredible to me. Isn't a lap dance a reasonably memorable thing?
MR. VOGT: Objection to form.
THE WITNESS: I didn't keep track of the exact number.
BY MS. BOLGER:
Q Were you drinking when you went to the strip clubs?
A Yes.
Q And you said you went to strip clubs in Orlando?
A Yes.
Q What strip clubs did you go to in Orlando?
A Diamond Club.
Q What is Diamond Club?
A It's a strip bar.
Q And where else in Orlando?
A That -- I believe that was the only one in this time frame that was around there. In 2008, I went to the -- Rachel's in Winter Park.
Q That's in -- my knowledge of Florida geography is -- is not great. Winter Park is near Orlando?

Page

A Correct.
Q Okay. And you were about to say something else?
A Then I went to the Rachel's in Orlando, I believe, in 2000. But I don't recall going back after that.
Q Did you ever get a lap dance there?
A At Rachel's?
Q Yes.
A Not that I recall.
Q And how about the Rachel's in Winter Park?
A Not that I recall.
Q How about the Diamond Club?
A Yes.
Q How many times did you go to the Diamond Club?
A Several times, I believe, for the -- in my life.
Q What does "several times" mean?
A I believe three.
Q What time period was that?
A 2012, 2013, maybe there's something in the late 2000s. It's been quite a while since I've -- I've been there.

Page

Q Do you know the names of any of the performers at the Diamond Club?
A No.
Q How about at Rachel's?
A No.
Q How about the Rachel's at Winter Park?
A No.
Q So I've got -- I count that up as five, eight -- I count that up itself as more than -- than ten.
Are there other times you went to -- to strip clubs?
A In Florida or anywhere?
Q In Florida.
A In 2008, I also went to Scarlett's outside Miami.
Q How many times were you there?
A Just once.
Q Did you get a lap dance?
A Not that I recall.
Q Okay. Other strip clubs in Florida?
A I believe that's everything from -- I believe that's everything for Florida.
Q Did you go to a strip club while you were on a family vacation before?

Page

A No.

Q Other than your -- the -- the trips to strip clubs in Florida that we've talked about, what other -- where else did you attend strip clubs?

A In my life?

Q Uh-huh.

A New York City.

Q When did you go to a strip club in New York City?

A 2016.

Q What strip club?

A Flash Dancers.

Q Who did you go to that with?

A Kaelan Dorr.

Q How many times have you been to FlashDancers?

A I believe it was once in 2016 and I had gone, I think, maybe in 1997 or '98.

Q Did you get lap dances any of those times?

A I don't recall. I don't believe so.

Q Okay. Other than those strip clubs in Florida and New York City -- was that it for New York City?

A That's -- I believe that's it.
Q Okay. Other than Florida and New York City, have you been to strip clubs anywhere else?
A I've been in Texas.
Q Where in Texas?
A It was in Houston. I don't remember the -- the name of it.
Q When was that?
A Fall of 2015.
Q Were you working for the Cruz campaign at the time?
A Yes.
Q Do you think Senator Cruz knows?
MR. VOGT: Objection to form.
THE WITNESS: I have no idea.
BY MS. BOLGER:
Q Who did you go to the strip club in Texas with?
A Jeff Roe who was the campaign manager.
Q For Ted Cruz?
A Yeah.
Q Did you get a lap dance?
A I don't recall.
Q Were you drinking?
A Yes.

Page

Q Other than going to the one strip club in Texas whose name you can't remember, did you go to any other strip clubs in Texas?

A No.

Q Okay. Other than Florida, New York and Texas, have you been to any strip clubs in any other locations?

A I've been in Chicago.

Q And where did you go in Chicago?

A I don't remember the name of it, but it was out by the -- out by the airport.

Q And when was that?

A 2004.

Q Who did you go to that with?

A I went twice. Bryan Lanza went with me on one of them.

THE COURT REPORTER: I'm sorry. Who did?

THE WITNESS: Bryan Lanza.

BY MS. BOLGER:

Q Okay. But -- so you knew Mr. Lanza in 2004 or that's been recent?

A I've known him since, I think, 2002 or 2003.

Q Okay. You said you went twice; right?

A Yeah. I don't remember who I went with the other time.
Q And you don't remember the names of the clubs?
A I don't.
Q So other than Florida, New York, Texas and Illinois, are there any other places you've been to a strip club?
A I went to one in Oceanside, California, in 1998, that I don't remember the name of.
Q Any others?
A Washington, D.C., I went to one that's now closed down. I forget the name of it.
Q How many times did you go there?
A Once or twice.
Q When was that?
A 2001 or 2002, somewhere in that range.
Q And who did you go there with?
A A group of friends from D.C. I don't remember who all was in attendance.
Q Okay. Did you go to strip clubs with Ms. Delgado other than on that fateful night in 2016?
A No.
Q Have you ever been to strip clubs in

Page

Las Vegas other than the one time you took your wife and the time you went for work?

A I have. I've been several times in Las Vegas.

Q What's several?

A I believe on three different trips.

Q In addition to the ones with your wife and the ones with Ms. Delgado?

A Correct.

Q Okay. So that's five total, right, in Las Vegas?

A Yes.

Q Do you know what strip clubs you went to those times?

