## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### 1:18-CV-24227-CMA-Altonaga

JASON MILLER,                              )
                                          )
                    Plaintiff,             )
                                          )
         vs.                               )
                                          )
GIZMODO MEDIA GROUP, LLC,                  )
a   Delaware   Corporation,   KATHERINE    )
KRUEGER,    individually,    and    WILL   )
MENAKER, individually,                     )
                                          )
                    Defendants.            )
_____

## DEFENDANTS' MOTION TO EXCLUDE EXPERT OPINIONS OF CRAIG KRONENBERGER UNDER FED. R. CIV. P. 37 AND FED. R. EVID. 702

Pursuant to Fed. R. Civ. P. 37 and Fed. R. Evid. 702, as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 578 (1993), Defendants, GIZMODO MEDIA GROUP, LLC and KATHERINE KRUEGER (together, "Defendants"), move to exclude the expert testimony and opinions of Miller's expert Craig Kronenberger, and state:

## BACKGROUND

This libel action arises out of Defendants' September 21, 2018 article reporting on a court document filed by non-party Arlene Delgado ("Delgado") in her ongoing family court battle with Plaintiff Jason Miller ("Miller") ("the Article"). Miller claims the Article damaged his reputation and retained Craig Kronenberger ("Kronenberger") as an expert, who prepared a report. *See* Expert Report of Craig Kronenberger ("Report"), attached hereto as Exhibit A.

Kronenberger offers two "expert" opinions in his Report: (1) "the publication, republication, and distribution of the Article across news outlets and social media caused significant negative impact on the reputation of Miller;" and (2) "the cost of the reasonable and necessary efforts to begin to repair Miller's reputation and correct the defamatory narrative disseminated about him are $63,372,471.65." Report at 4, 5. The Report and Kronenberger's opinions should be excluded for two independent reasons.

First, by not revealing the actual methodology used to reach both of these opinions, Kronenberger failed to comply with the requirements of Fed. R. Civ. P. 26, which mandates that an expert provide "a *complete* statement of all opinions the witness will express and the *basis* and *reasons* for them." Fed. R. Civ. P. 26(a)(2) (emphasis added). As a result, pursuant to Fed. R. Civ. P. 37, this Court should exclude Kronenberger's opinions. *See* Fed. R. Civ. P. 37(c)(1) ("[i]f a party fails to provide information . . . as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

Second, Kronenberger's Report independently fails because it falls far short of the standard of admissibility under *Daubert*. To the degree the methodology is actually known, and it is not, it is clear from the Report that Kronenberger's methodology is unreliable and is rife with assumptions, not hard data. Most troubling, Kronenberger artificially limited his search of online reports so that it excluded the time period during which other events affecting Miller's reputation were publicly reported – *e.g.*, his visit to a strip club, affair with Delgado, his demands for an abortion, the fact that Delgado was pregnant at the same time his wife was pregnant, and

1

his exit from the Trump White House. As a result, the Report's causation analysis has no foundation because it excludes any assessment of Miller's pre-Article reputation and any comparison of that reputation with Miller's post-Article reputation.  Accordingly, Kronenberger's "expert" opinion places a $63 million sticker price on repairing a reputation that was already severely damaged well before the Article rather than addressing damage caused, if any, by the new allegations contained in the Supplement. Further, the Report relies on unreliable sources, engages in rank speculation and expresses opinions that are confusing, misleading and unhelpful. At bottom, the Report is unfounded, will prejudice Defendants and should be rejected.

## MEMORANDUM OF LAW

I.   **Kronenberger's Report Fails to Comply with Federal Rule 26**

    a.   *Requirements of Fed. R. Civ. P. 26(a)(2)*

The law is clear. Fed. R. Civ. P. 26 requires expert disclosures to include "a complete statement of all opinions the witness will express and the basis and reasons for them[.]" Fed. R. Civ. P. 26(a)(2)(B)(i). This Rule is intended to provide opposing parties "'reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses,'" including rebuttal experts. *Reese v. Herbert*, 527 F.3d 1253, 1265 (11th Cir. 2008) (quoting *Sherrod v. Lingle*, 223 F. 3d 605, 613 (7th Cir. 2000)).

"An expert report is deemed adequate when it is 'sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced.'" *Brown v. NCL (Bah.) Ltd.*, 190 F. Supp. 3d 1136, 1141 (S.D. Fla. 2016) (quoting *Abdulla v. Klosinski*, 898 F. Supp. 2d 1348, 1357 (S.D. Ga. 2012)). Conclusory contentions are not sufficient. An expert report is only complete when it "include[s] the substance of the testimony which the expert is expected to give as well as the reasons therefore, *including the "how" and "why" the expert reached a particular result* rather than the expert's conclusory opinions." *Porto Venezia Condo. Ass'n v. WB Fort Lauderdale, LLC*, Case No. 11-60665-CIV, 2012 U.S. Dist. LEXIS 186963, at *9 (S.D. Fla. Aug. 19, 2012) (citing *Salgado v. General Motors Corp.,* 150 F. 3d 735 (7th Cir. 1998)) (emphasis added). In the absence of a description of the methodology followed in reaching conclusions – the "how" and "why" – opposing counsel would inevitably be "ambush[ed]" at trial." *Dyett v. N. Broward Hosp. Dist.*, Case No. 03-60804-CIV, 2004 U.S. Dist. LEXIS 30473, at *4 (S.D. Fla. Jan. 16, 2004) (quoting *Salgado,* 150 F. 3d at 742).

### b.  Enforcement Under Fed. R. Civ. P. 37

Failure to comply with Rule 26 has consequences. When a "party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). To be sure, "the sanction of exclusion is automatic and mandatory unless *the sanctioned party* can show that its violation of Rule 26(a) was either justified or harmless." *Brown*, 190 F. Supp. 3d at 1141 (quoting *Salgado*, 150 F. 3d at 742) (emphasis added); *see also Mitchell v. Ford Motor Co.*, 318 Fed. Appx. 821, 824 (11th Cir. 2009) (burden is on party accused of failing to provide sufficient disclosure to demonstrate failure was substantially justified or harmless); *Formica v. Rowe*, 2013 U.S. Dist. LEXIS 199229, No. 8:11-cv-516 (S.D. Fla. Sept. 28, 2013) (excluding expert testimony because his report "[did] not contain an explanation of the methodology [he] used").

"Substantial justification" requires "justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request." *Access Now Inc. v. Macy's E., Inc.*, Case No. 99-9088-CIV, 2001 U.S. Dist. LEXIS 26505, at *8 (S.D. Fla. Oct. 18, 2001) (quoting *Fitz, Inc. v. Ralph Wilson Plastics Co.*, 174 F.R.D. 587, 591 (D.N.J. 1997)). Whether the nondisclosure is harmless depends on whether it caused prejudice to the party who was entitled to the disclosure. *Id.* (citing *Chapple v. State of Alabama*, 174 F.R.D. 698 (M.D. Ala. 1997)). Notably, "[n]othing causes greater prejudice than to have to guess how and why an adversarial expert reached his or her conclusion." *Id*. (quoting *Reed v. Binder*, 165 F.R.D. 424, 430 (D.N.J. 1996)).

### c.  Kronenberger's Report Fails to Explain his Methodology

In order to reach his Report's two conclusions – the publication of the Article "caused significant negative impact on the reputation of Miller;" and to repair and rebuild Miller's reputation, it would cost more than $63 million – Kronenberger testified that he analyzed the "volume," "authority" and "sentiment" of the online conversation regarding Miller as it related to the Article and other online content that also reported on Delgado's court filing. Deposition of Craig Kronenberger ("Dep.") at 135:11-16.[1] However, Kronenberger's Report did not define the

---

[1] Pertinent excerpts from the deposition of Kronenberger are attached hereto as Exhibit B.

3

terms, "volume," "authority" and "sentiment." Nor did the Report provide the actual methodology he used in order to reach these conclusions.

Kronenberger's deposition revealed that the methodology described in his Report was not the actual methodology he used. Kronenberger testified that, in order to determine the "volume" and "authority" related to the Article, he accessed a database called "Talkwalker," which is a "monitoring and listening tool for social media, news and forums." *Id.* at 70:19-71:10; Report at 20. Specifically, Kronenberger testified that he conducted searches within the Talkwalker database, and then Talkwalker produced raw data regarding the volume and authority. Dep. at 91:4-17, 92:12-15; 78:22-79:4; 275:22-276:7. Using the Talkwalker raw data, Kronenberger determined that there were 55,500 "mentions" on social media and 375,377 "engagements"[2] across social channels.[3] Report at 20. Next, Kronenberger used the Talkwalker data to identify the URLs of websites that either referenced or linked to the Article, and then he plugged those URLs into Cision/Trendkite – another database which "measure[s] and monitor[s]" media – which produced the "readership value" for each URL.[4] Dep. at 199:3-200:3, 201:12-202:22; Report at 20-21.

Critical to Kronenberger's Report was his use of a "trendline" (titled "Jason Miller") and "word cloud" from Talkwalker that purportedly visually represented the negative impact of the Article on Miller's reputation. Report at 14 (showing searches for the term "Jason Miller" *by itself* as opposed to a search for "Jason Miller" *plus another word*). More specifically, the Report stated that, "[o]f the 73.8K mentions about *Jason Miller* in the past year" – *all* 73.8K of which are visually represented by the trendline – "92.8 percent (or 68.5K) included the keywords 'Jason Miller + Abortion' and derived from the Article." *Id.* at 14 (emphasis added). This was a key finding and necessary to support Kronenberger's conclusion that the Article's report on the Supplement's allegations was central to Miller's online reputation.

---

[2] The number of "engagements" refers to the number of "people that commented, shared, [or] liked a particular mention or comment." Dep. at 117:14-17.

[3] Kronenberger used the 375,377 engagements generated by Talkwalker to calculate the "negative social media mentions cost" of $7,012,042 (which he subsequently multiplied by 5 to equal $35,060,210). Report at 20, 22.

[4] Kronenberger used the readership value to calculate the "negative search engine cost" of $73,192.73 (which he again subsequently multiplied by 5 to equal $365,963.65). Report at 20-21.

But the methodology described in the Report was *not* the actual methodology used by Kronenberger. In his deposition, Kronenberger admitted that the raw data, trendline and word cloud were created using Boolean search queries that included "Jason Miller + *Abortion*," and "Jason Miller + *Abortion Pill*," among others. Dep. at 72:14-23; 86:3-8 ("Our search queries focused around Jason Miller, abortion, abortion pill, Splinter News article, and Jason Miller's social handles"); 276:2-7. As such, it was Kronenberger's selected search terms that dictated his results, and they were skewed to reach the result that he wanted to reach.

Even more troubling, not only did his Report fail to identify the actual Boolean search queries he used, but Kronenberger could not specifically identify them *during his deposition. Id.* at 87:3-7; 89:10-14; 278:4-9. Compounding his failure to provide Defendants with the "how" and "why" for his conclusions, Kronenberger did not attach the raw data generated from Talkwalker *to his Report* or bring it to his deposition and could not testify to its contents *during his deposition. Id.* at 92:8-17. The Boolean search queries that Kronenberger used and the raw data produced as a result of those queries are critically important because they contain the exact data inputs and outputs that are the very foundation of his conclusions.

Kronenberger's obfuscation made it impossible for Defendants' retained expert, Terri Giddens, Ph.D., to properly examine and replicate the methodology used by Kronenberger in order to assess the reliability of his methodology and to confirm his results. At her deposition, Dr. Giddens explained why Kronenberger's failure to include his methodology was so problematic for her: "[O]ne of the things that [she] need[s] to do is to be able to replicate what he did to – so that [she] can verify and validate his results." Giddens Dep. at 36:4-6.[5] Later in the deposition, she elaborated as follows:

> Okay, so what I'm doing here is, I'm trying the best that I can do address Kronenberger's results. And because it was so unclear as to his methodology and how he formed his -- I mean, he just gave a list of searches, he didn't say he limited it on date, he didn't say he limited in any way. So my hands are pretty tied as trying to address what Kronenberger said in his report. Because he did not state his methodology very clearly, if at all.

*Id.* at 117:23-118:6. By failing to provide the Boolean search queries and the raw data from Talkwalker, Kronenberger effectively deprived Defendants' expert of the opportunity to replicate

---

[5] Excerpts of her deposition are attached hereto as Exhibit C.

his methodology, thus limiting or eliminating her ability to verify his results and rebut his opinions in a precise and meaningful way.

### d. *Kronenberger's Report Fails to Comply with Fed. R. Civ. P. 26*

The Report made it appear as if Kronenberger was studying online interest in the topic "Jason Miller." As it turned out, he was using targeted search queries (that he failed to provide and could not identify at his deposition) to assess online discussion of Miller and the particular topics raised by the Supplement. By failing to fully explain his methodology used in his Report – including, but not limited to, failing to identify the Boolean search queries used to produce the Talkwalker raw data, trendline and word cloud – Kronenberger failed to provide a "*complete* statement of all opinions the witness will express and the *basis* and *reasons* for them." Fed. R. Civ. P. 26(a)(2)(B)(i) (emphasis added).

In short, the Report failed to provide the very data (including inputs and outputs) necessary to understand the methodology used. As such, the Report failed to give Defendants a "reasonable opportunity" to prepare their expert's rebuttal opinions and testimony. *Brown*, 190 F. Supp. 3d at 1141. Further, the Report is not "complete" because it did not explain "'how' and 'why' the expert reached a particular result," *Porto Venezia Condo. Ass'n*, 2012 U.S. Dist. LEXIS 186963, at *9, nor would it have "avoid[ed] ambush at trial" (had Defendants chosen not to depose Kronenberger prior to trial), *Dyett*, 2004 U.S. Dist. LEXIS 30473, at *4. As a result, Kronenberger's opinions, including the trendline and word cloud, should be excluded from evidence at trial as a sanction for Kronenberger's failure to comply with Fed. R. Civ. P. 26. *See Kakawi Yachting, Inc. v. Marlow Marine Sales, Inc.*, Case No. 8:13-cv-1408, 2014 U.S. Dist. LEXIS 200294, at *9 (M.D. Fla. Oct. 28, 2014) ("Federal courts routinely strike expert reports or exclude expert testimony which is not timely disclosed, *even if the consequence is to preclude a party's entire claim or defense*.") (emphasis added); *see also Formica*, 2013 U.S. Dist. LEXIS 199229, No. 8:11-cv-516.

### e. *Kronenberger's Failure to Comply is Not Substantially Justified or Harmless*

It is Miller's burden to establish that his expert's failure to comply is substantially justified or harmless. *Brown*, 190 F. Supp. 3d at 1141. He cannot meet this burden.

Kronenberger knew or should have known the importance of the Boolean search queries at the time he authored his Report. Indeed, as he admitted at his deposition, he sought to tailor those undisclosed Boolean search queries to limit the data produced by Talkwalker as he saw fit

and relied extensively on the data that Talkwalker generated to evaluate the purported effect of the Article on Miller's reputation. *See, e.g.*, Dep. at 72:14-23; 73:3-7; 245:2-13. These search queries were indisputably part of his methodology. Based on the foregoing, whatever justification is asserted, it cannot be substantial enough to "satisfy a reasonable person that parties could differ as to whether the [Miller] was required to comply with the disclosure request" (the "disclosure request" being the requirements under Fed. R. Civ. P. 26(a)(2)(B)).

And the harm caused to Defendants by Kronenberger's failure to reveal the key components to his methodology is significant. As recognized by this District, "*[n]othing causes greater prejudice than to have to guess how and why an adversarial expert reached his or her conclusion*." *Access Now*, *Inc.*, 2001 U.S. Dist. LEXIS 26505, at *8. Here, Defendants' expert was left guessing. The Boolean search queries were critical to understanding "how" and "why" Kronenberger reached his conclusions. Lacking this foundational information, Dr. Giddens "ha[d] to make assumptions on how he came up with the data," and her "hands [were] pretty tied [in] trying to address what Kronenberger said in his report." She could not "replicate what he did" and she could not "verify and validate his results." Giddens Dep. at 54:4-5; 118:3-5; 36:4-6.

Indeed, the prejudice to Defendants was further multiplied. Kronenberger testified that he would provide the Talkwalker raw data and Boolean search queries to Defendants. Yet, he *still* has not provided the raw data. And he failed to provide the Boolean search queries until June 21, 2019, a full two weeks after his deposition and just six days before the *Daubert* motion deadline.[6]

But even this belated and inadequate disclosure has not cured the deficiencies in the Report or the prejudice to Defendants. Based on what was sent, it now appears that Kronenberger used 70 different search queries in formulating his opinions in the Report. But neither his Report, his Deposition, nor this late email from Miller's counsel explain *how* the search queries led to the still undisclosed raw data that in turn led to the expert's opinions. As such, Kronenberger's methodology remains unexplained to this day. Even more troubling, a cursory review of the search queries reveals that they would have yielded data that was unrelated to the Article. For example, searching "jason miller" AND pregnan*" could produce results related to news stories predating the Article, including stories about Miller getting Delgado

---

[6] The email from Miller's attorney with the "search queries info" is attached as Exhibit D.

*pregnant* while his wife was also *pregnant*. Similarly, searching "jason miller" AND "stripper" could similarly produce results related to news stories predating the Article about Miller visiting a Las Vegas strip club when he was a senior communications strategist for the Trump campaign. Searching for "jason miller" and "delgado" would naturally yield results concerning a number of topics unrelated to and predating the Article, like their work together on the Trump campaign, their affair, the resulting pregnancy, or their contentious family court battle.

The deadlines for rebuttal expert reports and discovery have both already passed, the *Daubert* and dispositive motion deadline is today, and trial, if necessary, will commence in just over two months. The opportunities to cure the deficiencies in the Report are extremely limited, if they exist at all. *See also Formica*, 2013 U.S. Dist. LEXIS 199229, at *6 (finding that the nondisclosing party's offer to cure the deficiencies in the expert report via deposition or supplementation "ignores the rules and procedures of the Court"). Miller should not be rewarded for his expert's failures; the proper remedy at this point is exclusion.

## II.     Kronenberger's Report Fails to Meet the *Daubert* Standard

### a. Daubert *Requirements*

Kronenberger's Report and opinions independently should be excluded for failure to comply with the basic requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 578 (1993). Federal Rule 702 codifies the standard of admissibility for expert opinions set forth in *Daubert* and places strict limits upon the admission of expert testimony in order to ensure that expert testimony being presented to a jury is well-grounded and is not in any way speculative. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge *will help the trier of fact* to understand the evidence or to determine a fact in issue;
> (b) the testimony is *based on sufficient facts or data*;
> (c) the testimony is *the product of reliable principles and methods*; and
> (d) the expert has *reliably applied the principles and methods* to the facts of the case.

