UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:18-cv-24227-CMA

JASON MILLER,

     Plaintiff,

       v.

GIZMODO MEDIA GROUP, LLC,
a Delaware Corporation, KATHERINE
KRUEGER, individually, and
WILL MENAKER, individually,

     Defendants.

_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'**
**MOTION TO EXCLUDE EXPERT OPINIONS OF CRAIG KRONENBERGER**

Plaintiff, Jason Miller ("Miller"), files his Response in Opposition to Defendants' Motion to Excluded Expert Opinions of Craig Kronenberger Under Fed. R. Civ. P. 37 and Fed. R. Evid. 702 ("Motion"), and states as follows:

## Introduction

Craig Kronenberger ("Kronenberger") is qualified and his opinions and methodology are reliable. Gizmodo Defendants challenge his opinions based on manufactured issues because they did not retain an expert in his field.

Kronenberger is the President of a leading reputation management firm, and routinely works with clients to manage public relations crises and repair reputations. Using his expertise and reliable, standard industry tools and methods in this area, Kronenberger evaluated the impact Defendants' defamatory article entitled "*Court Docs Allege Ex-Trump Staffer Drugged Woman He Got Pregnant With 'Abortion Pill'*" (the "Article"), and determined the expected costs associated with repairing effects of the Article on Plaintiff, Jason Miller ("Miller"). Defendants do not challenge Kronenberger's credentials; rather, they argue his methodology is unreliable, which is not true. Kronenberger's methodology utilized a combination of industry-recognized tools, his vast knowledge, practical experience, and expertise to develop his opinions.

{BC00239140:1}

Kronenberger's opinions are reliable, based on sound concepts, and will be beneficial to the jury. As such, the Motion should be denied.

## Background

### I.      Kronenberger's Qualifications

Kronenberger is the President of Stripe Reputation, Inc. ("Stripe Reputation"), a leading consultancy for online reputation management.  *See* Expert Report of Craig Kronenberger ("Report"), p. 2 attached as **Exhibit A**.  Stripe Reputation offers digital marketing and reputation management strategies and services. *Id.* at 3.  Those services include digital measurement and analytics, paid media management, crisis and issues management, new media analysis and monitoring, and search engine optimization, among other services.  *Id.*  Kronenberger has significant experience in promotion and protection of reputations for brands, organizations, executives and individuals.  *Id.* at 2.

Prior to working at Stipe Reputation, Kronenberger was the Global Managing Director of Strategic Growth at Edelman, the world's largest public relations firm.  *Id.*  At Edelman, Kronenberger was responsible for leading global teams in the areas of Search Engine Management, Digital Crisis and Risk, Paid Media, and Research and Insights.  *Id.*

Kronenberger has worked in many high profile situations and has worked with individuals that are in the media and those that are not.  Deposition of Craig Kronenberger ("Depo"), p. 306 attached as **Exhibit B**.  He has also worked and dealt with an array of topics including sexual harassment, human trafficking, drug trafficking, and rape.  *Id.*   Accordingly, he has extensive experience seeing data across varying categories and topics, and evaluating the reactions from people.  *Id.*

Kronenberger previously served as an expert witness in a case before the United States District Court for the Northern District of Georgia and the United States District Court in Nevada. *See* Kronenberger CV, STRIPE 0004 attached as **Exhibit C**.  He also provided testimony regarding reputation damages was accepted, considered, and used to substantiate a damages award by the Court in the Georgia case.  *See Ahmed v. Kifle,* 2015 WL 11199078 (N.D. Ga. Feb. 6, 2015).  He has also testified in non-jury trial and has also served as a consulting or advising expert in the areas of online reputation, search engine management, paid media, and digital crisis, numerous times. Depo, pp. 296, 298.

## II.     Kronenberger's Opinions

Kronenberger offers two primary opinions in his expert report: (1) the publication, re-publication, and distribution of the Article across news outlets and social media caused significant negative impact on the reputation of Miller; and (2) the cost of the reasonable and necessary efforts to begin to repair Miller's reputation and correct the defamatory narrative disseminated about him are $63,372,471.65.[1]

To develop his opinion regarding the negative impact of the Article on Miller's reputation, Kronenberger engaged in a multi-step process.  First, he reviewed and analyzed the Article itself, including the Supplement, and determined it was a very negative story about Miller.  Depo, pp. 55-57.  The Article was particularly negative given the nature of allegations therein.  Depo, pp. 55, 58, 134, 148-149.

