**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**1:18-CV-24227-CMA-Altonaga**

| | |
|---|---|
| JASON MILLER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| GIZMODO MEDIA GROUP, LLC, | ) |
| a Delaware Corporation, KATHERINE | ) |
| KRUEGER, individually, and WILL | ) |
| MENAKER, individually, | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' MOTIONS *IN LIMINE***

I.    **MOTION *IN LIMINE* TO PRECLUDE PLAINTIFF FROM CHARACTERIZING THE "MEANING" OF THE ARTICLE OR THE STATEMENTS AT ISSUE**

By this motion, Defendants seek an order preventing Plaintiff from usurping the role of the jury by offering argument or testimony as to what the plain language of the Article or the Supplement means.  In particular, Plaintiff should not be allowed to testify that the Article says he committed "murder" or "attempted murder," and neither he nor his counsel should be permitted to substitute their own inflammatory characterizations of the Article for its actual language.

Plaintiff bears the burden of proving that the statements at issue were false.  *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986).  In order to determine this, of course, the jury must first decide what the statements mean.  The law is clear that it is the role of the judge to determine whether the statements at issue are capable of defamatory meaning, and the role of the jury to determine how ordinary readers would actually understand the words.  *See, e.g.*, *Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir. 1997); *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 714-15 (11th Cir. 1985).

Plaintiff testified at his deposition that the Article accused him of "murdering" or "killing a child" and "attempting to murder" Jane Doe. Ex. A 227, 229-230, 243, 306-307.  In fact, the words "murder" and "kill" do not appear anywhere in the Article.  *See* Article; *see also* Ex. A at 227-228.  And the Article draws no conclusion regarding any possible legal consequences of the actions described in the Supplement.

Plaintiff should not be permitted to testify as to what he believed the Article accused him of.  Next, Plaintiff should not be permitted to question witnesses about what they understood the Article to mean.  Testimony about meaning, whether from experts or laypeople, is inadmissible.  This evidence is irrelevant to the jury's task of assigning the words the natural meaning that would be given to them by reasonable people, and it amounts to inadmissible opinion evidence.  And even if it were relevant, any limited probative value to this testimony is far outweighed by the serious danger of prejudice.

Finally, Plaintiff should not be permitted to define the meaning of the Article by using unidentified third-party comments concerning the Article.  Based upon his exhibit list, Plaintiff intends to offer into evidence dozens of cherry-picked tweets from third parties on Twitter, presumably as an attempt to show how "members of the public" (selectively chosen by Plaintiff

and his counsel) understood the statements at issue.  *See* Dkt. 192 (Pl. Ex. List), Exs. 50-81.  In addition to being obvious inadmissible hearsay, and inadmissible lay opinion of the Article's meaning, these tweets would serve only to bias and inflame the jury, compromising their determination of the challenged statements' reasonable meaning. Furthermore, Plaintiff's cherry-picked set of tweets would necessarily present an incomplete picture of all public reactions, or even all reactions on Twitter.  Measured against the minimal or non-existent probative value of this evidence to the issues at trial, Rule 403 requires their exclusion.

*First*, testimony on the meaning of any statements at issue should be excluded because the jury is perfectly capable of interpreting the Article for itself.  Under New York law, the trier of fact must interpret the words at issue "in the context of the entire statement or publication as a whole, tested against the understanding of the average reader," *Dillon v. City of N.Y.*, 261 A.D.2d 34, 38 (N.Y. App. Div. 1st Dep't 1999), and must "give the language a natural reading rather than strain to read it as mildly as possible at one extreme, or to find defamatory innuendo on the other." *Weiner v. Doubleday & Co.*, 74 N.Y.2d 586, 592 (1989); *see also Schiller v. Viacom, Inc.*, No. 1:15-cv-22129-UU, 2016 WL 9280239, at *8 (S.D. Fla. Apr. 4, 2016) ("[T]he Court must examine how a reasonable and common mind would understand the statements, and it should not give the statements a tortured interpretation.").

New York courts recognize that no one is better placed to "give the language a natural reading," and determine "how a reasonable and common mind would understand the statements" at issue than the jury itself – and that testimony about how a particular witness understood the statements at issue is therefore irrelevant and inadmissible. *See, e.g.*, *Burdick v. Shearson Am. Express, Inc.*, 160 A.D.2d 642, 642-43 (N.Y. App. Div. 1st Dep't 1990) (trial court did not err in striking testimony about witnesses' "own, personal understanding of the term 'forgery' as used by defendant," because "[i]t was for the jury to determine whether the word 'forgery', when taken in its natural and ordinary meaning, was susceptible to a defamatory connotation."); *Levin v. McPhee*, 917 F. Supp. 230, 238 n.7 (S.D.N.Y. 1996) (noting that "given that the issue with respect to defamatory meaning is the likely construction by proverbial reasonable person, the issue arguably is properly left to the trier of fact," and citing cases excluding such evidence), *aff'd*, 119 F.3d 189 (2d Cir. 1997); *Julian v. Am. Bus. Consultants, Inc.*, 2 N.Y.2d 1, 19 (1956) ("The direct questions put to a witness … were improper and the answers inadmissible as they sought the witness' opinion that the publication attacked the plaintiff.").  *See also, e.g., Duncan*

*v. Pearson*, 135 F.2d 146, 150-51 (4th Cir. 1943) (affirming exclusion by the trial court of "[e]vidence as to the construction placed by witnesses upon the article alleged to be libelous"); *Tomblin v. WCHS-TV8*, 434 F. App'x 205, 212 (4th Cir. 2011) (trial court did not err when it found third parties' opinions regarding the alleged defamatory meaning of a broadcast inadmissible, since "such impressions would not be helpful to the trier of fact because they would be duplicative of those which could be reached by the jury").

Independently, because it is not helpful to the jury, such evidence is also inadmissible under the rules governing lay and expert opinion evidence. *See* Fed. R. Evid. 701 (lay opinion testimony inadmissible unless it would be "helpful to clearly understanding the witness's testimony or to determining a fact in issue"); *United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004) (expert opinion evidence only admissible if it "assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.").

Here, then, testimony about the meaning of the statements at issue should be excluded as irrelevant and unhelpful to the jury, whether from Plaintiff, other witnesses, or third-party tweets.

*Second*, even if it is marginally relevant, testimony by Plaintiff's witnesses about their opinions and personal understanding of the Article's meaning is likely to cause significant prejudice and should be excluded under the balancing test of Federal Rule of Evidence 403, which permits the Court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one of more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Because Plaintiff's chosen witnesses can offer the jury little meaningful insight into how the average person would have understood the Article, their testimony "transforms a common sense issue into a technical one" and is therefore "more apt to confuse than to enlighten, more unfairly prejudicial than probative." *World Boxing Council v. Cosell*, 715 F. Supp. 1259, 1264-65 (S.D.N.Y. 1989) (excluding expert evidence on meaning). Such evidence would also open the door to rebuttal evidence from Defendants about how other people did not share Plaintiffs' witnesses' interpretation of the Article. All of this evidence would be cumulative, confusing, and ultimately of little or no assistance to the jury's determination based on its own review of the plain language of the Article. Accordingly, it should be excluded.

4

## II.   MOTION *IN LIMINE* TO INSTRUCT JURY ON LAW OF DEFAMATION PRIOR TO OPENING ARGUMENTS

This Court should give the jury impartial instructions about the law they are expected to apply, before it hears from counsel.  In *Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987), then-Judge Ruth Bader Ginsburg observed that, in defamation cases where significant constitutional issues are to be determined by the jury, it is especially important for trial judges to "explain, instruct, or clarify continuously, from the commencement of the trial through to the jury's deliberations," including by "instructing the jury, in plain English, at the opening of the case and at appropriate times during trial, as well as at the close of the case."  *Id.* at 807 (Ginsburg, J., concurring) (footnote omitted); *see also Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 n.7 (1989) (noting that trial judge can prevent juror confusion in defamation actions by offering instructions at appropriate junctures throughout trial); William W. Schwarzer, *Reforming Jury Trials*, 132 F.R.D. 575, 583 (1991) ("The case for giving the jury preliminary instructions at the start of the trial is compelling. . . . [N]ot giving preinstructions is like telling jurors to watch a baseball game and decide who won without telling them the rules until the end of the game.").[1]  The law of defamation, and the issues that the jury will be called to decide – including but not limited to the "actual malice" standard and the fair-report privilege – rely upon

---

[1] *See also, e.g.*, Stephen Susman, Richard Lorren Jolly & Roy Futterman, *Innovating for Wise Juries: Preliminary Instructions*, Law360, July 14, 2017 ("By giving jurors preliminary instructions, the court provides jurors more context for what they are about to hear, so that they will be better able to understand, process, retain and prioritize information as it comes in."); Franklin Strier, *The Road to Reform: Judges on Juries and Attorneys*, 30 LOY. L.A. L. REV. 1249, 1256 (Apr. 1997) (benefits of pre-instruction include "improving juror integration of law and facts, enhancing juror recall, improving juror focus on the relevant issues, enhancing jurors' chances of applying the correct rule to the evidence, reducing juror questions during deliberations, creating more informed verdicts, and increasing juror satisfaction") (footnotes omitted); William H. Erickson, *Criminal Jury Instructions*, 1993 U. ILL. L. REV. 285, 291-92 (1993) ("By waiting until the end of the case to deliver instructions . . . a trial judge may deprive jurors of important guidelines to use in observing and evaluating the evidence and demeanor presented throughout the trial. . . . Moreover, instructions at the start of the trial may steer jurors away from irrelevant issues."); Joe S. Cecil, et al., *Citizen Comprehension of Difficult Issues: Lessons From Civil Jury Trials*, 40 AM. U. L. REV. 727, 770 (Winter 1991) ("Empirical research suggests that preliminary instructions increase juror satisfaction with trials, and assist jurors in following legal guidelines.") (footnotes omitted); Judge Mark A. Frankel, *A Trial Judge's Perspective on Providing Tools for Rational Jury Decisionmaking*, 85 NW. U. L. REV. 221, 225 (Fall 1990) ("There is no question in my mind that providing jurors with additional tools such as preliminary instruction . . . enhances the rational aspects of the jury's fact-finding role.").

legal terms of art that would be foreign to non-lawyers and at times counterintuitive to their plain-English meaning.  Impartial preliminary instructions delivered at the outset of the trial, prior to opening statements, will provide the jury with the legal primer necessary to evaluate the evidence presented at trial and deliver an informed and well-reasoned verdict.

