UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:18-cv-24227-CMA

JASON MILLER,

      Plaintiff,

       v.

GIZMODO MEDIA GROUP, LLC,
a Delaware Corporation, KATHERINE
KRUEGER, individually, and
WILL MENAKER, individually,

      Defendants.

_____/

### PLAINTIFF'S MOTION *IN LIMINE*

Plaintiff, Jason Miller ("Miller"), by counsel and pursuant to Local Rule 16.1(j) and the Amended Scheduling Order [Doc. 101], files his Motion *in Limine,* and in support states as follows:

### INTRODUCTION

This is an action for defamation[1] through which Miller seeks damages and permanent injunctive relief arising out of Gizmodo Defendants' publication of false and defamatory statements about Miller from a "confidential" or sealed family court filing.  On September 21, 2018, Gizmodo Defendants posted on the website *Splinter* an article titled, "*Court Docs Allege Ex-Trump Staffer Drugged Woman He Got Pregnant With Abortion Pill*" (the "Article"), which embedded an image of a document, *Supplement to Mother's March 2018 Motion for Court to Consider Psychological Evaluation of the Father* (the "Supplement"), filed by Arlene Delgado ("Delgado") in an ongoing, acrimonious paternity case between her and Miller (the "Family Case").

---

[1] In his First Amended Complaint, Miller also asserted claims for Tortious Interference, Intentional Infliction of Emotional Distress, Invasion of Privacy, and Conspiracy [Doc. 5], which the Court dismissed for failure to state a cause of action [Doc. 110].  All rights related to these claims are preserved.

The false and defamatory statements at issue are: (1) In 2012, Miller had a sexual relationship with "Jane Doe," a stripper he met at Rachel's Gentleman's Club in Orlando, Florida, resulting in her pregnancy, at which point Miller secretly dosed her with an abortion pill in a smoothie, inducing an abortion that caused the death of Jane Doe's unborn child and almost killed Jane Doe, who wound up in a hospital emergency room, bleeding heavily and nearly went into a coma; following which Miller tried to have Jane Doe sign a non-disclosure agreement in exchange for money; which are described as "felonious criminal acts, including illegally obtaining an 'abortion pill;' illegally administering said medication, administering medication to an individual unbeknownst to said individual; and causing the death of an unborn child via a forcibly induced abortion" (the "Jane Doe Statements"); (2) Around the same time, Miller also was romantically involved with a woman who lives in Clearwater, Florida, whom he physically abused and beat "with an open hand" (the "Clearwater Statements"); and (3) Jane Doe *herself* claimed Miller caused her "pregnancy's termination and nearly her death" (the "Woman Claims Statement").

Miller is seeking to recover damages for harm to his reputation, humiliation, embarrassment, mental suffering, shame, and emotional distress, as well as economic losses for lost employment opportunities and the cost of counteracting the false and defamatory Article, as well as punitive damages and a permanent injunction prohibiting the continued and any future publication of the false and defamatory statements by Gizmodo Defendants.

## MEMORANDUM OF LAW

### I.  Legal Standard

Motions *in limine* permit a judge to exclude evidence that would be not be admissible at trial for any reason, and are "an important tool available to the trial judge to ensure the expeditious and evenhanded management of the trial proceedings." *Jonasson v. Lutheran Child & Family Services*, 115 F.3d 436, 440 (7th Cir. 1997). They sharpen the focus of the trial and permit the parties to focus their preparation on those matters that will be considered by the jury. *Id.* Further, "the motion *in limine* fosters efficiency by saving time at trial and saves parties the costs of bringing witnesses to court who will not be allowed to testify or whose testimony will not be needed because the evidence they would authenticate or rebut has been declared inadmissible." 21 Charles Alan Wright & Kenneth W. Graham, Jr., FED. PRAC. & PROC. § 5037.10. In short, motions *in limine* perform "a gatekeeping function and permits the trial judge to eliminate from

further consideration evidentiary submissions that clearly ought not be presented to the jury because they clearly would be inadmissible for any purpose." *Jonasson*, 115 F.3d at 440.

To this end, motions *in limine* are appropriate to exclude irrelevant evidence. *See Thompkins v. Lil' Joe Records, Inc.*, 2003 WL 25719229 (S.D. Fla. Dec. 3, 2003); *Jonasson*, 115 F.3d at 440. Evidence is only relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401, 402. However, even relevant evidence "may be excluded if may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

Motions *in limine* are particularly useful for prejudicial evidence as they allow for "pre-trial resolution of evidentiary disputes without having to present potentially prejudicial evidence in front of a jury… [which] avoid[s] the need to 'unring the bell' once inadmissible evidence has been presented to the jury." *Fed. Trade Comm'n v. PointBreak Media, LLC,* 2018 WL 3697471 (S.D. Fla. May 21, 2018) (internal citation omitted). This prevents a scenario that could irretrievably affect the fairness of a trial. *See Smith v. Royal Caribbean Cruises, Ltd.,* 2014 WL 5312534, at *1 (S.D. Fla. Oct. 10, 2014).

