# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-24227-CIV-ALTONAGA/Goodman

**JASON MILLER**,

      Plaintiff,

v.

**GIZMODO MEDIA GROUP, LLC**; *et al.*,

      Defendants.

_____/

## ORDER

    **THIS CAUSE** came before the Court on Defendants, Gizmodo Media Group, LLC ("Gizmodo") and Katherine Krueger's ("Krueger['s]") Motion for Summary Judgment [ECF No. 155] submitted with their Statement of Undisputed Material Facts ("Defs.' SOF") [ECF No. 156]. Defendants have submitted the Declarations of Krueger [ECF No. 157], Timothy Marchman [ECF No. 158], and Aleksander Chan [ECF No. 159] in support of the Motion.[1]  Plaintiff, Jason Miller, filed his Response [ECF No. 172] as well as his Statement of Facts ("Pl.'s SOF") [ECF No. 171], to which Defendants filed a Reply [ECF No. 177] and Counterstatement to Plaintiff's Additional Facts [ECF No. 178].

    The Court has carefully considered the Amended Complaint [ECF No. 5], the parties' submissions, the record, and applicable law.  Because there are no material facts in dispute that could defeat Defendants' affirmative defense raising the New York fair report privilege, codified in section 74 of the New York Civil Rights law, the Motion is granted, and summary judgment will be entered by separate order.

---

[1] The Krueger Declaration attaches Exhibits 1–17.  The Marchman Declaration attaches Exhibit 18. Defendants submitted Exhibits 19–24 separately.  (*See* Notice of Filing Materials in Support of Defendants' Motion for Summary Judgment ("Notice of Supplementary Materials") [ECF No. 160]).

## I.   BACKGROUND

This is a defamation case.  (*See generally* Am. Compl.).  Plaintiff is a political strategist and commentator.  (*See* Defs.' SOF ¶¶ 2, 39).  Krueger is the managing editor of a news website, *Splinter*.  (*See id*. ¶ 52).  Gizmodo is *Splinter*'s corporate parent.  (*See* Am. Compl. ¶¶ 19–20).  Plaintiff alleges Defendants defamed him by publishing an online article (the "Article") containing false accusations made against him in a confidential court filing and inaccurately characterizing the accusations.  (*See generally id*.).  The material undisputed facts follow.

### A.      The Facts

Plaintiff worked on campaigns, in the administrations of numerous pro-life politicians, and as a political commentator on CNN.  (*See* Defs.' SOF ¶¶ 2, 39).[2]  The events at issue in this case began in the summer of 2016, when Plaintiff served as a Senior Communications Advisor for the 2016 presidential campaign.  (*See id*. ¶ 4).  In August 2016, Plaintiff hired Arlene Delgado ("Delgado") to work as a spokesperson for the campaign.  (*See id*. ¶ 11).  Delgado is a Harvard Law School graduate and member of the New York bar.  (*See id*. ¶ 8).  She has appeared on numerous radio and television shows and has been published in multiple news outlets.  (*See id*. ¶ 9).

In October 2016, Plaintiff and Delgado began an affair.  (*See id*. ¶¶ 15–16).  The affair resulted in Delgado's pregnancy.  (*See id*. ¶ 25).  In July 2017, Plaintiff and Delgado's son was born.  (*See id*. ¶ 41).  Articles about the affair, birth of Plaintiff and Delgado's son, and subsequent custody dispute have appeared in publications including the *Atlantic*, *Talking Points Memo*, the *New York Post*, the *Daily Mail* and *Vanity Fair*.  (*See id*. ¶ 43).

---

[2] All facts are considered undisputed unless otherwise indicated.

1. <u>The Family Court Action</u>

In July 2017, Plaintiff initiated a custody proceeding in Miami-Dade County, Florida Family Court (the "Family Court Action"). (*See id*. ¶ 42). On September 14, 2018, Delgado filed a document entitled "Mother's Supplement to Mother's March 2018 Motion for Court to Consider Psychological Evaluation of the Father" (the "Supplement") in the Family Court Action. (*See id*. ¶ 44; Krueger Decl., Ex. 9, Supplement [ECF No. 157-9]). The parties dispute whether the Supplement has been sealed since it was filed or whether it is publicly available.[3] (*See* Defs.' SOF ¶¶ 45–50; Pl.'s SOF ¶¶ 45–50).

In the Supplement, Delgado accuses Plaintiff of having an affair with and impregnating "Jane Doe" years earlier, slipping her an "abortion pill," and killing her unborn child without her consent. (Supplement 2–3).[4] The Supplement states, in part:

In summer 2018, [Delgado] was informed as follows:

1. In 2012, Mr. Miller, while working for Jamestown Associates, was working closely with the firm's Florida clients.

2. As part of this, Mr. Miller spent significant time in Orlando, FL.

3. Evenings with clients and colleagues sometimes entailed steakhouse dinners followed by strip clubs and/or patronage of escorts for some of the participants.

4. During one such evening, Mr. Miller and other colleagues/clients visited Rachel's Gentleman's Club, a strip club in Orlando (which also has a West Palm Beach location).

5. At the time, Mr. Miller was already married to his wife (whom he married in July 2008) and had a 4-year-old daughter (who was born in late 2008).

---

[3] As explained *infra* in section III(A), whether the Supplement was sealed does not affect the Court's analysis.

[4] The Court relies on the pagination generated by the Case Management/Electronic Case Files system, which appears as a header on all filings.

CASE NO. 18-24227-CIV-ALTONAGA/Goodman

6.  Mr. Miller met a stripper that evening, which [sic] will be referred to herein as "Jane Doe" (Mother has individual's full name).

**7.  Mr. Miller had sexual intercourse with Jane Doe and continued a sexual relationship with her for some unknown period of time.**

**8.  Jane Doe became pregnant.**

9.  Shortly thereafter, according to Jane Doe, Mr. Miller visited her apartment with a Smoothie beverage.

10. Unbeknownst to Jane Doe, the Smoothie **contained an abortion [p]ill.**

11. The pill induced an abortion, and Jane Doe wound up in a hospital emergency room, bleeding heavily and nearly went into a coma.

12. The unborn child died.

(*Id.* (alterations added; emphasis in original)).