A Crazy Horse, Olympic Gardens. Those are the two that I remember.

Q Okay. And the last time you went to a strip club you say is the night you had -- began your affair with Ms. Delgado?

A Correct.

Q Have you been unfaithful on your wife with -- unfaithful to your wife since December of 2016?

A I'm sorry. What was --

Q Have you been -- sorry. I know the

Page

answer to that.

You just testified that you had sex with an escort in the spring of 2017. Other than -- is that the last time you have been unfaithful to your wife?

A Other than the massage parlor trip, yes.

Q And -- okay.

Did you at any of these places have a relationship with any of the strippers?

A No.

Q Did you have sex with any of the strippers?

A No.

Q At no point, not from 2000 to 2016, did you have sex with any of the strippers?

A No, I've never had a relationship with someone I've met at a strip club whether it be a stripper or another attendee or anything of the sort.

Q You may be using the word "relationship" differently.

Have you gotten a hand job from a stripper?

A No.

Page

Q Have you had a blow job from a stripper?

A No.

Q But you have had lap dances from a stripper?

A Correct.

Q How many times do you think you've had a lap dance?

A I don't know the exact number.

Q Does your wife know about all of these attendances at strip clubs?

A Most of them.

Q What does she think about it?

MR. VOGT: Objection.

Don't answer to the extent it calls for you to reveal privileged communications with your wife, respectfully.

MS. BOLGER: Because you know I disagree with the objection.

BY MS. BOLGER:

Q What are you -- are you going to answer or can you answer that question without not taking Mr. Vogt's advice?

A I'll follow the advice of counsel.

Q When did you first believe that

Page

Ms. Delgado was mentally unstable?

A The -- that week after she told my wife about the affair and the pregnancy, her behavior became extremely erratic and the level of vitriol ratcheted up quite significantly, and there were some really terrible things that were said.

And then the way she went public with everything to air it all out in a manner that would publicly attack her child's father, I -- I -- probably during that time frame.

Q So the week she -- you decided she was mentally unstable happens to also be the week you stopped sleeping with her?

MR. VOGT: Objection to form.

BY MS. BOLGER:

Q Right?

A There -- the relationship changed after election day. I -- I didn't call it off, but I started to realize that there were some other issues that were going on, and -- but then it became full-on unstable when things were broken off between us.

Q Did it ever occur to you that maybe she was angry and hurt and not unstable?

A The -- I can't speak to her thinking or

Page

and --

Q For what?

A Say that I forced her to have sex and it wasn't by her choice.

Q You had been sleeping with Ms. Delgado for seven or eight weeks and lying to her about the state of your marriage with your wife, and then you rejected her and got back together with your pregnant wife.

How did you expect her to react?

MR. VOGT: Objection to form.

THE WITNESS: It was a very difficult situation, and I don't know if I had any expectations for how she would react.

But I think as we've seen since then, whether it's the 1,100 tweets attacking me or 200 tweets plus attacking my wife or cooking up this fake smoothie story that was then sent to Splinter to go and publish, I mean, it's clear that there's something wrong there.

BY MS. BOLGER:

Q Did Ms. Delgado tweet a hundred times from yesterday?

A I'm sorry. What?

Q Did Ms. Delgado tweet about you 100

Page

anyone picked it up.

BY MS. BOLGER:

Q That's not my question, Mr. Miller, and the fact that you can't answer a simple question is beginning to look like you don't want to tell me things you don't want to tell me.

MR. VOGT: Come on, Kate.

BY MS. BOLGER:

Q The supplement was filed in the open public record of the court initially; correct?

MR. VOGT: Objection to form.

THE WITNESS: It was initially filed in the -- the family law case, yes.

BY MS. BOLGER:

Q In an open public record; correct?

MR. VOGT: Objection to form.

BY MS. BOLGER:

Q Initially?

MR. VOGT: Objection to form.

THE WITNESS: It was initially filed in public, but it was sealed before anyone picked it up.

BY MS. BOLGER:

Q What's your basis for saying it was sealed before anyone picked it up?

Page

So you were on CNN for a comment -- as a commentator for a period of time, and you were there largely to give the point of view of the presidential candidate Trump, President-elect Trump -- and then -- presidential candidate Trump and then President-elect Trump; is that right?

A I was on as a supporter of the president's and someone who's familiar with -- familiar with his thinking and his team's thinking, yes.

Q Okay. You have a nondisclosure agreement with the Trump campaign; correct?

A Yes, there's an NDA that both myself and Ms. Delgado and everyone else who worked on the campaign signed.

Q Okay. And you signed that nondisclosure agreement. It also has a nondisparagement clause; correct?

A It does.

Q Okay. And what does that clause prohibit you from doing?

A I haven't read the exact language in a while, but --

MR. VOGT: Don't guess. If you don't know, you don't know.

Page

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Dana C. Ryan, Registered Professional Reporter, Certified Realtime Reporter, the officer before whom the foregoing proceedings were taken do hereby certify that the foregoing transcript is a true and correct record to the best of my ability of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 4th day of June 2019.

My Commission expires:
July 15, 2020

Dana C. Ryan
_____________________________

NOTARY PUBLIC IN AND FOR THE
DISTRICT OF COLUMBIA