Fed. R. Evid. 702 (emphasis added).

The United States Supreme Court made clear in *Daubert*[7] that district courts are duty-bound to exclude expert testimony that violates the basic principles set forth in Rule 702. Relying on *Daubert*, the Eleventh Circuit has emphasized that this "gatekeeping function" of the district courts is crucial in order "to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Rink v. Cherminova, Inc.,* 400 F. 3d 1286, 1291 (11th Cir. 2005).

The test for admissibility of expert testimony is rigorous. *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC,* 746 F. 3d 1008, 1027 (11th Cir. 2014). Under *Daubert*, three requirements must be met before any expert opinion may be admitted at trial, and if *any* of the three are missing, the opinion *must* be excluded. First, the expert must be qualified on the *specific* matter about which he intends to testify. *Hughes v. Kia Motors Corp.*, 766 F. 3d 1317, 1329 (11th Cir. 2014). Second, the methodology used to reach the opinion must be reliable. *Id.* And third, the expert's testimony must be able to assist the trier of fact through the application of expertise to understand the evidence or fact in issue. *Id*. Miller, as the party seeking to admit the expert testimony, bears the burden to establish that all elements are satisfied by a preponderance of the evidence. *Hughes*, 766 F. 3d at 1329; *see also Chapman v. Procter & Gamble Dist., LLC*, 766 F. 3d 1296, 1304 (11th Cir. 2014).

The reliability of the expert's methodology is central to the analysis. To determine reliability, the *Daubert* inquiry focuses on several factors, including: (1) whether the methodology can be and has been tested; (2) whether the theory or technique has been subjected to peer review; (3) the known or potential rate of error of the methodology employed; and (4) whether the methodology is generally accepted. *Daubert,* 509 U.S. at 593–94; *Chapman*, 766 F. 3d at 1305; *Hughes*, 766 F. 3d at 1329. Trial courts also consider whether the *sources* of the expert's information are reliable. *Grupo Televisa, S.A., v. Telemundo Communs. Group, Inc.*, Case No. 04-20073-CIV, 2005 U.S. Dist. LEXIS 45883 (S.D. Fla. Aug. 17, 2005); *Affiliati Network, Inc. v. Wanamaker*, Case No. 1:16-cv-24097, 2017 U.S. Dist. LEXIS 217403 (S.D. Fla. Aug. 14, 2017) (striking reputational damages expert).

---

[7] The principles of *Daubert* apply across the board to *all* expert testimony and not just to scientific testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 119 U.S. 1167, 1179 (1999); *see also United States v. Frazier*, 387 F. 3d 1244, 1262 (11th Cir. 2004).

In conducting this multi-factor analysis, a court is required to abide by several guiding principles that appear throughout the large body of controlling *Daubert* authority:

First, the methodology is far more important than the conclusions. Indeed, a proper analysis under *Daubert* does not examine whether the expert's conclusions are correct, but rather must focus on whether the expert used a reliable methodology. *Daubert*, 509 U.S. at 594-95; *Chapman v. Procter & Gamble Dist., LLC*, 766 F. 3d 1296, 1305-06 (11th Cir. 2014) ("[I]t is proper and necessary for the trial judge to focus on the reliability of a proffered expert's sources and methods.").

Second, the expert does not get the benefit of the doubt. In other words, the trial court is required to look beyond the expert's own assurances that his or her methodology is reliable. Indeed, a methodology is not rendered "reliable" under *Daubert* simply because the purported expert says so. *Hughes*, 766 F. 3d at 1330. "[T]he trial court's gatekeeping function requires more than simply taking the expert's word for it." *Id.*; *Frazier*, 387 F. 3d at 1265; Fed. R. Evid. 702, Advisory Comm. Notes (2000).

Third, acceptance and replication of the methodology are key. The party offering the expert testimony must establish that "[s]omeone else using the same data and method must be able to replicate the result." *Rembrandt*, 282 F.R.D. at 667 (citing *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F. 3d 416, 419 (7th Cir. 2005)). As the court noted in *Zenith*, "[a] witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith*, 395 F. 3d at 419. The court went on to explain that an expert may be the world's leading authority on a particular topic, but if he cannot explain how his specific conclusions meet Rule 702's requirements, his testimony must be excluded. *Id.*; *Chapman*, 766 F. 3d at 1305 ("[O]ne may be considered an expert but still offer unreliable testimony.").

Fourth, speculation is prohibited. To the extent that an expert's testimony is speculative, it would only serve to "mislead and confuse" the jury and must therefore be excluded. *Legg v. Voice Media Group, Inc.*, Case No. 13-62044-CIV, 2014 U.S. Dist. LEXIS 61322, at *4 (S.D. Fla. 2014); *see also Frazier*, 387 F. 3d at 1262 (quoting Fed. R. Evid. 702, Advisory Comm. Notes (2000 amends.)) (emphasis added). Indeed, "the trial judge in all cases of proffered expert

testimony must find that it is *properly grounded, well-reasoned, and not speculative* before it can be admitted." Fed. R. Evid. 702, Advisory Comm. Notes (2000 amends.) (emphasis added).[8]

Applying these basic principles and the rigorous multi-factor analysis to Kronenberger's methodology, analysis and opinions, it is evident that his testimony falls far short of what *Daubert* requires on multiple levels. His opinions are based on facts or data that are insufficient and inadequate. His methodology – to the extent it has been identified – is not reliable. And his opinions are confusing, misleading and unhelpful. For all of these reasons, Kronenberger's expert opinions must be excluded.

### b. *Kronenberger Failed to Consider Miller's Pre-Article Reputation*

Kronenberger admits that his analysis was limited to a one-year period, from March 2018 through March 2019. Report at 14; Dep. at 78:4-8. When asked why he limited his search to just one year, Kronenberger explained that "[i]t's common to do, you know, a full year's quick search on stuff," and that he did not "do[] a full historical pull" because it "cost money." *Id*. at 80:10-15.

If the Article was the only piece of critical news about Miller that had ever been reported online, then perhaps this one-year period would be appropriate. However, here, Miller has been the subject of multiple negative news stories in the recent past. For example, in October 2016, it was reported that Miller visited a strip club while working on the Trump campaign.  And in December 2016, it was reported that Miller had an extramarital affair with Delgado and that Delgado was pregnant with Miller's child. Further, it was reported that, at the time of the affair, Miller and Delgado were working on President Trump's campaign together, and Miller was Delgado's direct supervisor. At the same time, Miller was married to Kelly Miller, who was also pregnant with his child. *See* Dkt. 156, ¶¶ 4, 7, 11, 15, 17, 21, 26, 31, 35, 36, 43, 68, 84.

Also outside the Report's artificial one year look-back, but still in the recent past, news reports revealed that, as a result of the revelation of the affair with Delgado, Miller lost the White House Communications Director position. About eight months after those news stories broke, Delgado sat down for an interview with the *Atlantic*, which published an article on Miller and

---

[8] A report based on speculative assumptions is so prejudicial that, as the *Frazier* court explained, the "powerful and potentially misleading effect of expert evidence," even if expert testimony were to survive scrutiny under *Daubert*, it should still be excluded under Fed. R. Evid. 403 if the probative value thereof is substantially outweighed by its potential to confuse or mislead the jury. *Frazier*, 387 F.3d at 1263.

Delgado's relationship in August 2017, including Miller's repeated efforts to convince Delgado to abort their child. *Id.* Of course, the *Atlantic* is an online news media source which even Kronenberger would agree has "high authority." *See, e.g.*, Dep. at 128:6-7 ("News content tends to have higher authority.").

Kronenberger concedes that these newsworthy events occurred and that they affected the online conversation about Miller. In fact, he acknowledged that "the interest in Jason Miller actually peak[ed] in December 2016," and that December 2016 was "the time frame in which news of his affair with Ms. Delgado became public." *Id.* at 143:4-16. He also admitted that the conversation about Miller's affair with Delgado "was there, to be clear. It did exist. It was there. It was visible. *Obviously, if you search for his name, it would show up.*" *Id.* at 29:10-30:6 (emphasis added). However, despite these key admissions, Kronenberger did *not* consider the online conversations about Miller concerning abortion, strip clubs, and an affair and resulting pregnancy with his subordinate – or anything else that happened before March 2018 – whatsoever in his analysis.

Kronenberger's causation analysis falls apart because of the limited scope of his online analysis. By failing to consider Miller's pre-Article reputation, or anything that may have affected his pre-Article reputation, Kronenberger omitted key and highly relevant data in reaching his opinions. As such, the methodology he used to formulate his causation opinion is inherently flawed and unreliable. Of particular import, because he did not evaluate any damage to Miller's reputation that pre-dated the Article, Kronenberger's assessment of how much damage the Article supposedly caused Miller's reputation, including his use of the trendline and word cloud, is inherently suspect and unreliable. This evidence would not be helpful to the trier-of-fact; on the contrary, it would serve to confuse and mislead them about the true impact of the Article on Miller's reputation (if any). Kronenberger's approach is akin to a car mechanic concluding that a car accident damaged a person's vehicle without taking into account the damage to the vehicle that existed *prior* to the accident. Put simply, without assessing the condition of Miller's reputation *prior* to the Article, Kronenberger cannot conclude that the Article was the actual *cause* of any damage.

Kronenberger's failure to analyze Miller's reputation before the Article appears to have been calculated and intentional. Tellingly, Miller hired Kronenberger *before* the Article was published "to address what was going on, mainly with his stuff regarding the family court [case],

and then in addition to what eventually became the [A]rticle." *Id.* at 12:9-12:24. And Kronenberger acknowledged that he actually looked at data concerning Miller, "on social media, in the news media, and blogs" that existed well before the Article. *Id.* at 16:16-19. In other words, since Kronenberger was hired by Plaintiff for his expertise in addressing a damaged online reputation well before the Article was published, Kronenberger was aware that Miller's reputation was damaged before the Article was published. But, he nonetheless chose to exclude any analysis of such pre-existing damage from his Report and did not conduct any comparison of online conversations concerning Miller before versus after the Article. Kronenberger attempted to brush aside this known and obvious gap in his analysis by observing that "in connection with serving as an expert in this case, [he was] not hired to opine on the status of Mr. Miller's reputation prior to the [A]rticle." *Id.* at 77:18-22.

At bottom, Kronenberger did not provide or discuss any pre-Article data or discuss his conclusions from that data, anywhere in his Report. At deposition, he testified that he rejected the import of any pre-Article coverage of Miller because "what happened back then, in [his] opinion, is not beneficial going forward," and that "[he] *felt* like [the conversation about Miller's affair with Ms. Delgado] was not an issue." *Id.* at 144:2-7; 29:10-30:6 (emphasis added). In essence, he disregarded prior unflattering coverage of Miller based on his *subjective* belief that the substance of that coverage – *i.e.*, Miller's extramarital affair, and the child and family court case resulting therefrom, his request that Delgado get an abortion, or his work on a controversial presidential campaign – was irrelevant to Miller's reputation following the publication of the Article.[9]

That is contrary to clear law. Subjective belief is *not* an appropriate subject of expert testimony. *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1167 (S.D. Fla. 1996) ("In order to be admissible, an expert's testimony must be based on 'more than subjective belief or unsupported speculation.'") (quoting *Daubert*, 509 U.S. at 590). Kronenberger's failure to consider Miller's

---

[9] The justification that Kronenberger offered for disregarding these prior news stories and online conversations is that committing adultery is not comparable to "putting an abortion pill into a smoothie;" they are "apples and oranges." *Id.* at 307:7-13; 144:23-145:2. However, Kronenberger provided no support, whether through research, studies or surveys, to support his decision to disregard Miller's publicly reported past actions. Moreover, the very nature of his justification makes it abundantly clear that it is a *subjective* opinion.

reputation prior to the Article – and his subjective discounting of information concerning Miller's pre-Article reputation – falls short of the *Daubert* standard. His testimony should be excluded on this basis, alone.

### c. *Kronenberger Failed to Consider Whether the Article* **Changed** *Perceptions*

Kronenberger also did not consider whether the part of the Article that Miller challenges changed anyone's perception of Miller and instead *simply assumed* that such change occurred. Again, because he did not seek to determine Miller's pre-Article reputation, there was no way to assess whether the Article caused a *change* in perceptions concerning Miller. And to reach the whopping figure of more than $63 million to try to begin to repair Miller's online reputation, Kronenberger confirmed that "[w]ith these advertising dollars, [he is] trying to reach *everyone* who saw the [A]rticle." Dep. at 161:14-17 (emphasis added). But that approach, without taking into account any pre-Article opinions of Miller, makes his opinion about the cost of fixing Miller's reputation inherently flawed and overinclusive. That is because this cost represents the amount of money needed to reach those persons who viewed (as opposed to *read*)[10] or engaged with the Article but *did not change his or her perception* of Miller as a result of the Article. In the end, Kronenberger's testimony makes clear that, for purposes of his calculations and opinions, he *simply assumed* that each person who viewed or engaged with the Article *changed* his or her perception of Miller in a negative way *because* of the Article.

For example, in reference to the first comment on page 16 of the Report, Kronenberger testified that "[he] would state that [the commenter's] opinion of Jason Miller is not good, it's negative." Dep. at 65:14-18. However, when asked if he knew whether the commenter's opinion of Miller *changed* after she viewed the Article, Kronenberger responded, "[w]e don't know what her opinion was prior to this, so we would not know that." *Id.* at 65:19-22. Later in the deposition, Kronenberger admitted that his method or analysis did not measure *changes* in opinions of Miller because "it is impossible to have done that." *Id.* at 154:9-156:1 (emphasis added). To be sure, Kronenberger ultimately testified that, with the advertising dollars, "there is *no way*" to "reach *only* that segment of people who saw the [A]rticle, whose opinions *changed* as a result of it." *Id.* at 161:18-21 (emphasis added).

---

[10] As Kronenberger acknowledged, there is no way to tell whether anyone who viewed the Article online actually read it. Dep. at 163:19-164:8.

This flawed analysis was underscored by Kronenberger's methods related to coding comments and mentions, which also led to overinclusive and thus unreliable results. Kronenberger explained that embedded within Talkwalker is a "sentiment tool" which uses artificial intelligence to code comments and mentions as positive, negative or neutral. *Id.* at 96:8-12; 103:21-23. Yet, Kronenberger admits that he does not trust the sentiment tool entirely, so he does a "visual sampling" of the comments and mentions. *Id.* at 96:14-19. For example, out of the 68,500 mentions, he sampled 6,000 (which is only 8.8%). *Id.* at 101:3-7. However, it appears that the *sole* purpose of the sampling was to ensure that the sentiment tool was picking up comments or mentions that included the terms within in his Boolean search queries. *Id.* at 100:25-101:2; 103:12-18. The purpose of the sampling was *not* to ensure that the sentiment tool was *properly coding* comments or mentions as positive, negative or neutral.

In fact, as his testimony revealed, Kronenberger's visual sampling did not make his coding method reliable. As Kronenberger admits, the sentiment tool does not have any way of determining whether the commenter or mentioner had a negative sentiment toward Miller prior to the Article. *Id.* at 104:18-24. Thus, Talkwalker identified comments and mentions of persons whose negative perceptions of Miller were *entirely unaffected* by the Article, and Kronenberger did not filter out these comments and mentions through his visual sampling. In other words, Kronenberger had no evidence that the comments reflected a *change* based on the Article. Nevertheless, Kronenberger considered them in his analysis and *simply assumed* that they were representative of a changed opinion.

In addition, not only does Talkwalker fail to filter out already-negative perceptions unchanged by the Article, but is also fails to filter out negative perceptions caused by the unchallenged parts of the Article about Miller, such as that he worked for the Trump campaign or had an affair with Delgado, getting her pregnant while his wife was also pregnant. Just as Kronenberger failed to identify perception *changes* resulting from the Article, he failed to consider whether, if someone's perception changed, it had anything to do with the unchallenged facts contained in the Article. The sentiment tool also did not have that capability, and Kronenberger did nothing to consider and control this variable in his analysis.

Instead, Kronenberger's theory was "if the content itself puts Jason Miller in a negative light, then it is considered negative." *Id.* at 46:8-13. This would include content that "comment[ed] on his physical appearance" or "his political affiliation." *Id.* at 47:25-48:9;

220:23-221:19. Indeed, one of the comments cited in the Report was, "I love when arrogant assholes go down. Especially if there [sic] conservative!" Report at 17. As mentioned, it is impossible to tell whether this commenter's perception of Miller changed at all. But it is equally impossible to conclude that, *if* this person thought any less of Miller following the publication of the Article, it was *because of* the challenged portion of the Article (rather than the reported fact that Miller is conservative). Nevertheless, this person and his or her comment was meaningful enough to Kronenberger to be included in his Report. That is because Kronenberger *simply assumed* that (1) this person did not already have a negative perception of Miller before the Article, and (2) this person's post-Article negative perception of Miller is directly related to the challenged portions of the Article and not to the undisputed facts concerning Miller's political affiliation, among other things.[11]

In sum, Kronenberger essentially opined that it would cost $63,372,471.65 to change negative perceptions of Miller, even if those negative perceptions (1) *were not caused by the Article itself,* (2) *were not caused by the challenged portion of the Article,* or (3) *have nothing to do with the Article whatsoever*. To return to the property damage analogy, this is akin to the mechanic demanding $5,000 to repair the back bumper and to replace the flat rear tire, even though the tire may have already been flat before the accident, simply because the tire is in the general vicinity of the alleged damage caused by the accident. To come to this conclusion requires one of two things: (1) speculation or assumption, or (2) a great leap in logic, neither of which are permissible under *Daubert*.

Regardless of which one underpins Kronenberger's methodology, it renders the ultimate opinion inadmissible. Speculation is not allowed. Because Kronenberger failed to determine whether any individual's negative reaction occuring after the publication of the Article was

---

[11] As to engagements – which are separate and distinct from comments or mentions – Kronenberger did not even code any of the engagements because he claims that "[t]here is nothing to read." *Id.* at 118:18-119:19. Defendants understand that, if someone is merely sharing the Article without additional commentary, there is no content from which sentiment can be determined. However, what is less clear is the basis for assuming that each of the 375,577 engagements was made by someone with a negative perception of Miller or, more particularly, someone who thought less of Miller because of the Article. This assumption is problematic because Kronenberger uses the 375,577 engagements to calculate the negative social media mentions cost of $7,012,042.

actually *caused* by the Article (and more specifically the alleged defamatory portion thereof), Kronenberger did not consider sufficient facts and data in his analysis. In turn, he resorted to *simply assuming* the actual cause of the negative reactions, which he did to Defendants' detriment. This is not permissible. The *Daubert* standard requires trial courts to "ensure that the testimony is *properly grounded*, *well reasoned*, and *not speculative* before it can be admitted at trial." Fed. R. Evid. 702 Advisory Committee's Note (2000 amends.) (emphasis added).