After reviewing the Article, Kronenberger used industry-standard methods to evaluate the volume of online conversation that was generated by the Article.  Depo, pp. 68, 70.  To accomplish this task, Kronenberger utilized Talkwalker—a widely recognized software tool in his industry—that searches for and analyzes online, social media, print, and TV/radio content from publicly available sources, such as news media, blogs, and social media websites. Depo, p. 70.  Kronenberger input specific search criteria into Talkwalker so that the results generated by the software would be narrowly focused on the Article and discussions related to the Article, while simultaneously excluding unrelated commentary.  Depo, pp. 72-74.

The content compiled by Talkwalker included articles that referenced or linked to the Article and social media commentary referring or discussing the Article.  In particular, the Talkwalker compiled data identified the "mentions" on social media related to the Article and provide a summary as to the number of those mentions.  Report, p. 14; Depo, pp. 78-79, 82-83.  Kronenberger also used Talkwalker to measure the "engagements" of the Article; that is, the number of people that commented, shared, or like a particular mention or comment related to the Article. Depo, pp. 96, 117, 119.  In addition to Talkwalker, Kronenberger used AHRefs—a search and analytics tool—to identify all of the media outlets that contained links going to the Article.  Report, p. 4; Depo, pp. 68, 111.  The totality of the mentions, engagements, and outlets that linked

---

[1] In defamation cases, plaintiffs are entitled to recover the cost of repairing their reputation. *Den Norske v. Sun Print & Publ. Assn.*, 226 N.Y. 1, 122 N.E. 463 (1919).

to the Article allowed Kronenberger to evaluate the "volume" of people that interacted with the Article.  Depo, p. 91.

After understanding the volume of the conversations, Kronenberger next evaluated the "sentiment" of those conversations.  Talkwalker provides a sentiment score for each of the search results indicating whether the article or commentary was positive, negative, or neutral.  Depo, pp. 91, 96-97.  Talkwalker's sentiment analysis is based on deep learning algorithms and advanced pattern recognition.  *See* Talkwalker website, available at: https://talkwalker.digitalexcellencecenter.com/home/sentiment.  By implementing these algorithms, Talkwalker is able to provide a 90% accuracy for sentiment analysis.  *Id.* Nonetheless, Kronenberger did his own independent review of the sentiment.  Depo, pp. 95-98; 101-104.

Kronenberger also evaluated the "authority" of the people and news outlets that wrote about or engaged on the Article.  Depo, pp. 127-128.  Higher "authority" sources have more credibility, more influence, and more exposure.  Depo, p. 131.  For example, Time Magazine writing about the Article would be more significant than an anonymous, unknown person tweeting about it.  The higher the authority sources disseminating the Article, the more influence the Article will have.  Depo, p. 129.

Based on his qualifications and experience, Kronenberger used the totality of this information to understand the "volume" of people who engaged with this Article and the "authority" of those which were engaged.  In short, by looking at the baseline of the conversation around Jason Miller preceding the Article, and the overall volume of conversation after the Article, the authority of the sources involved in the conversation, the negativity of the conversation, and the negativity of the Article itself, Kronenberger opined that there was significant damage to Miller's reputation.  Depo, pp. 132.

The second opinion Kronenberger reached was the costs associated with counteracting the impact of the Article.  Depo, pp. 51, 158-159.  Kronenberger used his experience and expertise to identify a combination of methods, including purchasing advertising space to disseminate positive content about Miller related to the Article, disseminating that content through social media, and running ads on search engines to improve search results related to Miller, to counteract the Article. Report, pp. 20-21.  Kronenberger assigned a cost to each of these means of distributing content to the audience exposed to the false and defamatory content of the Article.  *Id.*  Kronenberger explains

– based on authoritative, industry-recognized sources (Report, p. 22) – that a message must be disseminated frequently enough to generate multiple interactions in order to change perceptions. Kronenberger opined—based on his expertise in and familiarity with the industry and his familiarity with industry research on the subject—that  that one would need to increase the frequency of these mechanisms by 7 to 12 times to obtain the same level of exposure as the Article due its reach and authority.  Depo, pp. 212, 249.  This increased frequency improves the likelihood of exposure, to engagement with, and awareness of the positive content.   Report, p. 22. Notwithstanding the industry averages, Kronenberger used a multiplier of five times the advertising costs to arrive at the total amount it would take to correct the impact of the Article to ensure he was conservative.  Depo, p. 217.