For the same reasons, the jury should be provided with copies of the preliminary instructions and should be encouraged to consult them as they receive the evidence.  These steps will acknowledge the wisdom of then-Judge Ginsburg's observation that, in defamation cases such as this, the trial judge should take pains to "explain, instruct or clarify continuously, from the commencement of the trial through to the jury's deliberations," *Tavoulareas*, 817 F.2d at 807 (Ginsburg, J., concurring).  As Judge Ginsburg noted, "[t]he challenge for the trial judge" in explaining difficult legal concepts to a jury "demands attention throughout the proceedings.  It is not met by allowing jurors to listen, without education, as the evidence unfolds and then submitting the case for their general verdict after 'dous[ing] [them] with a kettleful of law during the charge that would make a third-year law-student blanch.'"  *Id.* (citations omitted, alterations in original); *see also Harte-Hanks*, 491 U.S. at 666 n.7 (quoting, with approval, then-Judge Ginsburg's comments).  This is especially so where, as here, it appears that the trial will likely be lengthy, and the evidence will be complex.  Pre-trial instructions will greatly assist the jurors as they begin the serious task of hearing the testimony and evaluating the evidence offered at trial.

## III.     MOTION *IN LIMINE* TO PRECLUDE EVIDENCE RELATING TO DAMAGES ALLEGEDLY SUFFERED BY PERSONS OTHER THAN PLAINTIFF

Defendants move this Court *in limine* for an order precluding Plaintiff from offering testimony, evidence, or argument relating to alleged damages or harm suffered by Plaintiff's wife, Plaintiff's children, or anyone other than Plaintiff himself.   Such evidence should be excluded as irrelevant because Plaintiff has no standing to assert a claim to relief for harm allegedly suffered by third parties.  *Powers v. Ohio*, 499 U.S. 400, 410 (1991) ("[A] litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties.").

Defamation is a tort personal to the party defamed.  *Davis v. Costa-Gavras*, 619 F. Supp. 1372, 1376 (S.D.N.Y. 1985); *see also* Prosser & Keeton, *The Law of Torts* § 111 (1984 ed. & Supp. 1988).  Accordingly, Plaintiff may not recover for derivative injuries that may be sustained by other individuals as a result of the alleged defamation of him.  *See Talbot v. Johnson*

6

*Newspapers Corp.*, 124 A.D. 2d 284, 286 (N.Y. App. Div. 3d Dep't 1986) (defamed plaintiff cannot recover for spouse's injuries caused by defamation of plaintiff); *Thomas v. Restaurant*, No. 115-CV-01113-DAD-SKO, 2015 WL 9583029, at *5 (E.D. Cal. Dec. 31, 2015) ("Plaintiff has no standing to seek redress for the emotional distress of third parties – i.e., his family."); *see also Sethi v. WFMJ Television Inc.*, 732 N.E.2d 451, 462-63 (Ohio Ct. App. 1999); *Hughes v. New England Newspaper Publ'g Co.*, 43 N.E.2d 657, 658-59 (Mass. 1942); *Lee v. Weston*, 402 N.E.2d 23, 27-28 (Ind. Ct. App. 1980). Similarly, a plaintiff cannot recover for defamation of someone else, even it causes the plaintiff injury. *Fowler v. Curtis Publ'g Co.*, 78 F. Supp. 303, 304 (D.D.C. 1948), *aff'd*, 182 F.2d 377 (D.C. Cir. 1950) ("A person who is injured by reason of the fact that someone else is libeled, has no right of recovery."); *Wehling v. Columbia Broad. Sys.*, 721 F.2d 506, 509 (5th Cir. 1983) (wife has no cause of action for husband's defamation); *Sethi*, 732 N.E.2d at 462-63; *Gugliuzza v. K.C.M.C. Inc.*, 606 So. 2d 790, 791-92 (La. 1992) (no cause of action for defamed decedent's relatives); *Geddes v. Princess Props. Int'l, Ltd.*, 88 A.D.2d 835 (N.Y. App. Div. 1ˢᵗ Dep't 1982) (spouse of defamed person has no cause of action for mental anguish and suffering).

Here, Plaintiff has claimed damages based upon, *inter alia*, his daughters allegedly suffering social ostracism by losing playdates and party invitations. *See* FAC ¶ 114, Pl. Interrog. Resp. 15(l). Plaintiff's wife testified to similar alleged harm to their children during her deposition. Ex. B at 133-135. Plaintiff's wife may testify to her personal knowledge and observation of emotional harm allegedly suffered by *Plaintiff*, but she may not testify about any harm allegedly suffered by children or other family members, nor may she testify about the Article's impact on her personally.

In addition to being irrelevant, the introduction of alleged damages suffered by Plaintiff's family members at trial would be highly prejudicial to Defendants, since such evidence would presumably be highly emotional. Because this evidence is neither relevant nor admissible to prove damages to Plaintiff personally, and its introduction would serve only to prejudice and confuse the jury as to the appropriate scope of compensable damages, it should be excluded from trial. *See* Fed. R. Evid. 401, 402, 403.

## IV.     MOTION *IN LIMINE* TO EXCLUDE ANY REFERENCE TO "GAWKER"

Defendants move for an order precluding Plaintiff or his counsel from referencing or invoking the former online publishing company Gawker or the 2016 Florida lawsuit *Bollea v. Gawker*. Plaintiff's Amended Complaint describes Splinter as "an offshoot of Gawker, the notorious web company that met its demise in 2016 after years of defamatory publications and violations of privacy rights." Compl. ¶ 93. Further, Plaintiff's attorneys include some of the attorneys who represented plaintiff Bollea (Hulk Hogan) in his invasion of privacy lawsuit against Gawker, which was tried in Florida state court. Plaintiff should not be able to invoke Gawker as a short-hand reference to alleged irresponsible reporting and attempt to tar the Defendants. The references are entirely irrelevant and highly prejudicial.

Simply put, Gawker is not a party to this case; indeed, the Gawker.com website that published the Hogan tape at issue in *Bollea* no longer exists and did not exist at the time the Article was published. On this basis alone, Gawker is completely irrelevant to the issues in this case. Defendant Katherine Krueger never worked at Gawker and has or had no affiliation with Gawker. It does not matter that Defendant Gizmodo, which published Splinter, was formed from assets formerly belonging to Gawker and sold in its bankruptcy auction. *See Deflecto, LLC v. Dundas \*Jafine Inc.*, No. 13-0116-CV-W-ODS, 2015 WL 9413148, at *7 (W.D. Mo. Dec. 22, 2015) (excluding as irrelevant evidence relating to plaintiff's parent company, a "completely separate legal entity," despite defendant's argument that the parent's business was "relevant to the history of the industry and to the evolution of" the plaintiff). Even if Gawker were an active legal entity and the *current* parent company of Defendant Gizmodo (which it is not), evidence concerning other lawsuits against it would be excluded as irrelevant and prejudicial. *See, e.g., Bunch v. Pac. Cycle, Inc.*, No. 4:13-CV-0036-HLM, 2015 WL 11622952, at *8 (N.D. Ga. Apr. 27, 2015) (granting motion *in limine* to exclude evidence of lawsuits or verdicts against defendant or its parent company).

Indeed, courts routinely exclude evidence of other lawsuits *against the named defendants*, finding such evidence to be hearsay as well as irrelevant, prejudicial, and inadmissible evidence of prior bad acts (Fed. R. Evid. 401, 403, 404). *See, e.g., Palmer v. Bd. of Regents of Univ. Sys. of Ga.*, 208 F.3d 969, 973 (11th Cir. 2000) (court properly excluded evidence of other lawsuits against defendant university where the complaints "involved different decision-makers, different departments, and different hiring processes"); *Bd. of Trustees of*

8

*AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 860 F. Supp. 2d 251, 254 (S.D.N.Y. 2012) ("courts generally exclude evidence of other related lawsuits"); *A.T.O. Golden Constr. Corp. v. Allied World Ins. Co.*, No. 17-24223-CIV, 2018 WL 5886663, at *8 (S.D. Fla. Nov. 9, 2018) (same) (collecting cases). *See also Tavoulareas v. Piro*, 93 F.R.D. 35, 44 (D.D.C. 1981) (rejecting plaintiff's discovery request for evidence of other libel actions brought against defendant The Washington Post since the evidence would be inadmissible under Rule 404). The same reasoning applies here, only more so: Defendants should not be prejudiced by association with a completely different entity that is not a party to this action, not a parent or subsidiary of any party to this action, and in fact no longer even existed at the time of the publication at issue in this case. Accordingly, Plaintiff should be precluded from mentioning or referencing Gawker or the *Bollea* case in any way during argument or testimony at trial.

## V.    MOTION *IN LIMINE* TO EXCLUDE EVIDENCE REGARDING SEALING STATUS OF SUPPLEMENT

Defendants seek an order precluding Plaintiff from offering any evidence, testimony or argument either attempting to prove that the Supplement was "sealed," or otherwise referring to it as a "sealed" filing. Whether the Supplement was sealed or not is irrelevant to any issue that may be tried in this case, and reference to its sealing status at trial would be confusing and highly prejudicial to the jury.

Certain facts are not in dispute concerning whether the Supplement was sealed. There is no dispute that no court order exists sealing the Supplement. While Plaintiff filed a motion to seal the Supplement, that motion has never been ruled on and was never granted. (Defs. SOF (Dkt. 156) ¶ 49.) Similarly, there is no dispute that the Supplement was filed in the open public files of the Florida family court and remained there for three days. (*Id.* ¶ 46.) And Plaintiff does not dispute that the Supplement's allegations were discussed in open court. (*Id.* ¶ 47.) The law of the case is also settled. This Court has already held that New York law controls Defendants' fair-report defense. *See* April 24, 2019 Order on Motion to Dismiss (Dkt. 110) ("MTD Order") at 13. In that decision, this Court also recognized that New York's fair-report privilege applies to court and government documents *regardless* of whether they are confidential or publicly accessible. *See* MTD Order at 9 (holding that "New York's statutory privilege generally applies to reports of confidential proceedings," citing a long line of cases); *see also Gubarev v.*

*BuzzFeed, Inc.*, 340 F. Supp. 3d 1304, 1314 (S.D. Fla. 2018) (New York courts apply Section 74 to any official proceeding, "even if it is not open to the public").[2]

In short, whether the Supplement was sealed is not a disputed issue for the jury and, in any event, is irrelevant for the jury's consideration of whether New York's fair report privilege applies.  Nonetheless, Plaintiff's pretrial disclosures indicate that he intends to conduct a mini-trial surrounding whether the Supplement, if not sealed by court order, was somehow deemed "confidential" by the clerk's office at the time the Article was published.  He has listed at least four trial witnesses from the Miami-Dade clerk's office whose testimony is relevant *solely* to whether or not the Supplement was deemed confidential by the clerk's office,[3] as well as several exhibits that would be offered for no other reason than attempting to prove that the Supplement was in some way "effectively sealed" or deemed "confidential" by the Clerk's office even though indisputably no court order granting Plaintiff's sealing motion exists.   There is no legal or factual foundation for a document being "effectively sealed" and this Court should not create a new category that finds no support in the law.[4]

In short, this evidence and testimony would unnecessarily extend the time needed for trial, while introducing a side issue that is simply irrelevant to the jury's decision and would serve only to confuse and prejudice them.