## II.   Overview of Elements at Issue

The elements of Miller's defamation claim are: (1) a defamatory statement; (2) that referred to ("of and concerning") the plaintiff; (3) published to a third-party by defendants; (4) that was false; and (5) published with actual malice. New York Pattern Jury Instructions – Civil 3:23. Here, the second ("of and concerning") and third ("publication") elements are undisputed. Thus, the remaining issues to be tried on Miller's claim are whether the statements at issue are defamatory and false, whether they were published with actual malice.[2] The *amount* of Miller's damages must also be determined, but causation and damages are presumed because the statements at issue are libelous on their face. [*See* Miller Memorandum of Law on Causation & Damages]

Gizmodo Defendants contend they are not liable for defamation because they are protected by the fair report privilege. On this defense, the issues to be tried include: (1) whether the privilege

---

[2] These elements are the subject of pending summary judgment motions [Doc. 155; Doc. 152].

applies (*i.e.,* whether the Supplement was "confidential" or sealed); and (2) if so, whether the Article was a fair and true report on the Supplement.[3]

## III.   Motions *in Limine*

### A.   Motion *in Limine* 1: Improper Character Evidence

Gizmodo Defendants intend to open the floodgates to a swell of improper character evidence related to Miller's past in hopes of tainting the jury.  The improper character evidence they seek to introduce is irrelevant to whether the statements at issue are defamatory and false, as well as an inappropriate mechanism for attacking Miller's reputation and credibility.

Gizmodo Defendants already tried to rely upon evidence concerning certain aspects of Miller's personal life and "indiscretions" [*see* Doc. 156 ¶¶ 23 (strip clubs), 24 (an affair), 34 (commentary about Sen. Kamala Harris), 37 (2019 Tweets about Sen. Nadler), 40 (CNN appearances); Doc. 170 ¶ 5 (indiscretions)].  They intend to do the same thing at trial, having designated Miller's testimony and identified proposed trial exhibits relating to these same issues. [Def. Trial Ex. 45 (strip club), 55-56 (commentary about Sen. Kamala Harris), 62-63 (2019 Tweets about Sen. Nadler), 81 (massage parlor) and 87-93 (CNN appearances)].  All evidence of Miller's "prior bad acts" and misconduct should be excluded under Rules 401, 402, 403, 404(a)(1) and (b), and 608.

Gizmodo Defendants have already made it clear that they intend to rely on evidence concerning Miller's other acts, conduct and "indiscretions" to try to refute clear and convincing evidence of falsity in this case.  [*See* Doc. 169 pp. 5-6, 15-16[4]]  They also openly sought to attack Miller's credibility with evidence of his prior acts and indiscretions.  [*See* Doc. 169 p. 13[5]]

---

[3] This defense also is the subject of a pending summary judgment motion [Doc. 155].

[4] In their summary judgment filings, Gizmodo Defendants used evidence of Miller's other acts to try to refute falsity, improperly suggesting the Jane Doe Statements and Clearwater Woman Statements were true because Miller has a propensity for or acted in conformance with his prior (yet unrelated) conduct.

[5] Gizmodo Defendants bluntly argued: "Miller is an admitted liar. Indeed, the record establishes Miller's pattern and practice of lying. At his deposition Miller admitted to lying about his affair with Delgado to his bosses and colleagues, Jared Kushner and Steve Bannon, to his wife, Kelly Miller, and to the other mistress he had an affair with in 2016. (Defs. CSOF ¶ 6.)8 Miller also did not tell his wife about his other indiscretions. (Ex. C at 175, 179.) And Miller's tendency to lie was not limited to his extramarital affairs. His former colleagues and pundits that appeared alongside him on CNN repeatedly questioned Miller's veracity. (Defs. SOF ¶ 40.)"  [Doc. 169 p. 13]

Rule 404(a)(1) provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."  The Rule deems such character evidence inadmissible because it is "of slight probative value and may be very prejudicial… [and]… tends to distract the trier of fact from the main question of what actually happened on the particular occasion." *See* Fed. R. Evid. 404(a) Advisory Committee Notes (internal quotation marks and citation omitted).  Likewise, Rule 404(b)(1) further provides that evidence of a "crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

In the defamation context, evidence of "bad acts" that do not tend to prove the truth of the charged libel are inadmissible.  *See Fraser v. Park Newspapers of St. Lawrence, Inc.*, 257 A.D.2d 961, 962 (3d Dep't 1999).  Moreover, evidence of specific acts of wrongdoing is inadmissible to prove the plaintiff's reputation.  *Id.* (citing *Crane v. New York World Tel. Corp.*, 308 N.Y. 470, 478, 126 N.E.2d 753 (1955); *Cudlip v. New York Evening Journal Publ. Co.*, 180 N.Y. 85, 87, 72 N.E. 925 (1904).  "Bad acts" also are inadmissible because  the bad disposition of a plaintiff is no defense to an action for defamation.  *Theodore v. Daily Mirror, Inc.*, 282 N.Y. 345, 347, 26 N.E.2d 286 (1940).

Gizmodo Defendants will undoubtedly argue Miller's reputation is "at issue" in his claim for defamation.  Although broadly speaking that proposition is true, the character trait at issue and its related proof are confined to reputation with respect to the aspects of the plaintiff's reputation that were allegedly defamed.  *Fraser*, 257 A.D.2d at 962; *Boyles v. Mid-Florida Telev. Corp.*, 431 So.2d 627, 640 (Fla. 5th DCA 1983), *aff'd*, 467 SO.2d 282 (Fla. 1985).  Evidence of particular instances of misconduct is not admissible to prove the plaintiff's general bad character or reputation, so as to show the plaintiff was not damaged significantly by the false statement.  *Fraser*, 257 A.D.2d at 962; *Boyles*, 431 So.2d at 640.  Importantly, specific instances of plaintiff's conduct or character traits also are not relevant unless they are generally known by others in the community.  *Boyles*, 431 So.2d at 640; see also *Forster v. West Dakota Vet. Clinic, Inc.*, 2004 ND 207, 689 N.W.2d 366 (N.D. 2004).