The Supplement identifies Delgado's sources for the information.  (*See id.* 4–11).  It states Delgado initially discovered the accusations from a man she met on Twitter, who told Delgado he received the information about Jane Doe from "multiple" sources whom he believed were "credible."  (*Id.* 7 (quotation marks in original; emphasis removed)).  He cautioned the account was "unverified by him" and he was "unable to vouch for its veracity."  (*Id.*).  The Supplement states a private investigator contacted Jane Doe, but she "was not interested in speaking out."  (*Id.* 3).

The Supplement further states Delgado notified a journalist after learning of the accusations, and the journalist (1) contacted Jane Doe via Facebook, spoke to her, her friends, and her family; (2) traveled to Florida to investigate the story (*see id.* 9); (3) "confirmed the account directly with the victim herself"; and (4) stated Jane Doe's instant reaction was "'Yes, that happened to me — how did you know? Who told you?'" (*id.*).

4

According to the Supplement, the journalist told Delgado he had "all [he] need[ed]" to write the story (*id.* (alternations added)), but the journalist had not published a report on the story due to his editors' concern "Jane Doe would backtrack" (*id.* 10–11).  The Supplement states the journalist "continues working on the report."  (*Id.* 11).

2.   The *Splinter* Article

On September 21, 2018, Krueger received a message from a source who informed her Delgado filed the Supplement in the Family Court Action.  (*See* Defs.' SOF ¶ 55).  The source sent Krueger a copy of the Supplement.  (*See id.*).  Krueger confirmed with Delgado the document was an authentic copy of the Supplement.  (*See id.* ¶¶ 56, 82; Krueger Decl. ¶ 53).

Krueger reviewed the Supplement in full and prepared to write a report on it.  (*See* Defs.' SOF ¶ 59; Krueger Decl. ¶ 56).  She intended to write "a straight forward report on a filed court document" and to "closely track the allegations made in the Supplement."  (Kreuger Decl. ¶ 57).  Prior to drafting, Krueger sent an electronic message to her editor, Timothy Marchman, stating, "I think I'm mostly gonna let [the allegations] speak for themselves? And just hew closely to the doc as filed . . . ."  (*Id.*, Ex. 10, Krueger/Marchman Electronic Correspondence [ECF No. 157-10] 7 (alterations added)).  Marchman responded, "[this is] one to play straight."  (*Id.* (alteration added)).

Krueger drafted the Article.  (*See* Defs.' SOF ¶ 80; Krueger Decl. ¶ 59).  It was then edited by *Splinter* Editor-in-Chief Aleksander Chan and Deputy Editor Jack Mirkinson.  (*See* Defs.' SOF ¶ 85; Krueger Decl. ¶ 59).

On September 21, 2018, *Splinter* published the Article, titled "Court Docs Allege Ex-Trump Staffer Drugged Woman He Got Pregnant With 'Abortion Pill,'" on its website.  (*See* Krueger Decl. ¶ 59; *id.*, Ex. 1, Article [ECF No. 157-1]).  The opening paragraph of the Article states:

> The ongoing custody battle between former Trump campaign operatives Jason Miller and A.J. Delgado has taken another nasty turn: In an explosive new court filing, Delgado's legal team alleges that Miller — prior to their [sic] own high-profile extramarital romance — carried out an affair with a woman he met at an Orlando strip club.  Additionally, the court documents claim, when the woman found out she was pregnant, Miller surreptitiously dosed her with an abortion pill without her knowledge, leading, the woman claims, to the pregnancy's termination and nearly her death.

(Article 2).  The Article provides background information on Plaintiff and Delgado's affair.  It includes hyperlinks to articles in the *Atlantic* and *Page Six* about the relationship, child, and custody battle.  (*See id.* 3–4).  The Article states the Supplement was "filed in Miami-Dade Circuit Court on Sept. 14 and obtained by Splinter" and "Delgado confirmed the document's authenticity to Splinter but declined to comment further."  (*Id.* 3).

The Article describes how Delgado obtained the information she includes in the Supplement.  It states Delgado initially learned of the story from a man she sought out on Twitter, after he "tweeted cryptic messages at Miller referencing the Orlando strip club by name and saying [he] want[s] his 'unethical immoral deals' to come to light.'"  (*Id.* 4 (alterations added)).  The Article states Delgado relayed the allegations to a journalist, "who spoke with Jane Doe to confirm details about the story."  (*Id.*).  Quoting the Supplement, the Article states:

> When the journalist asked about the account, the filing says, "Jane Doe's instant reaction was: 'Yes, that happened to me—how did you know? Who told you?'"

 (*Id.*).  The end of the Article invites viewers to "[r]ead the full court filing below."  (*Id.* (alteration added)).  It embeds a full copy of the Supplement, which readers can review in full without leaving the webpage.  (*See id.* 6–7; Defs.' SOF ¶ 91).

After the Article was published, Plaintiff's counsel contacted Gizmodo and stated the allegations in the Supplement were false.  (*See* Defs.' SOF ¶ 92).  Within an hour, Defendants updated the Article to include Plaintiff's denial.  (*See id.*).  The next day, Plaintiff posted a series

of tweets on his public Twitter page stating the accusations in the Supplement and Article "have already been disproven by at least one reporter . . . ." (*Id*. ¶ 93 (quoting Jason Miller tweet dated Sept. 22, 2018 [ECF 157-16] 3; alteration added)). Shortly thereafter, the journalist referenced in the Supplement tweeted: "I have not disproven such claims and to say so is inaccurate," and "[i]t is indeed accurate that I spoke to two women in Florida who made claims similar to the ones listed in Ms. Delgado's filing." (*Id*. ¶ 94 (quoting Yashar Ali tweet dated Sept. 22, 2018 [ECF No. 157-17] 2 (alteration added)). Defendants updated the Article to include both Plaintiff's tweeted denial of the allegations, as well as the journalist's tweets in response, within an hour of Plaintiff's initial Twitter posts. (*See id*. ¶ 95; Article 5).

### 3. Krueger's and her Editors' Unrebutted Testimony

Krueger, Mirkinson, and Chan stated the goal of the Article was to report on the fact the Supplement had been filed and describe the Supplement's contents. (*See* Krueger Decl. ¶ 57; Notice of Supplementary Materials, Ex. 41, Jack Mirkinson Deposition [ECF No. 160-23] 3:18–21; Chan Decl. ¶ 8[5]). Krueger stated she and her editors embedded the entire Supplement at the end of the Article so readers could "review [the Supplement] in full and judge for themselves whether there was additional information in the Supplement that might change their view regarding the allegations." (Krueger Decl. ¶ 88 (alteration added)). Krueger further stated the Article "closely tracks the information contained in the Supplement" and "includes 19 separate references to 'court documents,' the 'filing,' and the like." (*Id.* ¶ 66).