At the same time, Kronenberger's analysis also rested on a significant leap in logic, which is also impermissible. "The reliability inquiry requires the court to independently analyze each step in the logic leading to the expert's conclusions; if the court determines that any step in the expert's chain of logic is unreliable, his entire opinion must be excluded." *Kilpatrick v. Breg, Inc.*, Case No. 08-10052-CIV, 2009 U.S. Dist. LEXIS 76128, at *8-9 (S.D. Fla. June 26, 2009) (citing *McClain v. Metabolife Int'l Inc.*, 401 F. 3d 1233, 1245 (11th Cir. 2005)). While it is common for experts to extrapolate from existing data, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *GE v. Joiner*, 522 U.S. 136, 146 (1997).

The absence of any information regarding the *cause* of each individual negative reaction constitutes an unreliable step in the chain of logic and produces too great of an analytical gap in the methodology. It also renders the ultimate cost opinion unhelpful to the jury because it is inherently overinclusive, and there is "no way" to limit it to reflect the appropriate subset of people whose perceptions of Miller changed in a negative way as a result of the allegedly defamatory portion of the Article. If this opinion is admitted, it would leave the jury to speculate as to what portion or percentage of the $63 million is needed to repair the damage that was actually caused by the Article (if any), and they would have no basis or foundation to even attempt to begin that speculative process. For these reasons, Kronenberger's opinion that it will cost $63,372,471.65 to begin to repair and rebuild Miller's reputation should be excluded.

The law dictates exclusion. Consider this District's opinion in *Affiliati Network, Inc. v. Wanamaker*, 2017 U.S. Dist. LEXIS 217403 (S.D. Fla. Aug. 14, 2017), which involved a similar *Daubert* challenge to a reputational damages expert. In that case, the defendant/counterplaintiff, Fitcrew, USA, Inc. ("Fitcrew"), alleged that the plaintiff/counterdefendant, The Affiliati Network, Inc. ("Affiliati"), damaged Fitcrew's reputation by removing its Terms of Sale from its initial landing page. *Id.* at *22. Fitcrew retained Jonathan Hochman to opine as to the cause and

extent of Fitcrew's reputational damages. To reach his opinions, Hochman reviewed the Better Business Bureau's website, as well as a website called "#REPORTSCAM." *Id.* at *24. Together, these websites included 23 complaints about Fitcrew, at least 20 of which "were posted during the same time period that [Affiliati] and its affiliates adverstised [Fitcrew's] product." *Id.* Hochman opined that, as a result of these complaints, Fitcrew's Better Business Bureau rating decreased. *Id.*

Affiliati moved to exclude Hochman's opinions on several grounds, arguing that Hochman did not "account for complaints that pre-date[d] [Affiliati's] involvement" and did not "explain why" he concluded that Affiliati damaged Fitcrew's reputation. *Id.* at *24-25. The Court rejected the expert testimony, finding that "Hochman *simply assume[d]* that *any* complaints lodged during the time period of AFI's marketing campaign were the result of AFI's marketing scheme." *Id.* (emphasis added). Because they were based on this assumption, "Hochman's expert opinions [were] *complete speculation*, which is *wholly unreliable* and, as such, *inadmissible* under *Daubert*." *Id.* (citing *McClain*, 401 F. 3d at 1250) (emphasis added). Accordingly, the Court did not consider Hochman's opinions upon summary judgment and precluded Fitcrew from offering expert testimony at trial. *Id.* at *33.[12]

Kronenberger's methodology suffers from the same defects that the Court found to mandate exclusion in *Affiliati*. Kronenberger "*simply assumed*" that *any* negative reaction occurring after the publication of the Article was the *result* of the publication of the Article (and, more specifically, the allegedly defamatory information in the Article). Because Kronenberger's opinions were based on this *simple assumption*, Kronenberger's "expert opinions are *complete*

---

[12] This Court also agreed with Affiliati on another ground, stating that "Hochman fail[ed] to proffer any information whatsoever to indicate that the . . . websites constitute reliable sources." *Id.* at *26. "In other words, Hochman relie[d] entirely on anecdotal complaints by anonymous sources, *without verifying, or attempting to verify, the authenticity of any of the ratings or reviews.*" *Id.* (citing *McClain*, 401 F. 3d at 1250; *Grupo Televisa, S.A.*, 2005 U.S. Dist. LEXIS 45883, at *5) (emphasis added). The same blind reliance occurred here. Kronenberger conceded that "[he], obviously, cannot survey every single person that saw [the Article]," – *i.e.*, he did not authenticate a single one of them. *Id.* at 160:1-4. As such, he has failed to "proffer any information whatsoever to indicate" that the comments, mentions or engagements "constitute reliable sources." *Id.* This was a fatal flaw in Hochman's methodology, and it is likewise a fatal flaw here.

*speculation*, which is *wholly unreliable* and, as such, *inadmissible* under *Daubert*." *Id.* at *26. For these reasons, this Court should find that Kronenberger's opinions are inadmissible under *Daubert*, and preclude Miller from offering any expert opinion at trial in this matter.

### d. Kronenberger Improperly Applied a Multiplier of Five

To reach his extraordinary $63 million in damages, Kronenberger applied an arbitrary multiplier of five that is based on nothing more than unsupported assumptions. Specifically, Kronenberger calculated the negative news media cost of $5,220,336, the negative social media mentions cost of $7,012,042 and the negative search engine cost of $73,192.73, the sum total of which is $12,305,570.73, and then opined that this sum must be multiplied by a factor of five. Report at 22.

Kronenberger opined that a multiplier of five is necessary in order to ensure that he reaches the audience enough times to change their perceptions of Miller (again, assuming that the Article changed the audience's perception of Miller in the first place). The purported theory behind this opinion is that, "in advertising, the effective frequency is the number of times a person must be exposed to advertisement message before a response is made and before consideration takes place." *Id.* However, this theory is specifically based on and applies to *advertising*.

While advertising is one of the components of Kronenberger's strategy to change people's perception, the strategy also includes a separate component designed to get people to *act* or *engage* with "new content" about Miller[13] – *i.e.*, the negative social media mentions cost. The purpose of the negative social media mentions component is to counteract the claimed 375,377 engagements about the Article with the same number of engagements about the new content about Miller. Dep. at 258:19-22. The calculation for the negative social media mentions cost is 375,377 (number of engagements about Article) × $18.68 (cost-per-action). Report at 20. Thus, under any concept of logic, the product of this calculation, $7,012,042, represents what it would cost to obtain 375,377 engagements about the new content.

But Kronenberger did not stop there. He then multiplied this product by five. By applying this multiplier, Kronenberger is effectively saying that he actually needs to pay for 1,876,885 engagements in order to ensure that the 375,377 engagements about the Article are counteracted.

---

[13] This new content does not yet exist. It is entirely theoretical at this time and also entirely dependent upon an apology or retraction from Defendants. Dep. at 178:4-181:5.

Indeed, at deposition, he agreed that, for every one person who engaged with the Article, he needs five people to engage with the new content. Dep. at 253:1-4. This approach is not consistent with his previous statement that the dollars needed to attempt to repair Miller's reputation are intended to reach only those people who read or engaged with the Article. Now, in this particular instance, he wants five times that number of people.[14]

At bottom, Kronenberger offered nothing to support the notion that paying for advertising and paying for engagements are the same thing, or to support his application of the multiplier of five to the negative social media mentions cost. Indeed, Kronenberger admitted that there has been no research about the number of engagements in new content required in order to counteract engagements in old content. Id. at 259:16-23; 258:12-17. Altogether, this testimony amounts to a concession that Kronenberger's opinion is completely arbitrary and speculative. Accordingly, this component of his methodology is unreliable, and Kronenberger should not be permitted to apply this multiplier to the negative social media mentions cost.

## CONCLUSION

Based on the foregoing, Defendants request that this Court grant this motion and exclude the expert testimony and opinions of Craig Kronenberger because they are based on speculation, assumption, insufficient facts and data and unreliable methodology. In addition, they would not be helpful and would actually confuse and mislead the jury in their determination of the cause and extent of Miller's reputational damages (if any).

---

[14] Of course, the original negative social media mentions cost of $7,012,042 was already inherently flawed. *See* Part II.c., *supra*. Now, Kronenberger is multiplying it by a factor of five that may apply to *advertising* but not necessarily to *engagements*.

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3), the undersigned counsel certifies that counsel for Defendants conferred with counsel for Plaintiff regarding the relief requested herein, and that Plaintiff opposes the relief requested herein.

Respectfully submitted,

| | |
|---|---|
| **Deanna K. Shullman** | **Elizabeth A. McNamara** |
| Deanna K. Shullman | Elizabeth A. McNamara (admitted *pro hac vice*) |
| dshullman@shullmanfugate.com | Katherine M. Bolger (admitted *pro hac vice*) |
| Florida Bar No. 514462 | Claire K. Leonard (admitted *pro hac vice*) |
| Rachel Fugate | DAVIS WRIGHT TREMAINE |
| rfugate@shullmanfugate.com | 1251 Avenue of the Americas, 21st Floor |
| Florida Bar. No. 144029 | New York, New York 10020 |
| Kendall Pfeifer | Telephone: (212) 489-8230 |
| kpfeifer@shullmanfugate.com | lizmcnamara@dwt.com |
| Florida Bar No. 105445 | katebolger@dwt.com |
| Shullman Fugate PLLC | claireleonard@dwt.com |
| 2101 Vista Parkway, Suite 4006 | |
| West Palm Beach, FL 33411 | |
| Phone: 561-429-3619 | |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of June, 2019, a true and correct copy of the foregoing has been served by CM/ECF on all counsel or parties of record on the service list.

**Deanna K. Shullman**
Deanna K. Shullman
Florida Bar No. 514462

## SERVICE LIST

Kenneth G. Turkel, Esq.
Shane B. Vogt, Esq.
Bajo Cuva Cohen Turkel
100 N. Tampa Street, Ste. 1900
Tampa, FL 33602
Phone: 813-443-2193
kturkel@bajocuva.com
shane.vogt@bajocuva.com
*Attorneys for Plaintiff*

*Jason Miller*

*v.*

*Gizmodo Media Group, LLC*

### EXPERT REPORT OF CRAIG KRONENBERGER

---

Prepared for

Shane B. Vogt & Kenneth G. Turkel
Bajo Cuva Cohen Turkel, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602

Submitted By



Stripe Reputation, Inc.
1190 North Highland Ave
Atlanta, GA 31106

**April 18, 2019**

# I.     INTRODUCTION

## A.     The Assignment

Bajo Cuva Cohen Turkel, P.A. retained Stripe Reputation, Inc. to provide expert services on behalf of Jason Miller ("Miller") in connection with claims seeking monetary damages against Gizmodo Media Group, LLC ("Gizmodo") and Katherine Krueger ("Krueger") in the case styled *Jason Miller v. Gizmodo Media Group, LLC, et al,* United States District Court for the Southern District of Florida, Case No. 1:18-cv-24227-CMA (the "Lawsuit").  Specifically, we have been asked to provide an opinion regarding the harm caused to Miller's reputation by a defamatory article posted on *Splinternews.com* on September 21, 2018 entitled *"Court Docs Allege Ex-Trump Staffer Drugged Woman He Got Pregnant With 'Abortion Pill'"* (the "Article") and the cost of repairing or mitigating the harm the Article caused to Miller's reputation.

This report is submitted as of April 18, 2019 ("Report Date").  The findings herein reflect our analysis of the information provided to us and our independent research as of the Report Date.  We reserve the right to amend, expand, and/or supplement this report should additional information or data be made available.

This report was prepared primarily by Craig Kronenberger, with the assistance of individuals employed by Stripe Reputation acting under his supervision.

## B.     Qualifications of the Expert

Craig Kronenberger is the President of Stripe Reputation, a leading consultancy for online reputation management.   Craig focuses primarily on promotion and protection of reputations for brands, organizations, executives and individuals.  A copy of Craig's CV is produced contemporaneously with this report.

Prior to Stripe Reputation, Craig was Global Managing Director of Strategic Growth at Edelman, the world's largest public relations firm, with more than 5,000 employees in 65 cities and affiliates in more than 35 cities.  At Edelman, Craig was responsible for leading global teams in the areas of Search Engine Management, Digital Crisis and Risk, Paid Media, Research and Insights.

Prior to Edelman Craig held managing positions with iCrossing and Digitas-Modem Media where he led search engine management strategy for brands such as Delta Airlines, Home Depot, Sony, Coca-Cola, CNN and Marriott.  At Digitas-Modem

Media, Craig was named Global Practice Lead for Search Marketing, where he was instrumental in building search practices in Europe and Asia.  Craig's digital marketing experience also includes search marketing strategy and global governance for Hewlett Packard, Coca-Cola, Unilever, Kraft and General Motors.

Stripe Reputation offers digital marketing and reputation management strategies and services. Offerings span digital measurement and analytics, paid media management, crisis and issues management, new media analysis and monitoring, and search engine optimization, among other services.

## II.     SUMMARY OF OPINIONS

After reviewing the information and documents provided[1] and performing independent research and analysis, and based on my and Stripe Reputation's professional background, knowledge, training, education, and experience in reputation management and digital media, we conclude that the publication, re-publication, and distribution of the Article across news outlets and social media caused significant negative impact on the reputation of Miller. This impact is evidenced by an analysis of the reach and traction of the Article (outlined below), and through Miller's loss of employment with CNN within 24 hours of the publication.

The damage to Miller's reputation is a consequence of the nature of the accusations about Miller in the Article and the Article's wide reach. According to "CONFIDENTIAL" documents provided by Gizmodo, the Article received 254,945 (and counting) unique page views.  The Article remained the top story on *Splinter* for at least three days following its publication and in the top five stories for many additional days. There was also significant engagement generated on the Article, including 345.6K reactions, 348 comments and 10 shares (see Appendix I).

To put the impact of this Article in context, it generated approximately 96% of the total engagements related to Jason Miller in the past year.

The negative impact of the Article was enhanced through targeted efforts by Gizmodo and Krueger to increase the reach of the story through republication by high-authority outlets. These efforts caused the story to be picked up by *The Cut, Raw Story, Bustle, Newsweek, Deadline, The Inquirer, Cosmopolitan, The Daily Beast, Politico, The Wrap, The Washington Post, Hollywood Reporter, Refinery29, Variety, New York Post, HuffPost, The Hill, The Independent, Talking Points Memo, TVNewser, and Mediaite,* among many others.

According to *AHRrefs,* a search and digital analytics tool, there are at least 201 referring domains to the Article, which means that there are at least 201 websites that contain a link to the Article.

---

[1] In connection with this assignment, the following documents were provided and reviewed: Miller's First Amended Complaint; Gizmodo and Krueger's Supplemental Responses to Miller's First Set of Interrogatories; Gizmodo's Second Supplemental Response to Miller's First Set of Interrogatories; Krueger 000001-000064; and Gizmodo 000001-000549.

As this increased media pick-up occurred, the Article gained "authority" (became viewed as a trusted source by internet search engines), and its reach and resonance grew as more people searched for, found and shared the Article through social media platforms.  The result is that the defamatory statements about Miller in the Article spread far beyond the original posting.  The defamatory content gained substantial authority as it was disseminated, which compounded the damage to Miller's reputation.

Although the Article received 254,945 unique page views on *Splinter*, once it was picked up by other media outlets and shared via social media, the potential audience exposed to the Article grew to 1.9 trillion. This substantial potential reach is the result of Miller being referenced in specific relation to the Article in at least 68.5K social media mentions across online channels. These 68.5K mentions generated more than 358.2K engagements (meaning there were at least 358.2K instances in which individuals shared, commented on, or liked the content), which illustrates the direct engagement with the defamatory statements about Miller by those who saw them and underscores the harm caused to Miller's reputation.

Miller's reputation can never be fully repaired and the harm the Article caused can never be fully reversed.  However, we conclude within a reasonable degree of certainty in our field that the cost of the reasonable and necessary efforts to begin to repair Miller's reputation and correct the defamatory narrative disseminated about him are $63,372,471.65.

The estimate of what it will cost to attempt to repair Jason Miller's reputation includes:  1) the fees to repair and rebuild Jason Miller's reputation online and offline; and 2) the advertising dollars needed to change the perception of those who were exposed to and engaged with the negative content. It must be emphasized, however, that it is impossible to fully restore Miller's reputation.

We reserve the right to revisit this analysis and amend these conclusions should additional information and/or documents become available for review.  We further reserve the right to respond to opinions and issues raised by any opposing experts. Finally, we reserve the right to use demonstratives and/or other exhibits to present the opinions expressed in this report and/or any supplemental, amended, and/or rebuttal reports.

### III.    BASIS OF OPINIONS

####    A.    The Parties

Miller is a communications strategist and political manager who in 2016, while a partner at political consulting firm Jamestown Associates, served as Senior Communications Advisor on President Donald Trump's 2016 campaign.  After the election, while still a partner at Jamestown Associates, he served as Communications Director on President Trump's transition team.  In late 2016, Miller was slated to be President Trump's White House Communications Director but declined the position after Arlene Delgado, with whom Miller had an affair, prompted press coverage of their relationship and resulting pregnancy.  Miller currently works for Teneo Strategy, a company that advises Fortune 500 CEOs on crisis communications, corporate communications, and media relations.  In March 2017, Miller started working as a Political Commentator for CNN, and often appeared on national television advocating for and defending the Trump Administration.  Given his line of work, Miller's livelihood depends on his reputation and public image.

Gizmodo is a Delaware limited liability company with its principal place of business and headquarters in New York, New York.  Gizmodo is registered to do business in Florida as a single-member limited liability company, whose sole member is Univision Interactive Media, Inc. d/b/a "Fusion Media Group" ("Fusion").  Fusion is a Delaware corporation with its principal place of business and headquarters in New York, New York.  Fusion operates a network of national and local online and mobile websites, including *Splinter*.  Krueger is the Managing Editor of *Splinter.*

####    B.    Overview of the Case

On September 21, 2018 at 8:01 p.m., Krueger and Gizmodo posted the story "*Court Docs Allege Ex-Trump Staffer Drugged Woman He Got Pregnant With "Abortion Pill"*"[2] (the "Article"), which discussed and included a link to view Arlene Delgado's Supplement to Mother's March 2018 Motion for Court to Consider Psychological Evaluation of the Father (the "Supplement").   The Article and image of the Supplement exposed scandalous, false, and defamatory accusations against Miller;

---

[2]  https://splinternews.com/court-docs-allege-ex-trump-staffer-drugged-woman-he-got-1829233105

including accusing Miller of having an affair with, impregnating, attempting to murder, and killing the unborn child of one woman ("Jane Doe") by slipping her an "abortion pill;" as well as beating another unidentified woman; and then trying to cover up these crimes.