## Memorandum of Law

Defendants seek to exclude the opinions of Kronenberger essentially taking issue with the sufficiency of his report and the methodology he utilized.  However, all the issues they raise go to the weight of Kronenberger's opinions, not their admissibility.  As such, the Motion should be denied.

### I.    Exclusion of Kronenberger's Testimony Under Rule 37 is Improper

Rule 26(a)(2)(B) sets forth a list of requirements that must be included in or accompanied by an expert's report, one of which is "a complete statement of all opinions the witness will express and the basis and reasons for them."   Defendants argue that the Report fails to meet this requirement because Kronenberger did not fully explain his methodology and did not produce the underlying data compiled by Talkwalker that he summarized in his report.  As such, Defendants argue that Kronenberger's opinions should be excluded as a sanction under Rule 37.

Kronenberger's report meets the requirements of Rule 26.  It clearly states Kronenberger's opinions on (1) the impact of the Article on Miller and (2) the costs of advertising to correct the impact.  *See* Report, p. 4.  It explains "how" and "why" he reached his conclusions (Motion p. 2), which were further examined at his deposition.  Thus, the Reports provides a "complete statement of all opinions the witness will express."

The Report also addresses the basis and reasons for the opinions.  Kronenberger explained the impact to Miller's reputation was determined based upon "an analysis of the reach and traction of the Article . . ." *Id.*  The Report explains the number of people that viewed and engaged with the Article, the number of social media mentions related to the Article, and the number of domains

that linked to the Article. *Id.* at 4-5, 11, 14. The Report also explains that Kronenberger reviewed specific comments about the Article and other stories it generated and concluded that the vast majority of the conversation related to the Article was negative. *Id.* at 14-15. The Report further explained that the Article gained authority as it was disseminated through social media and other sources, and how he arrived at that conclusion. *Id.* at 5, 12. Based upon the dissemination of the Article, the negative response associated with the conversations related to the Article, and the authority the Article was obtaining, Kronenberger opined that Miller's reputation was negatively impacted by the Article. *Id.* at 4, 16. In short, the Report meets the level of detail required by Rule 26 by providing a complete statement of all opinions Kronenberger would express and the basis and reasons for them. As such, there is no basis to impose sanctions under Rule 37.

Assuming *arguendo* the Report did fail to comply with Rule 26, Kronenberger's opinions should not be excluded because any alleged deficiency is harmless. "Under Rule 37(c), a district court has authority to exclude an expert's testimony where a party has failed to comply with Rule 26(a) *unless the failure was substantially justified or is harmless*.' OFS Fitel, LLC v. Epstein, Becker and Green, P.C.,* 549 F.3d 1344 (11th Cir. 2008); *see also* Fed. R. Civ. P. 37(c)(1). "The main purpose underlying the sanctions in Rule 37(c)(1) is to prevent surprise and prejudice to the opposing party." *Henry v. Bradshaw,* 2008 WL 11409966 at *3 (S.D. Fla. 2008) (quotations, alterations and citations omitted).

A court's determination as to whether failure to make sufficient expert disclosures is substantially justified or harmless should be guided by the following factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Mobile Shelter Sys. USA. Inc. v. Grate Pallet Sols., LLC*, 845 F.Supp.2d 1241, 1250-51 (M.D. Fla. 2012). Ultimately, "[f]ailure to disclose is 'harmless' where there is no substantial prejudice to the party entitled to receive the disclosure." *Poole v. Gee*, 2008 WL 2397603, at *2 (M.D. Fla. June 10, 2008).