---

[2] In the summary judgment briefing pending before this Court, Plaintiff tries to avoid this clear law by asking this Court to create a new exception to New York's statutory privilege and thereby hold as a matter of law that New York's fair report privilege does not apply to Defendants' Article.  Defendants' summary judgment papers discuss at length why Plaintiff's proposed "exception" is at odds with New York law, and in any event would not apply to a Florida proceeding that is public and open and an action involving public figures involving highly newsworthy allegations.  *See* Defs. SJ Mot. (Dkt. 155) at 12-16, Defs. SJ Reply (Dkt. 177), at 1-2.

[3] Plaintiff has listed among his trial witnesses Maria Fernandez and Doreen Ruggiero, identified as corporate representatives of the Miami-Dade Clerk of Courts (Family Court Office), Vainize Lalemond, an employee of the Clerk's Office, as well as a Records Custodian for the Miami-Dade Clerk of Courts.  (*See* Dkt. 202.)

[4] These exhibits include Plaintiff's proposed Exhibits 87, 88, 89, 90, 91, 92, 93, 94, 95 and 96.  (*See* Dkt. 201.)  In an abundance of caution, Defendants have preliminarily listed their own evidence pertaining to this issue – including evidence that the Supplement was obtained from the Clerk's office on several occasions by individuals who are not parties to the Family Court proceeding – but if this motion is granted they will remove from their own disclosures any evidence relevant only to proving the sealing status of the Supplement.

As Defendants set forth in their pending summary judgment motion, application of the fair report privilege can and should be determined by this Court as a matter of law because there are no material facts in dispute, and the Court can determine that the Article is "fair and true" as a matter of law based upon those undisputed facts. *See* Defs. SJ Mot. (Dkt. 155) at 8-12, Defs. SJ Reply (Dkt. 177), at 2-4.  But even if the Court were to decide that Defendants' fair-report defense requires a jury determination of whether the Article was as a matter of fact  "fair and true," that determination would be based on the jury reviewing the entire contents of the Supplement and the wording of the Article as a whole.  The sealing status of the Supplement, or whether the Clerk's office should have treated the Supplement as "confidential,"  is completely irrelevant to whether the Article is "fair and true."  Fed. R. Evid. 401.

Since it is not relevant to any fact of consequence in determining this action, Plaintiff's attempts to prove that the Supplement was "effectively sealed" by non-judicial order could only be offered for an improper purpose.  *First*, offering this evidence will confuse the jury by suggesting that the document's sealing status *is* relevant to the fair-report privilege, even though New York law makes clear that it is not, as the Court has already held.  *Second*, offering this evidence will prejudice the jury by suggesting that Defendants did something wrong or illegal by obtaining the Supplement, or potentially urging them to issue a verdict based on a personal belief that the Article  *shouldn't* be protected by the fair report privilege, rather than applying the law as it exists.  *Finally*, conducting a mini-trial on sealing status is a waste the time of the jury, the Court, and the parties.  Even if the evidence were of minimal relevance, that relevance is far outweighed by the significant risk of prejudice, confusion, misleading the jury, and wasting the jury's time. Fed. R. Evid. 403.  Granting this motion will streamline the witness and exhibit lists so that the parties can focus on the issues relevant to determination of this action, and not engage in irrelevant and prejudicial sideshows.

For these reasons, the Court should order that Plaintiff may not offer testimony, evidence, or argument at trial regarding the sealing status of the Supplement.

## VI.     MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF DEFENDANTS' PERSONAL POLITICAL AFFILIATIONS OR POLITICAL VIEWS

Plaintiff has indicated his intention to introduce evidence concerning the political beliefs and orientation of Defendants, in an attempt to show that Defendants had a "motive" for defaming him.  During discovery, Plaintiff went to great lengths to demonstrate that Defendants

and their witnesses are politically opposed to President Trump and describe themselves as "progressive" or "liberal."  *See, e.g.,* Ex. E at 25-28; Ex. D at 13-14.  This evidence is irrelevant to any fact at issue in this case and, depending on the political orientation of individual jury members, could be extremely prejudicial to Defendants – particularly in today's polarized political climate.  The Court should not permit this trial to be a referendum on the personal politics of the individual defendant, the publication defendant or any of their witnesses, or on their feelings about President Trump.

As the Eleventh Circuit has recognized, "[m]embership in a political party, by itself, does not necessarily signify anything about a person's truthfulness."  *United States v. Arias-Izquierdo*, 449 F.3d 1168, 1180 (11th Cir. 2006).  Plaintiff and his witnesses have admitted as much in testimony, concurring with Defendants' witnesses that "there are news outlets who make mistakes on all sides" of the political spectrum and Plaintiff cannot "say one is more accurate than the other."  Ex. A at 48-50; *see also* Ex. C at 20 ("Q: And it is your belief, I would believe, that you can have a political point of view but still tell the truth, correct? A. Absolutely. Yes, ma'am.").  *Accord* Ex. D at 104 ("I don't believe that because you identify one way politically, that you can't still objectively and accurately report facts.").  Indeed, "[i]t would be sadly ironic for judges in our adversarial system to conclude … that the mere taking of an adversarial stance is antithetical to the truthful presentation of facts."  *Tavoulareas*, 817 F.2d at795 .

Evidence of political or personal differences between defendants and plaintiff, standing alone, is not probative of actual malice because it sheds no light on a defendant's knowledge of falsity or reckless disregard for truth.  "[A] newspaper's motive in publishing a story—whether to promote an opponent's candidacy or to increase its circulation—cannot provide a sufficient basis for finding actual malice."  *Harte-Hanks*, 491 U.S. at 665 (.  Here, there is no conceivable relevance to testimony that Ms. Krueger considers herself to be on the left side of the political spectrum, or that Splinter's editor in chief describes the publication as "progressive."  The Article was not even taking political "sides" – it was reporting on a dispute between Plaintiff and Delgado, both of whom were Republicans, avowed Trump supporters and public surrogates for Trump.  This indisputable fact underscores that Plaintiff is attempting to use the political preferences of Defendants' witnesses solely for their possible prejudicial effect, since plainly Gizmodo's reliance on the Supplement (filed by A.J. Delgado, a Trump supporter) that contained

12

allegations concerning Plaintiff (another Trump supporter) would not logically flow from some bias in favor of Ms. Delgado based on her political beliefs.

Moreover, asking witnesses about their personal political beliefs and activities carries a significant risk of prejudice that would outweigh any minimal relevance. *See Low v. Trump Univ., LLC*, No. 310CV00940GPCWVG, 2016 WL 6732110, at *4 (S.D. Cal. Nov. 15, 2016) (granting plaintiffs' motion *in limine* to exclude evidence or argument regarding witnesses' "political affiliation, voting preferences, and political contributions," finding that such evidence "has no apparent relevance and may be unduly inflammatory").

Simply put, there is nothing unusual or nefarious about a publisher having a particular political viewpoint in its coverage:

> [I]t is hardly unusual for publications to print matter that will please their subscribers; many publications set out to portray a particular viewpoint or even to advance a partisan cause. Defamation judgments do not exist to police their objectivity; the First Amendment presupposes that a veritable medley of opposing voices is better suited to the search for truth.

*Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 716 (4th Cir. 1991) (reversing jury verdict for failure to demonstrate actual malice). Allowing Plaintiff to cross-examine witnesses on their personal political beliefs, and their views of President Trump, would invite the jury to "police" defendants and find liability premised on what they perceive to be a lack of political objectivity or differing partisan viewpoints. Such an approach would be fundamentally at odds with the purpose of the actual malice standard, which enshrines "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Because this evidence is irrelevant and prejudicial, it should be excluded under Fed. R. Evid. 401 and 403.

## VII.    MOTION *IN LIMINE* TO PRECLUDE PLAINTIFF FROM RELYING ON DEFENDANTS' POST-PUBLICATION COMMUNICATIONS

By this motion, Defendants seek an order precluding Plaintiff from introducing at trial evidence of Defendants' conduct after the publication of the Article because such evidence is not probative of any element of Plaintiff's claim and its prejudicial value outweighs its probative value.

To prevail in this action, Plaintiff must demonstrate that Defendants published an unprivileged, false, defamatory, statement of fact with actual malice. *Celle v. Filipino Reporter Enterprises Inc.*, 209 F. 3d 163, 176 (2d Cir. 2000). The only element to which the evidence discussed below could possibly be relevant is actual malice. To show actual malice, Plaintiff must show, by clear and convincing evidence, that Defendants *at the time of the publication*, either were actually aware that the statements at issue were false or that they "in fact entertained serious doubts as to the truth" of the statements. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *see also Silvester v. Amer. Broad. Cos, Inc.*, 839 F. 2d 1491, 1498 (11th Cir. 1988). Nonetheless, Plaintiff has listed several exhibits and identified a handful of witness concerning events that happened after the Article was published. Specifically, Plaintiff intends to offer the following exhibits,: (1) exhibits showing Defendants' efforts to promote the Article *after it had already been published* (*e.g.*, Pl. Ex. (Dkt. 201) 3, 5, 23, 25-36, 38); (2) Defendants' efforts to obtain information about Plaintiff's relationship with CNN and reporting on same *after the Article had already been published* (*id.* Exs. 16, 20); (3) the Article's performance, or lack thereof, during the four days *following publication* (*id.* Exs. 39, 40, 48, 49); (4) Plaintiff's lawsuit against Defendants, which was filed on October 16, 2018, *25 days after publication* of the Article, and Krueger's and Menaker's reactions to the lawsuit (*id.* Exs. 111, 118, 119).[5]

All of this evidence, however, relates to a time *after* the Article was published. It is therefore not relevant to a finding of liability here. This is particularly true concerning the exhibits listed in category 4 – the reaction of Krueger and Menaker to the lawsuit. How the author of the Article feels about being sued is clearly not relevant to whether she acted with subjective awareness of probable falsity at the time the Article was written.

Further, if allowed, the evidence would be prejudicial and would make it more likely that the jury would make its determination based on improper evidence. This is exactly what Federal Rule of Evidence 403 is intended to prevent. Indeed, the term "[u]nfair prejudice . . . means an undue tendency to suggest decision on an *improper basis*, commonly, though not necessarily, *an emotional one*." Fed. R. Evid. 403 advisory committee's note. This unfortunate effect cannot simply be cured by giving the jury prompt and proper instructions on the meanings of the phrase

---

[5] Of course, anything that *Menaker* said or did does not and cannot reflect on *Defendants'* knowledge, intent or state of mind at any point in time, and such evidence should be excluded altogether as irrelevant (and likely hearsay) for that reason alone.