Gizmodo Defendants cannot avoid these clear limits on character evidence by generalizing the facts surrounding the "bad acts" they want to use.  For example, they have argued "[t]he Supplement says Miller is an adulterer who sleeps with strippers."  [Doc. 169 p. 15]  However, the

defamatory statements at issue are much more specific; as they state that in Orlando in 2012 Miller impregnated a specific woman – Jane Doe – and then murdered her unborn baby and almost killed Jane Doe by surreptitiously dosing them with an abortion pill in a smoothie.  None of Gizmodo Defendants' improper character evidence relates to those specific facts.  The testimony about Miller's "indiscretions" also has been misleadingly taken out of context [Doc. 175 ¶ 5] and misleadingly generalized [Doc. 169 p. 15] to purposefully omit the details showing Miller's "bad acts" are not temporally or factually related or connected to the events described in the Article and Supplement.

The bad acts Gizmodo Defendants seek to introduce also are <u>not</u> confined to Miller's reputation with respect to the Jane Doe and Clearwater Woman Statements.  *Boyles*, 431 So.2d at 640.  They aren't related to Miller's reputation at all – as none of them were publicly known.  *Id.*; *Forster*, 2004 ND 207.  In fact, Gizmodo Defendants seek only to introduce the specific acts themselves, not to elicit testimony from witnesses who will testify about Miller's reputation based on these acts.

Any evidence of Miller's prior "bad acts" also should be excluded under Rule 403.  As outlined above, there is <u>no</u> probative value to any of Miller's prior indiscretions, but a substantial likelihood (if not certainty) that evidence of these acts would unfairly prejudice and confuse the jury.  Again, there is <u>no</u> temporal connection or factual similarity between the bad acts Gizmodo Defendants want to introduce and the Jane Doe or Clearwater Woman Statements.  Their only purpose would be to prove Miller's general bad character, which the law clearly does not allow. *Boyles*, 431 So.2d at 640.

**B.     Motion *in Limine 2*:  Intimate Details of Delgado & Miller Relationship**

Gizmodo Defendants may seek to introduce specific details about the affair between Delgado and Miller and *allegations* Delgado has made about Miller – none of which are relevant or admissible in *this* case.  The affair is undisputed, as are the resulting pregnancy and child, the existence of the Family Case, and certain press reports about them.  The only reason to introduce other, specific details about the relationship would be to taint the jury with irrelevant and improper character evidence.

The intimate details of the affair are completely irrelevant.[6]  This evidence does not have any tendency to make a fact of consequence in determining the truth or falsity of the defamatory statements about Miller any more or less probable.  Fed. R. Evid. 401.

Gizmodo Defendants already sought to rely upon specific evidence concerning the affair between Miller and Delgado [*see* Doc. 156 ¶¶ 15-43; Doc. 155 pp. 2-3], including that "Miller asked her to have an abortion and… sexually and physically abused her" (which Miller denies) [*See* Doc. 170 p. 2 (citing Doc. 156 ¶¶ 18-19, 27)].   Gizmodo Defendants seek to introduce numerous exhibits at trial regarding these same irrelevant issues.  [Defendants' Trial Exhibit Nos. 11-12, 45-49, 54, 57-61, 64, 71-73, 76-78, 95-98, 103-04, 119].   This includes over 340 pages of personal messages [Ex. 103] and voice mails [Exs. 95-98] related to the affair, and numerous of Delgado's Tweets [*i.e.*, Ex. 71, 76-78], as well as a December 24, 2016 email from Delgado to Kelly Miller [Ex. 54].  In addition to being irrelevant, Plaintiff has objected to these exhibits as hearsay under Rule 801 and 802.  These materials and any evidence like them are not in any way relevant to the truth or falsity of the Jane Doe, Clearwater Woman, or Woman Claims Statements, actual malice, nor the fair report privilege.

The only reasons for Gizmodo Defendants to elicit evidence about the specific, intimate details of the relationship between Miller and Delgado would be to try to paint Miller in a negative light before the jury and improperly attack his character.  As set forth above, Rules 404(a)(1) and (b) and 608 prohibit the use of evidence for these improper purposes.

Even if the intimate details of Miller's relationship with Delgado were deemed relevant, they still should be excluded as highly prejudicial under Rule 403.  There is no probative value to the specific details of Miller's relationship with Delgado.  Even if there was, any probative value is substantially outweighed by the prejudicial effect of such evidence on the jury.

C.      **Motion *in Limine* 3: Evidence regarding "Good Faith" – Sword and Shield**

Under the sword and shield doctrine, Gizmodo Defendants should be barred from arguing and introducing evidence that they published the Article in "good faith."  Their supposed "good faith" belief was based on or influenced by conversations with counsel that they refused to disclose in discovery.