---

[5] Plaintiff disputes Chan edited the Article with the intention of keeping it a straightforward report on the Supplement and its allegations. (*See* Defs.' SOF ¶ 86; Pl.'s SOF ¶ 86). In support, Plaintiff cites excerpts from Chan's deposition in which Chan testifies Krueger chose which allegations from the Supplement to include in the Article and that he added the phrase "Delgado's legal team" to the Article because he did not realize the Supplement was in fact filed by Delgado *pro se*. (*See* Pl.'s SOF ¶ 86 (citing Aleksander Chan Deposition [ECF No. 171-28])). Neither excerpt creates a material dispute of fact regarding Chan's intent to straightforwardly report on the Supplement.

During the editing process, Chan modified the last sentence of the opening paragraph, or the "lede," by changing the phrase "she claims" in the original draft to "the woman claims." (Defs.' SOF ¶ 87;[6] Kreuger Decl. ¶¶ 63, 82; Chan Decl. ¶ 10; Article 2).  As published, the sentence reads: "Additionally, *the court documents* claim, when the woman found out she was pregnant, Miller surreptitiously dosed her with an abortion pill without her knowledge, leading, *the woman claims*, to the pregnancy's termination and nearly her death."  (Article 2 (emphasis added)).

Chan testified he made this revision to clarify the court-filed Supplement stated the victim herself had confirmed the allegations to the journalist.  (*See* Defs.' SOF ¶ 88; Chan Decl. ¶¶ 10–11).  He stated the lede is "describing in a shorthand fashion information that the reader will learn in more detail later in the article."  (Chan Decl. ¶ 11).  Chan elaborated, "the Article proceeds to explain to the reader precisely how and to whom Jane Doe confirmed the story and it even includes the actual confirming quote from the victim that was contained in the Supplement."  (*Id*.).

Both Krueger and Marchman stated they viewed the clause "the woman claims" as a subordinate clause to the sentence's prior reference to "the court documents claim."  (Krueger Decl. ¶ 63 (internal quotation marks omitted); Marchman Decl. ¶ 19; Defs.' SOF ¶ 89).  Read in context, they understood it to mean the Supplement "included a confirmation from the victim to the journalist that the events described had happened."  (Marchman Decl. ¶ 20; *see also* Krueger Decl. ¶¶ 63, 82–83).

Chan further testified he revised the lede to include the phrase, "Delgado's legal team," although he now understands Delgado filed the document as a *pro se* plaintiff.  (Chan Decl. ¶ 12 (internal quotation marks omitted)).  He said he does not find the phrase misleading, as "the Article

---

[6] Plaintiff disputes the fact presented in paragraph 87, but he does not dispute Chan made this revision.  (*See* Pl.'s SOF ¶ 87).  Plaintiff only disputes whether the revision made the passage inaccurate and misleading. (*See id*.).

consistently informs the reader that these are 'Delgado's allegations" and because Delgado is an attorney. (*Id.*). Krueger likewise stated the Article "over and over makes it clear to the readers that these are 'Delgado's allegations, that 'Delgado says,' and that it is 'Delgado' who is asking the court to order Miller to have a psychological examination . . . ." (Krueger Decl. ¶ 80 (alteration added)).

In addition, Krueger stated she included the facts that *Splinter* "obtained" the Supplement and Delgado verified its "authenticity" in the Article to inform readers she obtained the document through means other than the court docket. (*See id.* ¶¶ 84–86 (quotation marks in original)). She testified she did not omit any material portion of the Supplement in the Article because the entire Supplement was embedded in the Article. (*See id.* ¶¶ 87–93). Krueger, Chan, and Marchman all declare they found the Article to be a straightforward, fair and accurate report on the contents of a court document. (*See id.* ¶ 7; Chan Decl. ¶ 14; Marchman Decl. ¶ 21).

## B.     Procedural History

On October 18, 2018, Plaintiff filed an Amended Complaint stating a defamation claim and four related causes of action against Defendants. (*See generally* Am. Compl.). Defendants filed a Corrected Motion to Dismiss the Amended Complaint [ECF No. 44], arguing in part the defamation claim should be dismissed under New York's fair report privilege and on First and Fourteenth Amendment grounds. On April 24, 2019 the Court granted in part the Motion to Dismiss ("Dismissal Order"), dismissing all but Plaintiff's defamation claim. (*See* Dismissal Order [ECF No. 110]).

As to the defamation claim, the Court found Plaintiff sufficiently stated a claim for defamation at the motion-to-dismiss stage — even if the fair report privilege applied — because he plausibly alleged the Article was not a fair and accurate report of the Supplement. (*See id.* 12–

20).  Defendants filed their Answer [ECF No. 118] on May 7, 2019, alleging as an affirmative defense the New York fair report privilege.  (*See id.* 21).   On June 27, 2019, Defendants filed the present Motion for Summary Judgment.

## II.    LEGAL STANDARD

Summary judgment is rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a), (c).  An issue of fact is "material" if it might affect the outcome of the case under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party.  *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party.  *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).  If there are any factual issues, summary judgment must be denied and the case proceeds to trial.  *See Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)).

A defendant seeking summary judgment based on an affirmative defense, such as the New York fair report privilege, has the burden of showing "beyond peradventure *all* of the essential elements of the . . . defense to warrant judgment in [its] favor."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (alterations added; emphasis in original).

## III.    DISCUSSION

Defendants request summary judgment on three separate grounds: (1) the Article is protected by New York's fair report privilege; (2) Defendants did not make any defamatory

statements of fact; and (3) there is no evidence Defendants acted with actual malice. (*See generally* Mot.). Because the Court finds undisputed material facts show the Article is privileged under New York law, it does not reach the second and third grounds.[7]

Under New York's fair report privilege, codified in section 74 of its Civil Rights Law, "A civil action cannot be maintained against any person, firm, or corporation, for the publication of a **fair and true report** of any judicial proceeding . . . ." N.Y. Civ. Rights Law § 74 (alteration and emphasis added). The purpose of the statutory privilege is to protect reports of judicial proceedings "made in the public interest." *Williams v. Williams*, 23 N.Y.2d 592, 599 (N.Y. 1969).