Before the Defamatory Article was published, Gizmodo was already working with a third-party public relations firm, The Lead PR, for assistance to "push out" the story about Miller.  In an e-mail sent at 7:25 p.m. on September 21, 2018, Gizmodo Editorial Director Susie Banikarim asked The Lead PR for help to "push out" the Miller story, while noting, "We have a court filing that lays out some pretty serious allegations against Jason Miller a high-profile Trump advocate and CNN contributor…"  At the same time, Gizmodo was internally planning to push the Defamatory Article on social media, through its employees' accounts and on its own Twitter and Facebook accounts, including on *Splinter's*, *Jezebel's*, *Gizmodo's*, and *Deadspin's* accounts.

On September 21, 2018, at 9:13 p.m., Miller demanded Krueger and *Splinter* pull the Article.  Shortly after Miller's retraction demand, at 9:30 p.m. on September 21, 2018, Krueger e-mailed Allison Gollust at CNN a link to the Article and asked whether in light of the "stunning allegations against Jason Miller… CNN will keep working with Miller?"  Krueger also tweeted the Article to her followers as her "Friday Night Scoop;" where it was retweeted and negatively commented on by readers, including comments tagging CNN and asking for Miller to be fired, referring to him as a criminal, and calling for him to be prosecuted.

Facing a public backlash over the Defamatory Article, Miller posted a statement trying to defend himself and denying the false accusations in the Article. Shortly thereafter, because of CNN's understandable concern over public perception of the situation, Miller and CNN agreed to terminate Miller's contract. After that happened, Krueger again took to Twitter to comment that her reporting led to Miller's departure from CNN; in response to which a new round of comments and tweets attacking Miller erupted.

Once the Article was published on *Splinter*, Krueger and Gizmodo launched their campaign.  Gizmodo immediately began posting the Article on its social media accounts and asking its staffers to do the same.   At 8:20 p.m. on September 21, 2018, Susie Banikarim e-mailed a link to and summary of the Article to *The Drudge Report*.  Shortly thereafter, Banikarim also e-mailed a link of the Article to The Lead PR, which immediately "push[ed] this to political and media reporters now."  As a

7

result, the Article was picked up the following day by several news outlets, such as *Newsweek*, *Raw Story*, and *Bustle*.   Over that weekend, pickup of the Article continued.   By Monday, September 24, 2018, the Article was picked up by numerous additional publications, such as *Cosmopolitan*, *The Daily Beast*, *Politico*, *The Washington Post*, *Hollywood Reporter*, *Variety*, *New York Post*, *Huffington Post*, *The Hill*, and *Talking Points Memo*.

Gizmodo was also concerned about maximizing search engine optimization (SEO) on the story and that *Splinter* wasn't featured as the top hit on Google. Gizmodo sought out to improve its SEO performance by changing the SEO headline to include phrases like "abortion pill" and "mistress" because of the way people searched for the story about Miller.  They also linked other stories about Miller to the Article.

### C.      Gizmodo Defendants' Promotion of the Article

News stories are often organically picked up by other news outlets over time.  Here, Gizmodo Defendants directly and through a public relations firm actively promoted the Article online, on social media, and through direct contact with political and media outlets.

On the evening the story was published, Krueger sent an email to Allison Gollust, Executive VP and Chief Marketing Officer for CNN Worldwide, stating:

> *Hi Allison –*
>
> *Katherine from Splinter here. Earlier this evening I reported on some pretty stunning allegations against Jason Miller in court documents filed by AJ Delgado.*
>
> *In light of those allegations I wanted to reach out to ask about CNN's continuing relationship with Miller, who lists himself as a commentator with the network in his Twitter bio. Will CNN keep working with Miller?*
>
> *Thanks for your time – hope to hear from you soon.*
>
> *Best,*
>
> *Katherine*

Ahead of the Article being published, Susie Banikarim, editorial director at Gizmodo, asked for additional support in getting the Article pushed and distributed.

Gizmodo pushed the Article on its own and through the employment of an external public relations (PR) consultant. Gizmodo leveraged the outside PR firm, The Lead PR, LLC, to support the additional distribution of the Article.  The Lead PR team was focused on amplifying the reach of the Article through "push[ing] this to political and media reporters now."

In addition to leveraging PR tactics to increase the Article's traction, Gizmodo featured and promoted the Article on its websites and their social media accounts. On September 21, 2018, Jon Eismen, head of social media at Gizmodo Group, and Caitlin Schneider, social media editor, were asked to share the article across all of Gizmodo Group's media properties including *Jezebel, Splinter, Deadspin, and Gizmodo*.  Eisman confirmed he posted the Article across all owned social channels. Eismen also enlisted Gizmodo staffers to promote the Article on their own social media accounts, stating, "If anyone is around and can spare some retweets @here."  Gizmodo's social media team was also asked to use the "breaking news" feature on *Facebook* to ensure the Article received priority in the news feed.

Given data-usage and sharing restrictions regarding *Facebook*, data on *Facebook* traction must be manually pulled and only measures public pages and posts. As such, there is no way to fully determine the volume of sharing and conversation around the Article on private pages.

On public *Facebook* channels, there were at least 24 related stories about Miller concerning the defamatory accusations made in the Article. Some of these stories generated significant traction. For example, a story by *Newsweek* was shared at least 12,600 times via *Facebook*, and the *Daily Beast's* story was shared 1,749 times.

There was also significant sharing of the Article on *Twitter*. To analyze the *Twitter* activity, we employed *TalkWalker*, a digital monitoring and listening tool, to determine overall traction. On *Twitter*, there were approximately 55,500 mentions that include the words "Jason Miller AND Abortion." Of these, 52,500 mentions occurred between September 21 and September 25, 2018.

### D.    Search Engine Optimization ("SEO")

Gizmodo also worked to ensure the Article ranked high in internet search results while also ensuring Miller would be associated with the most damaging and negative keywords in the Article. On September 24, 2018, "Cherilyn," an outside

9

SEO consultant, was contacted by Caitlin Vincel, Director of Editorial Product at Fusion Media Group, with the goal of increasing the SEO exposure of the Article. In their messages, Cherilyn provided multiple SEO recommendations including:

- Using keywords to increase exposure around Jason Miller's name
  - ➢ "the way people are searching for it – "abortion pill" and "mistress" - two keywords I would make sure are in the SEO headline"[3]
- Increasing high-authority inbound links coming into the article
  - ➢ "Make sure your other stories around this topic are linking to this story and if you can, add in some links to this story"
  - ➢ "You did it right by including his name in the SEO"

The success of these efforts later became the subject of internal discussion and achievement as illustrated by the comment: "@joneiseman its funny because splinter is a breakout term[4] in trends around Jason Miller 'topic.'"

Overall, the reach data shows the Article ranks for at least 332 keywords; meaning there are 332 keywords that when searched will drive readers to the Article. The Article also ranks within the top 15 results for the following keywords and phrases:

- Jason Miller
- Jason Miller Trump
- Jason Miller Strip Club
- Jason Miller Girlfriend
- Jason Miller Abortion
- Jason Miller Abortion Pill
- Jason Miller Wife

---

[3] An "SEO headline" refers to the keywords in a piece of content's title that signal to search engines what the content is about and the most important words in the content.

[4] A "breakout term" is a search term that has grown by more than 5,000%, according to Google Trends.

- Jason Miller Baby Daddy

- Jason Miller News

- Jason Miller Affair

**E.     Overview of Article Exposure**

- Total mentions across digital channels: 68.5K

- Total engagements across digital channels: 358.2K

- Potential reach across digital channels: 1.9T

- Total pageviews of initial article: 254.9K

- Total links from other sites to the *Splinter* article: 3.12K

- Percentage of positive article comments: 1%

- Percentage of negative comments: 79%

## IV.    Digital Reputation

According to the [2019 Edelman Trust Barometer](#), traditional media and search engines are tied as the most trusted sources of information about a person or brand (65%). Trust in online news media is also fairly high at 55%. With these channels being the top three most trusted sources of information, one can begin to appreciate the impact of digital media and search results on reputation.

Gizmodo pushed the Article throughout digital channels and proactively pitched it to traditional and online media outlets. As a result, the defamatory content about Miller was widely republished and its authority and relevance increased. This pick-up resulted in stories based on the Article appearing in the first page of Miller's *Google* search results, and thus negatively impacted Miller's reputation on the channels that people most often use to seek truthful information.



Additionally, due to the vast media pick-up and circulation of the content of the Article, the defamatory accusations were added to Miller's *Wikipedia* page with citation to the *Splinter* Article. *Wikipedia* is one of the most popular sites on the internet and almost always ranks on the first page of search results.



Our analysis shows the Article had a far greater impact on Miller's reputation than any other topic in the past year. The below graph represents all digital and social media mentions related to Miller from March 2018 to March 2019. Conversation related to Miller was historically low but saw a massive spike on the date of the Article's publication. Of the 73.8K mentions about Jason Miller in the past year, 92.8 percent (or 68.5K) included the keywords "Jason Miller + Abortion" and derived from the Article.



The negative impact on Miller's reputation is further depicted in the below word cloud. This graphic visually represents the keywords most commonly associated with a topic. The larger the word, the stronger the association. The following shows terms such as "abortion", "pregnant", "stripper", "smoothie", "sexual", "secretly", "drugged", "impregnated", and "arrested" have become deeply connected with Miller's name.



As the distribution of the Article and its defamatory content increased, Miller became directly associated with several hashtags including #FamilyValues, #Abortion, #WarOnWomen, #SexualPredators, #GOPRapeCulture, #psychopath, #GOPRapists, #MeToo, and #FeloniousPoison; which further deepened the negative reputational impact on Miller in the context of large social campaigns and movements.



Of all the comments posted in response to the Article and other stories it generated, only one percent were positive. The vast majority of the comments were negative (79 percent) or neutral (20 percent).

We researched the demographics of those who engaged with this content and found that a top interest of the people who engaged were "family and parenting." Also, many people who engaged with the content are professionals.   This demographic typically includes a cross-section of the television news audience, as confirmed by comments mentioning Miller's job at CNN, which underscores reputational damage given Jason Miller's work as a political commentator on a major broadcast news outlet.



As part of our analysis, we also reviewed specific comments made about the Article and other stories it generated. Overall, the comments show a negative impact on Miller's reputation, including expressions of disgust, hatred, and anger. A small sample of these comments includes:

- "If that story about slipping an abortion pill is true, that's scary and wrong on so many levels. The one that sticks with me is that the "abortion pill" (I assume they're talking about "plan B") is supposed to be taken no more than 72 hours after unprotected sex. It is NOT supposed to be used to terminate an existing pregnancy. Dosing a pregnant woman with steroid to induce miscarriage is extremely dangerous for the woman, fatal for the baby, and most importantly, as bad or worse than rape in the context of taking away a woman's right to choose what to do with her own body. I don't know what the law says, but from a moral perspective, that should be a crime with heavy jail time."

- "This monster is finished. His legacy is forever tarnished. He deserves it. Now get the rest of them Karma and show no mercy!"

- "No lie—I think of him as a long-lost Gorka spawn. Level of cravenness is about equal. Although level of revulsion for almost killing a woman because he couldn't fucking handle a pregnancy—Christ on an ass."

16

- "Looked a bit into Teneo Strategy, where this ambulatory pork chop got a job — one assumes having passed some sort of interview and background check. Founded by Declan Kenny and Doug Band, both dear friends of and advisors to ... Hillary and Bill Clinton. Teneo apparently had Huma Abedin on as a paid consultant thanks to a State Dept waiver, which upset Chuck Grassley, who seems an otherwise blithe fellow.. Tony Blair also served as advisor. Make of all that what you will."

- "Oh, and CNN, WTF are you doing having shit like this on your shows? For god's sake do a little background work before you let another one of these nut cases (/all of them) on television."

- "He deserves to have his smoothie dosed with rat poison, because he is vermin."

- "I love when arrogant assholes go down. Especially if there conservative!"

## V.      Reputational Damages

Simply put, we will never be able to reach every person who read the Article and other stories it generated, saw posts about the Article on social media, and came across this material by searching Miller's name on Google or other search engines. We can, however, take the steps set forth below to attempt to restore Miller's reputation.

To restore reputation, we develop and manage a digital campaign that would change the negative reputational impact caused by the Article, with the intent of changing the negative opinion it created.  This campaign includes four categories:  1.)  negative news media articles; 2.) negative search engine results; 3.) negative social media engagements; and 4.) the frequency or amount of times we need to put an ad in front of someone to repair Jason Miller's reputation.

To address these categories, we arrive at the amount of professional fees and paid advertising dollars necessary to reach the Article's audiences and change the perception it created.  We create a media plan that is designed to reach the Article's audiences in similar channels, where we target a specified amount of advertising impressions and frequency in order to change the negative perceptions it created.

### A.      Fees to Repair and Rebuild Jason Miller's Reputation

To begin repairing and rebuilding Miller's reputation, we must do the following: 1) ask publishers or individuals to take down content that was being published or shared; 2) suppress negative content through the development of new content; 3) develop strategies for Miller  to rebuild his personal and professional reputation; and 4) implement and manage advertising campaigns in channels most likely to reach the audiences impacted by the Article.

We estimate the total amount needed to complete these necessary tasks is $1,844,618 for professional fees, which would include the development of new content and campaigns around Miller's reputation, ongoing management of content in order to build the ranking around it, working with legal support to gather take-down notices, and engaging publishers to remove negative content. Professional Fees would also cover ongoing reporting and monitoring of progress and running a paid media campaign to rebuild Miller's reputation.

### B.      Advertising Dollars to Repair and Rebuild Jason Miller's Reputation

Based on our professional background, knowledge, training, education, and experience, we recommend a paid media spend of $61,527,853.65 with the goal of reaching as many people as possible that were impacted by the negative stories, sharing of the stories on social media, and the rankings of negative content in search engines.  We expect the process of repairing Jason Miller's reputation to take between 12 and 18 months.

### (1)      Negative News Media Articles Cost Calculation

To calculate the advertising dollars necessary to combat the negative content shared about Miller, we used a formula endorsed and used by Cision/Trendkite and many fortune 100 companies around the world.  The formula is the following: Ad Vale Equivalency (AVE) = Readership (Unique Visitors per Month, UVM) x Average Potential Article Readership (2.35%) x Average Ad Cost ($0.08).

The average potential article readership is based on the assumption that not every person that goes to a site in a given month will read a particular article.

Average Ad Cost is based on an average cost per thousand impressions (or CPM) of $8, which we've found is a representative average across different media type and outlet sizes across the Internet. That number is multiplied by 10 to account for the fact that the average ad size is about 10x smaller than the average article in terms of web page real estate. [$8/1000*10 = $0.08]

STEPS TO CALCULATE AVE

- •      Located the Readership value (also known as UVM or Unique Visitors per Month) of the Article located in "Jason Miller Export.xls"

- •      Multiplied the Readership (UVM) of the Article by the Average Potential Article Readership (2.35%)

- •      Took the sum of the previous equation multiplied by the Average Ad Cost ($0.08)

- •      The sum of Steps 1 through 3 is the Ad Equivalency Value of the mention

*The total AVE of the 339 news media mentions is $5,220,336.*

SOURCES:
- *Source:  Cision/Trendkite –Global leader in measurement and monitoring of media. https://www.trendkite.com/ and https://www.cision.com*
- *Source:  Talkwalker - Leading monitoring and listening tool for social media, news and forums..  https://app.talkwalker.com*

### (2)   Negative Social Media Mentions Cost Calculation

We identified over 55,500 mentions on social media and 375,377 engagement across those social channels.  In order to determine the reputational impact we looked at the average cost-per-action (CPA) of $18.68 and applied it to the total engagements across all social posts on social media.

*The total social media engagement times the average CPA is  $7,012,042.*

APPROACH
- Used Talkwalker to capture all mentions around the topic from the launch of the Splinter article to April 16th.
- Calculated the total engagements from social sources including Facebook, Instagram, YouTube, LinkedIn, Pinterest, Google+, Twitter, Forums, Blogs.
- Applied the total to industry benchmark of $18.68.

SOURCES
- *Source:  TalkWalker - Leading monitoring and listening tool for social media, news and forums.  https://app.talkwalker.com*
- *Source:  Industry  - Wordstream 2018 $18.68 across multiple industries is the average CPA = Cost per action or cost per acquisition.*

### (3)   Negative Search Engine Cost Calculation

The negative stories based on the Article result from numerous searches on Google and other search engines, including "Jason Miller", "Jason Miller DC", "Jason Miller Trump", "Jason Miller CNN" and Miller's current employer "Jason Miller, Teneo".  In order to understand the monetary impact of the rankings, we reviewed all negative stories to see if they were ranking for keywords on Google with the goal of understanding how many potential people may have seen the content or clicked on it.  We then determined how much Google would charge to run an ad for each keyword and the estimated amount of traffic it would drive to that

page.  Next, we estimated the amount of time it will take to rebuild Miller's reputation based on running ads for the same amount of time the stories generated by the Article have been visible on Google.  Lastly, we ran similar calculations for other search engines outside of Google, including Bing, Yahoo and Baidu.

The total for search engine impact is $8,134.80 a month.  Applying this amount to a total of eight months (the amount of time the stories have been visible) equates to $65,078.40.  When we add in the percentage from other search engines, the final total is $73,192.73.

APPROACH:
• Captured all URLS tied to the topic.
• Ran URLs through AHREFS to capture the ranking position that target URL holds in the organic search results for a given keyword.
• Eliminated all URLs that did not have keyword rankings.
• Captured all of the keywords and ran through Google Keyword Planner to determine estimated cost per click.  Used $1.50 average cost per click when no recommendation was available.
• In order to take into account other search engines like Bing, Yahoo and Baidu, we used a calculation based on the average global usage of search engines in October of 2018 equaling and additional 7.13%.

SOURCES:
• *Sources:  AHREFS - Leading technology tool in search engine optimization and management.  https://ahrefs.com*
• *Source:  Google  Keyword  Planner  for  average  Cost  Per Click https://ads.google.com/home/tools/keyword-planner/*
• *Source:  Ranking  keyword  estimated  clicks https://ahrefs.com/blog/seo-metrics/#section7*
• *Source:  We reviewed the average cost per click across industries which was sourced at $2.69 but reduced it to $1.50 cost per click since this is for an individual vs an industry.*
• *Source:  Wordstream The average cost per click in AdWords across all industries is $2.69 - Wordstream Google Ad benchmarks, April 10, 2019*
• *Source:  Worldwide Desktop Market Share of Leading Search Engines Globally -  https://www.statista.com/statistics/216573/worldwide-market-share-of-search-engines/*
  o *Google – 90.28%*

- o  *Bing – 3.82%*
- o  *Yahoo – 2.76%*
- o  *Baidu - .55%*

### (4)    Frequency of Advertisement To Ensure A Perception Change

In advertising, the effective frequency is the number of times a person must be exposed to advertisement message before a response is made and before consideration takes place. To ensure we reach and change perception of the audience, we will need to increase frequency of the advertising by five-to-nine times.  This will improve the chance that someone sees the ads, engages, or becomes aware. For purposes of this assignment, we used the lowest frequency of 5X.