Regarding the first factor, Defendants fail to establish surprise regarding Kronenberger's opinions or methodology. Defendants fully probed the basis and methodology of Kronenberger's expert opinions during his deposition. Miller also offered to allow Defendants to depose Kronenberger again if they need additional examination to understand his methods. However, it

seems that is not necessary because Defendants appear to have outlined Kronenberger's methodology based on his deposition testimony in the Motion. *See* Motion, p. 4. Further, although claiming the methodology was lacking, Defendants' expert conceded that Kronenberger's deposition provided "a more complete picture of what he actually did, what his methodology was . . ." Deposition of Terri D. Giddens ("Giddens Depo"), p. 59 attached as **Exhibit D**. Defendants cannot reasonably argue that a purported failure to explain the methodology in the Report will cause them surprise. Notably, Defendants did not raise any deficiency in Kronenberger's Report nor ask Miller's counsel to supplement it, nor provide any indication of potential problems before Kronenberger's deposition. To the extent the Report did cause them surprise at the deposition, it was cured through the deposition testimony and by the fact that Miller has offered to produce Mr. Kronenberger for deposition again.

As to the failure to provide the particular search terms used with Talkwalker, they have been provided to Defendants and are attached as an exhibit to the Motion; undermining any notion that Defendants will face surprise from that issue. Moreover, Defendants' own expert testified the search terms do not matter in the sense that the spike of activity related to Miller due to the Article is apparent and was even confirmed by her own results. Giddens Depo, p. 129. Nonetheless, to the extent Defendants believe there is still somehow a threat of surprise, Miller has offered to allow Kronenberger to be deposed again prior to trial to address any specific lingering issues. Regardless, the opportunity to cure any purported surprise, consistent with the second factor, is available to Defendants.

As for the third factor, there would be no disruption to the trial if Kronenberger's testimony is allowed, as Kronenberger has already been deposed, they understand his methods, Defendants' retained a rebuttal expert that has been deposed, and Defendants' rebuttal expert understands Kronenberger's methodology. *See* Giddens Depo, p. 59. To the extent Defendants elect to conduct a follow up deposition of Kronenberger, there is ample time to complete a deposition on the narrow issues raised in the Motion in advance of trial. The parties are still conducting other discovery depositions.

Regarding the fourth factor, Kronenberger's opinions will significantly assist jurors to evaluate the cost associated with counteracting the impact of the Article, a recoverable item of damage if Miller prevails. This evidence will assist the jury by establishing an objective, concrete basis to evaluate damages based on the costs of correcting the impact of the Article.

The fifth factor also weighs in favor of Miller.  Miller has a good faith belief and basis to conclude that the Report fulfilled the obligations of Rule 26.  As such, there was never a reason to provide a further explanation as to Kronenberger's opinions or methodology.  Notably, Defendants complain about Talkwalker data, but they voluntarily chose <u>not</u> to obtain access to Talkwalker; although they did access a comparable program.  Giddens Depo, pp. 27, 29.  Also, Talkwalker's data is publicly available.  In fact, Defendants use programs to track and monitor the same content.  Deposition of Jonathan Eiseman, pp. 32-34 attached as **Exhibit E**.

Based on the evaluation of these factors, there is no ongoing prejudice to Defendants to warrant precluding Kronenberger from testifying. And to the extent Defendants claim there was some prejudice because of their expert's initial inability to properly evaluate Kronenberger's conclusions, that prejudice has been cured.  Defendants effectively cross-examined Kronenberger at his deposition and their rebuttal expert, who will testify at trial, testified that she understands Kronenberger's methodology.  If Defendants or their expert believe that there are flaws in that methodology, they can be raised at trial to attack the weight of his testimony.  In the end, the purported prejudice argued by Defendants seems more to be an attack on the implementation of Kronenberger's methodology itself rather than the *disclosure* of the methodology.  Those are issues capable of being challenged at trial and are immaterial to a purported violation of Rule 26.

The Report complies with the requirements of Rule 26.  Even if initially it did not, the lack of compliance is harmless under the circumstances and has been cured.  Sanctions under Rule 37 are not appropriate, particularly in light of the principle that excluding expert testimony is a "drastic" sanction requiring careful consideration. *See Brooks v. United States*, 837 F.2d 958, 961 (11th Cir. 1988).