"actual malice" or the purpose of each item of evidence. *See Westmoreland v. CBS, Inc.*, 596 F. Supp. 1170, 1172 n.1 (S.D.N.Y. 1984).  Thus, this Court should exclude any and all evidence of Defendants' post-publication conduct that has no bearing on their alleged subjective knowledge of falsity or serious doubts as to truth at the time of publication.  Plaintiff's proposed 3, 5, 23, 25-36, 38, 39, 40, 48, 49, 111, 118, 119  and the deposition testimony of Jonathan Eiseman, Susie Banikarim, Jeffrey Schneider (of Lead PR) and Cherilyn Cubeta regarding the evidence discussed herein that has been designated by Plaintiff should all be excluded.

## VIII.   MOTION *IN LIMINE* TO PRECLUDE IMPERMISSIBLE CHARACTER EVIDENCE RELATING TO A.J. DELGADO

A central theme of Plaintiff's case is that his now-estranged lover and the mother of one of his children, with whom he is locked in a bitter custody battle, is "crazy" – and therefore Defendants acted with actual malice in relying on the contents of a document she filed in that custody dispute under penalty of perjury.[6]  Based on his questioning in discovery and proposed exhibits list for trial, Plaintiff intends to introduce evidence of a prior restraining order entered against Ms. Delgado by an ex-boyfriend (Dkt. 201 (Pl. Ex. 99); a court filing in the custody dispute between Plaintiff and Ms. Delgado in which a judge, upon recusing himself, criticizes Ms. Delgado for her "inability to control her emotions" during court hearings and questions her "emotional and mental health" (*id.* Ex. 100); two articles authored by Ms. Delgado in 2014, in which she questions the credibility of women who raise accusations of rape and domestic violence (*id.* Exs. 97, 98); and three news articles about two separate incidents in which a man either admitted or was accused of inducing his partner's miscarriage by putting abortifacient pills in her drink (Dkt. 201 Exs. 166-168).  None of these exhibits are remotely relevant to this issues in this case, and they are plainly inadmissible under the Federal Rules.  Accordingly, Plaintiff should not be permitted to introduce these exhibits, nor may he refer to them in testimony or argument.

*First*, none of this evidence is relevant to whether Defendants acted with actual malice. Actual malice is a subjective inquiry based on each defendant's actual knowledge at the time of publication.  *See Bose Corp. v. Consumer Union of U.S., Inc.*, 466 U.S. 485, 512 (1984).  There

---

[6] Plaintiff ignores that Ms. Delgado is a Harvard educated, New York licensed attorney.  Her *pro se* filing must be evaluated within that context.

is no evidence that Defendants were aware of any of these documents; and in fact, Ms. Krueger testified that she had no knowledge of the 2012 restraining order (Pl. Ex. 99) or the "Crying Rape" article (Pl. Ex. 97). *See* Ex. E at 189-190, 191. Even if she *did* know about it, the fact that Ms. Delgado was the subject of a restraining order in 2012 or criticized for her demeanor in family court has no bearing on her or the Supplement's reliability and is therefore not relevant to whether Defendants acted with actual malice by relying on the contents of her court filing. *See, e.g., Cobb v. Time, Inc.*, 278 F.3d 629, 638 (6th Cir. 2002) (no actual malice where journalist relied on source who was a drug user with "criminal background"); *Secord v. Cockburn*, 747 F. Supp. 779, 794 (D.D.C. 1990) (use of "convicted felons" as sources does not constitute actual malice). Moreover, Ms. Delgado testified that she had never seen any of these articles (Dkt. 201 Exs. 166-168), nor had she ever read *any* article about a man inducing a miscarriage by putting an abortion pill in a drink prior to filing the Supplement. Ex. F at 289-292.

*Second*, each of the documents is independently inadmissible under the Federal Rules. Plaintiff has previously described the two articles as Delgado's "playbook," insinuating that she was following the example of women she criticized in the article for making "false allegations." *See* Compl. ¶¶ 50, 51. In this way, he is seeking to submit them for the truth of their contents and transform Ms. Delgado into an "expert" about how women are generally untrustworthy. Accordingly, the articles are inadmissible hearsay under Fed. R. Evid. 802, as well as inadmissible lay opinion under Fed. R. Evid. 701. Moreover, any minimal relevance that Plaintiff might argue is far outweighed by the prejudicial effect of permitting the jury to read articles insinuating that women who allege sexual assault and domestic violence are not to be trusted. Plaintiff's argument is inherently offensive, finds no support in the record or common sense and should summarily be rejected by the Court. Fed. R. Evid. 403.

The news articles about other incidents where men induced miscarriage are plainly inadmissible hearsay. And to the extent Plaintiff is trying to insinuate that Ms. Delgado made up the allegations in the Supplement out of whole cloth, relying on these articles, he has not remotely laid a foundation for that theory. In fact, Ms. Delgado's undisputed testimony is exactly the opposite: she testified that she never heard of these incidents, or saw these articles, before she filed the Supplement – and expressed shock that "apparently this happens a lot." Ex. F at 289-292. Further, any minimal probative value it may possess is far outweighed by the clear danger of prejudice and the likelihood of confusing and misleading the jury. Fed. R. Evid. 403.

The "Order of Recusal" is presumably offered for the truth of the family court judge's criticisms of Ms. Delgado, including his "question[s] [about] her emotional or mental health." This renders it inadmissible hearsay and lay opinion, and it does not fall within any exception in Rule 803. Moreover, any minimal relevance is outweighed by the enormous prejudice of permitting the jury to learn of criticisms of the witness by a judge in a separate court proceeding. Fed. R. Evid. 403.

Finally, the 2012 restraining order is inadmissible character evidence under Fed. R. Evid. 608(b), in addition to being unduly prejudicial under Fed. R. Evid. 403. The fact that an ex-boyfriend obtained an order of protection against Ms. Delgado, allegedly for sending harassing e-mails, has no bearing on Ms. Delgado's character for truthfulness. *See, e.g., United States v. Baskerville*, No. CRIM 04-280 (FSH), 2010 WL 446454, at *1 (D.N.J. Feb. 3, 2010) (witness's prior civil restraining order was not probative of truthfulness), *aff'd*, 492 F. App'x 254 (3d Cir. 2012); *United States v. Jeffers*, 402 F. App'x. 601, 603 (2d Cir. 2010) (alleged prior acts of domestic violence not probative of witness's credibility); *see also Hartman v. Snelders*, No. 04 CV 1784 (CLP), 2010 WL 11626508, at *11 (E.D.N.Y. Jan. 28, 2010) (excluding evidence of plaintiff's prior convictions for harassment under Rule 609(a)(2) since "there is nothing in the basic elements of the crime of harassment that requires proof of false statements or dishonesty").

In sum, Plaintiff should not be permitted to turn this trial into an extension of his acrimonious custody dispute with Ms. Delgado. *Jeffers*, 402 F. App'x at 603 (court properly excluded evidence about cooperating government witness's alleged domestic abuse during his relationship with the defendant, which would have necessitated a "mini-trial on domestic disputes"). None of the above evidence is relevant or admissible, and all of it is highly prejudicial. Plaintiff should not be permitted to offer it to the jury, nor to reference it in testimony or argument.

## IX.   MOTION *IN LIMINE* TO INSTRUCT JURY TO READ ENTIRE ARTICLE PRIOR TO OPENING STATEMENTS

The Court should give the members of the jury exactly what Gizmodo published – its article together with the complete Supplement embedded within it – prior to opening statements, and instruct them to read both in full.

New York courts recognize that an allegedly defamatory publication must be assessed as a whole. *See, e.g.*, *Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985) ("The words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader."); *James v. Gannett Co.*, 40 N.Y.2d 415, 419-20 (1976) (holding that "[i]n analyzing the words in order to ascertain whether a question of fact exists for resolution upon trial, the court will not pick out and isolate particular phrases but will consider the publication as a whole," and the court must consider "the whole scope and apparent object of the writer," and read the paragraph at issue "as a whole with the entire article."). Florida law is the same. *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983) ("[A] publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.' When words and pictures are presented together, each is an important element of what, *in toto,* constitutes the publication. Articles are to be considered with their illustrations; pictures are to be viewed with their captions; stories are to be read with their headlines… A correlative principle is that the trial court must evaluate the publication, not by 'extremes, but as the common mind would naturally understand it.'") (citations omitted); *Brown v. Tallahassee Democrat, Inc.*, 440 So. 2d 588, 589 (Fla. 1st DCA 1983) ("It is sound principle that an allegedly defamatory publication must be considered in its entirety rather than with an eye constrained to the objectionable feature alone.").

In other words, in deciding whether plaintiffs have satisfied the elements of a defamation claim, courts and juries look not to what the plaintiffs complain about, but what the defendants actually published. *See, e.g.*, *Parsi v. Daioleslam*, 595 F. Supp. 2d 99, 110 (D.D.C. 2009) (striking portion of complaint that "misconstrues defendant's actual statement"). For this reason, courts and juries will even read entire books to understand the statements at issue in context. *See, e.g.*, *Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1226 (11th Cir. 2002); *Chau v. Lewis*, 935 F. Supp. 2d 644, 661 (S.D.N.Y. 2013), *aff'd*, 771 F.3d 118 (2d Cir. 2014); *Price v. Viking Penguin, Inc.*, 676 F. Supp. 1501, 1504 (D. Minn. 1988), *aff'd*, 881 F.3d 1426 (8th Cir. 1989).

In this case, many of the key issues that the jury will be asked to resolve require it to assess the contents of the Article and the Supplement. Jurors should therefore be afforded the opportunity to review the publication at issue, in its entirety, for themselves *before* they hear opening statements or other descriptions of what Gizmodo published from the mouths of counsel. By allowing the jury to read the Article and Supplement before hearing from counsel,

jurors can assess the evidence they receive and the arguments they hear in the context of their own evaluation of the relevant publication.  Such a procedure will further the overarching goal of a jury verdict based on an objective and reasoned evaluation of the evidence.  *See* Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 106[02], at 106-17 (quoting McCormack, *Evidence* § 56, at 131 (1954)) (danger posed by prospect that fact-finder will misunderstand statement taken out of context "'is not completely averted by a later, separate instruction supplying of the relevant omitted parts.  The distorted impression may sometimes linger and work its influence at the subconscious level'").