---

[6] Miller initially alleged detailed facts about Delgado and the events surrounding the family case, but the relevance of those facts and Delgado changed when the Court dismissed Miller's conspiracy claim.  [Doc. 110]

On September 21, 2018, Krueger, Chan, Marchman, and Mirkinson exchanged several e-mails with Gizmodo's in-house counsel, Lynn Oberlander, concerning whether to publish the Article.  [*See* Doc. 179, Exhibit 1 (Gizmodo 00049-50, 52-67)]  In addition to these e-mails, on September 21, 2018, Krueger, Chan, Marchman, and Mirkinson had a phone conference with their in-house counsel.  [*Id*. (Gizmodo-00052-53)]  During the course of the privileged phone call, Gizmodo Defendants discussed the credibility of the allegations in the Supplement, whether the Supplement was sealed, and the impact of Miller's Notice of Confidential Information on the sealing issue.  [Doc. 171, ¶¶ 61, 79]

Gizmodo Defendants reached a collective decision about the credibility of the Supplement, as evidenced by Mirkinson's and Chan's acknowledgement that "we" made the credibility determination [*See* Doc. 179-3 (Mirkinson Depo. pp. 59, 77-78) ("We found the document to be a credible document."); Doc. 171, ¶ 79 ("We believed it was credible…")]; and Marchman's testimony that he only discussed his thoughts on the credibility of the accusations in the privileged context.  [Doc. 171, ¶ 79].  Further, Krueger testified the "communications with in-house counsel weighed heavily" in the decision to publish.  [Krueger Depo. p. 164]

Gizmodo Defendants elected to hide behind the attorney-client privilege and refused to provide any details of their privileged communications.  They refused to disclose the substance of the privileged communications in their interrogatory answers, their responses to requests for production, and during their depositions.  *See, e.g.,* Doc. 179, Exhibits 7-10; Doc. 171 ¶¶ 62, 79.

This presents a quintessential example of a defendant using the attorney-client privilege as both a sword and shield.   In *Pena v. Handy Wash, Inc.*, 114 F. Supp. 3d 1239, 1243-45 (S.D. Fla. 2015), Her Honor addressed this very issue and excluded evidence of a good faith defense based on the sword and shield doctrine, as well as Rule 403.

The same rationale was applied in *Greenberg v. CBS, Inc.*, 69 A.D.2d 693, 708-709 (1979), which involved the application of the sword and shield doctrine to evidence related to actual malice in the context of an assertion of the Shield Law to prevent discovery.  Although the defendants were justified in asserting this privilege, it "deprived the plaintiff of access to valuable and material evidence on a critical element of the plaintiff's cause of action [malice]."  [*Id*. at 708-09]  The solution was "readily apparent:"  give no consideration to the defense of good faith based on the material the defendants refused to disclose.  *Id*.  The defendants controlled their defense – if they

chose to fully disclose their investigation, no limitation of the defense would occur. *Id.*; *see also Maar v. Beall's, Inc.*, 237 F.Supp.3d 1336, 1339-40 (S.D. Fla. 2017).

In *Collins v. Troy Publishing Co., Inc.*, 213 A.D.2d 879, 881 (1995), the court also concluded the defendants could not rely on confidential information withheld from the plaintiff to prove they acted without malice because they deprived the plaintiff of access to valuable material evidence. The trial court's decision to refuse to consider information imparted by and the reliability of the confidential sources the defendant refused to disclose was affirmed. *Id.* at 880.

In *U.S. v. Bilzerian*, 926 F.2d 1285, 1292-93 (2d Cir. 1991), the Second Circuit explained the reasons why defendants cannot assert their "good faith" belief in the legality of their actions while they refuse to disclose their privileged communications with counsel. Where a defendant claims he thought his actions were legal, it puts his knowledge of the law and basis for his understanding of what the law required at issue. *Id.* at 1292. The defendant's own testimony as to his "good faith" opens the door to otherwise privileged communications. *Id.* at 1293. If the defendant wanted to maintain the privilege, he was still free to deny intent without asserting good faith or argue his good faith defense by means of opening and closing statements and by examining witnesses. *Id.; see also Stern v. O'Quinn*, 253 F.R.D. 663, 676 (S.D. Fla. 2008) (citing *Bilzerian*); *Maplewood Partners, L.P. v. Indian Harbor Insurance Co.*, 295 F.R.D. 550 (S.D. Fla. 2013).

Numerous other courts have reached the same conclusion. For example, in *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001), the Ninth Circuit relied on *Bilzerian* in approving the exclusion of evidence on the issue of intent where the attorney-client privilege was asserted:

> The district court was also within its discretion in excluding evidence of Feltner's reliance on advice of counsel. Feltner sought to rely on advice of counsel to demonstrate that his infringement was not willful. But Feltner refused to answer questions regarding his interactions with counsel at his deposition. Accordingly, prior to the bench trial, the district court precluded Feltner from relying on the defense of advice of counsel at trial.

> Following remand from the Supreme Court, Columbia filed a motion in limine to reaffirm the district court's prior ruling prohibiting Feltner from relying on the advice of counsel defense. In opposition to the motion in limine, Feltner offered "to make himself available for deposition on this issue." The district court rejected this offer, stating that "[t]he Defendant cannot now, at the eleventh hour, make himself available for a deposition."

> Although courts have recognized that reliance on advice of counsel may be probative of non-willfulness, see *RCA/Ariola Int'l, Inc. v. Thomas & Grayston*

*Co.,* 845 F.2d 773, 779 (8th Cir.1988), the district court was within its discretion in precluding Feltner from relying on advice of counsel in this case. "The privilege which protects attorney-client communications may not be used both as a sword and a shield. Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived." *Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1162 (9th Cir.1992) (citing *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.1991)). Here, Feltner sought to argue that he continued his infringing activities based on the advice of his attorney, while at the same time refusing to answer questions regarding relevant communications with counsel until the "eleventh hour." Under these circumstances, the district court was within its discretion in precluding Feltner from invoking the advice of counsel defense.