A publication is considered "fair and true" if it is "substantially accurate." *Cholowsky v. Civiletti*, 887 N.Y.S.2d 592, 595–96 (App. Div. 2d Dep't 2009) (quoting *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 67 (N.Y. 1979)) (internal quotation marks omitted). "A report is substantially accurate if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir. 2005) (internal quotation marks and citations omitted). In contrast, a report is not substantially accurate "if it would have a different effect on the mind of the recipient than the actual truth." *Id.* (internal quotation marks and citation omitted).

---

[7] After filing his Response, Plaintiff filed a Motion for Leave to Amend or Supplement Sword and Shield Objections or, Alternatively, to File Surreply [ECF No. 185]. Plaintiff sought to elaborate on his "sword and shield" objections, which he raised in response to Defendants' evidence that: (1) the Supplement was not sealed, and (2) they did not act with actual malice. (*See id.* 6–7). Setting aside the fact that this filing was submitted after the deadline for pretrial motions in the Amended Scheduling Order [ECF No. 101], allowing Plaintiff supplemental briefing on these matters would not change the Court's analysis because the Court assumes for purposes of this Order that the Supplement was sealed, and the Court does not reach Defendants' actual malice argument.

The Court first clarifies how the fair report privilege applies to publication of the Supplement, and then explains why the material facts of record show the Article is a fair and true report as a matter of law, leaving no triable issue of fact on Defendants' affirmative defense.

**A.    New York Civil Rights Law Section 74 Applies to the Supplement**

The parties contest whether the fair report privilege applies to the Supplement because the Supplement was sealed.  (*See* Mot. 12–15; Resp. 5–9).  Plaintiff argues New York Civil Rights Law section 74 does not apply to the Supplement under an exception for reports on sealed family court filings.  (*See* Resp. 5–9 (citing *Stevenson v. News Syndicate Co.*, 96 N.Y.S. 2d 751 (App. Div. 2d Dep't 1950), *aff'd*, 302 N.Y. 81 (N.Y. 1950); and *Shiles v. News Syndicate Co.*, 27 N.Y.2d 9 (N.Y. 1970)).  According to Defendants, the exception Plaintiff identifies is narrow and limited to filings in matrimonial actions sealed under section 235(1) of New York's Domestic Relations Law.  (*See* Mot. 15).  Defendants contend the narrow exception does not apply to the Supplement. (*See id.*).

The Court agrees with Defendants.  Under a long line of New York cases — as noted in the Dismissal Order (*see* Dismissal Order 9) — New York's fair report privilege generally applies to sealed documents.  *See, e.g.*, *Keogh v. N.Y. Herald Tribune, Inc.*, 274 N.Y.S.2d 302, 305 (Sup. Ct. 1966) (applying privilege to reports of grand jury proceedings even though they are confidential); *Freeze Right Refrigeration & Air Conditioning Servs., Inc. v. City of New York*, 475 N.Y.S.2d 383, 388 (App. Div. 1st Dep't 1984) (explaining "the activities of the agency need not be public for the statutory privilege to apply"); *Komarov v. Advance Magazine Publishers, Inc.*, 691 N.Y.S.2d 298, 300 (N.Y. Sup. Ct. 1999) (concluding section 74 applies to a report on an affidavit of an FBI agent that was "not prepared for public consumption"); *Grab v. Poughkeepsie Newspapers, Inc.*, 399 N.Y.S.2d 97, 98 (N.Y. Sup. Ct. 1977) (applying the privilege to coverage

of confidential youth offender proceedings); *Gubarev v. BuzzFeed, Inc.*, 340 F. Supp. 3d 1304, 1314 (S.D. Fla. 2018) (applying New York law and finding "New York courts have extended the term 'official proceeding' to cover any official investigation even if it is not open to the public.").

Plaintiff's reliance on the exceptions set forth in *Stevenson* and *Shiles* is misplaced. *Stevenson* concerned a prior version of New York's fair report statute, section 337 of the Civil Practice Act, which expressly applied only to reports of "public" proceedings and has since been repealed. *Stevenson*, 96 N.Y.S.2d at 753; *see also Keogh*, 274 N.Y.S.2d at 305 (explaining "[t]he word 'public' was subsequently deleted from section 337 . . . and is not contained in section 74") (alterations added)).[8] *Shiles* sets forth a <u>limited</u> exception to the fair report privilege, applicable only to materials sealed under section 235(1) of New York's Domestic Relations Law. *See* 27 N.Y.2d at 12–13. The *Shiles* opinion does not hold the exception should expand beyond the specific statute at issue, and the Court finds no basis to support Plaintiff's contention that *Shiles* limits the fair report privilege to reports serving "the administration of justice." (Resp. 7). A close reading of *Shiles* shows the court identified a narrow exception to the fair report privilege based on the New York legislature's intent in enacting section 235(1) of the Domestic Relations Law. *See* 27 N.Y.2d at 18 ("In short, section 74 of the Civil Rights Law does not afford a party a license to destroy by indirection the salutary protection afforded by section 235 of the Domestic Relations Law.").

---

[8] Even if removal of the word "public" from section 74 did not change the meaning of the statute, as Plaintiff asserts (*see* Resp. 8), *Stevenson* also turned on the fact that the articles at issue were based on an affidavit that was confidential under Rule 278 of the New York Rules of Civil Practice, which rendered matrimonial filings confidential. *See* 96 N.Y.S.2d at 752–53, 755. Section 235 of the Domestic Relations Law, analyzed in *Shiles*, replaced Rule 278 of the Rules of Civil Practice. *See Shiles*, 27 N.Y.2d at 13, n.2. Thus, like *Shiles*, *Stevenson* involves an exception for filings in matrimonial actions that are sealed by operation of New York statute, which is not applicable here.

Indeed, after *Shiles*, courts have continued to apply the fair report privilege to family court proceedings not governed by section 235(1) of the Domestic Relations Law, regardless of whether the information served the public interest.[9]  *See, e.g.*, *Zappin v. NYP Holdings Inc.*, 769 F. App'x 5, 8 (2d Cir. 2019) (applying section 74 to an article about matrimonial proceedings); *Gillings v. New York Post*, 87 N.Y.S.3d 220, 223 (App. Div. 2d Dep't 2018) (applying section 74 to article describing divorce action).  Moreover, courts interpreting *Shiles* have found it only applies to reports on filings rendered confidential by operation of section 235(1) of the Domestic Relations Law.  *See Zappin*, 769 F. App'x at 8 (declining to extend *Shiles* to matrimonial proceedings under section 235(2) of the Domestic Relations Law); *Grab*, 399 N.Y.S.2d at 98 (distinguishing *Shiles* because it involved papers filed in a matrimonial action which a New York statute required be sealed).