*SOURCES:*
*Source – Nielson, How frequency of exposure can maximize the resonance of your digital campaigns.*
*https://www.nielsen.com/au/en/insights/news/2017/how-frequency-of-exposure-can-maximise-the-resonance-of-your-digital-campaigns.html*

### (5)    Summary of Cost Calculations

Based on the frequency of 5x across the three major channels of search ($73,192.73), social ($7,012,042) and new media ($5,220,336), the total Advertising Dollars to repair and rebuild Miller's reputation is 12,305,570.73 x (5X) = $61,527,853.65.

## VI.    CONCLUSION

Jason Miller's reputation was substantially impacted by the Article and Gizmodo's and Krueger's aggressive promotion and distribution of the Article.

While many media outlets work to expand the reach of their content, the enlistment of an outside PR firm, stated focus on associating Jason Miller with the most negative keywords in the Article as part of an SEO strategy, and the promotion of the Article across all Gizmodo news and social channels suggest a focused attempt to harm Miller's reputation and generate brand recognition for Gizmodo and *Splinter*.

The substantial reach and traction of the Article and its negative content requires an advertising campaign sufficient to overcome the widespread negative impact of the Article on Miller's reputation.  The total amount of the fees and costs necessary to begin to rebuild and repair Miller's reputation is $63,372,471.65.


Craig Kronenberger

**Appendix I: Screenshot of the Article's Performance**

# Court Docs Allege Ex-Trump Staffer Drugged Woman He Got Pregnant With 'Abortion Pill' [UPDATED]

Katherine Krueger
9/21/18 8:14pm • Filed to: JASON MILLER ˅

🔥 345.6K   💬 348   🔖 10      f  🐦  ✉  🔗



**Appendix II: Visualization of the Article's reach**



\* DA = Domain Authority or the authority of the website.  PA = Page Authority or the authority of the specific URL or page.

```
 1                UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF FLORIDA

 3                  1:18-CV-24227-CMA-Altonaga

 4

 5    JASON MILLER                        )

 6            Plaintiff,                  )

 7    VS.                                 )

 8    GIZMODO MEDIA GROUP, LLC,           )

 9    A Delaware Corporation,             )

10    KATHERINE KRUEGER, individually,)

11    And WILL MENAKER, individually, )

12            Defendants.                 )

13    _____/

14

15                      DEPOSITION OF

16                      CRAIG KRONENBERGER

17                      Friday, June 7, 2019

18                      9:00 a.m. to 4:30 p.m.

19                      100 Hartsfield Center Parkway

20                      Suite 500

21                      Atlanta, Georgia  30354

22

23

24    Tamika Burnette, RPR, CRR-2870

25
```



1    Q.   How long have you been the CEO of Stripe?

2    A.   Just about three years.

3    Q.   Is that when Stripe --

4    A.   Started.

5    Q.   That was my question.  You started Stripe

6    three years ago?

7    A.   I formally had started five years ago, but I

8    started doing it full-time three years ago.

9    Q.   Okay.  And when was Stripe Reputation

10   Management first hired by Jason Miller?

11   A.   It would have been in the August time frame,

12   which the e-mails have the first communication

13   correspondence that Ken was talking about on them.  So

14   it was prior to the article going out, but it would

15   have been in the August time frame.

16   Q.   August of 2018?

17   A.   Yes.

18   Q.   And what did Mr. Miller hire Stripe to do

19   then?

20   A.   It was -- when we first started talking and

21   we had our conversations, he was trying to address

22   what was going on, mainly with his stuff regarding the

23   family court, and then in addition to what eventually

24   became the article, general conversations around it,

25   filing the end, giving me background on A.J. Delgado,



 1   essentially the monitoring and the data to get an
 2   understanding of what was going on.
 3        Q.   All right.  Break that down a little bit --
 4        A.   Yes.
 5        Q.   -- for those of us who don't understand.
 6        A.   Yes.
 7        Q.   What did you -- you said you looked at the
 8   monitoring of the data, what does that mean?
 9        A.   So what happened is that we used a set of
10   different tools, in this case, Talkwalker, Ahrefs, and
11   Moz, which I'm sure we'll talk about Moz as we go
12   through this process.
13             Talkwalker is intended to go out and pull up
14   any conversation that is online, dealing with whatever
15   the topic is.  So in this case the topic was Jason
16   Miller.  So we were looking at all of the
17   conversations related to Jason Miller; on social
18   media, in the news media, and blogs, different online
19   resources.  And so it takes that data, extracts it so
20   that we can get some type of historical view.  You
21   can't go too far back because the tools do not allow
22   you to do it because the platforms don't give you the
23   data.  And so --
24        Q.   How far -- I'm sorry, to interrupt you.  How
25   far back does Talkwalker go?



1  wasn't necessarily a lot of news media articles being

2  written about it, but you had a lot of people on

3  social media talking about it, complaining and pushing

4  back, on Olive Garden.

5           So in these examples, the volume of people

6  talking about it becomes critical to it.  The other

7  component of it is velocity.  So you're looking at the

8  speed of which a story is picked up, and the

9  trendline, and how much visibility it gets overall.

10     Q.   Was there a lot of visibility between the

11  affair of Ms. Delgado and Mr. Miller?

12     A.   No.

13     Q.   No, it had not been reported on?

14          MR. TURKEL:  Object to form.

15          THE WITNESS:  It's been reported on.

16          MR. TURKEL:  He didn't say it hadn't been

17  reported on.

18          MS. SHULLMAN:  Okay.

19          THE WITNESS:  Yes.

20  BY MS. SHULLMAN:

21     Q.   Okay.  You said it had been reported on?

22     A.    In our point of view of looking at it, one,

23  it died off quickly.  He still had positive content

24  out there on him.  We didn't see a lot of engagement

25  around the conversation on it, and it was there, to be



 1   clear.  It did exist.  It was there.  It was visible.

 2   Obviously, if you searched for his name, it would show

 3   up.  But in looking at how much traction it got, and

 4   the fact that A.J. Delgado was still tweeting about

 5   it, and she wasn't getting any engagement, we felt

 6   like it was not an issue.

 7        Q.   And --

 8        A.   It died, in our terms.

 9        Q.   Right.  And again, though, you don't have any

10   documents or data that could support your findings,

11   because you did not retain any of that stuff?

12        A.   Well, you can -- in the expert witness

13   report, I believe, on that timeline, you can actually

14   see some stuff pop up on it.  But no, I don't.  We

15   would have looked at it at that time and made a

16   decision.

17        Q.   And you didn't do anything prior to the

18   article that came out, you didn't -- you didn't take

19   any steps to repair Mr. Miller's reputation?  You sort

20   of just looked, and I just want to try to summarize

21   your summary.  You looked, and you said there's

22   nothing necessary at this time, was that your

23   conclusion then?

24        A.   Correct.

25             MR. TURKEL:  Object to form.



 1   It's a red flag.  If she sees anything that's junk

 2   commentary, or not applicable or spam, she then sends

 3   the document to me, I go through it, and I go through

 4   my own content tagging process.

 5          So I review what needs to be tagged, and I

 6   determine whether it is negative, positive, or

 7   neutral.

 8      Q.   Okay.  And what other criteria you use to

 9   determine whether a comment is negative, positive, or

10   neutral?

11      A.   If the -- if the content itself puts Jason

12   Miller in a negative light, then it is considered

13   negative.  If it's unclear, it is neutral.  And, of

14   course, if we see something that is positive, then we

15   try to -- you know, there are certain terms or

16   language that may look negative, but really was meant

17   to be positive, so you'll have to read it to make sure

18   you understand that.

19      Q.   And how is it that you reviewing the comment

20   of someone else, can determine whether they meant it

21   to be positive or negative?

22      A.   Well because they're reading -- in this case,

23   whenever someone is commenting, they're essentially

24   engaging, and they're engaging with the article and

25   the topic.



1    Q.   Can you sense sarcasm or other humerus

2    mechanisms?

3    A.   Yes.

4    Q.   And how do you do that?

5    A.   You can tell by people's commentary.

6    Q.   Do you have any special training in

7    linguistics or language arts or anything like that

8    that would help you do that?

9    A.   I have -- keep in mind, when you say

10   "training," there is no formalized training in these

11   toolsets, you know.  The stuff has only been around

12   for, you know, five, six years.  So do I have training

13   in looking at this data from a linguistic perspective,

14   and understanding sentiment context, yes.

15   Q.   And what is that training?

16   A.   It's experience of doing this many, many,

17   many, many times over and over again.

18   Q.   Do you ever speak with the people who have

19   made the comments about their comments on a particular

20   topic?

21   A.   No.

22   Q.   Did you speak with any of the commenters

23   about their comments on the article?

24   A.   No.

25   Q.   When you said you characterized things that



 1  paint Mr. Miller in a negative light as negative --

 2      A.   Yes.

 3      Q.   -- would that include things that comment on

 4  his physical appearance?

 5      A.   Yes.

 6      Q.   What about things that comment on his

 7  political affiliation?

 8      A.   Yes.  If it's a negative -- if it's used in a

 9  negative context, yes.

10      Q.   So --

11      A.   Surfacing, I don't like you because you are a

12  republican, that is considered negative.

13      Q.   Okay.  Or if they referred to him, like, as a

14  Trumpter, or something like that, would interpret that

15  to be a negative connotation?

16      A.   No.  It depends on how it's stated.  If he's

17  a Trumpter, then he's someone that's part of Trump

18  affiliation, that wouldn't be considered negative.  I

19  mean, it's depending on the context of how it's being

20  used.

21      Q.   Okay.  Do you have any way to measure whether

22  someone who comments on his physical appearance, has

23  changed his opinion of Mr. Miller as a result of

24  reading the article?

25      A.   When somebody comments on an article in a



CRAIG KRONENBERGER                                    June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                           65

 1      A.    No.   She talks about the story.   And she's

 2  talking about facts about the story that were talked

 3  about.

 4      Q.    But she's not ready to accept that story as

 5  true, that's what I'm --

 6      A.    No.   Nobody --

 7          MR. TURKEL:   Object to form.

 8          THE WITNESS:   What is the question?

 9  BY MS. SHULLMAN:

10      Q.    Do you know what this commentary --

11  commentator's opinion of Mr. Miller was, prior to the

12  point at which time, he or she read the article?

13      A.    No.   I do not know that.

14      Q.    So do you know then whether her opinion

15  changed as a result of reading the article?

16      A.    If we are looking at comments that she has

17  written on this, we would state that her opinion of

18  Jason Miller is not good, it's negative.

19      Q.    It may be negative, but has it changed?   Do

20  you know when her opinion of Mr. Miller has changed?

21      A.    We don't know what her opinion was prior to

22  this, so we would not know that.

23      Q.    Okay.   And with respect to the rest of the

24  comments that you have picked out here --

25      A.    Yes.



```
 1    look at within the content.
 2        Q.   What is the volume?
 3        A.   The volume is the amount of people in
 4    conversation of the mention -- it is the amount of
 5    mentions, overall, that have occurred around the
 6    topic.
 7        Q.   And how would we determine the amount of
 8    mentions that occurred?
 9        A.   So in this case, using Talkwalker, which is a
10    recognized tool in the industry and has, I believe,
11    over 98 percent accuracy in extracting data from
12    anything that's publicly available, through news
13    media, social media sources, blogs, we extracted as
14    much as we can.
15          The data has to be public.  We, obviously,
16    cannot pull data from Facebook sources that are
17    closed, so it's a private platform and we cannot get
18    that data.
19        Q.   Is Talkwalker a software program or what is
20    it?
21        A.   Yes.
22        Q.   Is it available to the public?
23        A.   Yes.  Anyone can go license and buy it.
24        Q.   Do you know, approximately, what the license
25    fees are for Talkwalker?
```



CRAIG KRONENBERGER                                    June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                          71

 1      A.   It depends on how many -- how long, the
 2   amount of mentions.
 3      Q.   It's pretty expensive, though, right?
 4      A.   I -- it -- it depends.  I don't know what
 5   expensive would mean.  It depends on the context.  If
 6   you're a professional in this world, no, I don't think
 7   it's expensive at all.
 8      Q.   Does Stripe have a subscription with
 9   Talkwalker?
10      A.   Yes.
11      Q.   Do you know how much the subscription cost?
12      A.   Yes.  I know how much our subscription cost.
13      Q.   How much is it?
14      A.   So our subscription, the pricing is based
15   upon the volume of mentions overall.
16      Q.   So it's a project specific sort of thing?
17      A.   No.  It's not project specific.
18      Q.   Okay.
19      A.   So if I give you pricing, I will give you
20   pricing for all the different work that I do across
21   many, many clients.
22      Q.   Got you.
23      A.   It's not priced just for this project.
24      Q.   Okay.  Your business has a Talkwalker
25   subscription that it uses generally --



CRAIG KRONENBERGER                               June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                        72

1    A.   Correct.

2    Q.   -- in its business operation?

3    A.   Yes.

4    Q.   Okay.

5    A.   So for me it would be more expensive because

6  I am using it and I put lots and lots of client work

7  on this tool.

8    Q.   Sure.  So tell me a little bit a little bit

9  in layperson's term what Talkwalker -- I know you said

10  it extracts public data, but what exactly does that

11  mean?

12   A.   So it's going out and it is capturing all of

13  the mentions that you put into the search query.

14   Q.   Okay.  Do you put a -- well, what search

15  queries did you use in this case?

16   A.    In this case it is Boolean, and it is what

17  you're using for the search query itself.  And your

18  goal is to narrow in as much as possible.  So in this

19  case, our search queries we're looking at, abortion,

20  pill, Jason Miller, Jason Miller, hash tags.  And, of

21  course, we looked a at the Splinter News category.  So

22  we looked at it, and we wanted to only look at things

23  that had those associations together.

24        So in other words, if it had Jason Miller's

25  divorce in it, we didn't want to pull that article.



1  If it had Jason Miller, you know, talking about, you

2  know, abortion, but not talking about -- I'm trying to

3  get the context of it.  If it's talking about things

4  that aren't related, specifically, to the article,

5  Boolean is intended to try to narrow it in as precise

6  as possible, so that we don't pick up content that's

7  not related to the issue itself.

8       Q.   So the --

9       A.   Like, Jason Miller and Trump.  Like, if there

10  is some conversation about Jason Miller and Trump

11  going on, we don't want that in the conversation

12  because this is really about this particular story,

13  and that's it.

14       Q.   So the goal then in this part of the process

15  is to obtain mentions, which was the word you used,

16  related to the story?

17       A.   Correct.  Now, in addition to that, we do set

18  up -- we did set up search queries for -- separate of

19  that.  We to have A.J. Delgado conversations that was

20  Jason Miller and A.J. Delgado, as part of that

21  process.  So we did separate that out, as part of it.

22       Q.   And --

23       A.   So in other words, if we wanted to pull all

24  conversations about Jason Miller and A.J. Delgado,

25  regardless of its article, we could have looked at it.



```
 1   conversation.  We want it to be tied to the story,
 2   because it's this story and the context of this story
 3   that is really causing the reputational impact.
 4       Q.   Okay.  So going back to something you just
 5   said, you said you determined there was no
 6   reputational impact of the Delgado story prior to this
 7   article.  Is -- where, in your report, can I find the
 8   methodology or analysis or opinions you reached to
 9   formulate that opinion?
10            MR. TURKEL:  Object to form.
11            THE WITNESS:  This is -- what's in the report
12   is what we put in the report.
13   BY MS. SHULLMAN:
14       Q.   Okay.  So you were --
15       A.   We did not provide that because we did not
16   need to provide it.  It's in the context of the story,
17   not anything prior to it.
18       Q.   Okay.  And you were not then hired -- in
19   connection with serving as an expert in this case, you
20   were not hired to opine on the status of Mr. Miller's
21   reputation prior on the article?
22       A.    Correct.  As it relates to this opinion, yes,
23   except for the fact that when you look on -- on here.
24   In the opinion, on page 14, you're seeing a trendline.
25   And the trendline looks at volumes of conversations
```



1  related to Jason Miller, so it's giving some

2  historical perspective of how people were talking

3  about him.

4      Q.   What is that -- what is that -- and we're

5  jumping ahead onto volume, but what is the time period

6  reflected on this chart that's on page 14?

7      A.   This is looking at March of 2018 through

8  March of 2019.  It's looking at a full year set of

9  data around Jason Miller and the term abortion.  And

10  you could see when we use -- when we use this what we

11  did is we -- this particular pull, basically is not

12  looking at the Splinter News article in the sense of

13  -- I should say it's looking at the Splinter.  What

14  it's doing is it's looking at the term abortion, so

15  we're expanding.  We're doing a little bit more

16  general with the search.  And because of that you can

17  see, back here, I believe, it's April, May.  And

18  you've got August, so this was a conversation which

19  was probably the conversation that you're talking with

20  the Atlantic, and conversations related to this

21  abortion conversation and Jason.

22      Q.   Where is this from, the chart that I'm

23  looking at on page -- the first chart on page 14 of

24  your report?

25      A.   Where does it come from?



CRAIG KRONENBERGER                                    June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                            79

```
 1        Q.   Yes.

 2        A.   Talkwalker.

 3        Q.   That comes from Talkwalker?

 4        A.   Correct.

 5        Q.   I think you said you're getting more general,

 6   but you're actually getting more specific, right?

 7   This is the keywords Jason Miller and abortion, or is

 8   this just Jason Miller?

 9        A.   Well this is -- this is expanding it because

10   prior -- when we're just looking at the article, we're

11   looking at the article of the launch date itself --

12        Q.   Yes?

13        A.   -- and we're looking at Splinter News as part

14   of that conversation from that point.  So now we're

15   kind of broadening the search to kind of show what was

16   going on as it relates to conversation of Jason Miller

17   and the term abortion.  So the Splinter news would

18   fall into that, but it's when I went to go to the

19   actual analysis, that gets more narrow.

20        Q.   But --

21        A.   This is broader.

22        Q.   I guess what I'm trying to -- if you look at

23   the horizontal line of that chart, it says Jason

24   Miller.  So that signals to me that Jason Miller is

25   your search query?
```



1    A.   No, this is not the search query.

2    Q.   Okay.

3    A.   The search query was used up above.  It says

4  Jason Miller, plus abortion.  This is a general

5  search, and Jason Miller here is the title of the

6  graph.  So we titled it.  You have to put a title in

7  for the -- it's what we call it.