**II.     Kronenberger's Opinions Satisfy the *Daubert* Standard**

**A.     Legal Standard**

Federal Rule of Evidence 702, which governs expert testimony and codifies the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 578 (1993), states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)     the testimony is based on sufficient facts or data;
>
> (c)     the testimony is the product of reliable principles and methods; and

(d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.   Under Rule 702, "district courts must act as 'gatekeepers' which admit expert testimony only if it is reliable and relevant." *Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1291 (11th Cir. 2005) (citing Daubert, 509 U.S. at 589).   In assessing the admissibility of expert testimony, the Eleventh Circuit requires district courts to engage in a three-part inquiry to determine whether:

(1)    the expert is qualified to testify competently regarding the matters he intends to address;

(2)    the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and

(3)    the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).

Defendants do not challenge Kronenberger's qualifications.  They contest the reliability of his methodology and whether his opinions will assist the trier of fact.

**B.    Kronenberger's methodology is reliable**

The Supreme Court has declined to set forth a "definitive checklist or test" for assessing reliability and instead has emphasized "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  Expert witnesses are granted "testimonial latitude unavailable to other witnesses on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Kumho Tire Co.*, 526 U.S. at 138.  Indeed, the Court's gatekeeping inquiry must be tailored to the facts of the case and the type of expert testimony at issue and is thus a flexible one.  *See Kumho Tire*, 526 U.S. at 150. This is particularly true in instances where the *Daubert* standard may be difficult to apply.  *See generally, Latele Television, C.A. v. Telemundo Communications Group, LLC,* 2014 WL 7150626, at \*5 (S.D. Fla. Dec. 15, 2014) ("the *Daubert* standard, which arose in the context of scientific or mathematical research and analysis, is often difficult to apply in the context of copyright infringement involving expressive or artistic work")

Ultimately, "[t]he key consideration is whether the expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002) (quoting *Kumho Tire*, 526 U.S. at 156). "Generally, if an expert utilizes methods that are consistent with his or her scholarship and research in the particular field, courts will find the methodology sufficiently reliable under *Daubert. Latele Television, C.A.,* 2014 WL 7150626, at *5.

When expert "testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire*, 526 U.S. at 149 (quoting *Daubert,* 509 U.S. at 592).. "[T]he inquiry for the Court is not whether the expert is correct, but whether the proponent of expert testimony has established by a preponderance of the evidence that the testimony is reliable in the context of the methodologies or techniques applied within the appropriate field." *Fortran Group International Inc. v. Tenet Hospitals Limited,* 2011 WL 13176213 (M.D. Fla. 2011). In fact, even an expert relying solely or primarily on experience alone may have his opinions and testimony admitted so long as he can "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *Frazier*, 387 F.3d at 1261, n. 14 (quoting Fed. R. Evid. 702 advisory committee's note (2000 amends.). Importantly, the Court's gatekeeper role "is not intended to supplant the adversary system or the role of the jury: 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'". *Allison v. McGhan Medical Corporation,* 184, F. 3d 1300 (11th Cir. 1999)(quoting *Daubert,* 509 U.S. at 596. To this end, "the Court 'must be careful not to conflate questions  of admissibility of expert testimony with the weight appropriately accorded such testimony by the fact finder." *Carideo v. Whet Travel, Inc.,* 2018 WL 1367444  at *6 (S.D. Fla. Mar. 16, 2018) (emphasis removed) (quoting *In re Trasylol Products Liab. Litig.,* 2010 WL 1489793, at *7 (S.D. Fla. Feb. 24, 2010)).

Kronenberger's methodology is reliable. Kronenberger used methods and tools routinely relied upon in his industry consistent with his background, experience, knowledge and research in his field, including industry-standard research tools such as Talkwalker, to identify and compile the conversation, content, volume, reach and authority surrounding Miller related to the Article.

For instance, Kronenberger used Talkwalker and Cision/Trendkite to assist in developing his opinions. Each of these tools is widely utilized and recognized in his industry, and thus, reliable. Depo, pp. 70, 93. Further, Defendants have not asserted that any of the tools utilized are unreliable. In fact, when evaluating an individual's reputation, Defendants' own expert testified that she too would use a search engine tool to evaluate an individual's reputation. Giddens Depo, p. 30.