An analogous procedure was employed successfully in *Masson v. New Yorker Magazine, Inc.*, 85 F.3d 1394 (9th Cir. 1996).  *Masson* focused on a jury's assessment of the contents of a lengthy magazine article.  The plaintiff claimed that the article contained several specific quotations that had been falsely attributed to him.  The defendants countered that, when read in the context of the entire work, the quotations were substantially accurate.  The trial court determined that, to resolve this dispute intelligently, the jury should be instructed to read the article prior to hearing opening statements or receiving any other evidence.  Accordingly, after the jury was selected, each juror was provided with a copy of the article and instructed to read it prior to the commencement of trial.[7]

Allowing jurors to review the Article and the Supplement before they hear argument puts the jurors in the best position to determine the reaction of the average reader of Gizmodo's publication.  As in *Masson*, the jury in this case should be instructed to review the publication in issue – the Article at issue, along with the Supplement that was embedded with the Article – untainted by the arguments of counsel, before it undertakes to consider the merits of the parties' contentions concerning the tone, tenor, and meaning of that publication.

## X.   MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OF SPECIAL DAMAGES FOR WHICH PLAINTIFF CANNOT ESTABLISH A CAUSAL CONNECTION

Defendants further seek an order preventing Plaintiff from introducing evidence of Plaintiff's alleged special damages because he has no evidence of a causal connection between

---

[7] A similar procedure has been followed by agreement of the parties in other recent defamation trials.  *See, e.g., Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*, No. 08-cv-9117 (S.D.N.Y. 2015), ECF No. 496, at 42-43; *Eramo v. Rolling Stone, LLC*, No. 3:15-cv-00023 (W.D. Va. 2016), ECF No. 296, at 5-6, 15-55.

the publication of the Article and the alleged damage. Absent that necessary predicate, Plaintiff's opinions would be highly prejudicial and should not be admitted.

Unlike general damages – which address damage to reputation, humiliation and mental anguish – special damages are only recoverable for "the loss of something having economic or pecuniary value, which must flow directly from the injury to reputation caused by defamation and not from the effects of the defamation." *Franklin v. Daily Holdings, Inc.*, 135 A.D. 3d 87, 93 (N.Y. App. Div. 1st Dep't 2015) (citing *Agnant v. Shakur*, 30 F. Supp. 2d 420, 426 (S.D.N.Y. 1998)); Restat. 2d of Torts, § 575.[8] In other words, special damages must "flow directly from the injury to reputation." *Franklin*, 135 A.D. 3d at 93. And one cannot prove that such losses "flow directly" from the injury to reputation with evidence that "engages in a great deal of speculation and falls well short of being sufficiently particular to identify Plaintiff's actual losses." *Marchuk v. Faruqi & Faruqi, LLP*, 100 F. Supp. 3d 302, 314 (S.D.N.Y. 2015). That is precisely the type of evidence at issue here.

For example, based on his answers to Defendants' interrogatories, Plaintiff intends to present evidence that, as a result of the Article: 1) Plaintiff's contract with CNN was terminated; 2) Plaintiff's agent, Mark McGrath, "dropped him"; 3) Plaintiff's contract to appear at Politicon 2019; 4) Plaintiff is no longer being offered speaking engagements, including SAGE, Gateway Partners, Tencent and Fox News Sunday; and 5) Plaintiff's future job opportunities and, in turn, his ability to provide for his family were "permanently crippled."[9]

What Plaintiff ignores, however, is that he must provide admissible evidence at trial of a causal connection between each of these alleged special damages and the alleged injury to his reputation that was caused by the statements at issue. *See Aronson*, 65 N.Y. 2d at 595 ("[T]here is no causal connection between the loss of that position and the alleged oral defamation, [so]

[8] Even though a plaintiff alleging defamation *per se* need not plead special damages in his complaint, if he seeks special damages at trial, he must abide by the same pleading and evidentiary rules that typically apply to special damages. *See, e.g.*, *W.C. Loftus & Co. v. Bennett*, 68 A.D. 128 (N.Y. App. Div. 1st Dep't 1902) (finding that, in an action for defamation per se, "evidence of special damage may be given in enhancement of damages, provided the special damage is pleaded," and reversing the judgment in favor of the plaintiff because he was impermissibly permitted to introduce evidence of special damages that had not been pled in his complaint).

[9] Further, Plaintiff intends to introduce a number of exhibits in support of these claims, including Exhibit 17 (Contributor's Agreement with CNN), Exhibit 82 (invoice for Politicon), Exhibit 83 (emails with Fox News Sunday), Exhibit 84 (emails with Fox News Sunday Podcast).

plaintiff cannot establish special damages as a matter of law."). Plaintiff has not done so. Critically, besides his own self-serving testimony, Plaintiff has not named witnesses with firsthand knowledge of *any* of the special damages claimed in his answers to interrogatories or discussed in the proposed exhibits. Plaintiff has not named anyone from CNN; anyone from Fox News; anyone from Politicon; anyone from William Morris Endeavor Entertainment, including his former agent Mark McGrath; or anyone from SAGE, Gateway Partners or Tencent. Nor are any of his exhibits in support of these alleged damages admissible. Exhibits 17 and 82-84 contain nothing more than inadmissible hearsay. They consist of out-of-court statements, and Plaintiff intends to offer them to prove the truth of the matters asserted therein.[10]

Accordingly, Plaintiff must necessarily rely <u>solely</u> on his own testimony to prove the special damages that he associates with these alleged contract losses or lost professional opportunities. This testimony is inadmissible as hearsay and/or because it would be based on speculation as to the motivations of absent third parties. Without a provable causal connection, any evidence of Plaintiff's special damages is not relevant under Fed. R. Evid. 401-402.

Defendants also seek an order precluding Plaintiff from introducing evidence of a hypothetical dollar amount – in this case a whopping $63 million – that he claims would be required to repair his reputation because such damages are not recoverable in defamation cases. In its decision in *Gertz v. Robert Welch*, the U.S. Supreme Court described the kinds of damages recoverable in defamation actions, holding that defamation damages should be "grounded in the constitutional command of the First Amendment. It is therefore appropriate to require that state remedies for defamatory falsehood reach *no farther* than compensating them for reputational harm. 418 U.S. 323, 349 (1974) (emphasis added). As the Court expressly cautioned in *Gertz*, the states have no substantial interest in securing for defamation plaintiffs "gratuitous awards of money damages far in excess of any actual injury." *Id.*

For this reason, Plaintiff should not be permitted to recover some purely speculative future cost of "repairing" his reputation. To the extent that courts award damages for efforts to mitigate a Plaintiff's reputation – and such cases are rare – courts have required plaintiffs to enumerate those damages specifically and in proportion to the damage incurred. *See Wachs v. Winter*, 569 F. Supp. 1438, 1446 (E.D.N.Y. 1983) ("One who attempts to mitigate such damages

---

[10] No exception to the hearsay rule would allow these emails chains with third parties (not appearing at trial) to be properly admitted.

is entitled to recover reasonable expenses that are proportionate to the injury and to the consequences to be averted.").  Here, Plaintiff has offered no evidence of such mitigation costs, thus he cannot recover them.  And, to allow him to recover a hypothetical future cost of repair would amount to awarding damages beyond those actually incurred, in direct violation of the Supreme Court's instruction.

   For these reasons, this Court should exclude any and all evidence of Plaintiff's alleged special damages at trial and of any hypothetical amount allegedly necessary to "repair" to his reputation.

## CERTIFICATE OF GOOD FAITH CONFERENCE

   Pursuant to Local Rule 7.1(a)(3), the undersigned counsel certifies that counsel for Defendants conferred with counsel for Plaintiff regarding the relief requested herein, and that Plaintiff opposes the relief requested herein.

           Respectfully submitted,

           August 15, 2019

| | |
|---|---|
| /s/ *Elizabeth A. McNamara* | /s/ *Deanna K. Shullman* |
| Elizabeth A. McNamara (*pro hac vice*) | Deanna K. Shullman (Florida Bar No. 514462) |
| Katherine M. Bolger (*pro hac vice*) | Rachel Fugate (Florida Bar. No. 144029) |
| Claire K. Leonard (*pro hac vice*) | Giselle M. Girones (Florida Bar. No. 124373) |
| DAVIS WRIGHT TREMAINE | SHULLMAN FUGATE PLLC |
| 1251 Avenue of the Americas, 21st Floor | 2101 Vista Parkway, Suite 4006 |
| New York, New York 10020 | West Palm Beach, FL 33411 |
| Telephone: (212) 489-8230 | Telephone: (561) 429-3619 |
| lizmcnamara@dwt.com | dshullman@shullmanfugate.com |
| katebolger@dwt.com | rfugate@shullmanfugate.com |
| claireleonard@dwt.com | ggirones@shullmanfugate.com |
| | |
| *Attorneys for Defendants Gizmodo Media* | *Attorneys for Defendants Gizmodo Media* |
| *Group, LLC and Katherine Krueger* | *Group, LLC and Katherine Krueger* |

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2019, a true and correct copy of the foregoing has been served by CM/ECF on all counsel or parties of record on the service list.

**Deanna K. Shullman**
Deanna K. Shullman
Florida Bar No. 514462

## SERVICE LIST

Kenneth G. Turkel, Esq.
Shane B. Vogt, Esq.
Bajo Cuva Cohen Turkel
100 N. Tampa Street, Ste. 1900
Tampa, FL 33602
Phone: 813-443-2193
kturkel@bajocuva.com
shane.vogt@bajocuva.com
*Attorneys for Plaintiff*

EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF FLORIDA

 3

 4      - - - - - - - - - - - - - - - -X

 5      JASON MILLER,                :

 6              Plaintiff,           :

 7      vs.                          : Case No.

 8      GIZMODO MEDIA GROUP, LLC, a   : 1:18-cv-24227-CMA

 9      Delaware Corporation,        :

10      KATHERINE KRUEGER,           :

11      individually, and WILL       :

12      MENAKER, individually,       :

13              Defendants.          :

14      - - - - - - - - - - - - - - -X

15

16        CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

17

18         Videotaped Deposition of JASON MILLER

19                  Washington, D.C.

20             Wednesday, May 30, 2019

21                   10:11 a.m.

22

23      Job No. 271563

24      Pages:  1 - 372

25      Reported by:  Dana C. Ryan, RPR, CRR
```

```
 1     the key issues would be, what I thought a campaign

 2     might look like.  Kind of -- of those nature.

 3          Q     How many conversations did you have

 4     with them?

 5          A     Two or three.

 6          Q     Were they long conversations?

 7          A     They're New Yorkers, so I don't think

 8     anything went particularly long.

 9          Q     I don't understand that.  What do you

10     mean?

11          A     They just talk and move very fast, and

12     so I don't remember them being particularly

13     lengthy.

14          Q     Okay.  In June of 2016, you came to

15     work for President -- now President Trump;

16     correct?

17          A     Yeah.  It was at the end of the month.

18     I think somewhere like the 29th or 30th.  I was

19     supposed to start on July 1, but the news leaked

20     out.

21          Q     But wasn't he "Sleazy Donald"?

22               MR. VOGT:  Objection to form.

23               THE WITNESS:  So when I worked for

24     Senator Cruz, I was critical of President Trump

25     which my good friends at places like Media Matters
```

```
 1        and left-of-center outlets like to point out to

 2        me.