A similar result was reached in *Aspex Eyewear, Inc. v. E'Lite Optik, Inc.*, 276 F. Supp. 2d 1084, 1092–93 (D. Nev. 2003), where the District Court found:

> Fundamental fairness compels the conclusion that a litigant may not use reliance on advice of counsel to support a claim or defense as a sword in litigation, and also deprive the opposing party the opportunity to test the legitimacy of that claim by asserting the attorney-client privilege or work-product doctrine as a shield. This court joins those courts that have held that the defendant, having waived the privilege by asserting the advice of counsel defense, must produce not only attorney-client communications, but also all documents relied upon or considered by counsel in rendering the opinions relied upon. *Mushroom Assoc. v. Monterey Mushrooms, Inc.,* 24 USPQ2d 1767, 1992 WL 442892 (N.D.Ca.1992); *FMT Corp. v. Nissei ASB Co.,* 24 USPQ2d 1073, 1992 WL 240688 (N.D.Ga.1992); *Handgards, Inc. v. Johnson & Johnson,* 413 F.Supp. 926 (N.D.Ca.1976). A contrary result ignores the potential for litigation abuses, and erects too much of an impediment to the truth seeking process. Counsel for the opposing party should not be able to act as the gatekeeper to determine what information their adversary is entitled to. As the court noted in *Chiron Corp. v. Genentech,* 179 F.Supp.2d 1182, 1186, parties should not be able to selectively disclose privileged communications they consider helpful while claiming privilege on damaging communications relating to the same subject.

In *Arista Records LLC v. Lime Group LLC*, 06 CV 5936 KMW, 2011 WL 1642434, at *2 (S.D.N.Y. Apr. 20, 2011), the Court also relied on *Bilzerian* when it applied the sword and shield doctrine to exclude evidence of good faith because the advice of counsel "played a substantial and significant role in formulating actions taken by [the defendant]":

> Plaintiffs are correct that a party may not assert that it believed its conduct was lawful, and simultaneously claim privilege to block inquiry into the basis for the party's state of mind or belief. *See United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.1991) (finding that, by asserting a good faith defense to securities fraud, Defendant had "assert[ed] a claim that in fairness requires examination of the protected communications.") Indeed, a party "cannot be permitted, on the one hand,

to argue that it acted in good faith and without an improper motive and then, on the other hand to deny ... access to the advice given by counsel where that advice ... played a substantial and significant role in formulating actions taken by [the defendant]." *Pereira v. United Jersey Bank,* 1997 WL 773716, at *6 (S.D.N.Y. Dec. 11, 1997). Accordingly, "[a] party who intends to rely at trial on the advice of counsel must make a full disclosure during discovery; *failure to do so constitutes a waiver of the advice-of-counsel defense." Vicinanzo v. Brunschwig & Fils, Inc.,* 739 F.Supp. 891, 894 (S.D.N.Y.1990) (emphasis added).

Defendants will undoubtedly argue that there is other evidence to support their "good faith" defense; such as suggesting that Delgado was a "credible" source and the Supplement had "indicia of reliability." *See* [Doc. 155]. But Gizmodo Defendants cannot arbitrarily claim an *independent* belief in the "credibility" of the accusations, acting as if their consultation with counsel never occurred, when the testimony shows they evaluated the decision to publish collectively with counsel. [Doc. 179-3, 171 ¶¶ 61, 62, 79] This holds particularly true in light of the testimony revealing that counsel coached them to say the accusations were "credible." [Doc. 171 ¶ 96] Any "good faith" belief is inextricably too intertwined with advice of counsel they refused to disclose.

Defendants cannot claim a "good faith" belief in publishing the Article and Supplement while simultaneously hiding behind the attorney-client privilege and refusing discovery into the full predicate for their supposed belief. Defendants should be prohibited from offering any evidence they had a "good faith" basis to publish the Article. *See AlphaMed Pharm. Corp. v. Arriva Pharm., Inc.*, 03-20078-CIV, 2005 WL 6742954, at *1 (S.D. Fla. Sept. 1, 2005) (granting a motion in limine stating "Having invoked the marital privilege, and having denied Defendants the opportunity to explore in discovery the conversations the Lezdeys had concerning the preparation of Noreen Lezdey's affidavit, AlphaMed is now precluded from introducing at trial testimony from John or Noreen Lezdey concerning the 'subject matter'" of the April 18, 1999 telephone call to Susan Wachter); *see also Pena*, 114 F. Supp. 3d at 1244. For the same reasons, this evidence should be excluded under Rule 403. *Pena*, 114 F.Supp.3d at 1244.

### D.    Motion *in Limine* 4: Evidence that Defendants Spoke with Counsel prior to Publication

Gizmodo Defendants also should be precluded from offering evidence that they spoke with their counsel before publishing the Article. This evidence is improper, inferential hearsay. Black's Law Dictionary defines "inferential hearsay" as "Hearsay that is implied in testimony that suggests the contents of a conversation that is not explicitly disclosed by the testimony." Black's Law Dictionary (10th ed.2014); *Pena*, 114 F. Supp. 3d at 1243. Her Honor pinpointed the inferential

hearsay problem in *Pena*: "Defendants wish to introduce evidence they consulted with counsel regarding their classification of the ticket drivers as independent contractors, without revealing the substance of the conversation. Their objective is clear: let the jury infer from the fact Defendants continued to classify their ticket drivers as independent contractors after consulting counsel; that... their attorney blessed their conduct." (quotations omitted). 114 F.Supp.3d at 1243.