Here, it is undisputed the Supplement was filed in a custody proceeding in the Miami-Dade County, Florida family court.  (*See* Defs.' SOF ¶¶ 42, 44).  The Family Court Action is not governed by section 235(1) of New York's Domestic Relations Law.[10]  Accordingly, *Shiles* does not bar Defendants from defensively asserting a privilege under section 74.

---

[9] Plaintiff interprets *Shiles* to mean the fair report privilege only applies to reports on sealed court filings if the filing is about a matter of public concern.  (*See* Resp. 6–8).  Based on this view, Plaintiff argues the privilege does not apply because the Supplement is a sealed court filing about a matter of private concern.  (*See id*.).  Even if Plaintiff's reading of *Shiles* were correct, the privilege would likely still apply to a fair report on the Supplement because Plaintiff is a public figure and media coverage of his affair and custody dispute makes it more likely the Supplement is about a matter of public concern.  (*See* Defs.' SOF ¶¶ 1, 36, 43).

[10] Florida family court actions are presumptively open to the public.  *See Barron v. Fla. Freedom Newspapers, Inc.*, 531 So. 2d 113, 119 (Fla. 1988) (holding presumption of openness for all court proceedings applies to dissolution proceedings).

CASE NO. 18-24227-CIV-ALTONAGA/Goodman

### B.      "Fair and True" Report

The Court "may determine as a matter of law whether allegedly defamatory publications are fair and true reports of official proceedings." *Nix v. ESPN, Inc.*, 772 F. App'x 807, 812 (11th Cir. 2019) (applying New York law) (citation and internal quotation marks omitted).  For a report to be characterized as "fair and true" within the meaning of section 74, "it is enough that the substance of the article be substantially accurate." *Holy Spirit Ass'n for the Unification of World Christianity*, 49 N.Y.2d at 67.  The language used in the Article "should not be dissected and analyzed with a lexicographer's precision." *Id*. at 68.  Instead, "[t]he term 'fair and true report' has been given a liberal interpretation." *Alf v. Buffalo News, Inc.*, 953 N.Y.S.2d 797, 798–99 (App. Div. 4th Dep't 2012), *aff'd*, 21 N.Y.3d 988 (N.Y. 2013) (alteration added; citations omitted).

As explained, "[a] report is 'substantially accurate' if, despite minor inaccuracies, it does not produce a different effect on the reader than would a report containing the precise truth." *Nix*, 772 F. App'x at 808 (citation and internal quotation marks omitted; alteration added).  A report is not substantially accurate where "it would have a 'different effect' on the mind of the recipient than the 'actual truth.'" *Karedes*, 423 F.3d at 119 (citation omitted).  "Section 74 does not afford protection if the specific statements at issue, considered in their context, suggest[] more serious conduct than that actually suggested in the official proceeding." *Id*. (citation and internal quotation marks omitted; alteration in original).  Whether a report is "fair and true" focuses on whether the report "attributes to Plaintiff[] misconduct beyond that alleged" in the court document. *Gubarev*, 340 F. Supp. 3d at 1318 (alteration added).  Any fair report analysis requires the court read the challenged statements "in the context of the entire statement or publication as a whole, tested

15

CASE NO. 18-24227-CIV-ALTONAGA/Goodman

against the understanding of the average reader . . . ."  *Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (N.Y. 1985) (alteration added; citations omitted).

Plaintiff identifies four inaccuracies in the Article he claims run afoul of the "fair and true" standard.  Plaintiff argues: (1) the phrase "the woman claims" in the last sentence of the opening paragraph is misleading because it attributes the accusations to the victim herself, as opposed to Delgado (*see* Resp. 15); (2) the statement the Supplement was filed by "Delgado's legal team" suggests it was vetted by a team of lawyers when in fact it was filed by Delgado herself (*see id*. 17); (3) the statement *Splinter* "obtained" the Supplement and verified its "authenticity" suggests Defendants independently investigated the allegations in the Supplement, which they did not (*see id*.); and (4) the Supplement omits facts that would cast doubt on the veracity of the allegations, if included (*see id*. 17–18).  The Court addresses each alleged inaccuracy in the Article in turn.

### 1.    First Alleged Inaccuracy

The last sentence of the opening paragraph of the Article reads: "Additionally, *the court documents claim*, when the woman found out she was pregnant, Miller surreptitiously dosed her with an abortion pill without her knowledge, leading, *the woman claims*, to the pregnancy's termination and nearly her death."  (Article 2 (emphasis added)).  Plaintiff argues in the Dismissal Order the Court already determined the phrase is misleading.  (*See* Resp. 11, 15).  Plaintiff also asserts the phrase renders the Article substantially inaccurate because it is ambiguous and gives greater credence to Delgado's unverified claims than appropriate.  (*See id*. 12, 15).

As a preliminary matter, the Dismissal Order did not decide the phrase "the woman claims" renders the Article misleading.  (*See* Dismissal Order 13–20).  The Court found only that, *at the motion-to-dismiss stage*, Plaintiff's allegations stated a plausible claim of defamation; that is, the Court could not conclude the Article did not produce a different effect on the average reader than

16

would a report on the Supplement.  (*See id.* 15–16).  Summary judgment presents a higher bar, and

Plaintiff "may not rest upon mere allegation or denials of his pleading but must set forth specific

facts showing there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256; *see also Gubarev*, 340

F. Supp. 3d at 1312.

With the summary judgment standard in mind, review of the record shows the Article: (a)

states the allegations come from an "explosive new court filing" in the "ongoing custody battle"

between Plaintiff and Delgado (Article 2); (b) describes the "acrimony" between Plaintiff and

Delgado (*id.* 4); (c) describes how Delgado obtained the information (*see id.*); (d) quotes the

victim's alleged reaction to the journalist, exactly as it is quoted in the Supplement (*see id.* (quoting

Jane Doe stating: "Yes, that happened to me — how did you know? Who told you?" (internal

quotation marks omitted)), *see also* Supplement 9 (same)); and significantly (e) embeds a full copy

of the Supplement, so readers can review the Supplement without leaving the webpage (*see* Defs.'