8    Q.   Okay.  And how --

9    A.   It's a graph name.  Yes.

10    Q.   How did you choose this particular time

11  period of one year?

12    A.   It's typical to look at a -- kind of a

13  year-long history.  There is a -- we're not doing a

14  full historical pull, which cost money.  It's common

15  to do, you know, a full year's quick search on stuff.

16  In this case it's, you know, it gives you some

17  trendline to understand the volume of conversations

18  around Jason in general.

19    Q.   Why did you exclude the time period of

20  August 2017 and December 2016, when Ms. Delgado broke

21  the news of the affair with Mr. Miller and the

22  resulting child, and sat down for the article, with

23  the Atlantic, to talk about that affair and resulting

24  child, because both of those time periods would also

25  have reflected conversations --



CRAIG KRONENBERGER                                June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                          86

 1   queries in Talkwalker?

 2       A.   Correct.

 3       Q.   And what were the search queries -- I want to

 4   say search query, what were the search queries you

 5   ran?

 6       A.   Our search queries focused around Jason

 7   Miller, abortion, abortion pill, Splinter News

 8   article, and Jason Miller's social handles.

 9       Q.   Okay.  Do you know, as you sit here --

10       A.   That was the primary.

11       Q.   Okay.

12       A.   Once again, we didn't parse the data.  We

13   looked at it and broke it down by A.J. Delgado.  We

14   broke it down by Trump.  We broke down multiple

15   elements in order to try to isolate those out of the

16   conversation.

17       Q.   Okay.  So your report doesn't tell me which

18   ones you used for determining the mentions, but in

19   discussing SEO results, your report mentions Jason

20   Miller, Jason Miller Trump, Jason Miller strip club,

21   Jason Miller abortion, Jason Miller abortion pill,

22   Jason Miller wife, Jason Miller baby daddy, Jason

23   Miller news, and Jason Miller affair?

24       A.   That report, are you looking at the search

25   data?



1    Q.   I am, and I just -- so I'm not clear --

2    A.   Yes.  That's different than Talkwalker.

3    Q.   Okay.  So how am I going to know what queries

4    you put into Talkwalker to come up with the raw file?

5    A.   I can provide you the Boolean tags, so I can

6    see if there's a way to extract out Boolean tags to

7    provide to you so you can see break downs of data.

8    Q.   Okay.

9    A.   That's part of it.

10   Q.   Do you -- so your report mentions running a

11   query for Jason Miller and abortion on Talkwalker.  Do

12   you believe there were other queries that you ran,

13   literally queries that you ran on Talkwalker to get to

14   the raw data for the mentions?  It just doesn't say

15   that.  I'm trying to understand --

16   A.   Yes, yes, yes.

17   Q.   -- because it's not in here.

18   A.   The primary -- the pull was hyper focused on

19   the Jason Miller abortion Splinter News story, and we

20   used the, I think, the word and language of abortion

21   pill as part of that search query.

22   Q.   Okay.

23   A.   Because we did not -- once again, we didn't

24   want to pull stuff that relate to Trump.  As I said,

25   we did set up search queries around things like Trump,



CRAIG KRONENBERGER                                          June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                                    89

1    Miller, and then it would say plus Donald Trump, plus

2    abortion pill, plus A.J.  Delgado.  That's how you

3    kind of write Boolean out.

4        Q.   Yes?

5        A.   I'm using that as an example.

6        Q.   Sure.

7        A.   But if there are certain terms that you don't

8    want in it, that you think might create noise, then

9    you can put minus X type of work language.

10       Q.   Okay.  And you don't -- but you don't know

11   the particular Boolean query used for this one, for

12   this -- for Talkwalker for the mentions?  I'm just --

13   I don't know what --

14       A.   I can provide it to you.

15       Q.   Okay.

16       A.   I can provide it to you.

17       Q.   And based on that Boolean query, Talkwalker

18   gives you what you've described, I believe, as the raw

19   file?

20       A.   No.  What it does is it gives me the data in

21   a visual format.

22       Q.   Okay.

23       A.   So it comes back so I can see it.  It's a

24   trendline like that graph you saw.

25       Q.   Yes?



1   September '18 through April 2019, because that's when

2   your report was being prepared?

3        A.   (Nodding yes.)

4        Q.   And you'll input a Boolean search in

5   Talkwalker --

6        A.   Yes.

7        Q.   -- which is not included in here, but you can

8   provide?

9        A.   Yes.

10       Q.   And Talkwalker gives you, what I called the

11  raw file, but then you sort of said it's a little

12  different than that.  So tell me what output

13  Talkwalker provides to you.

14       A.   It will breakdown the data and show total

15  volume.  It will show how it's trending or how it

16  trended over time.  It will show a sentiment

17  breakdown.

18       Q.   Okay.  So let me interrupt you then.  This

19  one search query is going to give you -- will it give

20  you -- well mentions is part of volume, sorry.

21       Okay.  Does it give you velocity and

22  authority as well or those are different?

23       A.   Well, it does -- it does give you authority

24  but it doesn't give you the full equation for

25  authority.



CRAIG KRONENBERGER                                          June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                              92

1        Q.    Okay.

2        A.    But it gives you partial.

3        Q.    So let's hold on that for now.  We'll talk

4   about that later.

5        A.    It gives you volume.

6        Q.    It gives you volume?

7        A.    Yes.

8        Q.    And that's a -- that's a file that, I think,

9   we've established, is not in your report but it's

10  something that you have?

11       A.    Yes.

12       Q.    So you have this raw data.  And then I

13  believe you said you turn that raw data into something

14  more meaningful, I think was the word that you used?

15       A.    Correct.

16       Q.    Is that in your report?

17       A.    Yes.

18       Q.    So where do I find --

19       A.    Well what we did is --

20       Q.    -- in these documents?

21       A.    -- we extracted the media contents, so --

22       Q.    And everything is labeled, so if you want to

23  point me to the number at the bottom of the page, that

24  would help.

25       A.    Okay.  So these are on here.  Let me find --



 1   you're looking at, once again, volume is the number

 2   one factor that you're looking at.

 3       Q.   And that you described, I think, is number of

 4   mentions --

 5       A.   Number of mentions.

 6       Q.   -- across all public sources?

 7       A.   Yes.

 8       Q.   Okay.  Does it give you anything -- is it

 9   just giving you a numerical spit out, or is it coding

10   as positive, negative, or neutral?  What is --

11       A.   The technology itself, as we stated before,

12   does code sentiment tools or can do it.

13       Q.   Okay.

14       A.   And we will -- we will look at it, but we

15   don't fully, you know, with 100 percent confidence

16   trust sentiment tools --

17       Q.   Okay.

18       A.   -- without doing some type of sampling,

19   visual sampling ourselves.

20       Q.   Okay.  And did you do visual sampling here?

21       A.   Yes.

22       Q.   And how does that process work?

23       A.   We go through the articles, and we go through

24   the titles of the articles.

25       Q.   And articles would be included in the



CRAIG KRONENBERGER                                    June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                               100

 1  online channels."  So then there seems to be a

 2  different number used later.

 3       A.   Let me just make sure I'm understanding.  I

 4  want to make sure I commented on it.

 5            (Witness examining document.)  Yes.  That's

 6  correct how that is written.  The difference is that

 7  we went through the mentions, and cleaned mentions,

 8  and we went into the actual damages portion of it and

 9  cleansed it.  So the 68.5 mentions drove the 1.9

10  trillion, from a reach perspective.

11       Q.   Okay.  But I'm just trying to understand

12  because I don't have the raw data.  The mentions that

13  Talkwalker threw out, they threw out 68.5 -- 68,500

14  mentions?

15       A.   Correct.

16       Q.   That's their raw data?

17       A.   Yes.

18       Q.   Okay.  Of those 68,500 mentions, how many of

19  them did you personally code as positive, negative, or

20  neutral?

21       A.   We -- I coded all of the news media's

22  mentions of it, and then we, essentially, took the

23  social content and we sampled the social content.  And

24  that was done visually, and that was done by me, and

25  it was a visual check to see if the sentiment tools



CRAIG KRONENBERGER                                              June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                                      101

```
 1   was picking up on the term abortion, in the context of
 2   those.
 3       Q.   What was the sample -- what percentage of
 4   social media mentions did you sample?
 5       A.   On the social media mentions, we were looking
 6   at, I believe it was 6,000 mentions that we went
 7   through.
 8       Q.   You say "we," so were there other people in
 9   your office?
10       A.   I'm sorry, myself.  No.
11       Q.   Okay.
12       A.   No.
13       Q.   So you reviewed --
14       A.   All news media mentions went in there, social
15   media mentions, obviously, had to be a sampled.
16       Q.   Sure.  So to your recollection, you sampled
17   -- you personally reviewed around 6,000 --
18       A.   Mentions.
19       Q.   -- mentions --
20       A.   Yes.
21       Q.   -- on social media?
22       A.   Yes.
23       Q.   And you personally coded them as positive,
24   negative, or neutral?
25       A.   No.
```



1  word, but to discount or to not use?  You get from

2  68.5 to 55.5, so obviously --

3      A.   As people join into the conversation, like,

4  trying to sell something, you'll find in there

5  sometimes.  You'll find, you know, basically,

6  spamming, Twitter, tweets that's just hash tag things,

7  just for the sake of hash tags.

8      Q.   What if they're harsh tagging to express

9  their dislike for Mr. Miller for other reasons, would

10  those be rejected?

11      A.   No.

12      Q.   So any -- any reference at all to Mr.

13  Miller --

14      A.   But it had to have abortion, abortion pill in

15  the conversation.  So if they're saying something

16  negative about Jason Miller, but not bringing up the

17  Splinter news article, abortion, abortion pill, it

18  wouldn't be in there.

19      Q.   Okay.

20      A.   So it wouldn't pull up that mention.

21  Remember what you're trying to do is you're trying to

22  -- the Talkwalker uses AI, so artificial intelligence

23  to drive the sentiment tool.  And you're trying to

24  gauge whether the sentiment tool is picking it up

25  properly.  Because if it's not picking it up properly



CRAIG KRONENBERGER                                      June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                              104

1   and you're getting too much junk, then you have to go

2   back and refine your search query.

3       Q.   Okay.  So you reject all data --

4       A.   That's the search point.

5       Q.   Right.  So you're trying to obtain data that

6   is only related to mentions of Mr. Miller in context

7   of this article?

8       A.   Correct.

9       Q.   You're discounting or rejecting mentions of

10  Mr. Miller outside of the context of this article?

11      A.   Correct.

12      Q.   And that leads you to the number of mentions,

13  and then you code those as positive, negative, or

14  neutral?  The sentiments tool codes it?

15      A.   The sentiment tool codes it.

16      Q.   And then you crosscheck it?

17      A.   Correct.

18      Q.   And does the sentiment tool have any -- that

19  codes it -- have any way of knowing whether any

20  mention, any individual mentioning or news

21  organizational mentioning or whoever the mentioning

22  is, had a negative sentiment towards Mr. Miller prior

23  to the article?

24      A.   No.  No.

25      Q.   Okay.  You say in your -- I want to go back



CRAIG KRONENBERGER                                    June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                          117

 1   why we have to use technology as part of the process.

 2        Q.   Okay.  So your -- so Stripe 7 through 31 is

 3   the 201 referring domains that you mentioned in your

 4   report?

 5        A.   Those are the referring domains.  Yes.

 6        Q.   Okay.  Is there anything else that you do to

 7   assess volume?

 8        A.   No.

 9        Q.   Okay.  So --

10        A.   Well, the amount of engagements is considered

11   a volume --

12        Q.   Okay.

13        A.   -- a factor.

14        Q.   What does the amount of engagement means?

15        A.   So that's the amount of people that

16   commented, shared, liked a particular mention or

17   comment.

18        Q.   And you're talking about people who comment,

19   share, or like across either online URLs hosting, the

20   article, or their own content, right?

21        A.   Yes.  So it will be -- by the way, the

22   definition is in the exhibits that I provided.

23        Q.   Yes.

24        A.   So it could be someone tweeted out the

25   article and they're re-tweeting the article.  Somebody



1  tweets it out and their friends then turns around and

2  re-tweets it.

3      Q.    How do you determine engagement?

4      A.    The calculation for engagement is there.  We

5  pull it through Talkwalker.

6      Q.    How is that different than mentions, because

7  I thought mentions was supposed to pick up all of this

8  stuff?

9      A.    It does, but every single mention, has an

10 engagement number associated with it.  Because just

11 because someone mentioned it, it involves people who

12 didn't mention it, but saw it.

13     Q.    Okay.

14     A.    So if people are sharing it, that's what

15 increases the reach of it.

16     Q.    Okay.

17     A.    Does that make sense?

18     Q.    Yes.  Okay.  So you -- and then once you

19 determine the number of engagements --

20     A.    Yes.

21     Q.    -- do you code those as positive, negative,

22 or neutral?

23     A.    You don't code the engagements.

24     Q.    It's just a volume?

25     A.    It's a volume.



1    Q.   Okay.  You just want to know the number?

2    A.   Yes.  It's the volume and the time.

3    Q.   Okay.

4    A.   It's not relevant to code the engagements.

5    Q.   Okay.  So you're really just looking at that

6  to look at number of likes, shares, and comments?

7    A.   Correct.

8    Q.   Not necessarily the substance of those likes,

9  shares, or comments?

10   A.   Yes, because I mean, you can't.

11   Q.   Okay.

12   A.   You can't -- there is no way to actually do

13  that.

14   Q.   Well, you could look at them, but the volume

15  is high?

16   A.   No.  In that case, if someone shares

17  something, you know, I mean, what am I going to read,

18  about a someone sharing.  There is nothing to read,

19  it's a share.

20   Q.   If they shared it, though, with commentary,

21  you could read that?

22   A.   I could.

23   Q.   Right.  It's just not practical, that's all

24  I'm trying to get at?

25   A.   Right.



CRAIG KRONENBERGER                                    June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                            128

 1  looking at it.  Because news is more real time and --
 2  first of all, just to be clear, no one knows the --
 3  all of the full outlet on how people actually
 4  operates, nobody knows.  There are assumptions and
 5  research and studies on what is considered to have
 6  high authority, and why you would rank it.  News
 7  content tends to have higher authority, and tends to
 8  do better in search results via Google.
 9      Q.   How do you test the authority -- I guess --
10  you're trying to test the authority of the article,
11  correct?
12      A.   Yes.  So in it, there are two different ways
13  to test the authority.
14      Q.   Okay.
15      A.   The first way is an AHRefs and Moz, they
16  provide an authority score.  So all of these articles
17  that are out there have authority associated with it.
18  So --
19      Q.   What was the authority score for Splinter,
20  for this article?
21      A.   I don't -- I don't believe I wrote down the
22  authority score for it.
23      Q.   Okay.
24      A.   Let me get -- let me finish it, and then that
25  will help.



1 | evaluating and doing analysis, and looking at this,

2 | and looking at many, many cases, dealing with this

3 | particular thing, which this includes, once again,

4 | adultery, sexual harassment, rape, human trafficking,

5 | drug trafficking, you name it, that this is considered

6 | a highly negative article, and that the overall volume

7 | and the authority of people who are talking about this

8 | particular article itself hurts his reputation in a

9 | significant way.

10 | BY MS. SHULLMAN:

11 |     Q.   Well, that's what I'm just -- that's what I'm

12 | trying to get to an understanding of.  The impact on

13 | the reputation is assumed by the volume of the

14 | discussion around the article?

15 |     A.   The volume, the sentiment, and the authority

16 | of the sources that are talking about it.

17 |     Q.   Okay.  On page 14, as well, you have this, I

18 | think, what you call a word cloud?

19 |     A.   Yes.

20 |     Q.   What is the date range on that word cloud?

21 |     A.   The date range is from when the article went

22 | out to when the actual opinion was actually released

23 | -- or I'm sorry, when we finished the opinion.

24 |     Q.   So it's September of 2018 to April of 2019?

25 |     A.   Correct.



CRAIG KRONENBERGER                                    June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                          143

1    up here the search terms.

2        Q.    Got you.

3        A.    Yes.

4        Q.    So the interest in Jason Miller, actually

5    peaks, in December of 2016, right?

6        A.    Correct.

7        Q.    And that's the time frame in which the news

8    of his affair with Ms. Delgado became public; is that

9    your understanding?

10       A.    Part of it is.

11       Q.    Okay.  What part did I get wrong?

12       A.    It depends on what was coming out, because

13   there was conversations with Jason Miller in -- to be

14   in that role itself.  There is the A.J. Delgado story.

15   There were multiple things that happened in the time

16   frame, so yes.

17       Q.    Did you study, though, the volume --

18       A.    There is also --

19       Q.    -- velocity, and authority, at that

20   December 2016 time frame?

21       A.    Once again, what happened is -- well, the

22   answer is I did look at a trendline, yes.  The

23   trendline, back then, is lower, in overall

24   conversation, and is -- is not even comparable to the

25   conversations that happened during the Splinter News



 1  article.

 2       Q.   And how would I determine that from looking

 3  at your report, sir?

 4       A.   I didn't write it in the report, and it's not

 5  in my opinion because the context of what happened

 6  back then, in my opinion, is not beneficial to going

 7  forward.

 8       Q.   But --

 9       A.   You're talking about -- I understand what

10  you're trying to get to.  There is -- the context of

11  the article is about abortion, killing a baby.  It has

12  nothing to do with adultery.  To me, the reputational

13  impact to those are judged completely different.  So I

14  do not compare the fact that this is adultery in the

15  conversations that occurred.  So I'm not going to get

16  that mixed with the context of this story.  My job is

17  to understand the implications of this article, on his

18  reputation.  And when I look at his reputation, over

19  time, when I look at it, and I did the trendline, this

20  conversation was extremely high, very negative, and is

21  related to the abortion pill in the Splinter News

22  story.

23            When I put into context of what happened back

24  in December, there's a -- there is one totally

25  different conversation going on, it's not in context,



1    it's apples and oranges, talking about an abortion,

2    killing a baby.

3         Q.   But it is the time where interest in Mr.

4    Miller was highest, right?

5         A.   No.

6         Q.   You can see --

7         A.   No.

8         Q.   -- if you look at the next page --

9         A.   No.

10        Q.   -- that's December 25th, 2016, it's 100?

11        A.   No.

12        Q.   Why not?

13             MR. TURKEL:  Object to form.

14             THE WITNESS:  This is done incorrectly.

15   BY MS. SHULLMAN:

16        Q.   Okay.

17        A.   This exhibit, as you see, it is incorrect.

18        Q.   Okay.  Tell me what's wrong with it.

19        A.   So the first thing is, is that the

20   trendlines, you're looking at, pulls in all data

21   related to the name Jason Miller.