After evaluating the tenor of the reach, volume, and authority of the Article, Kronenberger used his qualifications and experience to develop a plan to disseminate paid content to counteract the impact of the Article. Kronenberger's methodology here is also reliable as it is based on sound tools and his extensive experience and expertise in the reputation repair and management area. This is evidenced by the fact that Kronenberger used this general methodology in a different litigation matter, and it was accepted and adopted by the Court. *See Ahmed v. Kifle,* 2015 WL 11199078 (N.D. Ga. Feb. 6, 2015). From a more pragmatic standpoint, Kronenberger uses and implements these same methods with success in his day-to-day work with clients facing public relations' issues. *See e.g.,* Depo, p. 310. As such, Kronenberger's testimony is reliable, including the methodologies or techniques applied within his field of work.

**C.     Defendants' attack on Kronenberger's methodology is unfounded.**

Defendants' purported attack on the reliability of Kronenberger's methodology is, in truth, an attack on Kronenberger's supposed incorrect *use* of the methodology rather than the reliability of the methodology itself. Defendants' arguments go to the weight rather than the admissibility of the testimony, and can be the proper subjects for "[v]igorous cross-examination," "presentation of contrary evidence," and argument to the jury. *See Daubert,* 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"). This is particularly true in a situation like this where there is no definitive methodology for evaluating the reputational harm of an article and the cost to repair that harm. *See Latele Television, C.A.,* 2014 WL 7150626 at *9 (declining to exclude an expert and explaining that "[g]iven that there is no definitive methodology for determining which costs should be deducted in non-patent intellectual property cases, Latele's challenge to Sheppard, a CPA with extensive experience in the entertainment industry, is one which relates to the weight of his opinions, not admissibility").

Further, Defendants' criticisms of the methodology are without merit. Defendants first argue that Kronenberger's methodology is flawed because he failed to consider Miller's reputation

prior to publication of the Article.   In particular, they argue that there were significant negative news stories about Miller in 2016 and 2017, but Kronenberger's analysis of Miller's reputation only dated back to March 2018.   *See* Motion, p. 11-12.

Kronenberger addressed this concern in his deposition, explaining why Miller's reputation preceding the publication of the Article was largely irrelevant to his analysis.   Specifically, the context of the Article contained allegations that were so extremely negative that there is no comparison to any other negativity that would have preceded the Article.   Depo, p. 148-149.   As it related to any past adultery, Kronenberger opined that the accusations in the Article are much, much worse.   Depo, pp. 27-28, 52.   Kronenberger is confident in his position regarding the significant difference between committing adultery and the types of accusations in the Article:

> we've worked on many, many cases in this area.   So we've worked with everything from rape.   We've worked with everything from sexual assault, rape, money laundering, human trafficking.   We've worked across many, many topics.   So we have, you know, the knowledge set from looking at a lot of these difference issue on how its impacting the space.

Depo, p. 28.   He also testified he knows there is a distinction "based upon experience, in the amount of cases that I've seen like this, and the amount of conversation, and the fact that people can't get their jobs.   It impacts their family.   I've seen the result of it because of experience."   Depo, p. 166. Nonetheless, if anything, Kronenberger's purported failure to assess Miller's reputation prior to publication would not be a flaw in methodology.   Rather, it would be a difference in opinion of how to apply the methodology.

Further, it is inaccurate to say that Kronenberger did not consider Miller's reputation prior to publication of the Article.   At one time, Kronenberger made a preliminary assessment of Miller's reputation which included a review and analysis of conversations in social media, news media, blogs, and other different online resources related to Miller.   Depo, pp. 15-16.   For the most part, there was little discussion or articles around Miller, any negative narrative regarding Miller was fairly controlled, and there was a lack of interest in Miller.   Depo, pp. 18, 21-22.   In fact, Defendants' own expert's research – and chart – demonstrate the same thing.   However, Kronenberger's preliminary assessment led him to conclude that there was no significant reputational impact prior to publication of the Article.   Depo, p. 76.   Thus, based on his expertise and judgment, he determined that Miller's reputation in the years preceding the Article was not appropriate or necessary to consider so that the analysis would be focused on the impact of the

story.  Depo, pp. 76-77.  In short, Kronenberger made an informed decision, based on his expertise in this area, on how to implement the methodology used to evaluate Miller's reputation.  Contrary to Defendants' claims, Kronenberger's failure to include an analysis of Miller's reputation dating back to December 2016 does not render his methodology unreliable.  It is simply a difference of opinion as to how to use the methodology.