 3                    But President Trump knew that I was

 4        fighting hard to try to get Senator Cruz elected,

 5        and he wanted me to come on board and work for

 6        him.

 7            BY MS. BOLGER:

 8            Q     Is it your position that left-of-center

 9        media outlets can't be truthful?

10                    MR. VOGT:  Objection to form.

11                    THE WITNESS:  I think that

12        left-of-center media outlets have an inherent --

13        many of them have an inherent bias towards

14        Republicans or people they view as being out of

15        step with their own ideology.

16            BY MS. BOLGER:

17            Q     So is it your position they can't be

18        truthful?

19                    MR. VOGT:  Objection to form.

20                    THE WITNESS:  I -- I would guess I'm

21        not --

22            BY MS. BOLGER:

23            Q     Are you saying that they're

24        left-of-center ideology means they are not

25        truthful?
```

```
 1              MR. VOGT:  Objection to form.

 2              THE WITNESS:  I've worked with

 3      left-of-center reporters in outlets who have been

 4      truthful.  I've also worked with left-of-center

 5      outlets who have been very untruthful.

 6         BY MS. BOLGER:

 7         Q    How about right-of-center outlets?  Are

 8      they always truthful?

 9              MR. VOGT:  Objection to form.

10              THE WITNESS:  Not always.

11         BY MS. BOLGER:

12         Q    Okay.  Are they more truthful than

13      left-of-center outlets?

14              MR. VOGT:  Objection to form.

15              THE WITNESS:  I don't know if I've ever

16      sat down and done a -- a full analysis of that,

17      but all news outlets make mistakes in some

18      situations.  They didn't do it intentionally.

19         BY MS. BOLGER:

20         Q    Do you believe right-of-center news

21      organizations make mistakes less frequently than

22      left-of-center news organizations?

23              MR. VOGT:  Object to form.

24              THE WITNESS:  I don't know if I've ever

25      sat down to do a full analysis of it.  All --
```

                                                        Page
 1        and a half ago and was like, eww, and just stepped

 2        back.

 3                And I'm constantly, every single day,

 4        pummeled online with people saying I'm a murderer;

 5        I'm a rapist; I slipped someone an abortion drug.

 6            BY MS. BOLGER:

 7            Q     Did the woman on the street go, eww, I

 8        read that Splinter article, or did she just go,

 9        eww?

10            A     I've never had someone do it like that.

11        People will tell me I'm number 1 in a less than

12        polite way.

13            Q     (Indicating).

14            A     Yeah, middle finger.  But, you know,

15        some of that's -- some of that's New York, but the

16        way that we literally -- every day on social

17        media, I get attacked.  People saying I should be

18        in prison.  I should be held accountable for

19        murdering a child and attempting to murder a

20        woman.

21            Q     Does the Splinter article use the word

22        "murder"?

23            A     It says surreptitiously slipped an

24        abortion pill and killing the child and almost

25        killing the woman.

May 30, 2019                                    228

                                                     Page
    1           Q     So I take that as a, no, it doesn't use

    2      the word "murderer"?

    3                 MR. VOGT:  Objection to form.

    4                 THE WITNESS:  I'm pretty sure it uses

    5      the word "kill," but it doesn't --

    6           BY MS. BOLGER:

    7           Q     It doesn't use the word "murderer"

    8      which is a whole different word than "kill."

    9      Doesn't use the word "murderer."

   10                 MR. VOGT:  Objection to form.

   11           BY MS. BOLGER:

   12           Q     Which is what you keep saying it says.

   13      I want to know if it says that.

   14           A     Because that's --

   15                 MR. VOGT:  Objection --

   16                 THE WITNESS:  -- what --

   17                 MR. VOGT:  -- to --

   18                 THE WITNESS:  -- people --

   19                 MR. VOGT:  -- form.

   20                 THE WITNESS:  -- took away.  And the

   21      even -- the even more egregious thing is the fact

   22      that you guys wrote up that there were actual --

   23      that this woman was making the allegations

   24      herself.

   25           BY MS. BOLGER:

```
                                                        Page

 1          Q     Does it use the words "felony" --

 2          A     And that's --

 3          Q     -- "level" --

 4          A     -- that's --

 5          Q     -- "violence"?

 6                Does it use the words "felony level

 7    violence"?

 8          A     It -- it said that I killed a child.

 9          Q     It certainly doesn't say you killed a

10    child.  That's just nonsense.

11                But does it say --

12          A     It said that --

13          Q     -- the words "killed the child"?

14                MR. VOGT:  Objection to form.

15                THE WITNESS:  It said the --

16    BY MS. BOLGER:

17          Q     Does it say "killed the child"?

18                MR. VOGT:  Objection to form.

19                THE WITNESS:  So the child -- so the

20    child was killed or the child died.  What's the --

21    at -- at this supposed roofieing or smoothie

22    abortion drug move.

23                I mean, that's literally -- why my

24    father-in-law got on a plane and flew across

25    country is he thought that this was credible.  He
```

                                                        Page
1        thought that some woman had accused me of doing

2        this.

3            BY MS. BOLGER:

4            Q    Does the story use the word "kill"?

5            A    I thought the word "kill" was in the

6        story.

7            Q    Does the story use the word "felony

8        level 1 violence"?

9            A    I don't believe so, but that's --

10           Q    Does it --

11           A    That's --

12           Q    -- use the word --

13           A    -- what it is.

14           Q    -- "murder"?

15           A    I mean, that's clearly -- what I'm

16       being accused of in that story is murdering a

17       child and attempting to murder a woman by

18       surreptitiously slipping some drug in there which

19       is complete -- completely fake.  And if you guys

20       had just at least waited for us to get back to

21       you, and it's -- and you've left it up there for

22       eight months.

23               Do you know what that's like for people

24       to think that you're a murderer?

25           Q    Okay.  Mr. Miller, there's no pending

                                                                  Page

```
 1          Q      For the damages caused by the

 2     publications regarding the birth of your son.

 3          A      My action is against Gizmodo and the

 4     reporter who wrote the story that I murdered a

 5     child and attempted to kill the child's mother.

 6          Q      Who is Boris Epshteyn?

 7          A      A friend of mine, former coworker from

 8     the Trump campaign.

 9          MS. BOLGER:  Okay.  I'm going to ask

10     Dana to mark as Exhibit -- what are we on? -- 7, a

11     text message exchange between you and Boris which

12     was produced with the Bates Number MILLER 652.

13     But it is a bit of a vision test.  It's right at

14     the bottom.

15          (J. Miller Deposition Exhibit 7 was

16     marked for identification and attached to the

17     transcript.)

18     BY MS. BOLGER:

19          Q      Mr. Miller, this seems to be a text

20     machine -- exchange in which you are talking to

21     Boris Epshteyn about litigation funding related to

22     the Gizmodo case; is that right?

23          A      I think there were conversations about

24     both the Gizmodo lawsuit as well as the family

25     court proceedings.
```

Transcript of Michael Con... (Co...)
May 30, 2019                                                      306

                                                          Page

```
 1      that the story had happened to her, that she'd

 2      ever met me, and -- and didn't even know who I

 3      was.

 4              So clearly there was no claim that was

 5      made by her.  The -- this whole Clearwater story,

 6      Mr. Ali told me, came from Delgado.

 7              And -- and first -- we're -- we're kind

 8      of missing the -- the Captain Obvious point.  I've

 9      never injured any woman like this or this -- or

10      definitely not surreptitiously slipping someone an

11      abortion pill, killing their child and almost

12      killing them.

13              I mean, that's -- there is no woman to

14      talk to about any of this because I've never done

15      anything like that.

16              MS. BOLGER:  I'm going to move to

17      strike the last half of that answer as --

18              THE WITNESS:  But --

19              MS. BOLGER:  -- nonresponsive.

20              THE WITNESS:  But --

21          BY MS. BOLGER:

22          Q    Mr. Miller --

23          A    Counsel, you have to --

24          Q    Mr. Miller --

25          A    You wrote an article saying --
```

```
                                                            Page
  1              Q     Mr. Miller --

  2              A     -- that I killed somebody.

  3              Q     Mr. Miller --

  4              A     How could you do that?

  5              Q     You --

  6              A     Do you realize people look at me

  7       like --

  8              Q     Mr. Miller --

  9              A     -- I'm a murderer?

 10              Q     Mr. Miller, there's no pending

 11       question.  I am going to take extra time off of

 12       this deposition, and you're going to be here all

 13       night if you keep giving speeches.

 14              A     But you called --

 15              Q     So --

 16              A     -- me.

 17              Q     -- I would -- no, Mr. Miller.  I'm

 18       Katherine Bolger.  We just met.

 19                    You can give your speeches and your

 20       eloquent stuff to a jury.  But right now I just

 21       want to know what you think Yashar Ali was doing.

 22              A     I think he was --

 23              Q     So my --

 24              A     -- colluding --

 25              Q     -- question right now -- and there is
```

# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF FLORIDA

 3

 4      - - - - - - - - - - - - - - - -X

 5      JASON MILLER,                  :

 6              Plaintiff,             :

 7      vs.                            : Case No.

 8      GIZMODO MEDIA GROUP, LLC, a    : 1:18-cv-24227-CMA

 9      Delaware Corporation,          :

10      KATHERINE KRUEGER,             :

11      individually, and WILL         :

12      MENAKER, individually,         :

13              Defendants.            :

14      - - - - - - - - - - - - - - - -X

15

16         CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

17

18         Videotaped Deposition of KELLY MILLER

19                  Washington, D.C.

20              Wednesday, May 29, 2019

21                   10:56 a.m.

22

23      Job No. 271561

24      Pages:  1 - 144

25      Reported by:  Dana C. Ryan, RPR, CRR
```

                                              Page

1      the story I heard.

2           Q      Okay.  From whom?

3           A      My husband.

4           Q      Okay.

5           A      So they were being kind.

6           Q      Did you -- did anybody talk -- we

7      talked about your family and your cousins and your

8      friends.

9           A      Yeah.

10          Q      Did -- other than the people we just

11     talked about before the break, did anybody talk to

12     you about the article?