Just like in *Pena*, Defendants should be precluded from offering any evidence that they spoke with counsel because it will infer to the jury that Defendants' counsel authorized the publication. *Pena*, 114 F.Supp.3d at 1243. Gizmodo Defendants also should not be permitted to offer their redacted emails with counsel (Def. Trial Ex. 13).

In addition to the inferential hearsay problem, evidence that Defendants met with counsel without disclosing the substance and context of the conversations is highly prejudicial to plaintiff and would confuse the jury. As such, this evidence also should be precluded under Rule 403. *See Pena,* 114 F.Supp.3d 1243-1244.

### E.      Motion *in Limine* 5: Improper Evidence to Attack Miller's Credibility

Gizmodo Defendants have already revealed their intent to attack Miller's credibility with improper character evidence. [Doc. 169, p. 13]. They intend to do the same thing at trial. [*See* Defendants' Trial Ex. 55-56 (Harris commentary), 62-63 (2019 Nadler Tweets), 81 (massage parlor), and 87-93 (CNN appearances)]. Essentially, Gizmodo Defendants plan on arguing Miller is an "admitted liar" based on a "pattern and practice" consisting of concealing his "indiscretions" from his wife and hearsay statements by his colleagues on CNN (during debates on TV broadcasts) [Doc. 169 p. 13; Doc. 155 p. 3; Defendants' Trial Ex. 87-93] This is precisely the type of improper credibility attck Rules 405, 406 and 608 prohibit.

Rule 608(b) explicitly provides that "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Rather, any attempted attack on Miller's truthfulness must be based on reputation or opinion testimony and conform with Rule 405(a). *See* Fed. R. Evid. 608, advisory committee notes; Rule 405(a). None of the specific instances of misconduct and alleged dishonesty raised by Defendants meet these requirements, and must therefore be excluded under Rules 405, 406, and 608.

Even if this evidence did not violate Rules 405, 406 and 608, it still should be excluded under Rule 403. The prejudicial effect of any past incidents of dishonesty have no bearing on the

facts of this case—particularly given that Miller's truthfulness is not placed at issue by the defamation claim.   These prior instances of dishonesty would have minimal, if any, probative value, while distracting and confusing the jury from the issues they must decide.   Accordingly, any evidence of prior instances of dishonesty also should be excluded under Rule 403.

### F.   Motion *in Limine* 6: Anthony Schram

Defendants listed Anthony Schram, Delgado's former lawyer, as a witness they intend to call at trial.   In their Rule 26 disclosures, Gizmodo Defendants state Mr. Schram only "[h]as knowledge concerning Arlene Delgado's telephone communication with Yashar Ali." Mr. Schram's declaration filed in support of Defendants' opposition to Plaintiff's motion for summary judgment on falsity [Doc. 170 Ex. B] only discusses his knowledge of this phone call with Ali.  Mr. Schram's proposed testimony about this phone call is rank hearsay, and hearsay within hearsay.   *See* Fed. R. Evid. 801.   "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801. Under Rule 802, hearsay is not admissible unless it falls within one of the exceptions in Rules 803 or 804.   Hearsay within hearsay is admissible only "if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Fed. R. Evid. 805.  Any testimony from Mr. Schram about what anyone said on the call between Delgado and Ali is the epitome of hearsay.  There is no applicable exception.

### G.   Motion *in Limine* 7: Lay Opinions of Giddens

Defendants' expert, Terri Giddens, is a 'technology consultant and instructor in the Rawls College of Business, Texas Tech University. " [Doc. 176-1]  Although qualified in her field, Dr. Giddens is not an expert in Kronenberger's area of expertise.  Dr. Giddens expressed opinions about Kronenberger's methods, but did not reach any conclusions about the damage component of Kronenberger's opinion.  (See Doc. 176-1; Giddens Depo. pp. 52-53)

Giddens' testimony includes her *lay* opinion as to Miller's reputation prior to publication of the Article, lay opinions that people automatically form negative opinions about others when they find out their political affiliation, and lay opinion that internet readers assess reputation based on political bias.  [*See* Deposition of Terri Giddens, pp. 68, 70-71, 93-94, 138-139; attached as **Exhibit 1**].  When asked about what expertise was necessary to determine whether Miller's prior affair with Delgado had a negative effect his reputation, Giddens simply replied, "I think you just need to be human." [*Id.* at p. 68.]  While Giddens goes on to assert that Miller's reputation prior

to the Article was tarnished and negatively impacted by reports of his affairs, it is clear from her testimony that she did not need any special expertise to reach her lay opinions. Indeed, Giddens has conceded as much. Accordingly, she is not expressing expert opinions and should be prohibited from testifying about her lay opinions at trial.

Giddens' testimony on these issues could not even be admitted as lay opinion testimony because they do not meet the criteria for admissibility under Federal Rule of Evidence 701. Rule 701 allows lay witnesses to testify about their opinions only when those opinions are: "(a) rationally based the witness's perception, (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. The first criterion is particularly applicable here; that is, a lay witness must base opinion testimony on matters that the witness has perceived and there must be a "rational connection between the witness' opinion and his perceptions.'" *KWPlastics v. US. Can Co.,* 131 F. Supp. 2d 1265, 1272 (M.D. Ala. 2001) quoting Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 6254 at 126 (1997)). "By restricting lay opinions to those based on the perception of the witness, the implication of Rule 701 is that lay opinion may not be based on hearsay." *Id.* at 1273 (internal quotations omitted). "An opinion is admissible only if the court determines that an adequate foundation has been established." *Id. at 1274.*

Here, none of Giddens's lay opinions are based upon her personal perception. Her opinion as to Miller's reputation after publication of the Article is based on hearsay, which also is improper to prove reputation. She offers no explanation as to her personal perception of facts that would rationally lead her to reach these opinions. Further, none of Giddens' lay opinions will be helpful to a jury. To the contrary, Giddens's lay opinion testimony would only confuse the jury as to the capacity in which she is testifying.