SOF ¶ 91).  Considering these undisputed facts, the Article is a substantially accurate report on the

Supplement under New York law.

*Holy Spirit Association for Unification of World Christianity v. New York Times Company*,

49 N.Y.2d 63, and its progeny are instructive.[11]  In *Holy Spirit*, *The New York Times* published

articles based on three intelligence documents containing information from an unidentified source.

*See* 49 N.Y.2d at 66.  The *Times* acknowledged information from one of the documents was

unverified but reported information in that document was "confirmed and elaborated" in the other

two documents, failing to disclose the information in those documents was also unverified.  *Id.* at

67.  The court affirmed summary judgment in favor of the *Times*.  *See id.* at 68.  It reasoned even

---

[11] As noted in the Order denying Defendants' Motion for Reconsideration [ECF No. 117], *Holy Spirit* is a summary judgment case, not a motion-to-dismiss case.  (*See* Reconsideration Order [ECF No. 139] 3).  *Holy Spirit* is more persuasive and relevant at this stage of the proceedings.

if the phrase "confirmed and elaborated" denoted "a sense of legitimacy which . . . could be characterized as imprudent given the unverified nature of the reports," the phrase was not enough to "render the newspaper articles unfair." *Id*. (alteration added).

Since *Holy Spirit*, courts have repeatedly found misstatements do not render an article substantially inaccurate where reading the full article corrects the misstatement or where the misstatement is minor.  *See, e.g.*, *Becher v. Troy Publ'g Co., Inc.*, 589 N.Y.S.2d 644, 648 (App. Div. 3d Dep't 1992) (finding articles that falsely suggested the plaintiff had been indicted on felony bribery charges were fair and accurate where the articles later correctly described the charges as misdemeanors for lesser offenses); *see also Alf*, 953 N.Y.S.2d at 799 (holding articles stating company admitted to repeatedly overcharging the government millions of dollars were substantially accurate, even though the company only pled guilty to a single charge of submitting a false document, because a review of the plea agreement in full supported the statement); *Silver v. Kuehbeck*, No. 05 Civ. 35 (RPP), 2005 WL 2990642, at *16 (S.D.N.Y. Nov. 7, 2005), *aff'd*, 217 F. App'x 18 (2d Cir. 2007) (dismissing defamation claim based on section 74 because statement was a substantially accurate report of a judicial proceeding "in view of the entire article in which [the] statement appeared") (alteration added).

Here, as in *Holy Spirit* and its progeny, the contested phrase is substantially accurate when read in the context of the whole Article.  Several aspects of the Article and the unrebutted evidence support this conclusion.

First, according to Krueger and her editors, the sentence reading "court documents claim . . . the woman claims," was intended to mean that according to the Supplement, the journalist confirmed the accusations with the victim.  (*See* Kreuger Decl. ¶ 63; Marchman Decl. ¶¶ 19–20; Chan Decl. ¶ 11).  In drafting the Article, Krueger intended to "closely track the allegations made

in the Supplement" (Krueger Decl. ¶ 57; *see also id.*, Ex. 10, Krueger/Marchman Electronic Correspondence 7); and in editing the Article, her editors intended to keep it a straightforward, fair, and accurate report on the Supplement (*see* Defs.' SOF ¶ 86).  This evidence is unrebutted and tends to show neither Krueger nor her editors intended to augment the credibility of the accusations in the Supplement by attributing them to Jane Doe herself, rather than to Delgado.

Second, the Supplement actually states the journalist confirmed the allegations with Jane Doe.[12]  The Supplement states: "Journalist A confirmed the account directly with the victim herself.  Jane Doe's instant reaction was: 'Yes, that happened to me — how did you know? Who told you?'"  (Supplement 9 (emphasis omitted)).  In addition to quoting *from the Supplement itself*, the Article describes how Delgado obtained the information and summarizes the journalist's confirmation of the accusations with the victim.  (*See* Article 4; Supplement 9).  Thus, the phrase "the woman claims" is a substantially accurate summary of what Jane Doe told the journalist, according to the Supplement.

Third, in at least 19 instances, the Article makes clear its substance is based on "court documents" or a "filing."  (Article; Krueger Decl. ¶ 66).  Certainly the headline reads "Court Docs Allege . . . ."  (Article 2 (alteration added)).  The repeated use of this language throughout the Article conveys the source of the information is the Supplement — not Jane Doe.  (*See generally* Article).

---

[12] Plaintiff asserts the Supplement's description of the journalist's interaction with Jane Doe does not "confirm" the allegations against him, because Jane Doe does not state he is the perpetrator, but rather merely confirms she was surreptitiously dosed with an abortion pill.  (*See* Resp. 15).  Even though Plaintiff's name is not in the quote from the victim, the Supplement states: "Journalist A confirmed what *Mr. Miller did* to Jane Doe . . . ."  (Supplement 10 (emphasis and alteration added)).  And after the Article was published, the journalist referred to in the Supplement wrote in a Twitter post: "the two women I spoke to in Florida made these abuse claims against Mr. Miller which he denied to me directly."  (Krueger Decl., Ex. 17, Yashar Ali's December 22, 2018 Twitter Posts [ECF No. 157-17]).

Fourth, the Article is candid that Delgado obtained the information from a third party rather than from a direct source.  (*See* Article 4).  The Article describes Delgado first learned of the story from a man she met via Twitter, then found Jane Doe on Facebook, then relayed the allegations to a journalist.  (*See id.*).  The Article further states the journalist "spoke with Jane Doe to confirm details about the story."  (*Id.*).  The Article does not state either Delgado or Krueger spoke to Jane Doe directly to confirm the allegations.  (*See generally id.*).

Fifth, the Article discloses Delgado's potential biases.  It states the Supplement was filed in an "ongoing custody battle" between Plaintiff and Delgado that has "taken a nasty turn."  (*Id.* 2).  It also describes Plaintiff and Delgado's relationship as marked by "acrimony."  (*Id.* at 2, 4).  By disclosing this information, Defendants invite readers to decide for themselves whether Delgado is credible.  Thus, under *Holy Spirit* and its progeny, the phrase the "woman claims" does not render the Article substantially inaccurate.  *See Holy Spirit*, 49 N.Y.2d at 67–68.