22        Q.   Correct.

23        A.   That means every single Jason Miller,

24   including the Jason Miller of the UFC fired.

25        Q.   Right.



CRAIG KRONENBERGER                                    June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                          154

1    A.    Yes.

2    Q.    And it was your opinion that that did not

3  impact his reputation, or was it your opinion that

4  that would impact his reputation?

5    A.    Sure.  People are out there saying that

6  stuff.  Sure, it has some impact on his reputation.

7  People, you know, dislike people.  He plays in a

8  political space, so yes.

9    Q.    So prior to reading the article, is it fair

10  to say that there were a number of people who already

11  disliked Mr. Miller at the time the article came out?

12        MR. TURKEL:  Object to form.

13        THE WITNESS:  Yes.  I'm sure there are people

14  who disliked Jason Miller prior to the article.

15  BY MS. SHULLMAN:

16    Q.    And the methodologies that you used to

17  formulate your opinion have no way to determine

18  whether the article caused any one particular

19  individual to change his or her opinion about Mr.

20  Miller; is that correct?

21        MR. TURKEL:  Object to the form.

22        THE WITNESS:  So I don't have information

23  relating to people's opinion -- individual people's

24  opinions, prior to the article or post-article, other

25  than commentary and the reactions that we've seen.



1   Does that answer the question?

2       Q.    (By Ms. Shullman)   Yes.   But the commentary

3   reactions you see, though, you're not able to

4   determine whether those comments or reactions were --

5   were brought about by that individual's prior opinion

6   of Mr. Miller, or whether there opinion changed as a

7   result of the article?

8       A.    I don't --

9            MR. TURKEL:   Form.

10           THE WITNESS:   I don't know where anyone's

11  opinions ultimately net out.   What I do know is that

12  people were reacting negatively to an article, an

13  article that, in the context from a reputational

14  perspective, is a criminal activity, it's killing of a

15  baby, it is much worse reputationally than anything

16  else, that might have been out there.   It's not even

17  comparable.

18  BY MS. SHULLMAN:

19      Q.    Did the method or analysis that you employed

20  in formulating your opinion that the article

21  negatively impacted Mr. Miller's reputation measure

22  change in opinions of Mr. Miller?

23      A.    No, no.

24           MR. TURKEL:   Object to form.

25           THE WITNESS:   There is no way to understand



CRAIG KRONENBERGER                                        June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                              156

```
 1    -- it's impossible to have done that.

 2    BY MS. SHULLMAN:

 3        Q.   You have a second opinion -- well, actually,

 4    before -- yes.  You have a second opinion in this

 5    case, correct?

 6             MR. TURKEL:  Form.

 7    BY MS. SHULLMAN:

 8        Q.   Did you formulate a second opinion in this

 9    case?

10        A.   I don't know.

11             MR. TURKEL:  Form.

12    BY MS. SHULLMAN:

13        Q.   It's not a memory test.  I'm just trying to

14    find it in the report myself.

15        A.   I don't know.  You've got it in the report.

16        Q.   Sure.  There was an opinion, and I'll find

17    it, specifically, expressed on the cost.  I'll read it

18    to you.  This is page 5 of your report.  "We conclude

19    with a reasonable degree of certainty in our field

20    that the cost of the reasonable and necessary efforts

21    to begin to repair Miller's reputation and correct the

22    defamatory narrative disseminated about him, are

23    $63,372,471.65."

24        A.   Yes.

25        Q.   Is that your opinion?
```



1  article, you know, it's not correct.  I, obviously,

2  cannot survey every single person that saw this

3  content.  It's not possible to do that.

4  BY MS. SHULLMAN:

5      Q.   Okay.  So --

6      A.   It could be every single person out there,

7  everyone, everyone.  There could be far more than what

8  we saw, actually believes the story, so...

9      Q.   But that's what I'm trying to get at.  Like,

10 are you trying to -- you're talking about changing the

11 perception of people created as a result of the

12 article, but are you really just trying to reach

13 everybody who saw the article, regardless of whether

14 their perception changed as a result of the article?

15          MR. TURKEL:  Object to form.  Do you have me?

16 I'm not mic'd up.  I'm sorry.

17          THE VIDEOGRAPHER:  I can hear you.

18          THE WITNESS:  I can't change -- I don't know

19 what people's opinion were, other than in the context

20 of the social media mentions.  So I don't -- I don't

21 -- I'm not trying to understand what their opinions

22 are, I can't.  There is no way for me to do that.

23 BY MS. SHULLMAN:

24     Q.   But is your --

25     A.   But your assumption would be that, you know,



 1  everybody walked away saying this is funny, this is

 2  ridiculous.

 3        Q.   Well I'm not assuming either way.

 4        A.   Yes.

 5        Q.   I think we just don't know what the reaction

 6  was.

 7        A.   Well we know what the reaction was.  We don't

 8  necessarily know --

 9        Q.   Whether there was a change?

10        A.   We don't know the opinion --

11        Q.   Right.

12        A.   -- without surveying and talking to each

13  individual person who read the article.

14        Q.   Right.  And so that's kind of what I'm trying

15  to get at.  With these advertising dollars, are we

16  trying to reach everyone who saw the article?

17        A.   Yes.

18        Q.   Okay.  And not -- so we are not trying to

19  reach only that segment of people who saw the article,

20  whose opinions changed as a result of it?

21        A.   Right, because there is no way of doing that.

22        Q.   Right.

23        A.   That is the only fair way of doing that.

24        Q.   Right.  So the way to reach the people whose

25  opinions changed by the article, because we don't know



1    Q.   It could be Jason's mom, it could be somebody

2    who doesn't know him?

3    A.   Correct.

4    Q.   All right.  So how do we -- I mean, candidly

5    $63 million is a lot of money --

6    A.   (Nodding yes.)

7    Q.   -- so let's go through how we come up -- how

8    you derive that it will cost $63 million to prepare

9    Mr. Miller's reputation?

10    A.   First off, candidly, it is a lot of money,

11    and the article -- the initial article reached an

12    enormous amount of people, and so therefore, you have

13    no choice, but to be able to do that.

14    Q.   And it reached a number of people and you're

15    -- you're getting that from -- you're getting that

16    reach number, again, from the same place --

17    A.   I'm not using reach in the calculation at

18    all.

19    Q.   Right.  But you're saying -- when you say it

20    reached a lot of people, you're saying a lot of people

21    were exposed to the article, but you don't know

22    whether they read all of it, some of it, none of it,

23    read it four times, five times?

24    A.   Correct.

25    Q.   Okay.  So how do we get to $63 million?



CRAIG KRONENBERGER                                  June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                           164

```
 1        A.    To be clear, though, your assumption would be

 2   that nobody read it.

 3        Q.    No.   I wouldn't make that assumption.

 4        A.    That's your opinion.

 5        Q.    No.   I'm not making that assumption.   I'm

 6   more asking whether we can determine it.   It sounds

 7   like we cannot determine whether people read it?

 8        A.    We cannot.

 9        Q.    Right.

10        A.    We can do the best that we can to try to fix

11   something that is terrible.   And just so we're clear,

12   when you have those kinds of allegations made against

13   you, and it gets this amount of exposure, you know,

14   you can't just walk away like it's not that easy.

15   I've done enough of these that it's detrimental to

16   people, it crushes them.   And it is unfair, and there

17   is nothing that you can do about it, except to try to

18   attempt to repair your reputation, change perceptions

19   about you.   It impacts everything in your life from

20   your kids, your wife, your family, everything.

21        Q.    Have you talked to Mr. Miller about any of

22   those impacts on his life?

23        A.    I've had conversations, yes.

24        Q.    But you testified earlier that you did not

25   speak with Mr. Miller in formulating your opinions, so
```



CRAIG KRONENBERGER                             June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                    178

1   there is nothing to say.  In this world today, you

2   think that there is something that can actually go out

3   and fix his reputation right now, there isn't.

4        Q.   But you opine that we need $63 million, and

5   part of that is to suppress negative content --

6        A.   Yes.  But first --

7        Q.   -- through the development of new content?

8             MR. TURKEL:  Object to form.

9             THE WITNESS:  But first, in order to be able

10  to do that, we need something.  We need -- we need

11  something that allows us to go out to try to change

12  the opinion.  We need an apology.  We need a

13  retraction.  We need to state to the general public

14  that this story was a bunch of bullshit.  That has to

15  happen.  And if you don't have anything like that, you

16  can't do anything.

17  BY MS. SHULLMAN:

18       Q.   And is that something that has to come from

19  Splinter.  I'm trying to understand because this is

20  part of your -- the suppression of negative content

21  through the development of new content is part of your

22  cost?

23       A.   Yes.  Splinter, it needs to come --

24            MR. TURKEL:  Object to form.  Go ahead and

25  answer.



1    Q.    (By Ms. Shullman)  Well, wait.  Let me finish

2    the question then so that --

3    A.    You gave me two questions.

4    Q.    I know.  So part of the fees that you think

5    are necessary to repair -- and I know we cannot fully

6    restore, we've already established that, but part of

7    the fees that you believe are necessary, includes fees

8    that will go to suppressing negative comment through

9    the development of new content; is that correct?

10    A.    Correct.

11    Q.    But then you also said that there is nothing

12    you can do because you need something else to happen,

13    and I'm trying to understand what you mean by that.

14    You --

15         MR. TURKEL:  You're still asking him, sorry.

16    BY MS. SHULLMAN:

17    Q.    Okay.  What do you need in order to be able

18    to develop new content that will be designed to

19    suppress negative content?

20         MR. TURKEL:  Form.

21         MS. SHULLMAN:  What's wrong with the form?

22         MR. TURKEL:  Other than a jury verdict in a

23    lawsuit, I mean, isn't that why we're here?

24         MS. SHULLMAN:  I'm asking for his answer, not

25    yours, Ken.



CRAIG KRONENBERGER                                    June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                          180

```
 1            MR. TURKEL:  But the form is just essentially
 2   asking for, your know, questions that replicates the
 3   legal version of what he's answered already, so it
 4   keeps coming out in different ways, so.
 5            MS. SHULLMAN:  Okay.  He wants money to be
 6   able to do this, but has said he can't yet do it,
 7   because he's missing things.
 8   BY MS. SHULLMAN:
 9       Q.   What are you missing to be able to do that?
10       A.   We -- we need -- we need something that --
11   well, there is a couple of things we need.  One is
12   there has to be something out there that states that
13   the article was incorrect, that the information was
14   not correct, and the story was essentially made up,
15   fake, whatever you want to call it.
16       Q.   Okay.  Let me pause there because I don't
17   want to get too far ahead.
18       A.   Wait.  That's one thing.
19       Q.   No, I know, but I want to go through all of
20   them.
21       A.   Okay.
22       Q.   I'll give you a chance to go through all of
23   them.  Is that something that has to come from
24   Splinter?
25       A.   Yes.
```



CRAIG KRONENBERGER                                June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                        181

```
 1              MR. TURKEL:  Object to form.
 2              THE WITNESS:  Basically, yes.
 3    BY MS. SHULLMAN:
 4         Q.   That would be included in your new content?
 5         A.   Yes.  That would be the core of it.
 6         Q.   Okay.
 7         A.   Yes.
 8         Q.   Okay.  All right.  And then the third thing,
 9    you said you need to develop strategies for Miller to
10    rebuild his personal and professional reputation; what
11    does that mean?
12         A.   Wait.  Go back to where we were.
13         Q.   Yes, I'm sorry.  Page 18.
14         A.   Yes.
15         Q.   And you've listed -- in the first paragraph
16    under Sub A you've listed the four things that you
17    say --
18         A.   Yes.
19         Q.   -- you must do, so the third one.
20         A.   Yes.  And the third one.  So what ends up
21    happening in these cases is that, outside of getting
22    that and putting that out there, there are other
23    tactics that you have to do; for example, you might
24    have to write letters on his behalf that he can use
25    with employers, potential employers.  There are things
```



CRAIG KRONENBERGER                           June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                    199

 1  people like me can understand it.

 2      A.   Yes.

 3      Q.   What is the readership?  Is that the

 4  readership of this particular article, or the

 5  readership of where you're going to put your

 6  advertisement?

 7      A.   Well, it's of this particular article.

 8      Q.   Okay.

 9      A.   So we extract all of the articles.  And once

10  the articles are extracted, we run this through Cision

11  Trendkite, to get to the AVA calculations.  So they

12  pull it.  They pull the actual calculations of all of

13  those news outlet, in order to define the formula.

14      Q.   Okay.  So help me understand.  The data that

15  goes into the readership component of that formula, is

16  a total of the unique visitors of all URLs referencing

17  the article --

18      A.   Per --

19      Q.   -- or linking to it?

20      A.   Correct.

21      Q.   So both of those?

22      A.   Linking -- again, these would be articles

23  that were referencing linking to it.  Yes.  Correct.

24      Q.   Okay.

25      A.   Referencing about this article.



1    Q.   Referencing or linking, right?

2    A.   Yes.

3    Q.   Okay.  So it would include the -- I just want

4  to make sure I understand.  It would include a website

5  that shows somebody has a link to the article, but it

6  would also include a website who wrote their own

7  article, based on our article?

8    A.   Correct.

9    Q.   Okay.

10    A.   In most cases they're repeating the article

11  and linking to it.

12    Q.   And how does it -- yes, I understand.  And

13  how does Cision Trendkite determine the unique

14  visitors per month; is it to the URL, where they're

15  hosting that article, or is it to their website in

16  general?

17    A.   It's -- it's too the actual site itself.

18    Q.   It's to the actual domain that's hosting the

19  content about the smoothie incident?

20    A.   It looks at the potential amount of readers

21  for that particular news outlet in order to try to

22  quantify it.

23    Q.   So it's not actual, it's a potential number?

24    A.   Well this is the average potential article

25  readership, so it will look at what -- what the amount



 1  of people are that would potentially read the article,

 2  for that particular news outlet.

 3      Q.   And how does it determine that number?

 4      A.   I mean there's a -- there's a formula

 5  algorithm that's created based upon the traffic that

 6  comes to the website, and it's -- they usually pull

 7  the data through some type of pixel or code that sits

 8  on the site to estimate it.  Or it's through surveying

 9  the news media outlet.  There is multiple ways company

10  come to it, but I believe there is just through pixel

11  technology.

12      Q.   Okay.  And is this data -- is this readership

13  value somewhere attached to your -- in your report?

14      A.   Yes.  That was the -- that was in the export

15  out.  It goes into the whole AVE stuff.  It should

16  have been.

17      Q.   That was what begins at Stripe -- I think,

18  Stripe 31?

19      A.   Yes.  It's like right in here.  It's the dark

20  one.

21      Q.   The dark one?

22      A.   Yes.

23      Q.   I'm sorry.  Those are later then?

24      A.   Those are the exports from it.

25      Q.   Stripe 123 then?



1        A.    Correct.

2        Q.    Beginning at Stripe 123?

3        A.    Correct.

4        Q.    Okay.  And is this an export of Trendkite,

5   Cision Trendkite, or is this something that you

6   created?

7        A.    That's Cision Trendkite.

8        Q.    Okay.

9        A.    It needed to be put in their system in order

10   to pull the AVE cost out of it.

11        Q.    That was my next question actually.  So did

12   you input the URLs that you had obtained --

13        A.    Through Talkwalker.

14        Q.    -- through Talkwalker?

15        A.    Yes.

16        Q.    Do you have to individually type those in, or

17   can you just export and import?

18        A.    No.  We exported them out.  We went through

19   -- I went through them, and then deleted things that

20   were considered not relevant, and then I took the

21   final list, and provided the list to put into the

22   Trendkite system.

23        Q.    And in inputting the -- or in importing, I

24   guess, because it's not really importing -- importing

25   information into the Trendkite system, did you



1    A.    Yes, it's mentions.  We used the search

2  queries to dice up the content and pull all total

3  mentions, which include social media and news media

4  mentions.  It follows the same process as the news

5  media content that we pulled.

6    Q.    Okay.

7    A.    It's just social media in nature versus news

8  media online.

9    Q.    So the methodology for determining whether a

10  potential mention was negative, is the same as that

11  which you employed with respect to the news media

12  content?

13    A.    Well the news media content we can actually

14  manually go through and look at it, which is what we

15  said we did.  Through this, what we did is,

16  essentially, an I-test, sifting through and looking at

17  a sample set of data.  In order to just make sure that

18  the system itself is picking up the right types of

19  topics.  The tool itself provides a sentiment score as

20  part of the process, and it shows the amount of

21  engagements and, of course, what the mention was,

22  where it came from.

23    Q.    Okay.  But again, if the mention was

24  something along the lines of -- and I'm just using

25  something I saw, chinless dickwad, that would be coded



CRAIG KRONENBERGER                          June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                  221

```
 1   as negative?

 2        A.   Well wait a minute.  So the mention, if the

 3   mention has to pull the language around abortion,

 4   abortion pill, Splinter News or Jason Miller.  No

 5   matter what the comment is associated with the actual

 6   article, or its associated with the topic.  So it's

 7   not just people out there calling Jason Miller names

 8   that we're picking it up.

 9        Q.   But if I called him a name --

10        A.   We wouldn't want to do that.

11        Q.   -- and commenting on the article --

12        A.   Right.

13        Q.   -- then it would pick it up?

14        A.   Yes.

15        Q.   And --

16        A.   If they were sharing the article and then

17   calling Jason Miller a name and -- and -- if they are

18   calling him a name, and linked to the article, then

19   yes, it would pick it up.

20        Q.   Or if he -- yes.  Or if they commented on the

21   article, on social media, and called him a name, the

22   same would happen, it would pick it up?

23        A.   I think we're talking the same thing.  I want

24   to make sure we're clear on this.

25        Q.   Okay.
```



CRAIG KRONENBERGER                                    June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                           245

1   that occurred.

2       Q.   Well, wait a minute.  I thought you did pull

3   the total?

4       A.   No.  We told you that there is too much stuff

5   that becomes noise, and we needed to get defined

6   enough, which is why we put in that abortion pill.

7   What about the people that commented, but didn't bring

8   up abortion pill, but read the article and started

9   ripping apart Jason Miller.  But we can't add those to

10  it because that would be unfair.

11      Q.   Right.  Got you.

12      A.   We want to be as precise as possible with the

13  data.