Defendants next argue that Kronenberger failed to consider whether the Article actually changed people's perceptions of Miller.  As a result, Defendants contend that Kronenberger's cost opinion would be over-inclusive and include reaching people whose perceptions of Miller did not change as a result of the Article.  This is a red-herring.

In the end, the corrective advertising Kronenberger opines about is intended to inform the people exposed to the Article that it is false.  If Miller prevails in this lawsuit, Miller has a right to repair his reputation by letting people know the truth.  Kronenberger's opinion accomplishes that goal. *Den Norse*, 226 N.Y. 1 at 6-11.

Independently, Kronenberger acknowledged it would be impossible to definitively determine people's perceptions of Miller prior to the Article and whether those perceptions have changed.  Depo, p. 155-156.  But he also confirmed that people were reacting negatively to the Article.  *Id.*  This is not surprising given that Article was filled with statements that were much more harmful from a reputational perspective than anything else that had been out there on Miller. In particular, Kronenberger testified: "people were reacting negatively to an article, an article that, in the context from a reputational perspective, is a criminal activity, it's killing of a baby, it is much worse reputationally than anything else, that might have been out there.  It's not even comparable."  Depo, p. 155.  He went on to explain, "[i]t doesn't – I mean the idea of saying that – this article went out there and people's perceptions are not changed, or people don't have opinions on it when they see that someone tried to kill a baby, especially with the context of his article, you know, it's not correct.  I, obviously cannot survey every single person that saw this content.  It's not possible to do that."  Depo, p. 159-160.

Kronenberger is an expert (whose qualifications and the tools he used are unchallenged) in the area of reputational damage and certainly has the ability to opine as to the impact of a particular statement.  He assesses those types of impact regularly.  Depo, p. 134-135. This is no different than Defendants' expert testifying that an affair was reported online would have a negative impact on someone's reputation.  Giddens Depo, p. 68.  As such, Kronenberger's opinion there would be

a negative impact on someone accused of a felony and killing a baby and the qualitative difference of that accusation as compared to anything else is well-within his sphere of expertise. Indeed, Kronenberger has worked with other clients involving issues related to "adultery, sexual harassment, rape, human trafficking, drug trafficking, you name it," and has a sufficient basis to understand the reputational impact that those statements would have as compared to those of adultery. Depo, p. 134-135. In working with these clients, Kronenberger has explained:

> my experience has been after doing this for years in this space, and evaluating and doing analysis, and looking at this, and looking at many, many cases, dealing with this particular thing, which this includes, once again, adultery, sexual harassment, rape, human trafficking, drug trafficking, you name it, that this is considered a highly negative article, and that the overall volume and the authority of people who are talking about this particular article  itself hurts his reputation in a significant way.

Depo, p. 134-135.  Against this background, Kronenberger is permitted to rely on his experience and expertise in providing this opinion.  *See Frazier*, 387 F.3d at 1261 (an expert relying solely or primarily on experience alone may have his opinions and testimony admitted so long as he can "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. (quoting Fed. R. Evid. 702 advisory committee's note (2000 amends.)).

As it relates to the corrective advertising figure itself, Kronenberger explained that it would be impossible to develop a mechanism of corrective advertising that only reached the segment of people who saw the Article whose opinions changed.  Depo, p. 159, 161.  Rather, the goal would be to reach everyone that saw the Article to counteract its impact.   Depo, pp. 51,158-159. Again, this was appropriate given the unquestionably defamatory and harmful content of the Article and the need to put out content to tell everyone that saw the Article that it was not true.  *See* Depo, p. 155, 166, 203.  Nonetheless, Kronenberger used very conservative calculations when determining the corrective advertising number understanding that it is extremely unlikely they would reach all of these people.  Depo, p. 162.  As such, even if the scope of the reach was somehow over-inclusive, that issue was addressed through Kronenberger's conservative calculations and Defendants can attack his opinion at trial.

Defendants' final argument is that Kronenberger improperly applied a multiplier to the costs to repair reputation, and claim this multiplier was applied arbitrarily.   However, Kronenberger repeatedly explained the reasons why the multiplier was necessary to generate the

same influence and counter-balancing impact as that of the Article.  Depo, p. 212.     The 5x multiplier is based on the concept that a person must see a message numerous times before a response is made and is a widely recognized and accepted concept in the advertising industry. Depo, p. 212.  Kronenberger supported the use of this multiplier based on his past experiences and familiarity with the industry usage.  Depo, p. 212, 214; Report, p. 22.  Further, the multiplier is less than that which would normally be applied.  Depo, p. 216.  As such, Kronenberger's opinion the multiplier is necessary and appropriate does not render the methodology unreliable.