13          A      A couple of moms reached out.  One

14     specifically was Patricia Passman because she is

15     divorced.  Her ex-husband lives with his mother,

16     and they sat their son down, who is one of my

17     daughter's -- one of my daughter's best little

18     friends, and said that they could no longer -- he

19     could no longer come to our house because Jason

20     wasn't safe.  And the only reason I think she told

21     me that was because she was worried that he would

22     tell REDACTED some of the specifics of the article,

23     which we haven't done.  But, I mean, she

24     definitely could Google it, but --

25          Q      Did -- do they still have no play

May 29, 2019                    134

```
                                              Page
  1    dates?

  2          A      Yeah.

  3          Q      They're not --

  4          A      We do with his mom.

  5          Q      Okay.

  6          A      We don't when he's with his dad.  But

  7    I'm friends with her, the mom.  I'm friends with

  8    the mom, and I'm friends with Laura Patching.  And

  9    those are the only play dates that REDACTED gets

 10    asked to do now.  And last year I couldn't -- I

 11    had to, like, decline play dates.

 12          Q      Has anyone told you that the reason for

 13    the play dates being cancelled is the article?

 14          A      Patricia -- I call her Trish -- told me

 15    that the grandma went through and told all the

 16    moms at the -- in the fourth grade about the

 17    article.

 18          Q      Sorry.  The grandma being her

 19    ex-husband's mother?

 20          A      Uh-huh.

 21          Q      Okay.  So has anyone told you that play

 22    dates were cancelled as a result --

 23          A      Huh-uh.

 24          Q      -- of the article?

 25          A      Huh-uh.  But I just don't get asked any
```

                                                          Page
1           more.  I haven't gotten asked since the article.

2           And I -- and she hasn't been invited to one

3           birthday party since the article.

4                   Q       Is she in fourth grade?

5                   A       Uh-huh.  And we didn't have a birthday

6           party for her because I just -- we couldn't.  It

7           was too close to the article, and we just -- we

8           took her away for her birthday.

9                   Q       Did -- has anyone told you they

10          believed the article?

11                  A       My dad.

12                  Q       Other than your dad?

13                  A       What?

14                  Q       Other than your dad?

15                  A       Huh-uh.

16                  Q       Has anyone told you that they thought

17          less of Mr. Miller as a result of the article?

18                  A       No, because I typically get pretty

19          defensive when people mention the article.  It's a

20          bit embarrassing, and I completely -- I tell my

21          version before they're able to tell theirs.

22                  Q       Who has spoken to you about the

23          article?

24                  A       Trish.

25                  Q       She doesn't believe it?

EXHIBIT C

```
 1        UNITED STATES DISTRICT COURT

 2     FOR THE SOUTHERN DISTRICT OF FLORIDA

 3              -   -   -

 4   JASON MILLER,              Case No.

 5          Plaintiff,          1:18-cv-24227-CMA

 6          V.

 7   GIZMODO MEDIA GROUP, LLC,
     Delaware Corporation,
 8   KATHERINE KRUEGER,
     Individually, and WILL
 9   MENAKER, Individually,

10          Defendants.

11              -   -   -

12        THURSDAY, JUNE 6, 2019

13              -   -   -

14           Videotaped deposition of KAELAN

15   DORR, held in the offices of Davis Wright

16   Tremaine, LLP, 1919 Pennsylvania Avenue, NW,

17   8th Floor, Washington, DC, commencing at 10:08

18   a.m., on the above date, before Deborah L.

19   Williams, a Certified LiveNote Reporter and a

20   Notary Public.

21              -   -   -

22

23

24

25
```

```
 1        A.    I do disagree with that criticism.

 2        Q.    Why?

 3        A.    I disagree with that criticism

 4   simply because it's no different than a lot of

 5   these local markets, things like that, that

 6   they are -- have deals with your CBS, your ABC,

 7   your NBC where they air your Jimmy Fallon, your

 8   Colbert.  They're constantly, you know, airing

 9   commentary that could be perceived as left

10   leaning.

11              I think the main criticism of

12   Sinclair is they are a right-leaning group, and

13   that's not necessarily the case.  I produce a

14   left-leaning segment as well.  The same rules

15   apply to those.  So I would argue that those

16   criticisms are unfounded.

17        Q.    And it is your belief, I would

18   believe, that you can have a political point of

19   view but still tell the truth, correct?

20        A.    Absolutely.  Yes, ma'am.

21        Q.    You worked at the White House before

22   you came to Sinclair, right?

23        A.    Yes, ma'am, I did.

24        Q.    And you were the director of

25   congressional communications, right?
```

EXHIBIT D

Aleksander Chan
May 15, 2019

1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                        MIAMI DIVISION

3                   Case No. 1:18-cv-24227-CMA

4    - - - - - - - - - - - - - - - - - -x
     JASON MILLER,
5
                         Plaintiff,
6
     v.
7
     GIZMODO MEDIA GROUP, LLC,
8    a Delaware Corporation, KATHERINE
     KRUEGER, individually, and
9    WILL MENAKER, individually,

10                         Defendants.

11   - - - - - - - - - - - - - - - - - -x

12

13           Videotaped deposition of ALEKSANDER CHAN,

14   taken pursuant to Notice, was held at the Law

15   Offices of DAVIS WRIGHT & TREMAINE, LLP, 1251 Sixth

16   Avenue, New York, New York, commencing May 15, 2019,

17   at 10:22 a.m., on the above date, before Amanda

18   McCredo, a Court Reporter and Notary Public in the

19   State of New York.

20

21

22

23

24

25

Aleksander Chan
May 15, 2019                                    13

```
 1        Q     What does Splinter do?

 2        A     Covers national politics.

 3        Q     Is that a complete scope of what Splinter

 4   covers, national politics?

 5        A     Broadly speaking, yes.

 6        Q     More specifically speaking, how would you

 7   modify that answer then, if that's a broad answer?

 8        A     We set out to cover the day's national

 9   politic -- political news, but just like any

10   publication, we try to provide our readers with a

11   variety of stories.

12        Q     But your main focus is politics, right?

13        A     That's correct.

14        Q     Are the pieces that Splinter writes written

15   from any specific political perspective?

16        A     Not always.

17        Q     I don't know how to take that.

18              Does that mean that often Splinter does

19   cover stories with a specific political perspective,

20   but sometimes it doesn't?

21        A     That's correct.

22        Q     What's the political perspective that

23   defines Splinter, if you can articulate one?

24              MS. SHULLMAN:  Object to the form.

25        A     I would say progressive politics.
```

```
 1        Q    And can you explain to me what "progressive
 2   politics" means to you?
 3        A    What "progressive politics" means to me?
 4        Q    Yes.
 5        A    "Progressive politics" means, to me -- I
 6   can give you -- it would be easier for me to answer
 7   with specific policy than piece them together.
 8        Q    That's fine.  Answer any way that you
 9   believe indicates your most truthful and honest
10   answer to the question.  And if I want to follow up
11   on it, because I don't understand it or something,
12   we'll go from there.
13        A    Progressive politics, to me -- progressive
14   politics, to me, is Medicare for all, you know, not
15   losing your home or, even worse, because you can't
16   afford to pay for your health coverage, workers'
17   rights, balancing the scales of power, which, in my
18   opinion, are tilted in one direction at the moment.
19        Q    Anything else?
20        A    Nothing at the moment.
21        Q    Do you believe in private property
22   ownership?
23             MS. SHULLMAN:  Object to the form.
24             And, you know, Ken, we're not really here
25        to get Mr. Chan's personal political beliefs.
```

Aleksander Chan
May 15, 2019                                    104

```
 1   subjects of their articles?
 2           MS. SHULLMAN:  Same objection.
 3       A    I can't know -- that would be a
 4   hypothetical, because, I, I, I can't know.  I
 5   wouldn't know.
 6       Q    As editor-in-chief, do you want your
 7   reporters' reporting to be impartial and free of
 8   bias?
 9       A    Well, how would you -- what do you mean by
10   "bias"?
11       Q    I mean that if someone is a staunch liberal
12   and Democrat, that they don't have bias when they're
13   writing about subjects who are Republican and
14   right-wing.
15       A    I don't believe that because you identify
16   one way politically, that you can't still
17   objectively and accurately report facts.
18       Q    Do you think that the article that was
19   ultimately written accurately reported what was
20   filed in the court supplement?
21       A    Can you say it one more time?
22       Q    Do you think the article that was
23   ultimately written about the Jason Miller-Delgado
24   court filing accurately described what was in the
25   court filing?
```

# EXHIBIT E

Katherine Krueger
May 13, 2019

1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                         MIAMI DIVISION

3                    Case No. 1:18-cv-24227-CMA

4    - - - - - - - - - - - - - - - - -x
     JASON MILLER,
5
                         Plaintiff,
6
     v.
7
     GIZMODO MEDIA GROUP, LLC,
8    a Delaware Corporation, KATHERINE
     KRUEGER, individually, and
9    WILL MENAKER, individually,

10                        Defendants.

11   - - - - - - - - - - - - - - - - -x

12

13           Videotaped deposition of KATHERINE

14   KRUEGER, taken pursuant to Notice, was held at the

15   Law Offices of DAVIS WRIGHT & TREMAINE, LLP, 1251

16   Sixth Avenue, New York, New York, commencing May 13,

17   2019, at 10:39 a.m., on the above date, before

18   Amanda McCredo, a Court Reporter and Notary Public

19   in the State of New York.

20

21

22

23

24

25

Katherine Krueger
May 13, 2019                                    25

```
1       A    Probably further left.

2       Q    So, from liberal to more liberal?

3       A    Yes.

4       Q    All right.  Is that how you would describe

5   yourself, liberal?

6       A    No.

7       Q    How would you describe yourself?

8       A    A leftist.

9       Q    What does that mean?

10      A    You are further left than liberal.

11      Q    Where does that stack up when compared to

12  the word "progressive"?

13      A    I think that's a, you know, kind of ongoing

14  argument.

15      Q    Is progressive more left than leftist --

16      A    I would --

17      Q    -- in your viewpoint?  I'm sorry.

18      A    In my -- personally, I would say no.

19      Q    So, if you were going to describe your

20  current political viewpoint, it would be left of

21  liberal and left of progressive; is that right?

22           MS. McNAMARA:  Objection;

23       mischaracterization.

24      Q    I don't know if -- I think I understood you

25  to say that.  You can tell me if I'm wrong.
```

Katherine Krueger
May 13, 2019                              26

1         A     Yes.

2         Q     I mean, that's what I thought you were

3    saying, is that, at least in your mind, leftist is

4    further left than progressive.

5         A     I use, you know, "progressive" kind of

6    interchangeably --

7         Q     All right.  So --

8         A     -- as a lot of people do, I think.

9         Q     You use "progressive" interchangeably with,

10   what, "leftist"?

11        A     Left, sure.

12        Q     Okay.  If I'm drawing a line that shows a

13   continuum of political spectrum, and on one side is

14   the far-left and one side is the far-right -- and

15   we're just in percentages here, okay.  And let's say

16   the farthest left is like 10 percent here -- are you

17   in that 10 percent?

18             MS. McNAMARA:  Objection; lack of

19        foundation.

20        Q     I'm just trying to get a description of how

21   far left leftist is, that's all.

22        A     I just -- I don't think of it in terms of

23   numbers.  I -- you know, I think of it in terms of

24   candidates I like, issues I'm very passionate about.