Moreover, Giddens' lay opinions about how the Article impacted Miller's reputation are not helpful because they are contrary to the law. The statements defendants published about Miller are libelous on their fair or defamatory *per se* – meaning harm to reputation is presumed. [*See* Miller Memorandum of Law on Causation and Damages, filed contemporaneously herewith.] Giddens' lay opinions (that the Article did not harm Miller's reputation) contradict the law and would not help, but rather confuse the jury – rendering them inadmissible under Rule 701 and Rule 403.

**H.**   **Motion *in Limine* 8: Unpleaded Defense**

Gizmodo Defendants have proposed a jury instruction and may intend to argue and/or offer evidence that Miller's reputation was "so bad that only slight, if any, harm could have been caused by the statements at issue."   They should be precluded from arguing and offering evidence to support this position because they did not plead the libel-proof plaintiff doctrine as an affirmative defense.  *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298 (2d Cir. 1986).  [*See* Doc. 118 pp. 21-23]

## LOCAL RULE 7.1(a)(3) CERTIFICATION

In accordance with S.D. Fla. L.R. 7.1(a)(3), Plaintiff's counsel conferred with Defendants' counsel, and Defendants oppose the relief requested in this motion.

Dated:  August 15, 2019.          Respectfully submitted,

*/s/ Shane B. Vogt*
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Shane B. Vogt – FBN 257620
E-mail:  svogt@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 443-2199
Fax: (813) 443-2193
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 15, 2019, the foregoing document was filed with the Court's CM/ECF system, which will send electronic notice to all counsel of record.

*/s/ Shane B. Vogt*
Attorney

# **EXHIBIT 1**

*to Plaintiff's Motion in Limine*

1           IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
2                     MIAMI DIVISION

3   JASON MILLER,                    )
            Plaintiff,               )
4                                    )
    vs.                              )  Case No.
5                                    )1:18-cv-24227-CMA
    GIZMODO MEDIA GROUP, LLC, a      )
6   Delaware Corporation,            )
    KATHERINE KRUEGER INDIVIDUALLY   )
7   and WILL MENAKER, INDIVIDUALLY,  )
            Defendants.              )
8

9

10          *   *   *   *   *   *   *   *   *   *

11               ORAL VIDEOTAPED DEPOSITION

12               TERRI D. GIDDENS, PH.D.

13                   June 11, 2019

14          *   *   *   *   *   *   *   *   *   *

15

16       ORAL VIDEOTAPED DEPOSITION OF TERRI D. GIDDENS,

17   PH.D., produced as a witness at the instance of the

18   Plaintiff and duly sworn, was taken in the

19   above-styled and numbered cause on June 11, 2019,

20   from 8:55 a.m. to 1:18 p.m., before Cheryl Duncan,

21   CSR, in and for the State of Texas, reported by

22   computerized stenotype machine at the offices of Rick

23   Husband Amarillo International Airport, 10801 Airport

24   Boulevard, Amarillo, Texas, pursuant to the Federal

25   Rules of Civil Procedure.

Terri Giddens, Ph.D.
June 11, 2019                                        68

 1    you this first:  Did you determine what Mr. Miller's
 2    reputation was prior to the Splinter article?
 3         A.    As far as determining what it was in what
 4    capacity?  Like trying to quantify it, qualify it?
 5         Q.    In any way.
 6         A.    Yeah.
 7         Q.    All right.  And what, what did you -- what
 8    were your conclusions?
 9         A.    That the, the affair, the, the resulting
10    child, the -- I mean, he's got, he's got a past
11    that's, that's not real favorable, in my opinion.
12         Q.    And when you say "in my opinion," is that
13    in your expert opinion or is that a layperson
14    opinion?
15         A.    That's a layperson opinion.  And probably
16    an expert opinion too.
17         Q.    All right.  In what way is it an expert
18    opinion?
19         A.    Well, I would think that an affair on
20    anybody's reputation online, that's reported online
21    is probably negative.
22         Q.    So in what way do you need an expertise to
23    determine that?
24         A.    I think you just need to be human.
25         Q.    Did you -- in forming any opinions about

Terri Giddens, Ph.D.
June 11, 2019                                    70

1   pretty broad question.

2        Q.    Is there anything you recall about any

3   literature or authoritative sources on online

4   reputation that you reviewed in the past that you

5   relied upon in forming your opinions in this case?

6        A.    Ask that again.

7        Q.    Is there anything in the literature or

8   authoritative sources that you've reviewed in the

9   past that you relied upon in forming your opinions in

10  this case?

11       A.    I've read through quite a bit.  I cannot

12  specifically say what it is.

13       Q.    And is there anything else that you opined

14  about Mr. Miller's reputation before the Splinter

15  article, other than what you had mentioned about the

16  affair and the child?

17            MS. SHULLMAN:   Object to the form.

18       A.    When you're looking at a political figure

19  and the reputation of a political person, it's quite

20  obvious today that there are people, in this

21  polarized country that we're in now, that people

22  automatically form negative opinions just when they

23  find out a political affiliation.