Plaintiff relies on *Easton v. Public Citizens, Inc.*, No. 91 Civ. 1639, 1991 WL 280688 (S.D.N.Y. Dec. 26, 1991), to support his argument "the woman claims" is ambiguous.  (*See* Resp. 15).  Curiously, *Easton* supports Defendants' position.  In *Easton*, the defendants published a report describing an earlier-published Commission Report, which contained allegations the plaintiff "violated Federal and State tax laws" and "fraudulently billed the Medicaid program."  1991 WL 280688, at *1 (internal quotation marks omitted).  Commenting on the Commission Report, the defendants stated, "[t]hese cases [from the Commission Report] illustrate that it is relatively easy to steal funds from public programs for people with serious mental illnesses."  *Id.* (alterations added).  The plaintiff — the doctor referred to in the Commission Report — alleged the statement including the phrase "it is relatively easy to steal . . ." was defamatory.  *Id.* at *1, 5 (alteration added).  In granting defendants summary judgment, the court reasoned the allegations

20

identified by the defendants involving Medicaid fraud and tax fraud were "form[s] of stealing" and the defendants defined them as such in their report. *Id*. at \*6 (alteration added). Thus, the claim did "not need to go to trial to resolve any ambiguity in terminology." *Id*.

Plaintiff fails to identify any ambiguous terminology or otherwise draw a connection to *Easton* aside from citing to the general premise that a court should allow the factfinder to interpret a phrase if the court identifies one as ambiguous. (*See* Resp. 15). As detailed above, the undisputed material facts show the contested phrase is substantially accurate.[13]

Plaintiff also argues this case "is squarely in line" with cases such as *Karedes v. Ackerley Group, Inc.*, and *Pisani v. Staten Island University Hospital*. (Resp. 12 (citing *Karedes*, 423 F.3d at 119; and *Pisani*, 440 F. Supp. at 170)).[14] These cases stand for the proposition that a publication may not imply conduct graver than that described in the underlying source. For instance, in *Karedes*, the defendant published an article on a public town meeting which suggested the plaintiff, the manager of a public golf course, caused the town to pay invoices for renovations which should have been paid by another entity. *See* 423 F.3d at 115–16. The article failed to include the fact an auditor clarified the town likely should have paid the invoices. *See id*. at 118. The court held "a reasonable jury could conclude that the article suggest[ed] more serious conduct than actually suggested in the official proceeding," because the article suggested the plaintiff improperly spent

---

[13] Plaintiff also cites *Fine v. ESPN, Inc.*, No. 5:12-CV-0836, 2013 WL 528468 (N.D.N.Y. Feb. 11, 2013), to support his contention the "woman claims" is ambiguous. (*See* Resp. 15). While the court in *Fine* stated the general principle that questions of fact may remain "if the reports are ambiguous," it granted the defendants' motion to dismiss, finding the articles were "fair and true reports and that no ambiguity" existed. 2013 WL 528468, at \*3.

[14] *Karedes* and *Pisani* were decided on motions to dismiss, not on motions for summary judgment. *See Karedes*, 423 F.3d at 110; *Pisani*, 440 F. Supp. 2d at 171.

public funds, whereas the auditor indicated the opposite. *Id.* at 119 (citation and internal quotation marks omitted; alteration in original).

Similarly, in *Pisani*, the defendants issued a press release regarding the settlement of a Medicaid fraud complaint, stating "We deeply regret and are embarrassed by the misconduct carried out by former executives of the Hospital that led to this settlement . . . ." 440 F. Supp. 2d at 170. The court held a reasonable jury could find this statement was not a "fair and accurate" report of the settlement agreement because defendants' statement "admit[ed] the misconduct of former executives," whereas "the settlement explicitly deni[ed] admission of those allegations[.]" *Id.* at 178 (alterations added).[15]

Here, unlike in *Karedes* and *Pisani*, the statements in the Article do not depart from those in the Supplement. The Supplement accuses Plaintiff of having an affair with and impregnating "Jane Doe;" then slipping her an "abortion pill," killing her unborn child without her consent. (Supplement 2–3). The Article reports those exact allegations. (*See* Article 2–3). The Supplement states a journalist "confirmed" the account with Jane Doe herself. (Supplement 9 (emphasis omitted)). The Article states the same. (Article 4).

Plaintiff insists the Article is unfair and untrue, even if it does not imply graver misconduct, because it gives greater credence to the accusations than does the Supplement. (*See* Resp. 12). The only case Plaintiff cites to support this assertion is *Holy Spirit*. (*See id.* (citing *Holy Spirit*, 49 N.Y.2d at 67–68)). Plaintiff quotes a portion of *Holy Spirit* reasoning the articles under consideration were fair and true reports of intelligence documents because they did not give "greater credence to those documents than was appropriate . . . ." 49 N.Y.2d at 67 (alteration added). *Holy Spirit* supports Defendants' position.

---

[15] Plaintiff also cites cases that apply the laws of other jurisdictions. (*See* Resp. 13–14). These cases are inapplicable because they do not interpret New York's statutory fair report privilege.

While *Holy Spirit* suggests an article can be unfair or inaccurate where it gives greater credence to accusations than the underlying documents, the court ultimately held the articles were substantially accurate even though they denoted "a sense of legitimacy which . . . could be characterized as imprudent."   49 N.Y.2d at 68 (alteration added).   Here, as explained, the phrase "the woman claims" does not give "greater credence" to the accusations than would a review of the Supplement itself, which is embedded in the Article and which the reader is invited to consult. And, as in *Holy Spirit*, even if the phrase did denote some "sense of legitimacy which, in hindsight, could be characterized as imprudent," *id.*, that would not be enough to render the report unfair or untrue.

### 2.    Second Alleged Inaccuracy

Plaintiff's next alleged inaccuracy comes from the statement: "In an explosive new court filing, *Delgado's legal team* alleges . . . ."  (Article 2 (alteration and emphasis added)).  Plaintiff argues the reference to "Delgado's legal team" unfairly bolsters the credibility of the allegations in the Supplement by suggesting the Supplement was vetted by a team of lawyers when in fact it was filed by Delgado *pro se*.  (*See* Resp. 17).  Defendants disagree, insisting the phrase "Delgado's legal team" does not make the Article substantially inaccurate because the Article makes clear the accusations are being made by Delgado and Delgado is an attorney.  (*See* Mot. 11).