14      Q.   Okay.

15      A.   I'm getting to this point because we're

16  arguing about the numbers and I assure you, in a

17  formula that, not only as precise, but this is very,

18  very conservative.  Because we can't even look at what

19  happened on Facebook, it's completely closed off to

20  us.  And I guarantee that the numbers are really high

21  on Facebook because of the amount of people on

22  Facebook that are sharing content, so...

23      Q.   You guarantee --

24      A.   Well, we don't know.

25      Q.   -- but you don't really know because you



1    Q.    So for every one person who engage with the

2    article, you are trying to obtain five people who will

3    engage with your paid content?

4    A.    Correct.

5    Q.    Got you.  How do you measure change in

6    perception?

7    A.    Change in perception is measured by -- once

8    again, we're looking at sentiment, commentary around

9    the share itself, how people are reacting to the

10   article, and benchmarking that against what happened

11   with this article.

12   Q.    Have you ever done any -- in your work as

13   Stripe Reputation, have you ever done any efficacy

14   studies on the change of perception?

15   A.    Not with Stripe.  No.

16   Q.    Have you done that prior to Stripe?

17   A.    Yes.

18   Q.    Approximately, how many times?

19   A.    I don't know.  I was at Edelman and were

20   involved in those, and we were involved in many

21   different studies to look at it.  I couldn't tell you

22   how many.

23   Q.    Okay.  And what --

24   A.    I didn't conduct it myself, but I was on the

25   projects where they were conducted.



CRAIG KRONENBERGER                              June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                        258

1   of number five in the calculation is?

2        A.   I -- I --

3             MR. TURKEL:  Object to form.

4             THE WITNESS:  I told you that the research

5   around competitiveness and keeping it in front of

6   people is super important to change people's opinion.

7   We know that's critical in advertisement

8   effectiveness.  So the research is out there on it.

9   We used five, which is actually lower than the

10  averages that are out there.

11  BY MS. SHULLMAN:

12       Q.   But is there research specific to --

13       A.   In the short --

14       Q.   -- engagements?

15       A.   In the short history of engagements that

16  people have had out there, I don't know if there is

17  any research, specifically, on engagements.

18       Q.   Okay.

19       A.   But my question for you would be then, how do

20  you think you're going to replace 375,000 plus

21  engagements?  The only way to do it is to pay for

22  engagements.  So logically, that makes sense.  I just

23  want to make sure -- you're getting into the formula

24  of beating up an advertising methodology that works.

25  I mean, this is how we do it.  We do pay for



CRAIG KRONENBERGER                                      June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                              259

1   engagements.  If I'm trying to equal 375,000

2   engagements, I have to go after it some way.

3       Q.   I'm just trying to figure out --

4       A.   And five times --

5       Q.   -- why you bid five.  That's all.

6       A.   Because as you see later in my opinion here,

7   in the opinion I state with the frequency and

8   exposure.  "The effectiveness in the frequency is the

9   number of times a person must be exposed to the

10  advertisement message before a response is made and

11  before consideration takes place."  To ensure that we

12  reach and change perceptions, my recommendation is

13  based upon all of this, is that it needed to be

14  somewhere between 5 to 9.  I ended up using 5, as a

15  factor for doing it.

16      Q.   Okay.  But again, there is no -- and I

17  understand the research with respect to frequency of

18  advertising, but you're not aware of any research with

19  respect to what the right number to use for frequency

20  with respect to engagements is?

21           MR. TURKEL:  Object to form.

22           THE WITNESS:  For engagements, no, but for

23  advertising in general, yes.

24  BY MS. SHULLMAN:

25      Q.   Right.  Okay.  And then the last part of your



CRAIG KRONENBERGER                                June 07, 2019
JASON MILLER vs GIZMODO MEDIA GROUP                        275

1   with it, but we don't know.

2   BY MS. SHULLMAN:

3       Q.   Okay.  And you use a -- you use a frequency

4   of five, again, on those Google advertisements?

5       A.   Correct.

6       Q.   Because that comports with your methodology,

7   just to kind of short circuit it.  Your methodology

8   with respect to the paid content that you would --

9       A.   I believe people have to see it five times in

10  order to believe it.

11      Q.   And you use an average of a $1.50 cost per

12  click?

13      A.   Yes.

14      Q.   Why do you pick $1.50?

15      A.   The -- there is industry source that you have

16  that's 0.09, not reduced.  We went to a $1.50, just

17  because we think that that is an average that is

18  acceptable and can be done across this category.

19      Q.   Okay.

20      A.   I mean there's -- you know.  We think it's a

21  fair value.

22      Q.   Turning back to the word cloud that appeared

23  earlier in your report?

24      A.   Yes.

25      Q.   If you find it first, let me know.



```
 1        A.    14.
 2        Q.    There we go.  Talkwalker generates this word
 3   cloud based on a search -- is it a Boolean search
 4   criteria, or is it just a search criteria for Jason
 5   Miller?
 6        A.    Well it's Boolean as it relates to Jason
 7   Miller.
 8        Q.    Okay.  So this word cloud --
 9        A.    It's the same one that's been used to pull
10   mentions.
11        Q.    Okay.  So if you backed you, though -- so,
12   really, isn't this word cloud measuring perception of
13   Mr. Miller around this particular topic?
14        A.    Correct.
15              MR. TURKEL:  Object to form.
16   BY MS. SHULLMAN:
17        Q.    So did you look at a word --
18        A.    Well let me see.  Perception is --
19        Q.    Association, sorry?
20        A.    The word association tied to all of the
21   mentions that were made.  These were the types of
22   words that were being used.
23        Q.    Did you use -- did you generate a word cloud
24   simply with respect to Jason Miller, like, his name?
25        A.    No.
```



 1  pills, Splinter News, Jason Miller, Jason Miller hash

 2  tag, that kind of thing.

 3  BY MS. SHULLMAN:

 4      Q.   Okay.  And you don't have with you today the

 5  Booleen -- you're not able to tell me the Boolean

 6  search used with respect to generating this word

 7  cloud, the same as with respect to generating the --

 8      A.   No.  But I can give you how we diced up the

 9  content.

10      Q.   You say in your report, Mr. Kronenberger,

11  that the article caused Mr. Miller's Wikipedia page to

12  be changed?

13      A.   Yes.

14      Q.   And I think you have that on page 13 of your

15  report?

16      A.   Yes.

17      Q.   "Due the to vast media pick-up and

18  circulation of the content of the article, the

19  defamatory accusations were added to Miller's

20  Wikipedia page with citation to the Splinter article,"

21  correct?

22      A.   Correct.

23      Q.   Did you look at how the accusations were

24  first added to Mr. Miller's Wikipedia page?

25      A.   Somebody put in an incorrect source.  Yes.





CRAIG KRONENBERGER
JASON MILLER vs GIZMODO MEDIA GROUP

June 07, 2019
307

```
1   So -- and the reality is is that you have to factor in
2   the fact that if you look at the baseline that we did
3   have in place, that there was not a significant amount
4   of conversation mentions that were occurring, even
5   with the A.J. Delgado story that went out.  There
6   just wasn't a lot out there, it was minimal, compared
7   to this story.  And then you add in the fact that this
8   story is here, is in a much different situation, once
9   again, than any of its previous history.  You can't
10  compare the fact of adultery or the fact that he was a
11  republican to being someone who is a murderer, killing
12  a baby, and secretly trying to kill a baby, putting an
13  abortion pill into a smoothie.  It's not comparable.
14      Q.  But the fact that he was republican could
15  have caused somebody to form a negative opinion about
16  him prior to the article, correct?
17          MR. TURKEL:  Object to form.
18          THE WITNESS:  Would people --
19  BY MS. SHULLMAN:
20      Q.  Could, could?  The fact that he was a
21  republican could have caused people to have a negative
22  opinion of him prior to the article, correct?
23          MR. TURKEL:  Form.
24          THE WITNESS:  Negative opinion, yes.
25  BY MS. SHULLMAN:
```



```
 1                       CERTIFICATE

 2

 3   STATE OF GEORGIA

 4

 5   COUNTY OF FULTON

 6

 7              I hereby certify that the foregoing

 8   transcript was taken down as stated in the caption,

 9   and the questions and answers thereto were reduced to

10   typewriting under my discretion; that the foregoing

11   pages 1 through 316 represents a true, complete and

12   correct transcript of the evidence given upon said

13   hearing.  And I further certify that I am not of kin

14   or counsel to the parties in the case; am not in the

15   regular employ of counsel for any said parties; nor am

16   I in anywise interested in the results of said case.

17

18              This 10th day of June 2019.

19

20              Tamika M. Burnette, RPR, CCR2870

21

22

23

24

25
```



Terri Giddens, Ph.D.
June 11, 2019

```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2                       MIAMI DIVISION

 3   JASON MILLER,                )
            Plaintiff,            )
 4                                )
     vs.                          )   Case No.
 5                                )1:18-cv-24227-CMA
     GIZMODO MEDIA GROUP, LLC, a  )
 6   Delaware Corporation,        )
     KATHERINE KRUEGER INDIVIDUALLY )
 7   and WILL MENAKER, INDIVIDUALLY, )
            Defendants.           )
 8

 9

10         *   *   *   *   *   *   *   *   *   *   *

11               ORAL VIDEOTAPED DEPOSITION

12               TERRI D. GIDDENS, PH.D.

13                     June 11, 2019

14         *   *   *   *   *   *   *   *   *   *   *

15

16       ORAL VIDEOTAPED DEPOSITION OF TERRI D. GIDDENS,

17   PH.D., produced as a witness at the instance of the

18   Plaintiff and duly sworn, was taken in the

19   above-styled and numbered cause on June 11, 2019,

20   from 8:55 a.m. to 1:18 p.m., before Cheryl Duncan,

21   CSR, in and for the State of Texas, reported by

22   computerized stenotype machine at the offices of Rick

23   Husband Amarillo International Airport, 10801 Airport

24   Boulevard, Amarillo, Texas, pursuant to the Federal

25   Rules of Civil Procedure.
```

Terri Giddens, Ph.D.
June 11, 2019                                    36

```
 1   potentially excluded information.

 2                  So for this particular case, I just

 3   used the search phrases that he used, for simplicity.

 4   And I -- you know, one of the things that I need to

 5   do is to be able to replicate what he did to -- so

 6   that I can verify and validate his results.  So it

 7   was very unclear in his report what his methodology

 8   was.

 9       Q.   And, obviously, you haven't gone back and

10   tried to do the searches you did with Boolean terms

11   now; is that right?

12       A.   Because I don't know what his Boolean terms

13   were.  He was not able to provide that in the

14   deposition.  And it would be very interesting to see

15   what he actually used.

16       Q.   What is a Boolean search?

17       A.   A Boolean search would be to use --

18   depending on what you're using, you might use a plus

19   sign like in a search engine like Google.  In

20   TalkWalker, I believe the linguistics -- or the

21   language that they use is more normal language, where

22   you use the terms "and" and "or" and "not."  So if

23   you were looking for specifically articles or

24   results -- not articles, but information pertaining

25   to Jason Miller and abortion, you might put "Jason
```

1    Kronenberger was trying to figure out what approach

2    he was taking, what his methodology was.  And he

3    wasn't very clear on how he came up with his data.

4    So I was having to make assumptions on how he came up

5    with the data.  And finding that in the deposition

6    that he used Boolean phrases, for example, when he

7    retrieved the information would have been highly

8    beneficial to have known.  He should have presented

9    that in the original document.  I was always kind of

10   confused as to why Mr. Kronenberger did not resort to

11   using Google search results, because that is what a

12   typical person would use in order to find information

13   on somebody.  Most people are going to go to a search

14   engine and pull a search query to find information.

15   He did not use that at all.

16              Online experts that I've gone against

17   in the past, that was their primary methodology that

18   they used.  Mr. Kronenberger didn't use it.  But then

19   I looked at the report that he did in a case prior,

20   and that was his primary methodology, was the use of

21   search engines.  So he changed his methodology from

22   the previous case.

23   Q.    And are there any other new opinions that

24   you reached?

25   A.    He wasn't real clear as to why he limited

Terri Giddens, Ph.D.
June 11, 2019                                117

 1       A.    And the Double Standard.

 2       Q.    Got it.

 3             And then Exhibit N, you did a search

 4  not limited by date range, right?

 5       A.    Neither one of these are.

 6       Q.    Okay.  And just so the record is clear,

 7  when we're talking about M -- appendix M and N,

 8  neither of those are limited by date range?

 9       A.    That's correct.

10       Q.    And Exhibit N, you did "Jason Miller

11  abortion"?

12       A.    Yes.

13       Q.    And then the other -- Exhibit P, you did a

14  search not limited by date range for "Jason Miller

15  arrested"?

16       A.    Yes.

17       Q.    And this turned up search results for Jason

18  Mayhem Miller, who is a UFC fighter, right?

19       A.    Correct.

20       Q.    Did you do any other searches on either

21  Google or Twitter to analyze Jason Miller's

22  reputation after the Splinter article?

23       A.    Okay, so what I'm doing here is, I'm trying

24  the best that I can to address Kronenberger's

25  results.  And because it was so unclear as to his

Terri Giddens, Ph.D.
June 11, 2019                                                    118

1    methodology and how he formed his -- I mean, he just

2    gave a list of searches, he didn't say he limited it

3    on date, he didn't say he limited in any way.  So my

4    hands are pretty tied as trying to address what

5    Kronenberger said in his report.  Because he did not

6    state his methodology very clearly, if at all.

7              The approach that I took -- because

8    I'm just kind of by the seat of my pants trying to

9    figure out and try to disprove maybe some of the

10   things that he said in his report.  It looks to me

11   that when he had that word "graph" appear on

12   TalkWalker, that he did not limit his search, even

13   though in the deposition he said that he did.  And

14   the reason that it looks -- appears that he did not

15   limit his search is because the word "arrested"

16   appeared.

17             So I wanted to know, well, where did

18   the word "arrested" come from?  So I did a "Jason

19   Miller arrested," which brings up this MMA fighter

20   that had been arrested many times.  So it's very

21   obvious in Kronenberger's results that his didn't

22   filter out this Jason Miller.  Even though in his

23   deposition he tried to say that he tried to get his

24   search results limited to the Splinter article

25   itself, it appears that he failed in that.

```
1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
2                        MIAMI DIVISION

3    JASON MILLER,                    )
            Plaintiff,                )
4                                     )
     vs.                              )   Case No.
5                                     )1:18-cv-24227-CMA
     GIZMODO MEDIA GROUP, LLC, a      )
6    Delaware Corporation,            )
     KATHERINE KRUEGER INDIVIDUALLY   )
7    and WILL MENAKER, INDIVIDUALLY,  )
            Defendants.               )

8

9                      REPORTER'S CERTIFICATE

10    ORAL VIDEOTAPED DEPOSITION OF TERRI D. GIDDENS, PH.D.

11                      June 11, 2019

12

13        I, Cheryl Duncan, Certified Shorthand Reporter

14   in and for the State of Texas, hereby certify to the

15   following:

16        That the witness, TERRI D. GIDDENS, PH.D., was

17   duly sworn and that the transcript of the deposition

18   is a true record of the testimony given by the

19   witness;

20        That the amount of time used by each party at

21   the deposition is as follows:

22        Mr. Shane B. Vogt (3 hours, 42 minutes)
          Ms. Deanna K. Shullman (07 minutes)
23

24        I further certify that I am neither counsel for,

25   related to, nor employed by any of the parties or
```

Exhibit C, Page 6 of 7

```
 1   attorneys in the action in which this proceeding was

 2   taken, and further that I am not financially or

 3   otherwise interested in the outcome of this action.

 4        In witness whereof, I hereunto set my hand and

 5   affixed my seal this the 14th day of June, 2019.

 6

 7        _____

 8        Cheryl Duncan, CSR
          Texas CSR 3371
 9        Expiration:  04/30/21
          U.S. Legal Support
10        5910 N. Central Expressway
          Suite 100
11        Dallas, Texas  75206
          Phone:  (214) 741-6001

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**From:**  Shane Vogt
**To:**  Ken Turkel; Deanna Shullman; Lisa Meriwether; Gayla Arnold
**Subject:**  RE: Kronenberger - missing docs
**Date:**  Friday, June 21, 2019 5:15:25 PM



- ████████████████████████████████████
- ████████████████████████████████████████
  ██████████████████████████████████
  ████████████████████
- Boolean search queries used to generate the results displayed in his report—Information on the search queries is set forth below
- Raw data from Talkwalker (*for example, what he used to analyze whether comments were "negative")—The raw data is being compiled and will be sent separately (likely on Monday) due to size.
- ██████████████████████████
  ████████████████████████████████████

The search queries info is as follows:

The taxonomy for the project was set-up to look at several topics.  Each one of the below names represents projects that were set-up.  In addition to the projects, filters were used to pull the data for each project as well as filters to get as narrow as possible on the contents of the article:

Jason Miller

("jason miller" OR +"@JasonMillerinDC" OR hashtag:#JasonMiller) AND (delgado OR +"@AJDelgado13" OR stripper OR "abortion pill" OR pregnan* OR splinter OR +"@splinter_news" OR "katherine krueger" OR +"@kath_krueger" OR +"@yashar")

AJ Delgado

+"@AJDelgado13" OR authorshort:AJDelgado13 OR authorshort:ajdelgado13 OR +"@ajdelgado13" OR "aj delgado" OR "A. J. Delgado" OR "A.J. Delgado" OR "arlene delgado" OR "arlene j. delgado" OR hashtag:#ajdelgado

Stripper Rumor

stripper OR "abortion pill" OR "jane doe" OR "strip club" OR "gentlemen's club" OR "Rachel's Gentleman's Club" OR smoothie OR abortion

<u>Legal</u>

libel OR defamation OR defamatory OR litigation OR "circuit court" OR "eleventh judicial circuit" OR "miami-dade county" OR "cease-and-desist" OR "court documents" OR "court filing" OR "psychological evaluation"

"legal team" OR "Martin-Lavielle" OR +"@Pamllaw" OR "Ana Martin Lavielle"

<u>Splinter News</u>

Splinter OR +"@splinter_news" OR authorshort:splinter_news OR +"kath_krueger" OR authorshort:kath_krueger OR "Court Docs Allege Ex-Trump Staffer Drugged Woman He Got Pregnant With Abortion Pill" OR "Katherine Krueger"

The following custom filters were created to select out more specific aspects:

- Delgado mentions: mentions of AJ Delgado and her social media account names
- Stripper Rumor: keywords related to the stripper rumor
- Legal related: assorted legal/lawsuit related keywords, and location of the court where the case was filed, as well as the legal team
- Kelly Courtney Miller: mentions of Jason Miller's wife's name and her social media account name
- Splinter mentions: mentions related to Splinter News, or the title and author of the article
- Jason Miller: mentions of Jason Miller's name or social handles (useful to filter Twitter channels to limit it to tweets about Jason Miller)
- Abortion and abortion pill related terms