Defendants support their general position as to Kronenberger's methodology with *Affiliati Network, Inc. v. Wanamaker*, 2017 WL 7361048 (S.D. Fla. 2017).  In *Affiliati,* an expert reviewed complaints about counter-plaintiff on two websites, and opined that, based on those complaints, that counter-plaintiff's reputation was damaged.  The Court excluded the expert in *Affiliati* for two main reasons.   First, his opinion was based on upon complaints set forth BBB and #REPORTSCAM that he did not verify or attempt to verify.  Second, the expert's opinion failed to offer any analysis to support the conclusion that any complaint was the result of counter-defendant's marketing scheme.  These flaws rendered the expert's opinions inadmissible.

The present matter is readily distinguishable.  First, Kronenberger did much more than rely on a few complaints from two websites.  Rather, he engaged in a widespread review of social media mentions, engagements, and news outlets that specifically referenced the Article as part of the process of evaluating the Article's negative impact.  Further, the information was sourced by well-recognized and regularly utilized industry tools, thus appropriately relied upon by Kronenberger.  *See CBS, Inc. v. PrimeTime 24 Joint Venture*, 9 F. Supp. 2d 1333, 1342 (S.D. Fla. 1998) (Experts may generally rely upon facts or data that is reasonably relied upon by experts in the field.")

Any challenges to the accuracy of the source of that information are challenges to the weight of the expert's opinion not its admissibility.  *See United States for Use & Benefit of S. Site & Underground, Inc. v. McCarthy Improvement Co.*, 2017 WL 10434414, at *5 (M.D. Fla. Feb. 3, 2017) ("Challenges to the accuracy or source of facts underlying an expert's opinion are challenges to its weight rather than its admissibility").

Second, Kronenberger does not "simply assume" anything about the negative reactions to the Article.  Kronenberger repeatedly reiterated that the accusations set forth in the Article are so serious in nature that they more harmful to Miller's reputation than anything else that may have

happened in the past.  This is not an assumption; rather, he is able to make the determination as to the negative impact based upon his experience and the numerous cases he has handled involving other significant accusations.  Because the basis for Kronenberger's opinions and testimony is far more reliable than that of the expert in *Affiliati,* Defendants' reliance on that case is misplaced.

In short, each of the attacks on Kronenberger's methodologies are unfounded.  At best, they are concerns and issues that address Kronenberger's use of the methodology rather than the reliability of the methodology itself.  Accordingly, such concerns can be addressed at trial through cross-examination and argument to the jury.  Kronenberger's opinions and testimony should not be excluded.

### D.      Kronenberger's opinions and testimony will assist the jury

Although briefly touched upon, Defendants contend that Kronenberger should be excluded as an expert because his opinions and testimony are confusing and would not assist the jury. Contrary to these assertions, Kronenberger will be beneficial to a jury.

Expert testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. To satisfy the helpfulness requirement, expert testimony must be relevant to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63.

Kronenberger's testimony meets this standard.  It offers insight in the reputation management field which will allow the jury to obtain a general understanding of the scope of dissemination of the Article and its negative impact.  Further, the testimony provides the jury with that insight to explain an objective monetary cost associated with counteracting the negative impact of the Article using specialized experience, tools and industry knowledge and a reliable methodology employed by an expert that uses it on a regular basis.  Testimony of this nature will undoubtedly help guide the jury.

### CONCLUSION

Based on the foregoing, the Court should deny the Motion in its entirety, and permit Kronenberger to present his opinions and testimony to the jury.

{BC00239140:1}                                              16

Dated:  July 11, 2019.

Respectfully submitted,

*/s/ Shane B. Vogt*
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Shane B. Vogt – FBN 257620
E-mail:  svogt@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 443-2199
Fax: (813) 443-2193
*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 11, 2019, the foregoing document was filed with the Court's CM/ECF system, which will send electronic notice to all counsel of record.

*/s/ Shane B. Vogt*
Attorney

{BC00239140:1}

17