25        Q     Where we started this discussion about your

Katherine Krueger
May 13, 2019                                    27

```
 1    personal political viewpoint was originally with why

 2    you went to Talking Points Memo.

 3            Do you remember that question, about ten

 4    questions ago?

 5        A    Yes.

 6        Q    All right.  And what you had said was that

 7    you gravitated towards it because you thought it was

 8    a good publication, or words to that effect, and you

 9    liked its political perspective.

10        A    And I also needed a job.

11        Q    Sure.  Absolutely.  But if that job had

12    been with Breitbart, would you have taken it?

13        A    Absolutely not.

14        Q    Why?

15        A    Because I think Breitbart is repugnant.

16        Q    When you -- when we talk about these

17    distinctions and your political perspective, from

18    what you were in November 2015 and through

19    October 2016, your Talking Points time to today,

20    when did you become more left, from, let's say,

21    October 2016 to now?

22            MS. McNAMARA:  Objection to form.

23        A    October 2016, sometime before that?

24        Q    No.  I thought what you were telling me was

25    you were more left now than you were when you were
```

Katherine Krueger
May 13, 2019                                          28

```
 1    at Talking Points.
 2         A    I think that's broadly true, yes.
 3         Q    When did that change happen?
 4         A    I can't, I can't trace the change to any
 5    particular date on a calendar.  The 2016 election
 6    was quite important for, you know, defining where I
 7    am today.
 8         Q    All right.  So, would it be fair to say
 9    that the process of how your political perspective
10    has changed has been an evolving one, since you left
11    college?
12         A    Yes, as I think many people's are.
13         Q    Whatever the labels we attach, how would
14    you have described your political perspective, in
15    September of 2018, when the article that forms the
16    basis for this lawsuit was published?
17         A    Sorry, can you repeat the question?
18         Q    Sure.  I'll actually read it back.
19              "Whatever the labels we attach, how would
20    you describe your political perspective, in
21    September of 2018, when the article that forms the
22    basis for this lawsuit was published?"
23         A    I was on the left.
24         Q    Further left than your Talking Point days?
25         A    Yes.
```

Katherine Krueger
May 13, 2019                                          189

```
 1        Q     What was the process -- let me ask you
 2   this:  Did you, did you ever call Jason's family
 3   lawyers?
 4        A     I did.
 5        Q     What time?
 6        A     I don't specifically recall.  It was late
 7   in the afternoon.
 8        Q     Late, like after 5:00 late?
 9        A     I don't remember.
10        Q     Did you ever do any independent research on
11   Delgado's past, exclusive of articles about her and
12   Jason Miller?
13        A     I knew about her background, I think what I
14   had read in the Atlantic article, just kind of broad
15   details.
16        Q     You keep referring to the Atlantic article.
17              Did you read anything else about her?
18              MS. McNAMARA:  Objection; asked and
19         answered.
20        A     Not that I recall offhand.
21        Q     Do you recall, in your research of
22   Ms. Delgado, finding an instance in which an
23   injunction was entered against her from entering New
24   York City because of her cyberstalking of an
25   ex-boyfriend up here?
```

Katherine Krueger
May 13, 2019                                      190

1              MS. McNAMARA:  Objection.

2       A    No.

3       Q    How much time would you say you spent

4   researching Ms. Delgado?

5       A    I wouldn't want to assign a number.

6       Q    In your review of materials related to

7   Ms. Delgado and Mr. Miller, did it appear clear to

8   you that Ms. Delgado had a great deal of acrimony

9   for Mr. Miller?

10      A    If anything, it seemed -- you know, the

11  whole, the whole battle was acrimonious, but her

12  telling of the details made it sound like most of

13  the acrimony was coming from the opposite direction.

14      Q    So, I don't know whether that answered my

15  question.

16           My question was whether you felt, based on

17  your research, that there was -- that Ms. Delgado

18  had a great deal of acrimony towards Mr. Miller.

19      A    My appraisal of Delgado was that she was a

20  single mom who just wanted the best thing for her

21  son and who was mistreated.

22      Q    Did you read her social media?

23      A    I had read her social media, yes.

24      Q    All of it?

25      A    Certainly not.

Katherine Krueger
May 13, 2019                                                191

```
1        Q     Did you ever come across an article written
2   by A.J. Delgado titled "Crying Rape"?
3        A     Not that I recall.
4        Q     You understand that she wrote an article
5   literally describing how women who want to be
6   perceived as victims and to ruin someone's life can
7   contrive a rape story?
8              MS. McNAMARA:  Objection.
9        A     I'm not familiar with the story.
10       Q     Do you think if she had written a story
11  like that, it would have had any bearing or if
12  you -- strike that.
13             Do you think if you had read a story
14  written by Delgado like I just described, it would
15  have had some bearing on her credibility to you?
16             MS. McNAMARA:  Objection.  It's
17       hypothetical.
18       A     I don't want to speculate.
19       Q     When did you first reach out -- when do you
20  first recall reaching out to Jason Miller to discuss
21  your article?
22       A     That's definitely preserved in a document,
23  but I don't recall the exact time offhand.
24                        (Gizmodo-000051 was marked as
25                         Exhibit 10 for identification,
```

EXHIBIT F

Arlene Delgado
June 04, 2019

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2
                        MIAMI DIVISION
 3
                  CASE NO.:  1:18-cv-24227-CMA
 4

 5   JASON MILLER,

 6        Plaintiff,

 7   -vs-

 8   GIZMODO MEDIA GROUP, LLC, a
     Delaware Corporation, KATHERINE
 9   KRUEGER, individually, and
     WILL MENAKER, individually,
10
          Defendants.
11   _____/

12

13
               CONTINUED DEPOSITION OF ARLENE DELGADO
14                  Pages 101 through 300
                         Videotaped
15

16

17               Tuesday, June 4, 2019
                 1:10 p.m. - 5:22 p.m.
18               One SE Third Avenue
                      Suite 1250
19               Miami, Florida 33131

20

21

22

23

24            Stenographically Reported By:
               Jennifer L. Bermudez, RPR
25            Registered Professional Reporter
```

Arlene Delgado
June 04, 2019                                        289

```
 1              (Exhibit 28 was marked for identification.)

 2      Q.   (By Mr. Turkel) Let me show you Exhibit 28.  I

 3  just have a couple more things and I will be done.

 4           MS. SHULLMAN:  Do you have a copy?

 5           MR. TURKEL:  Yeah.  It's just an article,

 6  Matt.

 7      Q.   (By Mr. Turkel) I just want to sort of verify

 8  something that Ms. Shullman talked to you about, which

 9  is the fact that the day before the debates you went to

10  a strip club with members of the team and the media, the

11  Trump team and the media.  Is that true?

12      A.   Yes.

13      Q.   Were you aware that this article, Exhibit 28,

14  was actually published after you went to the strip club

15  with the people referenced?

16      A.   I don't remember ever reading it but I had

17  heard there was an article.  I think this is the first I

18  have seen it.

19      Q.   All right.

20              (Exhibit 29 was marked for identification.)

21      Q.   (By Mr. Turkel) Let me show you Exhibit 29.

22  I'm showing you an article from news.com.au.  It's just

23  a story about a man putting an abortion pill in a

24  smoothie.  Have you ever read this article?

25      A.   No.  Wow.
```

Arlene Delgado
June 04, 2019                                         290

```
 1      Q.    So you have never seen Exhibit 29?

 2      A.    No.  My God . . .

 3            MR. SARELSON:  Just answer the question.

 4      A.    It's disgusting what they are implying.  Jesus

 5  Christ.

 6      Q.    (By Mr. Turkel) Take a look --

 7            MS. SHULLMAN:  Ken, do you know the date of

 8  this article?

 9            MR. TURKEL:  If you look at the bottom it

10  captured the time stamps.

11            MS. SHULLMAN:  Is that the date that you

12  printed it or the date of the article?  You don't know?

13            MR. TURKEL:  I really can't answer the

14  question.  Probably not the date of the article because

15  it says The court won't make a ruling on May 17.

16            THE WITNESS:  You can probably just Google it

17  right now and see.

18            MR. TURKEL:  You can find the date.

19            MS. SHULLMAN:  You are just asking her if she

20  has ever seen it?

21            MR. TURKEL:  I'm just asking if she saw it.

22      A.    And my answer -- let me be very clear.  I have

23  never seen that article, I have never read any article

24  about anyone -- about any man inducing a miscarriage

25  through any kind of administering.
```

Arlene Delgado
June 04, 2019                                                291

1          (Exhibit 30 was marked for identification.)

2     Q.   (By Mr. Turkel) So I'm going to show you

3  Exhibit 30, which is a similar article.  And perhaps you

4  have made quick work of it by telling me that you never

5  read any article discuss --

6     A.   Not prior to the supplement, not prior to the

7  supplement.  After the supplement.

8     Q.   Please let me finish my question.

9     A.   I was answering yours.

10    Q.   I wasn't finished with it, though, and now I

11 have to ask the whole thing over again.

12    A.   Okay.  Reanswer it -- ask it.  Okay.

13    Q.   When you say you read stories like that after

14 the supplement, what do you mean?  I don't understand

15 that.

16    A.   I think like somebody sent me one on Twitter

17 or something, like, oh this is -- so I want to be very

18 clear, it's possible I may have read one such instance

19 after that because people responded to . . .

20    Q.   All right.  To the extent Exhibit 30 is an

21 article that bears a date of March 18, 2015, you would

22 not have read that before the supplement.  Right?

23    A.   Absolutely not.  I have never -- in fact, I

24 was surprised when I heard the story from Gentleman A

25 that you even -- it was even, it would even be possible

Arlene Delgado
June 04, 2019                                          292

1   to mix a pill inside something like this.

2           (Exhibit 31 was marked for identification.)

3       Q.   (By Mr. Turkel) All right.  Let me show you --

4       A.   But this would certainly give a man an idea.

5       Q.   -- Exhibit 31, which is another similar

6   article published December 14, 2017.

7           MR. TURKEL:  Here, Deanna, I'm sorry, that

8   stuck.

9           MS. SHULLMAN:  I'm just going to make an

10  objection to the form and foundation for 29 through 31.

11          MR. TURKEL:  I'm not connoting anything, I'm

12  just asking her whether she has ever seen this article.

13          MS. SHULLMAN:  That's fine.  No objection to

14  that question.

15      A.   I think this one I saw after the supplement.

16  I think this might have been the one somebody sent me

17  or -- the one somebody sent me, I can tell you exactly,

18  was on Twitter, was like a story of like a -- I think

19  the guy was a doctor is the one somebody sent me on

20  social media after all of the publication.  I don't

21  think it was this one.

22      Q.   (By Mr. Turkel) So you have never seen Exhibit

23  31, then?

24      A.   No.  But apparently this happens, wow, a lot.

25  Wow.