24       Q.    And is that something that you're telling

25  me about in the capacity of an expert or as a

Terri Giddens, Ph.D.
June 11, 2019                                        71

1    layperson?

2        A.    As a layperson.

3        Q.    And with respect to Mr. Miller's reputation

4    prior to the Splinter article, did you come across

5    anything in the work that you did on this case that

6    indicated that Mr. Miller had ever been accused of a

7    crime?

8        A.    No.

9        Q.    In any of the research that you did in

10   connection with this case about -- or that involved

11   Mr. Miller's reputation before the Splinter article,

12   did you see any information relating to Mr. Miller

13   having any affairs with anyone other than A.J.

14   Delgado?

15       A.    No.

16       Q.    And in evaluating Mr. Miller's reputation

17   for the time period before the Splinter article --

18   what time period did you look at?

19       A.    December 2016.

20       Q.    Up through the day prior to publication of

21   the article?

22       A.    Yes.

23       Q.    And what did you do to evaluate his

24   reputation?

25       A.    So looking at it before the Splinter

Terri Giddens, Ph.D.
June 11, 2019                                    93

 1    that Splinter article.

 2         Q.    Do you consider specifically the

 3    information of the Splinter article related to

 4    Mr. Miller having an affair with a stripper, getting

 5    her pregnant, slipping her an abortion pill in a

 6    smoothie, killing the unborn child and almost killing

 7    the woman, do you consider that to be negative?

 8                   MS. SHULLMAN:  Objection, form.

 9         A.    I'm going to have to -- and this is just

10    from my personal perspective, building up my timeline

11    and going back and looking at Jason Miller and his

12    past and his reputation.  And I'm doing this strictly

13    from a personal perspective.  The reputation that he

14    had prior to the Splinter article, where he had an

15    affair while his wife was at home pregnant with his

16    second child, getting his mistress pregnant, that had

17    a profound effect on me personally.  When I read the

18    Splinter article that had the accusations in there

19    that were denied, it did not change my opinion.  This

20    is just me personally.  If you're wanting to know

21    whether or not the -- it changed anybody else's

22    opinions, would need to go look at the actual data

23    itself.  I can only attest to did it change my

24    opinion, I'm going to say no.

25         Q.    And when you say "my personal opinion,"

Terri Giddens, Ph.D.
June 11, 2019                                            94

1    you're talking about your opinion as a layperson?

2         A.    Yes.

3         Q.    Did you form any expert opinions?

4         A.    Yes.

5         Q.    What were those?

6         A.    Okay, so the only way that you can make an

7    opinion on this without just doing pure speculation

8    is to look at the data that's there.  I went back and

9    I looked at the actual comments on that article.  And

10   when you're looking at did it affect anybody, did it

11   change anybody's opinion towards Jason Miller, you've

12   got a subset of what you're going to find on the

13   internet from the 200-plus comments that are on that

14   article.  I think that would be a good snapshot of

15   what's there.  If you go back and you look at the

16   comments on that article, you're not going to find a

17   single comment that states that they now think less

18   of Mr. Miller, that their opinion changed, that they

19   didn't like him before, now they don't like him any

20   more.  Where are the comments in there?

21        Q.    Appendix O.

22        A.    Okay.  Looking at individual comments,

23   from --

24        Q.    All right.  So on the first page, there's

25   a -- Picklenose has a comment.

Terri Giddens, Ph.D.
June 11, 2019                                    138

```
 1        A.     Okay.

 2        Q.     You talk about reputational judgment based

 3   on polarized political bias.

 4        A.     Uh-huh.

 5        Q.     And one of the statements you make is that

 6   many internet readers assess reputation based on

 7   political bias.

 8        A.     Yes.

 9        Q.     What's the support for that statement?

10        A.     That's -- it's just common knowledge.  We

11   live in a very polarized society.  People at family

12   tables are having arguments simply because of

13   political affiliation.  People form opinions -- you

14   hear people just say, that person's liberal or that

15   person's conservative.  So it's just -- they discount

16   the person immediately.  When you're looking at

17   different news -- online news sources -- and we'll

18   just take the major one -- the CNN, the MSNBC and the

19   Fox News.  When you look at commentary on any article

20   on those sites, most of the commentary on Fox News is

21   conservative and they are making very negative

22   comments about liberals in general.  On CNN, on

23   MSNBC, you've got more of a liberal commentary, where

24   they are making negative comments about anything

25   associated with the conservative side.
```

Terri Giddens, Ph.D.
June 11, 2019                                    139

```
 1      Q.    And I just -- I understand the common
 2   knowledge component of it.  I just want to make sure
 3   that I'm not -- like you didn't rely on any written
 4   materials to --
 5      A.    No, it's just common --
 6                THE COURT REPORTER:  Okay, I'm sorry,
 7   I didn't get the end of your question.  You didn't
 8   rely on any?
 9      Q.    Any written materials.
10      A.    No.
11      Q.    And you can explain.  Go ahead and --
12      A.    Well, it's written materials because it's
13   the comments, it's the articles, it's what you hear
14   on TV all the time about how polarized everything is.
15   That -- it's just common knowledge.
16      Q.    So is it fair to say that you're giving me
17   here more of a layperson opinion --
18                MS. SHULLMAN:  Object to the form.
19      Q.    -- on political bias than any form of
20   expert opinion?
21      A.    A very common layperson opinion.
22      Q.    Do you think that people from different
23   political perspectives would view an accusation that
24   a person secretly dosed someone with an abortion
25   pill, causing them to have an abortion, do you think
```