The Court agrees with Defendants.  As noted, a report is substantially accurate under section 74 "if, despite minor inaccuracies, it does not produce a different effect on the reader than would a report containing the precise truth."  *Nix*, 772 F. App'x at 812 (citation and internal quotation marks omitted).  Courts have found articles to be "fair and true" reports of judicial proceedings despite containing similar minor inaccuracies.  For instance, in *Abko Music, Inc. v. William Sagan, Norton, LLC*, the court found a press release constituted a "fair and true report" of

a complaint even though the press release inaccurately stated the underlying lawsuit was filed by the National Music Publishers' Association ("NMPA"), instead of by several individual music publishers. *See* No. 15 Civ. 4025 (ER), 2016 WL 2642224, at *4 (S.D.N.Y. May 6, 2016). The court rejected the argument that "crediting NMPA with filing the lawsuit provides the lawsuit greater legitimacy," and explained "despite inaccurately attributing the lawsuit's filing to NMPA, the press release does not report conduct that is more serious than actually alleged" in the complaint. *Id.*; *see also Tacopina v. O'Keeffe*, 645 F. App'x 7, 8 (2d Cir. 2016) (holding fair report privilege barred the plaintiff's defamation claim concerning drug-use allegations even though newspaper "misattributed the source of the cocaine allegations.").

Here, as in *Abko*, 2016 WL 2642224, at *4, the statement that the Supplement was filed by "Delgado's legal team" does not confer upon the filing "greater legitimacy" because whether the Supplement was filed by a legal team or by Delgado (who is a lawyer) *pro se* does not alter the overall effect of the Article. Either way, it is clear Delgado is the one making the accusations. (*See* Krueger Decl. ¶ 80). And, as in *Abko*, the Article does not report conduct more serious than alleged in the Supplement. *See* 2016 WL 2642224, at *4. Thus, the Article's reference to "Delgado's legal team" does not render the Article unfair or untrue.

3.     Third Alleged Inaccuracy

Plaintiff argues the statement the Supplement was "obtained" by *Splinter*, coupled with the statement Delgado confirmed its "authenticity," improperly suggest Defendants independently investigated the allegations in the Supplement. (*See* Resp. 17). It is no misstatement that *Splinter* "obtained" the Supplement and verified its "authenticity." It is undisputed that Krueger obtained the Supplement from a source and confirmed its authenticity with Delgado prior to publishing the Article. (*See* Defs.' SOF ¶¶ 55–56, 82; Pl.'s SOF ¶ 82). These statements do not render the Article

24

substantially inaccurate. *See Holy Spirit*, 49 N.Y.2d at 67 (rejecting the plaintiff's argument use of the word "confirmed" implies information in the document had been verified by independent sources rendering the articles misleading).

### 4.      Fourth Alleged Inaccuracy

Fourth, Plaintiff argues the Article omits material facts from the Supplement that cast doubt on the veracity of the allegations. These include: (1) the man Delgado met through Twitter said the story was "unverified" by him; (2) a private investigator failed to confirm the accusations with Jane Doe; and (3) the journalist referred to in the Supplement never published a story on the accusations.[16] (*See* Resp. 17–18).

There is "no requirement that the publication report the plaintiff's side of the controversy." *Cholowsky*, 887 N.Y.S.2d at 596 (citations omitted); *see also Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 521 (S.D.N.Y. 2013) (same); *Alf*, 953 N.Y.S.2d at 800 (same); *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 478 (S.D.N.Y. 2012) (same). Thus, the omissions Plaintiff identifies do not render the Article substantially inaccurate. *See Holy Spirit*, 49 N.Y. 2d at 67–68 (holding articles were substantially accurate even though they did not disclose the unverified nature of the information).

The Court is further persuaded these omissions do not render the Article unfair or untrue because, as discussed, it is undisputed the Article discloses Delgado obtained the information from indirect sources (*see* Article 4), and the Supplement was filed in a contentious custody battle (*see id*. 2). These details convey the biased nature of the accusations and invite the reader to independently determine the credibility of the accusations. Additionally, it is undisputed the

---

[16] Plaintiff also asserts the Article failed to disclose a confidential source told Krueger that Delgado is "kind of nuts." (Resp. 17–18). This statement is not in the Supplement, so the Article is not an unfair or inaccurate report of the Supplement for failing to mention the source's characterization of Delgado.

Article embeds a full copy of the Supplement, which readers can review in full without leaving the webpage. (*See* Defs.' SOF ¶ 91).

The cases Plaintiff relies on are inapposite because they concern alleged omissions implying graver misconduct than alleged in the underlying proceeding. *See, e.g.*, *Wenz v. Becker*, 948 F. Supp. 319, 324 (S.D.N.Y. 1996) (holding a reasonable jury could find the article concerning CEO's termination was unfair or untrue because omitted facts created the false impression the CEO altered the company's financial statements); *Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp. 3d 35, 49 (S.D.N.Y. 2015) (holding a reasonable jury could find press release was inaccurate because it characterized the agreement between the parties as an agreement to remove "fake" artwork, omitting the fact the agreement did not contain any admission by the organizers of the exhibition that the removed works were inauthentic). As noted, the Article — which is embedded in the Supplement for comparison — does not describe graver misconduct than the misconduct appearing in the Supplement. In fact, by embedding the full Supplement, Defendants ensured they would not omit any facts at all.

Taken together, the four alleged inaccuracies in the Article ("the woman claims," "Delgado's legal team," Krueger "obtained" the Supplement and verified its "authenticity," and the omissions) do not suggest Plaintiff engaged in graver misconduct than would a review of the Supplement. Nor do the alleged inaccuracies cause the Article to "produce a different effect on the reader than would a report containing the precise truth." *Nix*, 772 F. App'x at 808 (citation and internal quotation marks omitted). Instead, the undisputed material facts show the Article "essentially summarize[s] or restate[s] the allegations" in the Supplement. *Biro*, 883 F. Supp. 2d at 478 (citation and internal quotation marks omitted; alterations added). Accordingly, the Article

CASE NO. 18-24227-CIV-ALTONAGA/Goodman

falls within section 74's absolute privilege and Defendants have shown they are entitled to a summary judgment on their New York fair report privilege affirmative defense.

### IV.    CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJDUGED** that Defendants' Motion for Summary Judgment [ECF No. 155] is **GRANTED**.  Final judgment will be entered by separate order.  The Clerk is directed to mark this case **CLOSED**, and all pending motions are **DENIED as moot**.

**DONE AND ORDERED** in Miami, Florida, this 27th day of August, 2019.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record